SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
MICHAEL M. LAUTER, Cal. Bar No. 246048
JACQUELINE G. LUTHER, Cal. Bar No. 271844
SHADI FARZAN, Cal. Bar No. 301610
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone: 415.434.9100
Facsimile: 415.434.3947
Email    okatz@sheppardmullin.com
         mlauter@sheppardmullin.com
         jluther@sheppardmullin.com
         sfarzan@sheppardmullin.com

Proposed Attorneys for Debtor
Imperial Toy LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>Imperial Toy LLC, a California limited liability company,<br><br>        Debtor. | Case No. 19-52335<br><br>Chapter 11<br><br>**FIRST DAY EMERGENCY MOTION TO APPROVE (I) BID PROCEDURES IN CONNECTION WITH SALE OF DEBTOR'S ASSETS; (II) BREAK-UP FEE; AND (III) RELATED RELIEF**<br><br>Date: Tuesday, November 19, 2019<br>Time: 10:00 a.m.<br>Judge: Honorable M. Elaine Hammond<br>       United States Bankruptcy Court<br>       280 South First Street<br>       San Jose, CA 95113<br>Crtrm.: 11 |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................5

II. BACKGROUND ...........................................................................................................5

    A.    The Debtor. ........................................................................................................5

    B.    The APA and Proposed Bid Procedures. .............................................................6

III. ARGUMENT ..............................................................................................................11

    A.    The Bid Procedures Are Adequate and Reasonable Under the Circumstances. ...................................................................................................11

    B.    The Break-Up Fee is Reasonable, Appropriate and Beneficial to the Estate. ................................................................................................................14

    C.    The Break-Up Fee Should be Approved as a Use of the Estate's Assets Outside the Ordinary Course of Business. ..............................................16

IV. CONCLUSION ..........................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

Cases

*In re Abbotts Dairies of Pennsylvania, Inc.*
   788 F.2d 143 (3rd Cir. 1986) ............................................................................. 12

*In re America West Airlines, Inc.*
   166 B.R. 908 (Bankr. D. Ariz. 1994) ............................................................ 14, 15

*In re APP Plus, Inc.*
   223 B.R. 870 (Bankr. E.D.N.Y. 1998) ............................................................... 14

*In re Castre*
   312 B.R. 426 (Bankr. D. Colo. 2004) ................................................................ 12

*In re Chinichian*
   784 F.2d 1440 (9th Cir. 1986) ............................................................................ 12

*In re Continental Airlines, Inc.*
   780 F.2d 1223 (5th Cir. 1986) ............................................................................ 12

*In re Crown Corp.*
   679 F.2d 774 (9th Cir. 1982) .............................................................................. 12

*In re Diamond Plus, Inc.*
   233 B.R. 829 (Bankr. E.D. Ark. 1999) .............................................................. 14

*In re Fifth Ave. Associates, L.P.*
   96 B.R. 24 (Bankr. S.D.N.Y. 1989) ................................................................... 14

*In re Geothermal Resources Int'l*
   93 F.3d 648 (9th Cir. 1996) ................................................................................ 13

*In re Integrated Resources, Inc.*
   135 B.R. 746 (Bankr. S.D.N.Y. 1992) ......................................................... 14, 15

*In re Lionel Corp.*
   722 F.2d 1063 (2nd Cir. 1983) ..................................................................... 12, 13

*In re O'Brien Envtl. Energy, Inc.*
   181 F.3d 527 (3d Cir. 1999) ................................................................... 14, 15, 16

*In re Pomona Valley Med. Group, Inc.*
   476 F.3d 665 (9th Cir. 2007) .................................................................................. 12

*In re Psychometric Systems, Inc.*
   267 B.R. 670 (Bankr. D. Colo. 2007) ....................................................................... 12

*In re Walter*
   83 B.R. 14 (9th Cir. 1988) ......................................................................................... 12

<u>Statutes</u>

Bankruptcy Code § 105(a) ................................................................................................ 12

Bankruptcy Code § 363 ................................................................................ 5, 12, 13, 16

Bankruptcy Code § 363(b) ............................................................................................... 16

Bankruptcy Code § 363(b)(1) .......................................................................................... 12

Bankruptcy Code § 365 ...................................................................................................... 5

