1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2       Including Professional Corporations
    ORI KATZ, Cal. Bar No. 209561
3   MICHAEL M. LAUTER, Cal. Bar No. 246048
    JACQUELINE G. LUTHER, Cal. Bar No. 271844
4   SHADI FARZAN, Cal. Bar No. 301610
    Four Embarcadero Center, 17th Floor
5   San Francisco, California 94111-4109
    Telephone: 415.434.9100
6   Facsimile: 415.434.3947
    E mail       okatz@sheppardmullin.com
7                mlauter@sheppardmullin.com
                 jluther@sheppardmullin.com
8                sfarzan@sheppardmullin.com

9   Proposed Attorneys for Debtor,
    Imperial Toy LLC

10

11

12                UNITED STATES BANKRUPTCY COURT

13         NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

14

15  In re                               Case No. 19-52335

16  IMPERIAL TOY LLC, a California       Chapter 11
    limited liability company,
17                                       **DECLARATION OF PETER TIGER
                 Debtor.                 IN SUPPORT OF FIRST DAY
18                                       MOTIONS**

19                                       Date:    November 19, 2019
                                         Time:    10:00 a.m.
20                                       Crtrm.:  11
                                         Judge:   Honorable M. Elaine Hammond
21                                                United States Bankruptcy Court
                                                  280 South First Street
22                                                San Jose, CA 95113

23

24

25

26

27

28

1

SMRH:4813-1285-5469.9                        First Day Declaration of Peter Tiger

I, Peter Tiger, declare:

1.     I am the Chief Executive Officer of Imperial Toy LLC, a California limited liability company, debtor and debtor-in-possession herein ("Debtor" or "Imperial Toy").  The following facts are based on my personal knowledge and if called to testify, I could and would competently testify to such facts.

2.     I make the statements in this Declaration in support of the emergency first day motions (collectively, the "Motions") filed by the Debtor concurrently herewith, which are as follows:

(a)     Motion For Orders (I) Authorizing The Debtor To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(C), 363(e), 364(d), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral Of Pre-Petition Secured Entities, (II) Granting Adequate Protection To Pre-Petition Secured Entities, (III) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c), and (IV) Granting Related Relief (the "DIP Financing Motion");

(b)     Debtor's Motion To: (I)  Approve Sale Of  Substantially All Debtor's Assets Free And Clear Of Liens; (II) Approve The Assumption And Assignment Of Executory Contracts; And (III) Provide  Related Relief (the "Sale Motion");

(c)     First Day Emergency Motion To Approve (I) Bid Procedures In Connection With Sale Of Debtor's Assets; (II) Break-Up Fee; and (III) Related Relief (the "Bid Procedures Motion");

(d)     Debtor's First Day Emergency Motion For An Order Authorizing Debtor To Maintain Its Existing Bank Accounts And Approving Debtor's Continuation Of Its Cash Management System (the "Cash Management Motion");

(e)     Debtor's First Day Emergency Motion For Order Authorizing Debtor To Honor Prepetition Obligations To Employees (the "Employee Motion");

(f)     Debtor's First Day Emergency Motion Pursuant To 11 U.S.C. §366 For Order Determining Adequate Assurance Of Payment Of Utility Services (the "Utility Motion");

(g)     Debtor's First Day Emergency Motion For Order Limiting Service Of Notice Of Certain Matters (the "Limited Notice Motion"); and

(h)     Application For Order Approving Designation Of Peter Tiger As Responsible Individual Pursuant To Bankruptcy Local Rule 4002-1 (the "Responsible Individual Application").

3. Capitalized terms not defined in this Declaration shall have the meanings ascribed to them in the Motions. This Declaration is submitted in compliance with the Northern District of California Bankruptcy Court's First Day Motion Guidelines for Chapter 11 Cases and first addresses the Debtor's Background, the Debtor's Capital Structure, the Events Leading to this Bankruptcy Filing, and the Next Steps for the Debtor, and following that are sections relevant to each of the Motions listed above. As to the Sale Motion in particular, this Declaration is also intended to satisfy the requirements of the Northern District of California Bankruptcy Court's Guidelines for Early Disposition of Assets in Chapter 11 Cases, Pre-Packaged Plans, The Sale of Substantially All Assets Under § 363.

## BACKGROUND OF THE DEBTOR

4. Imperial Toy was founded in 1969 by the Kort Family, and has grown over its 50 years in business to be a worldwide leader in the sale and manufacture of bubbles, novelty toys, and other children's products. Imperial is engaged in the business of product development, manufacturing and wholesale sales and distribution of children's toys primarily in the categories of bubbles and bubble toys, licensed and non-licensed novelty toys, outdoor, seasonal and role play toys and other similar children's products.

5. Imperial is a manufacturer and wholesaler that distributes its products to over 75 countries around the world. Included in Imperial's portfolio of innovative and award-winning products are proprietary brands developed over the years such as Blitz, Super Miracle Bubbles, KiddyUp, Zooma, Splat X, and KAOS, sub brands such as Life-Like and Googly, and a stable of licensed products with internationally known brands such as Disney, Marvel, DC Comics, Little Tikes, Thomas the Train, and Teenage Mutant Ninja Turtles, among others. About 78% of the Debtor's sales consist of products that either bear the Debtor's own brands or are private label, and about 22% of its sales consists of products with licensed brands.