Bankruptcy Code § 503(b) ............................................................................................... 15

Bankruptcy Code § 1107(a) ............................................................................................... 6

Bankruptcy Code § 1108 .................................................................................................... 6

<u>Other Authorities</u>

Federal Rules of Bankruptcy Procedure 2002 .................................................................. 5

Federal Rules of Bankruptcy Procedure 6004 .................................................................. 5

Federal Rules of Bankruptcy Procedure 6006 .................................................................. 5

## I. INTRODUCTION

Imperial Toy LLC, the debtor and debtor-in-possession in the above-captioned case ("Imperial Toy" or the "Debtor") intends to seek Court approval of a sale (the "Sale") of substantially all of the Debtor's assets (the "Assets") pursuant to the Asset Purchase Agreement dated November 18, 2019 (the "APA") with Ja-Ru, Inc. ("Ja-Ru" or the "Stalking Horse Bidder"). The Debtor is filing a separate motion for the approval of the Sale (the "Sale Motion"), which attaches the APA as an Exhibit. In connection with the Sale, the Debtor intends to hold an auction at the hearing on the Sale Motion in the event that any other person or entity submits a qualifying overbid for the Assets (the "Sale Hearing"). The Assets are comprised of the majority of Debtor's property, including the membership interest in non-debtor affiliate Imperial Toy de Mexico, S. de R.L.

The Debtor submits this motion (the "Motion") to establish certain bid and sale procedures, to allow Ja-Ru a "break-up fee" of $650,000 of the purchase price in the APA and to approve related relief. This Motion is made pursuant to Sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006. The Debtor requests that the Court approve the bidding procedures enumerated below in connection with the contemplated Sale and auction of the Assets.

The Motion is based on the arguments below, as well as the accompanying Notice of the Motion, the concurrently filed declaration of Peter Tiger In Support of First Day Motions ("Tiger Declaration"), and all other pleadings, evidence or arguments submitted at or before final determination of this Motion.

## II. BACKGROUND

### A. The Debtor.

Imperial Toy is a California limited liability company that was founded in 1969 by the Kort Family, and has grown over its 50 years in business to be a worldwide leader in the sale and manufacture of bubbles, novelty toys, and other

children's products. Imperial Toy is a manufacturer and wholesaler that distributes its products to over 75 countries around the world. A more detailed description of Imperial Toy may be found in the concurrently filed Tiger Declaration.

The Debtor commenced this bankruptcy case by filing a voluntary chapter 11 petition on November 18, 2019. The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committee of unsecured creditors has yet to be appointed.

As stated in the Debtor's "first day" filings, the Debtor's strategy in the case is to conduct a Sale in an expedited manner in order to maximize value and mitigate damage claims. The Debtor has now entered into an APA with Ja-Ru and desires to sell the Assets at an auction pursuant to the bid and sale procedures described below.

### B. The APA and Proposed Bid Procedures.

Following extensive marketing of its assets the Debtor determined in early November that it should focus its efforts on the Stalking Horse Bidder. Following extensive negotiations the parties entered into a non-binding letter of intent, followed by the APA.

The transaction under the APA (the "Stalking Horse Bid") provides for the Sale of the Assets for $13,000,000. Under the APA, the Stalking Horse Bidder will be entitled to a break-up fee in the amount of $650,000 (the "Break-Up Fee") in the event the Sale closes to a third party other than Purchase, which amount shall be paid only from the proceeds of such other Sale and shall have priority as an administrative expense under Sections 503(b) and 507(a)(2) of the Bankruptcy Code. The Break-Up Fee, at 5% of the purchase price under the APA, is a reasonable amount to compensate the Stalking Horse Bidder for its costs and its agreement to serve as a stalking horse buyer.

The bid procedures that the Debtor proposes to implement are set forth in this Motion (the "Bid Procedures"). The Debtor has designed the Bid Procedures to

6
SMRH:4838-7699-9085.5
MOTION TO APPROVE BID PROCEDURES
Case: 19-52335    Doc# 3    Filed: 11/18/19    Entered: 11/18/19 12:23:07    Page 6 of 17

facilitate a full and fair process designed to maximize the value of the Assets for the benefit of the Debtor's estate and so that the sale process will not be delayed by last minute offers. The timeline below also reflects the deteriorating financial condition of the Debtor, the high cash burn occurring each week in this bankruptcy case, and the need to achieve certainty of closing. The Bid Procedures provide for the following:

    1. <u>Break-Up Fee</u>. A break-up fee payable to Stalking Horse Bidder upon and pursuant to the events set forth in the Sale Procedures Order in an amount equal to Six Hundred Fifty Thousand Dollars ($650,000.00).