6.      Among the numerous awards and honors bestowed on its proprietary products are: Best Toy Awards from Good Housekeeping, Oppenheim Toy Portfolio, and the Australian Toy Association; Best in Play from Parenting; Autism Live Best of the Best for Googly Ball and Blitz bubbles in the sensory category; and several recognitions as a finalist at the Toy of the Year Awards.  In addition, the Debtor has had the number one selling bubble toy in the domestic market two years running with Blitz Bubble Blaster (2017) and Blitz Bubble Blowout (2018), as well as the number one selling sport activities and games toy with Googly in 2018.  The Debtor has been a member of the International Council of Toy Industries (ICTI) since 2005.

7.      All of the Debtor's products seek to inspire children to have real-life, interactive, and imaginative play-based experiences in order to encourage children's development and overall enjoyment of life in a world increasingly beset by the stale glow of screens.  Photos of some of the Debtor's innovative, award-winning products are depicted on Exhibit A to this declaration.

8.      Imperial Toy sells its products in many retailers, including Wal-Mart, Dollar Tree, CVS, HEB, Amazon, Target, Kroger, Kohl's, and Walgreens.

9.      Imperial Toy has five facilities throughout the world operated either itself or through its subsidiaries.  Its headquarters are in North Hills, California, where it has about 40 employees.  Aside from its headquarters, it has two other domestic locations – a distribution facility in San Diego with about 30 employees, and a small sales office in Bentonville, Arkansas with two employees.  The remainder of Imperial Toy's locations are located outside of the United States. Imperial has two manufacturing and packaging facilities in Tijuana, Mexico where it employs about 300 workers (but up to 1,200 during peak season in March). Imperial's final location is in Hong Kong where its subsidiary, Imperial Entertainment International (IEI), has about 50 employees and is focused on product development and supply chain management – *i.e.*, sourcing, design and

Case 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 4 of 26
SMRH:4815-1285-5469.9                                                First Day Declaration of Peter Tiger

procurement, and shipping.  The Debtor sources more than 60% of its material from IEI, which has a network of more than 60 vendors.

10.     Gross revenues for the Debtor were about $106.7 million in 2018.  The majority of that is domestic – roughly $78.4 million of the gross revenues in 2018.  Sales through the Debtor's subsidiary in Hong Kong, IEI, accounted for the next largest share, at about $28.2 million.

11.     While the Debtor is a seasonal toy company (70% of retail sales in Spring and Summer), it does not share the typical seasonal highs and lows of most retailers.  The November/December holiday season is not the Debtor's busiest or most important period.  Rather, the months of March to July are most critical for the Debtor, comprising the peak for sales.  The Debtor believes that its unique business cycle makes it absolutely critical that a sale of substantially all of the Debtor's assets close in 2019, so that the purchaser is positioned to take advantage of the high point of the season for the Debtor's business.  The Debtor's biggest shipping period begins in earnest in December before ramping up through March.  The equivalent of Christmas for the Debtor is the Easter holiday season.

12.     The Debtor is a California limited liability company, and while it is headquartered in North Hills, California, the Debtor does substantial business with entities in and around San Jose, California.  Consequently, the Debtor would be subject to the jurisdiction of state and federal courts in Santa Clara County, California were any of those business partners to file an action against the Debtor.

## CAPITAL STRUCTURE OF THE DEBTOR

13.     The Debtor's capital structure consists of a factoring agreement with CIT (defined below), a secured loan facility with Great Rock (defined below), and secured notes held by The Hirsch Family Trust Dated June 9, 1998 (the "Hirsch Trust").

14.     The factoring arrangement with CIT is documented in that certain Factoring Agreement dated December 13, 2016 (as amended, modified, restated,

and/or supplemented, the "Factoring Agreement"), and the other agreements entered into further thereto or in connection therewith, including without limitation an Inventory Security Agreement dated December 13, 2016, an Equipment Security Agreement dated December 13, 2016, a Standby Letter of Credit Agreement dated December 13, 2016, and a Grant of Security Interest in Trademarks, Patents, Copyrights, and Licenses dated December 13, 2016 (each, as amended, modified, restated, and/or supplemented, together with the Factoring Agreement, the "Factoring Documents"), among other things, (a) the Debtor sold and assigned to The CIT Group/Commercial Services, Inc. ("CIT), and CIT purchased, all of the Debtor's pre-petition accounts (the "Pre-Petition Accounts"), and (b) CIT made loans, advances, and/or other financial accommodations to the Debtor. The current outstanding balance of the debt to CIT under the Factoring Documents is approximately $8 million. Aside from the purchase of the Pre-Petition Accounts, the Debtor's obligations to CIT under the Factoring Documents are secured by a lien on all accounts, inventory, equipment, investment property and intellectual property.