    2. <u>Overbids</u>. A minimum initial overbid increment of Seven Hundred Fifty Thousand Dollars ($750,000.00).

    3. <u>Bid Increments</u>. Minimum subsequent bid increments of One Hundred Thousand Dollars ($100,000.00).

    4. <u>Qualified Bids</u>. In order to participate in the Auction at the Sale Hearing, an interested bidder must be designed by the Debtor, after consultation with the Consultation Parties, as a "<u>Qualified Bidder</u>." In order to be a Qualified Bidder, the interested bidder must submit a bidding package (a "<u>Qualified Bid</u>") to the Debtor that includes the following on or before December 12, 2019 (the "<u>Bid Deadline</u>"): (i) an executed form of Asset Purchase Agreement without financing, diligence, or other contingencies, that (a) provides for a sale price in a cash amount of not less than $13,750,000, (b) provides for consummation of the proposed sale transaction by no later than December 18, 2019, and (c) is capable of being executed by Seller immediately, and (ii) confirmation of financing committed or immediate funding available that indicates its financial ability to pay the Purchase Price. In addition, a Qualified Bid must be irrevocable, must waive substantial contribution claims, and not provide for any break-up fees or expense reimbursement (other than the stalking horse bid of Ja-Ru, Inc.), must consent to the jurisdiction of the Bankruptcy Court to resolve all disputes, must identify with particularity which

contracts the proposed bidder would assume and provide in detail the bidder's proposal for cure amounts and adequate assurance of future performance with respect to such contracts, and must comply with any pre-petition privacy policy of the Debtor's applicable to the Assets being purchased. The Stalking Horse Bidder (Ja-Ru, Inc.) – once all contingencies under the APA have been eliminated, and the Pre-Petition Secured Parties (as defined in the Interim DIP Financing Order) are automatically deemed to be Qualified Bidders. The Debtor will announce the full list of Qualified Bidders at the outset of the Auction, if applicable, and the Sale Hearing.

5. <u>Winning Bid</u>. The winning bid shall be the highest bid (the "<u>Winning Bid</u>"); provided, however, that if (i) the highest bid made by a qualified bidder other than Stalking Horse Bidder minus the Break Up Fee is less than (ii) the highest bid of Stalking Horse Bidder, then the bid of Stalking Horse Bidder shall be the Winning Bid, so that, no matter how high bidding may go, a successful winning bid will result in a payment to Stalking Horse Bidder of the Break-Up Fee.

6. <u>Cash Bids</u>. All bids made by Stalking Horse Bidder as part of the Sale Hearing will be authorized to be comprised of (i) a cash payment and (ii) a credit bid authorized pursuant to paragraph 11 below.

7. <u>Good Faith Deposit</u>. In order to be deemed a qualified bidder, each prospective bidder must provide a "good faith deposit" in an amount no less than One Million Dollars ($1,000,000.00) to be deposited in escrow in immediately available funds no later than the Bid Deadline.

8. <u>Payment of Break-Up Fee from Deposit of Overbidder</u>. In the event that Stalking Horse Bidder is not the prevailing bidder and an Order is entered authorizing Seller to sell to a party other than Stalking Horse Bidder, the Break-Up Fee owed to Ja-Ru, Inc. as stalking horse bidder shall be paid from no source other than: (a) immediately from the prevailing party's deposit, or (b) from the proceeds of an alternate transaction approved from the Court.

9. <u>Sale Hearing and Auction</u>.  The hearing on the Sale Motion (the "Sale Hearing") will commence on December 16, 2019.  If competing Qualified Bids are received by the Bid Deadline, an auction for the Debtor's Assets (the "Auction") will be held two (2) business days prior to the Sale Hearing at the office of Debtor's counsel or some other location to be designated in advance by the Debtor.  If the Debtor does not receive any Qualified Bids other than the Stalking Horse Bid, the Debtor will not conduct the Auction, and will request at the Sale Hearing that the Stalking Horse Bid be designated as the Winning Bid.