15. The secured loan facility with Great Rock is documented in that certain Loan Agreement dated July 5, 2018 (as amended to date, the "Great Rock Loan Agreement") by and among Great Rock Capital Partners Management, LLC, as administrative agent for the lenders party thereto ("Great Rock"), the lenders from time to time party thereto, and the Debtor and Imperial Toy de Mexico, S. de R.L., de C.V., a Mexican Sociedad de Responsabilidad Limitada de Capital Variable, as borrowers. The current outstanding balance of the obligations under the Great Rock Loan Agreement is approximately $13,000,000. The borrowers' obligations are secured by a lien on substantially all of the Debtor's personal property, which lien is junior to that of CIT to the extent the collateral for the Great Rock Loan Agreement overlaps with the collateral for CIT's Factoring Documents.

16. The obligations to the Hirsch Trust originated in February 2018, when the Debtor entered into a series of redemption, loan, security and related agreements

Case 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 6 of 26

with the Hirsch Trust to repurchase and redeem from the Hirsch Trust equity of the Debtor equal to 40% of the then outstanding equity of the Debtor. The Hirsch Trust received a number of promissory notes from the Debtor and Path Global Ltd., a Hong Kong entity. The Hirsch Trust began to receive cash payments from the Debtor and Path Global relating to the redemption in July 2019 and such payments from the Debtor and IEI continued through the remainder of 2018 until early 2019. Prior to such redemption, Peter Tiger and Art Hirsch each owned 50% of the Debtor and all of such equity had voting rights. The loan obligations to the Hirsch Trust are secured (but subordinated as described below).

17. The obligations to the Hirsch Trust are also secured by a lien on substantially all assets of the Debtor. These liens are subordinated to the liens of CIT and Great Rock pursuant to intercreditor agreements entered into by the Hirsch Trust, CIT, and Great Rock. The current outstanding balance of the obligations to the Hirsch Trust is approximately $9,144,333.

**EVENTS LEADING TO THE BANKRUPTCY FILING**

18. As described above, over the course of 2018, the Debtor took on significant indebtedness to simultaneously fund growth of the business and redeem Hirsch Trust equity. By early second quarter of 2019, a combination of external market factors began to cause deterioration in the Debtor's performance and began to drain capital from the business. Perhaps the largest single factor was an unusually wet spring with cooler and wetter weather deeper into the second quarter of 2019. The Debtor's business is highly seasonal, and the second quarter is typically the start of peak demand for its products. The delayed start of the selling season resulted in a sharp decline in revenue compared to prior years. Even before that, however, the Trump administration's continuing threats of trade tariffs, particularly against China and Mexico, led to two compounding responses. Wholesalers such as the Debtor moved to bring in product before tariffs might increase, in order to protect their margins. On the other hand, retailers reduced

orders to limit potential exposure to excess inventory and the need to raise prices. These trends combined to push the Debtor into an operating loss during the time of year when it should have been profitable and drove a steeper than usual investment in working capital.

19. The Debtor was thus compelled to take on loans from the Hirsch Trust and Peter Tiger in order to continue operations in early 2019 and the second quarter. As a result, the Debtor began to examine a potential sale to a third party and retained an investment banking firm, CriticalPoint Partners ("CPP"), in March 2019, to locate a buyer. Unfortunately, the Debtor's auditors did not deliver audited financial statements until late July 2019, but CPP nonetheless initiated an aggressive marketing effort to reach approximately 300 prospective buyers, both strategic and financial, as well as capital providers. The Debtors were open to discussing a complete, majority or minority equity sale or a refinancing/recapitalization.

20. Despite the late start to the process, the Debtor received a very promising non-binding indication of interest from a strategic buyer in July 2019 that would have yielded net sale proceeds sufficient to repay its obligations to CIT and Great Rock in full. On September 27, 2019, the parties entered into a non-binding LOI contemplating a simultaneous signing and closing on October 30, 2019. After signing the LOI, the Debtor's business and financial health deteriorated further and the buyer proposed significantly reducing the purchase price through a working capital adjustment and a number of holdback and escrow amounts. The resulting reduction in price would have prevented the Debtor from repaying its obligations to CIT and Great Rock in full at closing. After sharing the buyer's newly modified purchase terms with its secured creditors, it became clear that the necessary concessions from those creditors could not be obtained and the Debtor believed it had no choice but to reject the offer and resume its auction sale process. The buyer formally rescinded their modified offer on October 24, 2019.

First Day Declaration of Peter Tiger

21. The Debtor worked quickly to reach out to several highly regarded prospective buyers and capital providers and by early November began serious negotiations with Ja-Ru, Inc. However, the Debtor was now in dire need of capital and the message in the market was one of distress. Great Rock made additional advances to the Debtor and by November 14, 2019, the Debtor and Ja-Ru entered into a letter of intent. The LOI contemplated Ja-Ru serving as the "stalking horse" bidder in a bankruptcy auction for substantially all of the assets of the Debtor, and also providing post-petition debtor-in-possession financing during the period leading up to that auction.

## NEXT STEPS FOR THE DEBTOR

22. The purpose of this bankruptcy filing is to permit the Debtor to run an expedited sale process focused on maximizing the going concern value of its assets while also minimizing the time (and attendant costs) needed to get to a sale closing, which the Debtor hopes to achieve within approximately 30 days of the petition date. Given the unique seasonality of the Debtor's business, the November and December time period results in a significant cash burn. The Debtor believes that a delay in closing on a going concern sale will be fatal to the Debtor's business because the already high cost of operating will be more than any lender or purchaser would be willing to pay to extend such process. As a result the Debtor's "runway" in bankruptcy is severely limited.