10. <u>Revisions to Bid Procedures</u>.  The Debtor, in consultation with Stalking Horse Bidder and the Consultation Parties, reserves the right to make reasonable revisions to the proposed Bidding Procedures as circumstances may warrant; provided, however, that any material modifications to the Bid Procedures shall require the consent of the Pre-Petition ABL Agent (as defined in the Interim DIP Financing Order).  The Debtor shall promptly notify parties in interest (including the Consultation Parties) and prospective bidders of any such modifications.

11. <u>Credit Bidding</u>.  The Stalking Horse Bidder (as DIP Lender), and each of the Pre-Petition Secured Parties (as such term is defined in the Interim DIP Financing Order) have the right to credit bid the full amount of their debt at the Auction as provided in Section 363(k) of the Bankruptcy Code, subject to the satisfaction of all liens having priority over the lien that is being credit bid.

12. <u>Consultation Parties</u>.  The Debtor shall consult with the Pre-Petition Secured Parties and counsel to any Official Committee of Unsecured Creditors appointed in the case (collectively, the "<u>Consultation Parties</u>") as set forth in these Bid Procedures; provided however, that the Debtor shall not be required to consult with any Consultation Party during the Auction to the extent such Consultation Party has submitted a bid or has had a bid submitted on its behalf for so long as such bid remains open, if the Debtor determines in its reasonable business

judgment that consulting with such Consultation Party regarding any issue, selection, or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to the goal of maximizing the value of the Debtor's estate. To the extent the Bid Procedures require the Debtor to consult with any Consultation Party in connection with making a determination or taking an action, or in connection with any other matter related to the Bid Procedures or the Auction, the Debtor shall do so in a timely manner prior to making such determination or taking such action. The Consultation Parties shall be permitted and authorized to provide the information available from any Qualified Bidder to their counsel, and advisors on a confidential basis, and, subject to an appropriate non-disclosure agreement, the members of the Official Committee of Unsecured Creditors, provided, however, that the Debtor shall retain the right and power to choose the winning bidder, subject to the approval of the Bankruptcy Court and, for any Sale based on a bid other than the Stalking Horse Bid, consent of the Pre-Petition ABL Agent.

13. <u>Due Diligence</u>. The Debtor will provide any potential bidder such due diligence access or additional information as the Debtor deems appropriate, which will be substantially the same information for all potential bidders interested in the same Assets or segment(s) but may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information. The due diligence period will extend through and including the Bid Deadline. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtor, in consultation with the Consultation Parties.

14. <u>Back-Up Bids</u>. The Qualified Bidder(s) with the next highest or otherwise best Qualified Bid or collection of Qualified Bids, as determined by the Debtor, in consultation with the Consultation Parties, at the time of the Auction, will be required to serve as a back-up bidder (each, a "<u>Back-Up Bidder</u>") and keep its bid

open and irrevocable until the earlier to occur of (i) thirty (30) days after the Sale Hearing and (ii) closing on the Winning Bid with the Winning Bidder. If the Winning Bidder fails to consummate the Sale, the Debtor will be authorized and directed to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court; provided, however, that any Sale to a Back-Up Bidder (except to the extent the Stalking Horse Bidder is selected as Back-Up Bidder with the Stalking Horse Bid as its Qualified Bid) shall be subject to the consent of the Pre-Petition ABL Agent.

15. <u>Return of Deposits</u>. All Good Faith Deposits shall be returned to each bidder not selected by the Debtor as the Winning Bidder or the Back-Up Bidder no later than five (5) business days following the entry of the Sale Order.

16. <u>Assumption and Assignment Objections</u>. The Debtor must file a list of all executory contracts that may potentially be assumed, together with proposed cure amounts, as a supplement to the sale motion filed concurrently herewith by no later than fourteen (14) days following the filing of said sale motion, which shall be served on all said parties. Any counterparty to a contract identified by the Debtor in that supplement must submit any objection to the proposed cure amount, the proposed adequate assurance to be provided, or another aspect of the assumption and assignment in writing to the Court, the Debtor, and the Stalking Horse Bidder by no later than seven (7) days prior to the Sale Hearing. All such objections that have not yet been resolved prior to the Sale Hearing will be resolved at the Sale Hearing. Any counterparty that does not submit an objection timely will be deemed to consent to the assignment and assumption of its contract to the Winning Bidder and to the proposed cure amount in said supplement.