23. Ja-Ru and other potential purchasers I have spoken to have generally been interested in retaining employees, honoring key existing contracts, and continuing to operate the Debtor's business. For this reason, I believe that a going concern sale will mitigate millions (if not tens of millions) of dollars in damages that would otherwise result from a sudden shutting of the company, in which I believe the Debtor's value would be significantly reduced as compared to that of a going concern. Creditors (both secured and unsecured), employees, customers, vendors

Case 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 9 of 26

and the like thus all would benefit from some form of going concern sale under the circumstances.

24.     The Debtor is filing a series of first day motions, including one seeking financing that will give the Debtor the necessary runway to achieve the desired sale, a bid procedures motion that will set the ground rules for the sale process, and a sale motion which seeks this Court's approval of a sale of substantially all of the Debtor's assets either to Ja-Ru, Inc. or an overbidder produced by the sale process. The Debtor believes that this quick sale process will both maximize the value of its assets for creditors and also minimize the mounting costs associated with keeping the Debtor in operation as it seeks to consummate a going concern sale.

Bid Procedures Motion

25.     The Debtor proposes to implement certain bid procedures (the "Bid Procedures") to facilitate a full and fair process designed to maximize the value of the Assets for the benefit of the Debtor's estate and so that the sale process will not be delayed by last minute offers.  The Bid Procedures provide for the following:

a.     Break-Up Fee.  A break-up fee payable to Ja-Ru (the "Stalking Horse Bidder") upon and pursuant to the events set forth in the Sale Procedures Order in an amount equal to Six Hundred Fifty Thousand Dollars ($650,000.00).

b.     Overbids.  A minimum initial overbid increment of Seven Hundred Fifty Thousand Dollars ($750,000.00).

c.     Bid Increments.  Minimum subsequent bid increments of One Hundred Thousand Dollars ($100,000.00).

d.     Qualified Bids.  In order to participate in the Auction at the Sale Hearing, an interested bidder must be designed by the Debtor, after consultation with the Consultation Parties, as a "Qualified Bidder."  In order to be a Qualified Bidder, the interested bidder must submit a bidding package (a "Qualified Bid") to the Debtor

that includes the following on or before December 12, 2019 (the "Bid Deadline"): (i) an executed form of Asset Purchase Agreement without financing, diligence, or other contingencies, that (a) provides for a sale price in a cash amount of not less than $13,750,000, (b) provides for consummation of the proposed sale transaction by no later than December 18, 2019, and (c) is capable of being executed by Seller immediately, and (ii) confirmation of financing committed or immediate funding available that indicates its financial ability to pay the Purchase Price. In addition, a Qualified Bid must be irrevocable, must waive substantial contribution claims, and not provide for any break-up fees or expense reimbursement (other than the stalking horse bid of Ja-Ru, Inc.), must consent to the jurisdiction of the Bankruptcy Court to resolve all disputes, must identify with particularity which contracts the proposed bidder would assume and provide in detail the bidder's proposal for cure amounts and adequate assurance of future performance with respect to such contracts, and must comply with any pre-petition privacy policy of the Debtor's applicable to the Assets being purchased. The Stalking Horse Bidder (Ja-Ru, Inc.) – once all contingencies under the APA have been eliminated, and the Pre-Petition Secured Parties (as defined in the Interim DIP Financing Order) are automatically deemed to be Qualified Bidders. The Debtor will announce the full list of Qualified Bidders at the outset of the Auction, if applicable, and the Sale Hearing.

e. <u>Winning Bid</u>. The winning bid shall be the highest bid (the "<u>Winning Bid</u>"); provided, however, that if (i) the highest bid made by a qualified bidder other than Stalking Horse Bidder

minus the Break Up Fee is less than (ii) the highest bid of Stalking Horse Bidder, then the bid of Stalking Horse Bidder shall be the Winning Bid, so that, no matter how high bidding may go, a successful winning bid will result in a payment to Stalking Horse Bidder of the Break-Up Fee.

f. <u>Cash Bids</u>. All bids made by Stalking Horse Bidder as part of the Sale Hearing will be authorized to be comprised of (i) a cash payment and (ii) a credit bid authorized pursuant to paragraph 11 below.

g. <u>Good Faith Deposit</u>. In order to be deemed a qualified bidder, each prospective bidder must provide a "good faith deposit" in an amount no less than One Million Dollars ($1,000,000.00) to be deposited in escrow in immediately available funds no later than the Bid Deadline.

h. <u>Payment of Break-Up Fee from Deposit of Overbidder</u>. In the event that Stalking Horse Bidder is not the prevailing bidder and an Order is entered authorizing Seller to sell to a party other than Stalking Horse Bidder, the Break-Up Fee owed to Ja-Ru, Inc. as stalking horse bidder shall be paid from no source other than: (a) immediately from the prevailing party's deposit, or (b) from the proceeds of an alternate transaction approved from the Court.

i. <u>Sale Hearing and Auction</u>. The hearing on the Sale Motion (the "Sale Hearing") will commence on December 16, 2019. If competing Qualified Bids are received by the Bid Deadline, an auction for the Debtor's Assets (the "Auction") will be held two (2) business days prior to the Sale Hearing at the office of Debtor's counsel or some other location to be designated in advance by the Debtor. If the Debtor does not receive any

SMRH:4815-1285-5469.9                                      First Day Declaration of Peter Tiger

1  Qualified Bids other than the Stalking Horse Bid, the Debtor will

2  not conduct the Auction, and will request at the Sale Hearing that

3  the Stalking Horse Bid be designated as the Winning Bid.