## III. ARGUMENT

### A. The Bid Procedures Are Adequate and Reasonable Under the Circumstances.

The proposed Bid Procedures serve the best interests of the bankruptcy estate.

The Bankruptcy Code provides that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 does not specify a standard for approving bid procedures, the Ninth Circuit Bankruptcy Appellate Panel has established a standard based on the Debtor's "sound business judgment." Under this standard, the "bankruptcy court has considerable discretion in deciding whether to approve or disapprove the use of estate property by a debtor in possession, in the light of sound business justification." *In re Walter*, 83 B.R. 14, 16 (9th Cir. 1988); *see also In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983); *In re Psychometric Systems, Inc.*, 267 B.R. 670, 674 (Bankr. D. Colo. 2007) (collecting cases).

In determining whether the debtor-in-possession has complied with the sound business judgment rule, the Court must consider whether: (a) there has been "[a]ny improper or bad motive," (b) the "price is fair and the negotiations or bidding has occurred at arm's length" and (c) the sale followed "[a]dequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest." *In re Castre*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004). When applying the rule, "the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) (considering the rule in the context of the debtor's decision to reject a contract). In the context of this rule, courts often approve overbid procedures, *see, e.g., In re Crown Corp.*, 679 F.2d 774, 777 (9th Cir. 1982).

Of course, this Court enjoys broad powers to approve such measures. "The Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *In re*

*Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986); *accord In re Geothermal Resources Int'l*, 93 F.3d 648, 651 (9th Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2nd Cir. 1983) (noting a bankruptcy judge's "broad administrative power" and "substantial freedom to tailor his orders" to a case at hand).

Here, the Bidding Procedures comport with the Debtor's sound business judgment. The Debtor believes that its ability to select the highest and best bidder at a Court-supervised auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value. The Bid Procedures permit Qualified Bidders to submit topping bids, as well as to propose alternative terms of sale. In this way, the Bidding Procedures embody an arm's-length process and ensure competitive bidding over the price and terms of sale. By making the price and terms of sale competitive, the Bidding Procedures provide proper exposure of the Assets to the market. This, in turn, will maximize the sale price of the Assets for the benefit of all creditors and the bankruptcy estate. In addition, the Bidding Procedures require Prospective Bidders to deposit a sum into escrow and to reveal their financial information, thus ensuring only earnest and fiscally capable buyers bid. Also, the Bidding Procedures provide reasonable notice of the sale to all parties in interest, including parties who might potentially be interested in bidding at the Auction. Further, the requirement of having an initial overbid higher than the stalking horse bid is consistent with the bid procedures commonly approved by bankruptcy courts which usually provide that a competing bid exceed the initial offer by a specified minimum amount. The initial overbid here is calculated to include the amount of the purchase price and an additional amount sufficient to protect the estate from the Break-Up Fee of the Stalking Horse Bidder and costs associated with the transaction. Lastly, the overbid increment of $750,000 complies with the Court's Guidelines for Early Disposition of Assets, Pre-Packaged Plans and the Sale of Substantially All Assets under § 363 ("Guidelines") that

provides that each overbid must be at least 5% more than the amount of the original offer.

### B. The Break-Up Fee is Reasonable, Appropriate and Beneficial to the Estate.

Sellers of assets often employ bidding protections, such as the payment of a break-up fee, in order to encourage the making of bids. "A 'break-up fee' is a fee paid to a potential acquirer of a business, or certain assets, by the seller, in the event that the transaction contemplated fails to be consummated and certain criteria in the purchase agreement are met." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992); *In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998); *In re America West Airlines, Inc.*, 166 B.R. 908, 910 (Bankr. D. Ariz. 1994). A break-up fee is intended to compensate the potential acquirer for the fees and expenses incurred in connection with its efforts to complete the transaction. *See In re Diamond Plus, Inc.*, 233 B.R. 829, 831 (Bankr. E.D. Ark. 1999); *In re APP Plus, Inc.*, 223 B.R. at 874 ("Typically, the break-up fee covers reimbursement of the disappointed purchaser's out-of-pocket expenses related to the proposed acquisition and/or compensation for the time, efforts, resources, lost opportunity costs and risks incurred by the disappointed purchaser."); *see also, In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (break-up fees compensate potential acquirer for the "time and expense it has spent in putting together its offer if the transaction is not completed" and encourages it "to do the due diligence that is prerequisite to any bid").