4  j.  <u>Revisions to Bid Procedures</u>.  The Debtor, in consultation with

5  Stalking Horse Bidder and the Consultation Parties, reserves the

6  right to make reasonable revisions to the proposed Bidding

7  Procedures as circumstances may warrant; provided, however,

8  that any material modifications to the Bid Procedures shall

9  require the consent of the Pre-Petition ABL Agent (as defined in

10  the Interim DIP Financing Order).  The Debtor shall promptly

11  notify parties in interest (including the Consultation Parties) and

12  prospective bidders of any such modifications.

13  k.  <u>Credit Bidding</u>.  The Stalking Horse Bidder (as DIP Lender), and

14  each of the Pre-Petition Secured Parties (as such term is defined

15  in the Interim DIP Financing Order) have the right to credit bid

16  the full amount of their debt at the Auction as provided in

17  Section 363(k) of the Bankruptcy Code, subject to the

18  satisfaction of all liens having priority over the lien that is being

19  credit bid.

20  l.  <u>Consultation Parties</u>.  The Debtor shall consult with the Pre-

21  Petition Secured Parties and counsel to any Official Committee

22  of Unsecured Creditors appointed in the case (collectively, the

23  "<u>Consultation Parties</u>") as set forth in these Bid Procedures;

24  provided however, that the Debtor shall not be required to

25  consult with any Consultation Party during the Auction to the

26  extent such Consultation Party has submitted a bid or has had a

27  bid submitted on its behalf for so long as such bid remains open,

28  if the Debtor determines in its reasonable business judgment that

13

consulting with such Consultation Party regarding any issue,
selection, or determination would be likely to have a chilling
effect on potential bidding or otherwise be contrary to the goal of
maximizing the value of the Debtor's estate.  To the extent the
Bid Procedures require the Debtor to consult with any
Consultation Party in connection with making a determination or
taking an action, or in connection with any other matter related to
the Bid Procedures or the Auction, the Debtor shall do so in a
timely manner prior to making such determination or taking such
action.  The Consultation Parties shall be permitted and
authorized to provide the information available from any
Qualified Bidder to their counsel, and advisors on a confidential
basis, and, subject to an appropriate non-disclosure agreement,
the members of the Official Committee of Unsecured Creditors,
provided, however, that the Debtor shall retain the right and
power to choose the winning bidder, subject to the approval of
the Bankruptcy Court and, for any Sale based on a bid other than
the Stalking Horse Bid, consent of the Pre-Petition ABL Agent.

m.  <u>Due Diligence</u>.  The Debtor will provide any potential bidder
such due diligence access or additional information as the Debtor
deems appropriate, which will be substantially the same
information for all potential bidders interested in the same Assets
or segment(s) but may include differentiations between the
diligence provided to strategic and financial bidders, as
appropriate, and contractual obligations to limit access to certain
proprietary information. The due diligence period will extend
through and including the Bid Deadline. Additional due
diligence will not be provided after the Bid Deadline, unless

otherwise deemed reasonably appropriate by the Debtor, in consultation with the Consultation Parties.

n. <u>Back-Up Bids</u>. The Qualified Bidder(s) with the next highest or otherwise best Qualified Bid or collection of Qualified Bids, as determined by the Debtor, in consultation with the Consultation Parties, at the time of the Auction, will be required to serve as a back-up bidder (each, a "<u>Back-Up Bidder</u>") and keep its bid open and irrevocable until the earlier to occur of (i) thirty (30) days after the Sale Hearing and (ii) closing on the Winning Bid with the Winning Bidder. If the Winning Bidder fails to consummate the Sale, the Debtor will be authorized and directed to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court; provided, however, that any Sale to a Back-Up Bidder (except to the extent the Stalking Horse Bidder is selected as Back-Up Bidder with the Stalking Horse Bid as its Qualified Bid) shall be subject to the consent of the Pre-Petition ABL Agent.

o. <u>Return of Deposits</u>. All Good Faith Deposits shall be returned to each bidder not selected by the Debtor as the Winning Bidder or the Back-Up Bidder no later than five (5) business days following the entry of the Sale Order.

p. <u>Assumption and Assignment Objections</u>. The Debtor must file a list of all executory contracts that may potentially be assumed, together with proposed cure amounts, as a supplement to the sale motion filed concurrently herewith by no later than fourteen (14) days following the filing of said sale motion, which shall be served on all said parties. Any counterparty to a contract identified by the Debtor in that supplement must submit any

Case: 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 15 of
26

objection to the proposed cure amount, the proposed adequate assurance to be provided, or another aspect of the assumption and assignment in writing to the Court, the Debtor, and the Stalking Horse Bidder by no later than seven (7) days prior to the Sale Hearing. All such objections that have not yet been resolved prior to the Sale Hearing will be resolved at the Sale Hearing. Any counterparty that does not submit an objection timely will be deemed to consent to the assignment and assumption of its contract to the Winning Bidder and to the proposed cure amount in said supplement.