While the Ninth Circuit has not addressed this issue, courts in this and other circuits have developed three main standards for evaluating the propriety of break-up fees in the context of the sale of estate assets. *See O'Brien*, 181 F.3d at 533-35. Some courts have employed a variation on the business judgment rule. *In re Fifth Ave. Associates, L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989); *see also, Integrated*

*Resources*, 135 B.R. at 753.[1] The best-interests-of-the-estate standard adopted by other courts tests "whether the interests of all concerned parties are best served by such a fee." *America West Airlines*, 166 B.R. at 912. Finally, declining to apply either standard, the Third Circuit found instead that *ex post* considerations of break-up fees must be made under the general administrative expense jurisprudence of Section 503(b). *O'Brien*, 181 F.3d at 535.

The Debtor submits that, using any of the above standards, the Break-Up Fee is reasonable and proper under the facts and circumstances of this case and should be approved. Among other things, the Stalking Horse Bidder, as stalking horse bidder, has expended significant time and resources and incurred legal fees, and will continue to do so, in completing due diligence, negotiating the APA, ensuring it can satisfy all bidding requirements, closing conditions and representation and warranties, and participating at the auction. Further, in negotiating the terms of the Break-Up Fee, the Debtor has exercised its business judgment and reasonably concluded that such Break-Up Fee is necessary to complete the contemplated transaction. The Debtor and Stalking Horse Bidder's negotiations have been conducted at arm's length and are devoid of any bad faith or unfair dealing. The Break-Up Fee is not the result of any improper leverage exerted by Stalking Horse Bidder.

In addition, the Debtor does not believe that the amount of the Break-Up Fee is so substantial as to chill other potential bidders from submitting competing bids. Rather, the amount of the Break-Up Fee is reasonable compared to the Purchase Price and will only be paid if the assets are sold to a bidder other than the Stalking Horse Bidder that must provide greater value for the Purchased Assets.

---

[1] Courts adopting this standard consider whether the break-up fee: (i) was tainted by self-dealing; (ii) chilled rather than encouraged bidding; and (iii) was reasonable relative to the purchase price. *See Integrated Resources*, 147 B.R. at 657.

Further, the Break-Up Fee is likely to encourage competitive bidding, in that the Debtor believes the Stalking Horse Bidder likely would not negotiate and execute an APA without a Break-Up Fee. The Break-Up Fee thus likely will "induc[e] a bid that otherwise would not have been made and without which bidding would [be] limited." *Id*. at 537. Similarly, the Stalking Horse Bidder's offer would provide a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." *Id*.

### C. The Break-Up Fee Should be Approved as a Use of the Estate's Assets Outside the Ordinary Course of Business.

Under Bankruptcy Code section 363(b), the Debtor is permitted to use property of the estate outside the ordinary course of business after notice and a hearing. Here, the Debtor and the Stalking Horse Bidder have agreed on the Break-Up Fee in furtherance of the Debtor's proposed sale of the Assets. The Debtor has exercised its business judgment, and reasonably concluded that the Break-Up Fee is necessary to complete the contemplated transaction and is in the best interests of the Debtor and its bankruptcy estate. To the extent necessary, the Debtor requests that the Court approve the Break-Up Fee pursuant to Section 363 as a use of the Debtor's property outside the ordinary course of business. As set forth in this Motion, the requested relief is in the best interest of the Debtor and its bankruptcy estate and is justified and appropriate under the circumstances.

\ \

\ \

\ \

\ \

## IV. CONCLUSION

For the foregoing reasons, the Debtor requests that this Court enter an order establishing the Bidding Procedures for the sale of the Assets, allow the Break-Up Fee, approving the related relief described above, and grant such other and further relief as the Court deems appropriate.

Dated: November 18, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By  */s/ Ori Katz*
ORI KATZ

Proposed Counsel for Debtor
Imperial Toy LLC