<u>Cash Management Motion</u>

26.    The Debtor currently maintains the following five bank accounts with CIT Bank:

| Account | Account Number | Description |
| --- | --- | --- |
| 1. Concentration Acct. | xxxxxxxx0293 | Primary operating and concentration account from which funds are transferred to the accounts described below as needed. Funds received from CIT are deposited directly into this account. |
| 2. Deposit Acct. | xxxxxxxx0309 | Funds processed from all Online Payment Processers, with the exception of CIT, are deposited into this account. |
| 3. Disbursement Acct. | xxxxxxxx0317 | Account used for payment of operating and day-to-day expenses. |
| 4. Payroll Acct. | xxxxxxxx0325 | Account used to process payroll. |
| 5. Corporate Expense Acct. | xxxxxxxx1011 | Account used to pay Debtor's corporate expenses incurred in the ordinary course of business. |

Case: 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 16 of 26

27.     In the normal course of business, the Debtor accepts payments over the internet for its products through its established arrangement with First Data.  First Data offers a web-based platform that operates an online payment system.  Through First Data, the Debtor is able to collect payments online from customers using credit cards.  However, very few sales are generated online directly from consumers.  The Debtor estimates that it averages only $5,000 in direct consumer internet sales per month.  Payments processed through First Data are deposited directly into the Debtor's Deposit Account at CIT Bank.

28.     The majority of the Debtor's sales are made to retail customers like Walmart, Kroger, and Dollar Tree.  The invoices generated from these customers are sent to CIT, as its factoring agent.  The Debtor's retail customers pay CIT directly and CIT processes those payments in exchange for certain processing fees.  CIT's processing fees for Walmart are 0.25% of the invoice value.  For all other customers, CIT's processing fees are 0.35% of the invoice value.  Payments received from CIT are transferred as "available" funds to the Debtor's Concentration Account at CIT Bank.

29.     The Debtor also sells its product through Amazon.com.  However, payments are received and processed by Amazon directly, as opposed to the Debtor receiving and processing orders from individual consumers.  Payments received from Amazon are deposited as "available" funds into the Debtor's Deposit Account at CIT Bank.

30.     Paycom and Payroll Service Inc. offer payroll processing services in the United States and Canada, respectively.  The Debtor uses these services to process its payroll via ACH payment which includes tax withholding payments.

31.     The Debtor seeks to maintain its five pre-petition bank accounts with CIT Bank, N.A. and its business arrangements with its online payment processors (the "Online Payment Processors").  The above accounts and arrangements collectively comprise the Debtor's cash management system, which enables the

Case: 19-52335   Doc# 10   Filed: 11/18/19   Entered: 11/18/19 13:03:27   Page 17 of 26

Debtor to receive payments for its products, process payments, maintain control over the receipt and disbursement of cash, and generate timely and accurate financial information. The above-described cash management system is essential to the Debtor's operations and business. If the Debtor's cash management practices and procedures are disrupted, the Debtor's efforts to restructure its affairs will likely be significantly hampered. The Debtor believes that it would not benefit its creditors or the bankruptcy estate if the Debtor had to open new accounts, close the old ones, and establish new payment systems with multiple third parties.

Employee Motion

32. The Debtor has a staff of approximately eighty-two (82) full-time employees in the United States (the "Employees"). The Debtor's Employees are essential to the Debtor's continued operation and viability, as well as to the Debtor's ability to fulfill its duties as debtor-in-possession in this case. Without its Employees, the Debtor will not be able to continue to operate its business, and its ability to preserve going concern value pending a sale of the Debtor's assets will be jeopardized.

33. The Debtor administers its payroll obligations through third parties, and its Employees are paid every two weeks (every other Friday) for the work period ending the prior Sunday. The Debtor's average gross payroll for its Employees is approximately $270,000 per two week period. The total amount of the prepetition wages and salaries owed is collectively approximately $320,000, with no one employee entitled to an amount in excess of $13,650.

34. From time to time, the Debtor's Employees incur miscellaneous expenses related to their jobs. These expenses were routinely reimbursed by the Debtor before the Petition Date. Employees generally submit expense reports, including receipts or other backup documentation, in order to receive reimbursement for their business expenses. After receiving approvals, the Debtor would remit

SMRH:4815-1285-5469.9

payment to the employee.  Based on current information, the Debtor estimates that there are approximately $10,000 in reimbursements owing to its Employees.

35.     Employees generally accrue between 2 to 3 weeks of paid time off per year, depending on the length of their employment.  Accrued paid time off is capped at 1.75 weeks of annual accrual.  Upon termination, the Debtor pays all Employees for any accrued but unused paid time off, pursuant to applicable law.  The Debtor seeks authority, in its sole discretion, to continue to honor its paid time off policy in the ordinary course, including to allow Employees post-petition to take paid time off earned prepetition.

36.     Employees are also entitled to certain medical and dental benefits.  As of November 20, 2019, there is approximately $52,000 in medical benefits owing and $7,000 in dental benefits owing.  The Debtor seeks authority, in its sole discretion, to continue to honor its medical and dental benefits policy in the ordinary course, including allowing Employees post-petition to utilize such benefits

Utility Motion

37.     In connection with the Debtor's business operations, the Debtor obtains electricity, natural gas, water, telephone, and trash service from local utility providers.

38.     The Debtor's utility-related obligations are owed to a number of different utility providers, identified on *Schedule 1* of the Utility Motion.

39.     The Debtor owes approximately $40,000 on all pre-petition obligations to the Utilities.

40.     Continued provision of utility services is critical to Debtor's operations and survival.  The Debtor's facilities need electricity and phone lines to operate, its trash needs to be attended to, and its water supply needs to remain on in order to keep the facilities running.  Without the ability to keep the Debtor's facilities open during this process, the Debtor would lose its revenue stream, and the Debtor's

Case: 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 19 of 26

ability to maintain the going concern value of its business would be seriously jeopardized.

41.  I believe that it is especially critical in this case to maintain uninterrupted utility services given that the Debtor cannot operate its distribution, manufacturing, packaging and shipping facilities without such services.  It is key to the Debtor's viability going forward that it operate business as usual during this process.  Any disruption in that effort may prove fatal to the Debtor's reorganization efforts

42.  The Debtor is prepared to provide each Utility with adequate assurance of payment in the form of a prepayment (the "Prepayment") that will be paid on or before the 1st of each month.  Each Prepayment will be based on an estimated amount arrived at by considering the utility bill from the same month in the prior year.

43.  Because the Debtor's monthly expenses are fairly consistent each month every year, prepayments estimated as proposed herein will result in prepayments that are fairly indicative of the utility bill being prepaid.  If this mechanism creates a shortfall for any Prepayment, it will be factored into and covered by the Prepayment for the next month.

Sale Motion

44.  With respect to the items required by Section 4 of the Northern District of California Bankruptcy Court's Guidelines for Early Disposition of Assets in Chapter 11 Cases, Pre-Packaged Plans, The Sale of Substantially All Assets Under § 363:

   *(1) & (2)  Alternatives to Sale and Marketing of Assets* – As described herein, the Debtor conducted an extensive effort to market and sell its assets in a non-distressed sale for over a year prior to the bankruptcy filing, including with the assistance of an investment banker.  While a prospective buyer emerged from that process, that deal did not materialize and the Debtor

Case: 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 20 of
26
SMRH:4815-1285-5469.9                                                        First Day Declaration of Peter Tiger

shifted gears to pursuing the current deal with Ja-Ru, Inc. as described in paragraphs 20 and 21 above.

(3) *Decision to Sell* – The Debtor signed a letter of intent with Ja-Ru, Inc. on Thursday, November 14, 2019, and signed the Asset Purchase Agreement with Ja-Ru, Inc. shortly before filing this bankruptcy petition on Monday, November 18, 2019.

(4) *Asset Valuation* – This Declaration provides substantial details on the Debtor's financial condition, particularly in the Background of the Debtor, Capital Structure of the Debtor, and Events Leading to Bankruptcy Filing sections of this Declaration.

(5) *Relationship to Buyer* – Prior to the effort to locate a buyer, the Debtor had no pre-existing business relationship with Ja-Ru, Inc. other than in their capacity as competitors in the toy industry. I am not aware of any pre-existing relationship between Ja-Ru, Inc. or its officers, directors, or shareholders, on the one hand, and any of the Debtor's creditors, accountants, or any person employed at the Office of the United States Trustee. I am aware that bankruptcy counsel for Ja-Ru, Inc. (Toby Keller and Jane Kim of Keller Benvenutti) know bankruptcy counsel for the Debtor (Ori Katz and Michael Lauter of Sheppard Mullin) professionally, and that the Debtor's financial advisor (Arch + Beam) has previously worked on unrelated matters with both Sheppard Mullin and Keller Benvenutti. I am not aware of any other specific connection between the attorneys, accountants, or advisors of the Debtor and Ja-Ru, Inc.

(6) *Post-Sale Relationship with Debtor* – Assuming the current deal with Ja-Ru, Inc. is approved, Ja-Ru retains the right to employ the Debtor's current employees, as set forth in Section 7.8 of the APA. I understand that if the sale with Ja-Ru closes they may seek to retain me as a consultant for a

Case: 19-52335   Doc# 10   Filed: 11/18/19   Entered: 11/18/19 13:03:27   Page 21 of 26

short period of time to assist with the transition, though the terms of any such consulting arrangement have not yet been reached.

(7) *Relationship with Secured Creditors* – A detailed description of the Debtor's existing secured credit facilities is set forth in the Capital Structure of the Debtor section above.

(8) *Insider Compensation* –Stephanie Tiger (Executive Vice President and General Counsel) and myself (Chief Executive Officer) will receive our normal base salary during the Bankruptcy Case. I understand that the Debtor will seek Court approval to retain Scott Avila of Paladin Management as its Chief Restructuring Officer, continuing his service in that role which commenced pre-petition.

45. The Debtor has executed an Asset Purchase Agreement (the "APA") with Ja-Ru (the "Purchaser"). A true and correct copy of the APA is attached as Exhibit A to the Sale Motion.

46. Pursuant to the APA, the Purchaser will acquire the Purchased Assets for a cash purchase price of $13,000,000 (the "Purchase Price"). A good-faith deposit in the amount of $1,000,000 is delivered under the APA, which will be used as a credit toward the Purchase Price subject to closing of the Sale to the Purchaser. The APA provides that the Sale to the Purchaser of the Purchased Assets will be free and clear of all liens, claims, encumbrances and other interests to the fullest extent allowed by law. The Debtor is aware of the following parties having liens asserted against all or a portion of the Purchased Assets: CIT Finance LLC, The CIT Group/Commercial Services, Inc., Canon Financial Services, Inc., Great Rock Capital Partners Management, LLC, IBM Credit LLC, and The Hirsch Family Trust dated June 9, 1998.

47. In addition, under the APA the Purchaser will be entitled to a break-up fee in the amount of $650,000 (the "Break-Up Fee") in the event the Sale closes to a third party other than Ja-Ru, Inc., which amount shall be paid only from the

Case: 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 22 of 26

proceeds of such Sale and shall have priority as an administrative expense under 11 U.S.C. §§ 503(b) and 507(a)(2). The Break-Up Fee is a reasonable amount to compensate the Purchaser for its costs and its agreement to serve as a stalking horse buyer.

48. The APA also contemplates the assumption and assignment to the Purchaser of the certain contracts to be designated by the Purchaser (each individually an "Assumed Contract" and, collectively, the "Assumed Contracts"). The APA contemplates that Purchaser will provide a list of the Assumed Contracts to Debtor by December 23, 2019, or earlier. The Debtor will file a supplement to this Motion listing out the contracts that may be Assumed Contracts and the proposed cure amounts, and a second supplement to this Motion that provides the list of Assumed Contracts from the Purchaser.

49. The Sale to the Purchaser is subject to overbid pursuant to the terms set forth in the Bid Procedures. The Debtor believes that conducting the Sale of the Purchased Assets pursuant to the Bid Procedures will allow the Debtor to maximize the value of the Purchased Assets for the benefit of its creditors.

50. Pursuant to the APA, for the Purchaser to consummate the Sale of the Purchased Assets, the order(s) approving the Sale must (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (a) the execution, delivery, and performance by the Debtor of the APA, (b) the Sale of the Purchased Assets to the Purchaser on the terms set forth herein and in the APA, including that such Sale is free and clear of encumbrances and claims, with any such liens, encumbrances, and claims to attach only to the proceeds of the sale, and (c) the performance by the Debtor of its obligations under the APA; (ii) authorize and direct the Debtor to assume and assign to the Purchaser all of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code subject to the right of the Purchaser to excluded any Assumed Contract prior to closing of the Sale; (iii) find that the Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and that

First Day Declaration of Peter Tiger

the Purchaser is entitled to have the protections afforded by that section; (iv) contain a finding that reasonable and adequate notice of the Sale and transfer of the Purchased Assets to the Purchaser, and assumption and assignment of all executory contracts to the Purchaser, has been provided to all parties required to be given notice under the applicable Bankruptcy Rules and Bankruptcy Local Rules; (v) contain a finding that neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Sale of the Purchased Assets to be avoided under Section 363(n) of the Bankruptcy Code; (vi) bar any third parties from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed expired executory contracts), liens or encumbrances of any kind or nature against the Purchaser or the Purchased Assets that arose prior to closing; and (vii) provide that the Sale Order (defined below) is binding on any and all successors and assigns, including any trustee appointed after entry of the Sale Order pursuant to Sections 701 or 702 of the Bankruptcy Code.

51.     Subject to the receipt of a qualified and timely overbid, as provided for in the Bid Procedures, the Debtor believes the proposed Sale to the Purchaser is in the best interest of creditors.  The APA provides that the Purchaser will consider every employee of the Debtor for potential employment, with the objective of retaining as many of them as practicable.  The assumption and assignment of the Debtor's executory contracts will substantially reduce potential and contingent claims against the Debtor's estate.  The Debtor believes that a sale of the Purchased Assets to the Purchaser or a successful overbidder will allow the Debtor to maximize the value of its assets for the benefit of its creditors.

Case: 19-52335    Doc# 10    Filed: 11/18/19    Entered: 11/18/19 13:03:27    Page 24 of 26

1       I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.  Executed on November 18, 2019, at

3   North Hills, California.

4

5   _____

6                      PETER TIGER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28







Case: 19-52335   Doc# 10   Filed: 11/18/19   Entered: 11/18/19 13:03:27   Page 26 of
26

SMRH:48T5-1285-5469.9                                        First Day Declaration of Peter Tiger