1
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2   Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
3 MICHAEL M. LAUTER, Cal. Bar No. 246048
JACQUELINE G. LUTHER, Cal. Bar No. 271844
4 SHADI FARZAN, Cal. Bar No. 301610
Four Embarcadero Center, 17th Floor
5 San Francisco, California 94111-4109
Telephone:   415.434.9100
6 Facsimile:   415.434.3947
E mail      okatz@sheppardmullin.com
7            mlauter@sheppardmullin.com
             jluther@sheppardmullin.com
8            sfarzan@sheppardmullin.com

9 Proposed Attorneys for Debtor,
Imperial Toy LLC
10

UNITED STATES BANKRUPTCY COURT
11

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
12

| | |
|---|---|
| In re | Case No. 19-52335 |
| | Chapter 11 |
| Imperial Toy LLC, a California limited liability company, | **DEBTOR'S MOTION TO:** |
| Debtor. | **(I) APPROVE SALE OF SUBSTANTIALLY ALL DEBTOR'S ASSETS FREE AND CLEAR OF LIENS;** |
| | **(II) APPROVE THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND** |
| | **(III) PROVIDE RELATED RELIEF** |
| | Date:   December 16, 2019 |
| | Time:   1:30 p.m. |
| | Judge:   Honorable M. Elaine Hammond |
| | United States Bankruptcy Court |
| | 280 South First Street |
| | San Jose, CA 95113 |

25 **Proposed Purchaser:** Ja-Ru, Inc., a Florida corporation, or its designee, subject to
overbid.

26

27 **Potentially Affected Lienholders**. CIT Finance LLC, The CIT Group/Commercial
Services, Inc., Canon Financial Services, Inc., Great Rock Capital Partners Management,
LLC, IBM Credit LLC, and The Hirsch Family Trust dated June 9, 1998, plus the
28 additional potential lienholders set forth in Schedule 1.

SMRH:4845-6814-3021.3                                                              Sale Motion

# TABLE OF CONTENTS

Page

I.    FACTUAL BACKGROUND ................................................................. 3

    A.    General Factual Background. ................................................. 3

    B.    Marketing of Assets. ........................................................... 4

    C.    Bid Procedures. .................................................................. 5

II.   SUMMARY OF SALE ..................................................................... 5

III.  RELIEF REQUESTED ..................................................................... 7

IV.   AUTHORITY FOR REQUESTED RELIEF ............................................ 8

    A.    The Sale Is Within The Sound Business Judgment Of The Debtor And Should Be Approved. ...................................................... 8

    B.    The Sale Is Proposed In "Good Faith" Under Section 363(m) Of The Bankruptcy Code. .................................................... 12

    C.    The Sale Satisfies The Requirements Of Section 363(f) Of The Bankruptcy Code. .............................................................. 14

    D.    Relief From The Ten Day Waiting Periods Under Bankruptcy Rule 6004(h) Is Appropriate. ................................................ 16

    E.    The Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized. .................................. 17

V.    CONCLUSION ............................................................................ 20

Imperial Toy LLC ("Debtor") moves the Court pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), and 365, for approval of the sale (the "Sale") of substantially all assets of the Debtor (the "Purchased Assets") to Ja-Ru, Inc., a Florida corporation, or its designee (the "Purchaser"), or to a winning overbidder, if any, at the conclusion of a hearing on this Motion free and clear of any and all liens, claims, and interests (the "Motion").

This Motion is supported by the concurrently filed declaration of Peter Tiger in Support of First Day Motions (the "Tiger Declaration"), and all other pleadings, evidence or arguments submitted at or before final determination of this Motion. The Debtor respectfully represents as follows in support of this Motion:

## I. FACTUAL BACKGROUND

### A. General Factual Background.

On November 18, 2019, the Debtor filed a voluntary Chapter 11 case in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Case"). No trustee has been appointed and the Debtor remains a debtor-in-possession of its estate pursuant to 11 U.S.C. §§ 1107 and 1108. No official committee of unsecured creditors has been appointed in this case.

Imperial Toy was founded in 1969 by the Kort Family, and has grown over its 50 years in business to be a worldwide leader in the sale and manufacture of bubbles, novelty toys, and other children's products. Imperial is engaged in the business of product development, manufacturing and wholesale sales and distribution of children's toys primarily in the categories of bubbles and bubble toys, licensed and non-licensed novelty toys, outdoor, seasonal and role play toys and other similar children's products.

Imperial is a manufacturer and wholesaler that distributes its products to over 75 countries around the world. Imperial Toy sells its products in many retailers, including Wal-Mart, Dollar Tree, CVS, HEB, Amazon, Target, Kroger, Kohl's, and Walgreens. Imperial Toy has five facilities throughout the world operated either itself or through its subsidiaries. Gross revenues for the Debtor were about $106.7 million in 2018. The majority of that is domestic – roughly $78.4 million of the gross revenues in 2018. Sales

through the Debtor's subsidiary in Hong Kong, IEI, accounted for the next largest share, at about $28.2 million.

## B. Marketing of Assets.

The Debtor began suffering capital needs in 2019 and required loans from its members in order to continue operations. As a result, in early 2019, the Debtor began to examine a potential sale to a third party. In March 2019 the Debtor retained an investment banking firm, CriticalPoint Partners ("CPP"), in order to market itself for sale and locate a buyer. After preparation of a confidential information memorandum and related materials and after waiting for a delayed set of audited financial statements from the Debtor's auditors for 2018 which were not received until late July 2019, CPP aggressively began marketing the Debtor in connection with a complete, majority or minority equity sale and, during this sale auction period, contacted approximately 300 prospective buyers and investors. During the life of the auction sale process, the Debtor received non-binding indications of interest from four prospective buyers.

The Debtor began discussion with one of the bidders in July 2019 and entered into a non-binding LOI with that lead bidder on September 27, 2019. The parties were pushing for a simultaneous signing and closing on October 30, 2019. After signing the LOI, the Debtor's business and financial health deteriorated and the buyer subsequently proposed to significantly reduce the purchase price through a significant working capital adjustment while also demanding a number of holdback and escrow amounts, which, when taken together, would have prevented the Debtor from being able to meet its loan repayment obligations to its secured creditors, CIT and Great Rock at closing. After sharing the buyer's newly modified purchase terms with its secured creditors, it became clear that the necessary concessions from those creditors could not be obtained and the Debtor believed it had no choice but to reject the offer and resume its auction sale process. The buyer's modified offer was formerly rescinded by the buyer on October 24, 2019.

During the month of November 2019, the Debtor reached out to several highly regarded prospective buyers and investors and in early November began serious

negotiations with Ja-Ru, Inc. On November 14, 2019, the Debtor and Ja-Ru entered into a letter of intent, pursuant to which Ja-Ru agreed to provide post-petition debtor-in-possession financing for the Debtor's emergency capital needs in advance of a chapter 11 bankruptcy filing in which Ja-Ru (or an overbidder) would purchase substantially all of the assets of the Debtor. Great Rock made significant additional advances to the Debtor in November to bridge the gap until a bankruptcy filing could occur.

C.    **Bid Procedures.**

Substantially concurrently with the filing of this Motion, the Debtor has filed a motion seeking the Court's approval of bid procedures (the "Bid Procedures")  in connection with the Sale (the "Bid Procedures Motion").  The Bid Procedures provide that if the Debtor receives one or more qualified bids, an auction will be held at the hearing on this Motion. As of the date of filing this Motion, the Bid Procedures have not yet been approved by the Court, and the Bid Procedures Motion is subject to the Court's consideration, which is anticipated to be at a hearing on November 19, 2019.

II.    **SUMMARY OF SALE**

Following extensive arm's length negotiations pre-petition between the Debtor and the Purchaser, the Debtor has executed an Asset Purchase Agreement (the "APA") with the Purchaser, a true and correct copy of which is attached hereto as Exhibit A.

Pursuant to the APA, the Purchaser will acquire the Purchased Assets for a cash purchase price of $13,000,000 (the "Purchase Price").  A good-faith deposit in the amount of $1,000,000  is delivered under the APA, which will be used as a credit toward the Purchase Price subject to closing of the Sale to the Purchaser.  The APA provides that the Sale to the Purchaser of the Purchased Assets will be free and clear of all liens, claims, encumbrances and other interests to the fullest extent allowed by law.  The Debtor is aware of the following parties having liens asserted against all or a portion of the Purchased Assets: CIT Finance LLC, The CIT Group/Commercial Services, Inc., Canon Financial Services, Inc., Great Rock Capital Partners Management, LLC, IBM Credit LLC, and The

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 5 of 74

Hirsch Family Trust dated June 9, 1998 and certain other parties which may potentially
have statutory or other unperfected liens, which are listed on Schedule 1.

In addition, under the APA the Purchaser will be entitled to a break-up fee in the
amount of $650,000 (the "Break-Up Fee") in the event the Sale closes to a third party other
than Ja-Ru, Inc., which amount shall be paid only from the proceeds of such Sale and shall
have priority as an administrative expense under 11 U.S.C. §§ 503(b) and 507(a)(2). The
Break-Up Fee is a reasonable amount to compensate the Purchaser for its costs and its
agreement to serve as a stalking horse buyer.

The APA also contemplates the assumption and assignment to the Purchaser of the
certain contracts to be designated by the Purchaser (each individually an "Assumed
Contract" and, collectively, the "Assumed Contracts"). The APA contemplates that
Purchaser will provide a list of the Assumed Contracts to Debtor by December 23, 2019,
or earlier. The Debtor will file a supplement to this Motion listing out the contracts that
may be Assumed Contracts and the proposed cure amounts, and a second supplement to
this Motion that provides the list of Assumed Contracts from the Purchaser.

The Sale to the Purchaser is subject to overbid pursuant to the terms set forth in the
Bid Procedures. The Debtor believes that conducting the Sale of the Purchased Assets
pursuant to the Bid Procedures will allow the Debtor to maximize the value of the
Purchased Assets for the benefit of its creditors.

Pursuant to the APA, for the Purchaser to consummate the Sale of the Purchased
Assets, the order(s) approving the Sale must (i) approve, pursuant to Sections 105, 363 and
365 of the Bankruptcy Code: (a) the execution, delivery, and performance by the Debtor of
the APA, (b) the Sale of the Purchased Assets to the Purchaser on the terms set forth herein
and in the APA, including that such Sale is free and clear of encumbrances and claims,
with any such liens, encumbrances, and claims to attach only to the proceeds of the sale,
and (c) the performance by the Debtor of its obligations under the APA; (ii) authorize and
direct the Debtor to assume and assign to the Purchaser all of the Assumed Contracts
pursuant to Section 365 of the Bankruptcy Code subject to the right of the Purchaser to

excluded any Assumed Contract prior to closing of the Sale; (iii) find that the Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and that the Purchaser is entitled to have the protections afforded by that section; (iv) contain a finding that reasonable and adequate notice of the Sale and transfer of the Purchased Assets to the Purchaser, and assumption and assignment of all executory contracts to the Purchaser, has been provided to all parties required to be given notice under the applicable Bankruptcy Rules and Bankruptcy Local Rules; (v) contain a finding that neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Sale of the Purchased Assets to be avoided under Section 363(n) of the Bankruptcy Code; (vi) bar any third parties from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed expired executory contracts), liens or encumbrances of any kind or nature against the Purchaser or the Purchased Assets that arose prior to closing; and (vii) provide that the Sale Order (defined below) is binding on any and all successors and assigns, including any trustee appointed after entry of the Sale Order pursuant to Sections 701 or 702 of the Bankruptcy Code.

Subject to the receipt of a qualified and timely overbid, as provided for in the Bid Procedures, the Debtor believes the proposed Sale to the Purchaser is in the best interest of creditors. The APA provides that the Purchaser will consider every employee of the Debtor for potential employment, with the objective of retaining as many of them as practicable. The assumption and assignment of the Debtor's executory contracts will substantially reduce potential and contingent claims against the Debtor's estate. The Debtor believes that a sale of the Purchased Assets to the Purchaser or a successful overbidder will allow the Debtor to maximize the value of its assets for the benefit of its creditors.

## III.    **RELIEF REQUESTED**

The Debtor seeks an order from this Court (the "Sale Order") approving the Sale of the Purchased Assets to the Purchaser, subject to overbid, pursuant to the terms and

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 7 of 74
SMRH:4845-6814-3021.3                                                                                              Sale Motion

conditions set forth in the APA, following the Bid Procedures set forth in the Bid Procedures Motion.

Because the Sale of the Purchased Assets is conditioned upon the assumption and assignment of the Assumed Contracts, the Debtor requests that the Sale Order also approve the Debtor's assumption and assignment of the Assumed Contracts, subject to the Purchaser's ability to exclude any of the Assumed Contracts prior to closing of the Sale from the Purchased Assets.

The Debtor's decision to assume and assign the Assumed Contracts is subject to Court approval and the occurrence of the closing of the Sale. Absent such approval and closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall remain in the same status as each was immediately prior to the filing of this Motion, subject to further order of the Court.

The Debtor requests that the Sale Order provide that the Sale of the Purchased Assets be free and clear of liens, claims, encumbrances and other interests, including, but not limited to, persons listed as creditors on the Debtor's Schedules or who have filed a Proof of Claim or request for notice in the Debtor's case and parties to lawsuits against the Debtor, with any such liens, claims, encumbrances or interests to attach to the proceeds of the Sale.

The Debtor requests that the Sale Order provide that Ja-Ru, Inc., or other successful bidder, be afforded the protections of Section 363(m) of the Bankruptcy Code.

The Debtor also requests the Sale Order provide that the provisions of Fed.R.Bankr.P. 6004(h) and 6006(d), which would otherwise stay any order approving the Sale of the Purchased Assets and allowing assumption and assignment of Assumed Contracts as requested in this Motion, be waived under the circumstances.

## IV. AUTHORITY FOR REQUESTED RELIEF

### A. The Sale Is Within The Sound Business Judgment Of The Debtor And Should Be Approved.

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 8 of 74
SMRH:4845-6814-3021.3                                                        Sale Motion

Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the Sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in the Ninth Circuit and others have required that the decision to sell assets outside the ordinary cause of business be based upon the sound business judgment of the debtors. See In re 240 North Brand Partners, Ltd., 200 B.R. 653, 659 (9th Cir. BAP 1996) ("debtors who wish to utilize § 363(b) to dispose of property of the estate must demonstrate that such disposition has a valid business justification") citing In re Lionel Corp., 722 F. 2d 1063, 1070 (2nd Cir. 1983).

Bankruptcy Code Section 363 does not require that the Court substitute its own business judgment for that of the debtor. See, e.g., In re Ionosphere Clubs, Inc., 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); In re Highway Equip. Co., 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986). Rather, the Court should ascertain whether the debtor has articulated a valid business justification for the proposed transaction. See, e.g., Lewis v. Anderson, 615 F.2d 778, 781 (9th Cir. 1979). This is consistent with the congressional intent to limit judicial involvement in business decisions and to leave day-to-day operational matters within the debtor's broad authority. In re Airlift Int'l, Inc., 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982) (recognizing "broad authority to operate the business of a debtor . . . [which] indicates congressional intent to limit court involvement in business decisions by a trustee . . . [so that] a court may not interfere with a reasonable business decision made in good faith by a trustee").

Several courts have held that the "sound business judgment" test requires a debtor to establish four elements in order to justify the Sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the Sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 9 of 74

1 | reasonable price, and (d) good faith.  See In re Abbotts Dairies of Pennsylvania, Inc.,

2 | 788 F.2d 3rd Cir. 1986), 788 F.2d 143; Lionel Corp, 722 F.2d at 1071.  In re Idaho

3 | Photocopy & Supply, Inc., 1994 WL 553065 (Bankr. D. Idaho 1994).

4 | A debtor's showing of a sound business purpose need not be unduly exhaustive but,

5 | rather, a debtor is "simply required to justify the proposed disposition with sound business

6 | reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

7 | Whether or not there are sufficient business reasons to justify a transaction depends upon

8 | the facts and circumstances of each case.  Lionel, 722 F.2d at 1071.

9 | Similarly, in In re Channel One Communications, Inc., 117 B.R. 493 (Bankr.  E.D.

10 | Mo. 1990), the court approved a sale of substantially all a debtor's assets, consisting of a

11 | radio station, where:

12 | > the Debtor's business will likely not generate sufficient revenue to permit the radio station to continue to operate.  Therefore, continued
13 | > operation of the Debtor's business will diminish Debtor's estate and reduce the amount available for distribution to creditors.

14 | 117 B.R. at 496.

15 |

16 | In this case, the Debtor submits that the decision to proceed with the Sale of the

17 | Purchased Assets pursuant to the APA is based upon its sound business judgment and

18 | should be approved.  Indeed, more than ample business justification exists to approve the

19 | APA.  Like the debtor in the Channel One case, the Debtor cannot generate sufficient

20 | revenue to permit it to keep operating.  The Debtor's plan from day one has been to

21 | effectuate a sale to preserve going concern value, which in turn will likely exponentially

22 | reduce and mitigate damage claims that would otherwise arise in an immediate shut-down.

23 | Further, if this case were to liquidate under chapter 7, the value of the Purchased

24 | Assets would decrease significantly.  A sale under the APA will result in the assumption of

25 | significant assigned contracts.  In a liquidation scenario, the Debtor could not perform

26 | those assigned contracts and significant additional liabilities would be created.  In addition,

27 | the Sale as a going concern while the Debtor remains in chapter 11 is the best path to

28 | generate benefits for the estate.  As explained in the Tiger Declaration, the Debtor has

"shopped" the Purchased Assets for over a year pre-petition, and these assets will also be subjected to further market check at the auction.

The Debtor believes that reasonable and adequate notice of the Sale is being provided to interested persons, satisfying the second prong of the Abbotts Dairies test. A notice of the Sale Hearing is served on all known creditors and interested parties to afford them notice of the auction. As such, the proposed Sale is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Debtor's assets. Accordingly, the notice prong of the Abbotts Dairies test is satisfied.

The third prong of the Abbotts Dairies test is the "fair and reasonable price" prong, which is satisfied here. The Debtor has extensively marketed the Debtor's assets and, to date, has not obtained any offers that are higher than the offer by the Purchaser.

The Debtor's marketing efforts began in early 2019, when the Debtor when Debtor began to examine a potential sale to a third party. In March 2019, the Debtor retained CCP to market the Debtor for sale. After preparation of a confidential information memorandum and related materials and after waiting for a delayed set of audited financial statements from the Debtor's auditors for 2018 which were not received until late July 2019, CPP aggressively began marketing the Debtor in connection with a complete, majority or minority equity sale and, during this sale auction period, contacted approximately 300 prospective buyers and investors. During the life of the auction sale process, the Debtor received non-binding indications of interest from four prospective buyers.

The Debtor began discussion with one of the bidders in July 2019 and entered into a non-binding LOI with that lead bidder on September 27, 2019. The parties were pushing for a simultaneous signing and closing on October 30, 2019. After signing the LOI, the Debtor's business and financial health deteriorated and the buyer subsequently proposed to significantly reduce the purchase price through a significant working capital adjustment while also demanding a number of holdback and escrow amounts, which, when taken

11

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 11 of
74

together, would have prevented the Debtor from being able to meet its loan repayment obligations to its secured creditors, CIT and Great Rock at closing.  After sharing the buyer's newly modified purchase terms with its secured creditors, it became clear that the necessary concessions from those creditors could not be obtained and the Debtor believed it had no choice but to reject the offer and resume its auction sale process. The buyer's modified offer was formerly rescinded by the buyer on October 24, 2019.

During the month of November 2019, the Debtor reached out to several highly regarded prospective buyers and investors and in early November began serious negotiations with Ja-Ru, Inc.  On November 14, 2019, the Debtor and Ja-Ru entered into a letter of intent, ultimately resulting in the APA.

Thus far, the APA is the best offer the Debtor has obtained.  In addition, the APA negotiated with the Purchaser is subject to overbidding at the hearing so that the Debtor can continue to search for other interested bidders.  The Bid Procedures ensure that the winning bid will be the highest price that the market will bear.  The APA with the Purchaser sets the floor for such bidding and all qualified bidders will have a fair and final opportunity to make a higher and better bid at the Auction, which will maximize the recovery for the estate.   The proposed Sale will be subject to market check through the solicitation of competing bids through the auctions as set forth in the Bid Procedures.  Accordingly, the Debtor and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable and, therefore, satisfies the third prong of the Abbotts Dairies test.

**B.**     **The Sale Is Proposed In "Good Faith" Under Section 363(m) Of The Bankruptcy Code.**

The fourth prong of the test examines whether the Sale of the Purchased Assets is in good faith.  The Debtor requests that the Court find that the Sale of the Purchased Assets meets this test and that the Purchaser and the winning bidder are entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code.

Section 363(m) of the Bankruptcy Code provides, in pertinent part:

SMRH:4845-6814-3021.3

Sale Motion

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the Sale is reversed on appeal.

As required by Section 363(m) of the Bankruptcy Code, the APA and the Bid Procedures for the Purchased Assets are proposed in good faith. Although the Bankruptcy Code does not define "good faith purchaser," the Ninth Circuit, construing Section 363(m) of the Bankruptcy Code, has stated that "[a] good faith buyer 'is one who buys 'in good faith' and 'for value.'" Ewell v. Diebert (In re Ewell), 958 F. 2d 276, 281 (9th Cir. 1992) (citing Abbotts Dairies, 788 F.2d at 147); see also, In re Filtercorp, Inc. v. Gateway Venture Partners III, L.P., 163 F.3d 570, 577 (9th Cir. 1998) (citing Ewell). To constitute lack of good faith, a party's conduct in connection with the Sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the Sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

Here, the Sale of the Purchased Assets pursuant to the APA is in good faith. There is no evidence of fraud or collusion in the terms of the APA. To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the hearing on the Motion, the APA is the culmination of a solicitation and negotiation process in which all parties were represented by sophisticated counsel. The Debtor had the benefit of having its CRO and financial advisor evaluate the sale terms and provide input throughout the process.

The Purchaser is not an insider of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code, and all negotiations were conducted on an arm's length, good faith basis. The Debtor has no connection with the Purchaser, and no director or officer of the Debtor is an officer or director of the Purchaser or vice-versa. While the Purchaser may extend offers of employment to certain employees of the Debtor on terms to be determined by the Purchaser in its sole discretion, the APA contains no special treatment for the Debtor, the bankruptcy estate, the Purchaser or their respective affiliates or insiders.

Likewise, the Bid Procedures for the Sale of the Purchased Assets to the winning bidder are proposed in good faith. All interested parties will have a fair opportunity to submit a bid for the Purchased Assets. The Debtor submits that the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process. Further, prospective bidders will be required to provide evidence in support of a finding of good faith with a showing to include those matters set forth at item 5 of the Guidelines Re Sale Orders promulgated by this Court.

As a result, under the circumstances, the Purchaser or any winning bidder for the Purchased Assets should be afforded the protections that Section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Bid Procedures are designed to prevent the Debtor or the winning bidder from engaging in any conduct that would cause or permit the APA, or the Sale, to be avoided under Section 363(n) of the Bankruptcy Code.

All creditors and parties in interest will receive notice of the hearing on the Motion and will be provided with an opportunity to be heard. The Debtor submits that such notice is adequate for entry of the order approving the APA and satisfies the requisite notice provisions required under Section 363(b) of the Bankruptcy Code.

### C. The Sale Satisfies The Requirements Of Section 363(f) Of The Bankruptcy Code.

Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such

property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); <u>Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by Section 363(f). <u>See</u>, <u>e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

The Debtor is aware of the following liens on the Purchased Assets, both from its own knowledge and from a review of lien filings with the Secretary of State: CIT Finance LLC, The CIT Group/Commercial Services, Inc., Canon Financial Services, Inc., Great Rock Capital Partners Management, LLC, IBM Credit LLC, and The Hirsch Family Trust dated June 9, 1998 and certain other parties which may potentially have statutory or other unperfected liens, which are listed on Schedule 1. The Debtor submits that one or more of the above-described bases are satisfied for authorizing the Sale to be free and clear of all such liens, claims or interests. First, the requested relief provides for the liens, claims or other interests in the Purchased Assets to be attached the proceeds of the Sale. As such, the Debtor submits that adequate protection for non-consenting creditors, if any, is provided by attaching their liens to the proceeds of the Sale. Second, the Debtor will cause notice to be provided to all persons and entities who were scheduled by the Debtors or who have filed a Proof of Claim, among others, and the Notice of this Motion will specify that such relief will be requested. Full copies of the Motion and supporting papers will be

served on all parties identified as potentially having liens, as provided by L.B.R. 6004-1(a). Thus, to the extent a party receives notice of, but does not file a written objection to, this Motion, such party should be deemed to have consented to the sale free and clear of their liens.  See In re Channel One Comm., Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo 1990).  Third, except as set forth above, the Debtor is unaware of any liens against the Purchased Assets.  Accordingly, to the extent any person or entity not identified herein asserts that it has a lien, claim or interest in or to the Purchased Assets, such lien, claim or interest is in bona fide dispute.

Accordingly, the Sale free and clear of such interests is authorized pursuant to Section 363(f)(4) of the Bankruptcy Code.

### D.  Relief From The Waiting Periods Under Bankruptcy Rule 6004(h) Is Appropriate.

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtor requests that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rule 6004(h) is waived. Such relief should be granted for several reasons.

First, the purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before an order is implemented.  See Advisory Committee Notes to Fed.R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14 day stay period, Collier on Bankruptcy suggests that the 14 day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6004.11 (16th ed. rev. 2019).  Therefore, to  the extent there are no objections to this Motion, the 14 day stay should be waived given that its purpose is to allow an objecting party to prepare an appeal.

Even if an objection is filed and overruled, this court should still waive the 14 day stay. When an objection is overruled to a sale motion, a court may waive the stay "upon a showing that there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected." 10 Collier on Bankruptcy ¶ 6004.11 (16th ed. rev. 2019). In this case, there is a strong justification to close the sale as soon as possible, as an ongoing concern sale is only likely if the sale is concluded on an expedited basis. Without a transaction, the Debtor is not likely to be able to continue operating for much longer after the targeted closing date. Also, under the APA and the terms of the DIP Financing provided by Ja-Ru, Inc., the closing deadline is set for January 3, 2020.

At the same time, the likelihood of success on an appeal of an order granting this Motion is very low, given that the winning bidder should be approved as a good faith purchaser under section 363(m), meaning that any party appealing the Court's order would need to obtain a stay pending appeal after the 14 day period to prevent the appeal from becoming moot. Even if such a stay were obtained, the standard of review of this Court's factual determinations that the Debtor had a valid business purpose for the sale and that it was made in good faith would be reviewable only under a clearly erroneous or clear error standard. See, Fed. R. Bankr. P. 8013 (findings of fact on appeal "shall not be set aside unless clearly erroneous"); In re Thorpe Insulation Co., 677 F.3d 869, 879 (9th Cir. 2012) (bankruptcy court findings of fact reviewed on appeal for clear error). Thus, even if an objection is made and overruled, the 14 day stay of Rule 6004(h) should be waived.

### E. The Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized.

Section 365(a) permits a debtor to assume or reject an executory contract or unexpired lease upon the authority of the Court after notice and a hearing.[1] The question

---

[1] Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 17 of 74
SMRH:4845-6814-3021.3                                                                    Sale Motion

of whether a contract should be rejected, and if not, on what terms it should be assumed, has long been viewed as one of business judgment.  Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R. Co., 318 U.S. 523, 550, *reh'g denied*, Group of Institutional Investors v. Abrams, 318 U.S. 803 (1943).  Under the Bankruptcy Code, most courts have applied the business judgment test to the decision to assume or reject a contract or lease.  In re Orion Pictures, Corp., 4 F.3d 1095 (2nd Cir. 1993); Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303 (5th Cir. 1985); see also In re Rega Properties, Ltd., 894 F.2d 1136 (9th Cir. 1990).  The Ninth Circuit Bankruptcy Appellate Panel has stated the standard by which the Debtor should exercise its business judgment as follows: "What are the criteria which the court and the trustee [debtor in possession] should legitimately consider in exercising their "business judgment?"  The primary issue is whether [assumption or] rejection would benefit the general unsecured creditors."  In re Chi-Feng Huang, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982).

Pursuant to the requirements of Section 365(f)(2), to assume a contract or lease there must also be assurance that the contract or lease will be performed in the future.[2] 3 Collier on Bankruptcy, *supra*, ¶ 365.05[3].  However, the Bankruptcy Code does not define adequate assurance of future performance.  "In the absence of any definition of 'adequate assurance' courts are counseled to give the phrase a pragmatic construction. . . . At a minimum, the primary focus of adequate assurance concerns the assignee's ability to fulfill the financial obligations . . ."  In re Martin Paint Stores, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996) (citations omitted).

---

[2]  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:
the trustee may assign an executory contract or unexpired lease of the debtor only if
–
(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

Adequate assurance, among other things, may be provided by demonstrating the assignee's financial health and resources and experience in the industry. Adequate assurance may also be shown when the assignee has expressed a willingness to devote sufficient resources to fund the business. In re Bygraph, Inc., 56 B.R. 596, 605-606 (Bankr. S.D.N.Y. 1986).

The Debtor believes that the Sale pursuant to the APA and the Bid Procedures, with the opportunity to submit better and higher offers, is in the best interests of creditors and the bankruptcy estate. Accordingly, the Debtor submits that together with approval of the Sale, assumption and assignment of the Assumed Contracts is within its sound business judgment.

With respect to the Assumed Contracts, which will be listed on supplements to the Motion, the Debtor submits that the Sale to the Purchaser provides adequate assurance of future performance under the Assumed Contracts. The proposed assumption and assignment of the Assumed Contracts is subject to all of the provisions of the contracts and the Purchaser is in a position to continue the Debtor's contractual relationships with the non-debtor parties to the Assumed Contracts.

The Debtor will provide proposed amounts to cure defaults under Assumed Contracts when listed and requests that such Cure Amount for each Assumed Contract, or as otherwise ordered by the Court at the Sale Hearing, be established as the Cure Amount for each Assumed Contract listed therein.

Pursuant to the procedures implemented in connection with the sale, any party wishing to object to the assumption and the assignment of the Assumed Contracts to the Purchaser, to adequate protection of future performance and/or to any Cure Amount may file and serve such objection prior to the hearing on this Motion as set forth in these procedures. The Debtor will serve a copy of this Motion and any supplement on the non-debtor parties to the Assumed Contracts so they have an opportunity to review the relief requested herein and to object to such relief if necessary.

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 19 of 74

At the Sale Hearing, the Court will consider any such objections. This procedure will provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser or the winning bidder to provide adequate assurance of future performance under the assumed liabilities, as required by Section 365(b)(1)(C) of the Bankruptcy Code. The Debtor submits, therefore, that the Court should authorize the assumption and assignment by the Debtor of the Assumed Contracts, effective upon the closing of the Sale.

The Debtor also requests that the provisions of Fed.R.Bankr.P. 6006(d) which would otherwise stay any order approving the assumption and assignment of executory contracts as requested herein, be waived under the circumstances. Upon entry of any Order authorizing the sale of the Purchased Assets, the Debtor will need to close and implement the APA as soon as possible in order to minimize any interference to its employees and the community. As such, the Debtor submits that cause exists for a waiver of the 14-day stay imposed by Fed.R. Bankr. P. 6004(d) to the extent applicable.

## V. **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting this Motion and such other and further relief as the Court deems just and proper.

Dated: November 18, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
                    */s/ Ori Katz*
                    ORI KATZ

Proposed Attorneys for Debtor
Imperial Toy LLC

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 20 of 74
SMRH:4845-6814-3021.3                                                                Sale Motion

## **Schedule 1**

CIT Bank N.A.
Amazon
Summit
Critical Point Partners

Federal:
IRS

California:
California EDD
California FTB
California Department of Tax and Fee Administration
County of Los Angeles
County of San Diego

Arkansas:
Arkansas Department of  Finance and Administration
Benton County Collector and Assessor

Shippers:
(A) Any other Shippers or warehousemen that may have liens
(B) Any importer that could assert a customs lien

(1) Mode Transportation;
(2) Express Service;
(3) Landstar Global;
(4) Federal Express Corp.;
(5) XPO Logistics, Inc.;
(6) McKinney Vehicle Service;
(7) Schneider National Inc.;
(8) JB Hunt Transport;
(9) Atlas Transportation;
(10) CMI;
(11) Gold Point Transport;
(12) CBT International, Inc.;
(13) Froco, S.DE FL DE CV;
(14) TQL;
(15) Turbo Express;
(16) CMI Transportation;
(17) ABF Freight Systems;
(18) Hollywood Delivery;
(19) EMO Trans, Inc.;
(20) Southwest Assets;

(21) Premier Air Cargo;
(22) Daylight Transport;
(23) United Parcel Services;
(24) Pierpass;
(25) Alba Wheels Up International;
(26) Expeditors International; and
(27) Casas International Brokerage

SMRH:4845-6814-3021.3                                                                    Sale Motion

**EXHIBIT A**

SMRH:4845-6814-3021.3                                                                 Sale Motion

ASSET PURCHASE AGREEMENT

AMONG

JA-RU, INC.

("Purchaser")

IMPERIAL TOY LLC

("Seller")

and

PETER TIGER

(the "Member")

Dated as of November 18, 2019

# TABLE OF CONTENTS

ARTICLE I  Definitions ........................................................................................................... 1

   1.1    Definitions ...................................................................................................... 1

ARTICLE II Sale and Transfer of Assets ............................................................................ 10

   2.1    Purchased Assets .......................................................................................... 10

   2.2    Excluded Assets ............................................................................................ 11

   2.3    Assumption of Liabilities ............................................................................. 11

   2.4    Assumption and Assignment of Contracts and Leases ................................. 13

ARTICLE III Purchase Price ................................................................................................ 15

   3.1    Aggregate Purchase Price ............................................................................. 15

   3.2    Deposit .......................................................................................................... 15

   3.3    Payment of the Aggregate Purchase Price .................................................... 15

   3.4    Allocation of Purchase Price ........................................................................ 16

ARTICLE IV  Closing. ......................................................................................................... 16

   4.1    Closing .......................................................................................................... 16

   4.2    Closing Actions and Deliveries .................................................................... 16

   4.3    Seller's Closing Deliveries ........................................................................... 16

   4.4    Purchaser's Closing Deliveries .................................................................... 18

ARTICLE V ......................................................................................................................... 18

   5.1    Organization; Subsidiaries; Ownership; Predecessors ................................ 18

   5.2    Due Authorization; No Conflict ................................................................... 19

   5.3    Financial Statements ..................................................................................... 19

   5.4    Title to Assets; Condition ............................................................................. 20

   5.5    Inventory ....................................................................................................... 21

   5.6    Real Property ................................................................................................ 21

   5.7    Taxes ............................................................................................................. 22

   5.8    Governmental Authorizations; Legal Requirements .................................... 22

   5.9    Environmental Matters ................................................................................. 23

   5.10   Proceedings .................................................................................................. 23

   5.11   Employee Benefit Plans; Employees ........................................................... 24

   5.12   Reserved. ...................................................................................................... 24

   5.13   Contracts ...................................................................................................... 25

   5.14    Brokers ........................................................................................................ 25

   5.15   Material Customers, Suppliers, Licensors and Licensees ........................... 25

   5.16   Intellectual Property ..................................................................................... 25

| 5.17 | Accounts Receivable | 26 |
|------|---------------------|-----|
| 5.18 | Transactions with Related Parties | 26 |
| 5.19 | Reserved. | 26 |
| 5.20 | Disclosure | 27 |
| **ARTICLE VI** | | 27 |
| 6.1 | Organization and Good Standing | 27 |
| 6.2 | Due Authorization; No Conflict | 27 |
| 6.3 | No Brokers | 28 |
| 6.4 | Proceedings | 28 |
| 6.5 | Disclosure | 28 |
| **ARTICLE VII** | | 28 |
| 7.1 | Purchaser's Investigation | 28 |
| 7.2 | Consents of Third Parties | 29 |
| 7.3 | Bankruptcy Matters; Bidding Process | 29 |
| 7.4 | Operations of the Business Prior to the Closing | 31 |
| 7.5 | Notification of Certain Matters | 32 |
| 7.6 | Acquisition Proposals | 32 |
| 7.7 | Required Efforts | 32 |
| 7.8 | Employee Matters | 33 |
| 7.9 | Adequate Assurances Regarding Assumed Contracts and Assumed Leases | 34 |
| 7.10 | Further Assurances | 34 |
| 7.11 | Prorations; Tax Cooperation | 34 |
| 7.12 | Remittance of Accounts Receivable Proceeds | 34 |
| 7.13 | Customer Relations | 35 |
| 7.14 | Books and Records | 35 |
| **ARTICLE VIII** | | 35 |
| 8.1 | Representations and Warranties | 35 |
| 8.2 | Covenants and Agreements | 36 |
| 8.3 | Compliance Certificate | 36 |
| 8.4 | Absence of Litigation | 36 |
| 8.5 | Governmental Approvals | 36 |
| 8.6 | Current Assets | 36 |
| 8.7 | Debtor-in-Possession Financing | 36 |
| 8.8 | Material Consents | 36 |
| 8.9 | Deliveries | 37 |
| 8.10 | No Material Adverse Change | 37 |

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 26 of
74

| 8.11 | Due Diligence Review | 37 |
| 8.12 | Bankruptcy Court Proceedings | 37 |
| ARTICLE IX | | 37 |
| 9.1 | Representations and Warranties | 37 |
| 9.2 | Covenants and Agreements | 37 |
| 9.3 | Compliance Certificate | 37 |
| 9.4 | Absence of Litigation | 37 |
| 9.5 | Governmental Approvals | 37 |
| 9.6 | Deliveries | 38 |
| ARTICLE X Termination | | 38 |
| 10.1 | Termination | 38 |
| 10.2 | Notice of Termination; Effect of Termination | 39 |
| ARTICLE XI | | 40 |
| 11.1 | Limitation of Liability for Purchaser | 40 |
| 11.2 | Limitation of Liability for Seller | 40 |
| 11.3 | Survival of Representations and Warranties | 40 |
| 11.4 | Acknowledgments by Purchaser | 41 |
| 11.5 | Acknowledgment by Seller | 41 |
| ARTICLE XII General Provisions | | 41 |
| 12.1 | Expenses; Transfer Taxes | 41 |
| 12.2 | Entire Agreement; No Third Party Beneficiaries; Amendment | 41 |
| 12.3 | Severability | 42 |
| 12.4 | Waiver | 42 |
| 12.5 | Public Announcements | 42 |
| 12.6 | Successors and Assigns | 42 |
| 12.7 | Notice | 42 |
| 12.8 | Section Headings; Counterparts; Facsimile Signature | 44 |
| 12.9 | Governing Law | 44 |
| 12.10 | Jurisdiction | 44 |
| 12.11 | Interpretation | 44 |

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 27 of 74

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into this 18th day of November, 2019, among **JA-RU, INC.**, a Florida corporation ("Purchaser"), **IMPERIAL TOY LLC**, a California limited liability company ("Seller"), and **PETER TIGER** (the "Member").

Preliminary Statement. Seller is engaged in the business of the manufacture and sale of bubble and other novelty toys (the "Business"). Seller will commence a bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code" and, the date on which the petition is filed, the "Petition Date") in the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Bankruptcy Court"), and shall continue to operate the Business and to maintain possession of its property as a debtor and debtor in possession. Seller desires to sell, or cause to be sold, the Purchased Assets and Purchaser desires to purchase the Purchased Assets and not assume any liabilities (except for assigned contracts and leases to the limited extent provided herein) upon the terms and subject to the conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants hereinafter set forth, the parties hereby agree as follows:

## ARTICLE I
## Definitions.

1.1     Definitions. All capitalized terms not otherwise defined elsewhere in this Agreement shall have the meanings ascribed to such terms in this Section 1.1.

"Acquisition Proposal" means any inquiry, proposal or offer from any Person (other than Purchaser) in writing relating to any Alternative Transaction.

"Actual Landed Cost" means the total cost (utilizing the "first-in-first-out" method of accounting) of the inventory of Seller (net of royalty fees with respect to the product) as set forth on the invoice from the agent plus freight, brokerage fee, broker's fees and duty, but shall not include capitalized costs.

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means (a) the possession, directly or indirectly, of the power to vote 50% or more of the securities or other equity interests of a Person having ordinary voting power, (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, by contract or otherwise, or (c) being a director, officer, executor, trustee or fiduciary (or their equivalents) of a Person. In addition to the foregoing, if the specified Person is an individual, the term "Affiliate" also includes (x) the individual's spouse, (y) the members of the immediate family (including parents, siblings and children) of the individual or of the individual's spouse and (z) any corporation,

limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.

"Aggregate Purchase Price" has the meaning set forth in Section 3.1 below.

"Allocation Schedule" has the meaning set forth in Section 3.4 below.

"Alternative Transaction" means any of the following transactions with or by a Person resulting in the sale of the Business: (a) the direct or indirect acquisition (whether in a single transaction or a series of related transactions) of a substantial portion of the assets of Seller, (b) the direct or indirect acquisition (whether in a single transaction or a series of related transactions) of any equity securities of Seller, or (c) the merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Seller, in each case, other than the Transaction.

"Approval" means any authorization, approval, consent, or ratification or any extension, modification, amendment or waiver of any of the foregoing.

"Assumed Contracts" has the meaning set forth in Section 2.1(e) below.

"Assumed Leases" has the meaning set forth in Section 2.1(f) below.

"Assumed Liabilities" has the meaning set forth in Section 2.3(a) below.

"Assumption Agreement" has the meaning set forth in Section 4.3(c) below.

"Assumption Date" means the date as of which an Assumed Contract or Assumed Lease is assumed by Seller in the Bankruptcy Case and assigned to Purchaser pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), in accordance with the terms of this Agreement.

"Auction" means the auction conducted by Seller pursuant to the Sale Procedures Order.

"Bankruptcy Case" has the meaning set forth in the Preliminary Statement above.

"Bankruptcy Code" has the meaning set forth in the Preliminary Statement above.

"Bankruptcy Court" has the meaning set forth in the Preliminary Statement above.

"Bill of Sale" has the meaning set forth in Section 4.3(d) below.

"Break Up Fee" has the meaning set forth in Section 7.3(c)(i) below.

"Business" has the meaning set forth in the Preliminary Statement above.

"Business Day" means a day other than a Saturday, Sunday or day on which commercial banks are authorized or required to be closed in the State of California.

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 29 of 74

"Charges" has the meaning set forth in Section 7.11(a) below.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" means the consummation of the transactions contemplated herein in accordance with Article IV.

"Closing Date" means the date on which the Closing occurs.

"Closing Date Deadline" has the meaning set forth in Section 10.1(i) below.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Plans" means all Employee Plans as to which Seller or Imperial Toy Mexico sponsors, maintains, contributes or is obligated to contribute, or under which Seller or Imperial Toy Mexico has or may have any Liability.

"Company Records" means all (i) books and records of Seller, but not including those related to Imperial Toy Mexico, Idea King, IEI or Kortoy, to the limited extent that Seller is required by Legal Requirements to retain them; (ii) minute books, membership interest records and corporate seals; and (iii) confidential documents relating to proposals to acquire the Business made by Persons other than Purchaser.

"Contract" means any contract, agreement, deed, mortgage, lease, license, commitment, understanding, franchise, warranty, note, bond, option, warrant, right or other instrument or consensual obligation that is binding upon or pertains to any material assets of a Person.

"Contract Designation Date" has the meaning set forth in Section 2.4(a) below.

"Copyrights" has the meaning set forth in Section 5.16(a) below.

"Cure Amounts" has the meaning set forth in Section 2.3(a) below.

"Debt" means, with respect to any Person at any date, all indebtedness of such Person and its Subsidiaries, including all: (a) obligations for borrowed money, including notes, loans, lines of credit, bonds, debentures, obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person and its Subsidiaries and all associated Liabilities, (b) outstanding indebtedness with respect to equipment leases (capitalized or otherwise), (c) the maximum Liability under any payment obligations (whether or not contingent) with respect to acquisitions of assets or businesses in whatever form, (d) obligations with respect to the factoring and discounting of accounts receivable, (e) obligations arising from cash/book overdrafts or negative cash balances, (f) Tax Liabilities, (g) Liabilities secured by an Encumbrance on any property owned by such Person or its Subsidiary, (h) guarantees, (i) Liabilities for the deferred purchase price of property or services (including accounts payable and liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property), (j) Liabilities relating to unfunded, vested benefits under any Employee Plan, and (k) accrued interest, prepayment premiums and penalties related to any of the foregoing.

3

"Deposit" has the meaning set forth in Section 3.2 below.

"Deposit Escrow Agent" has the meaning set forth in Section 3.2 below.

"Deposit Escrow Agreement" has the meaning set forth in Section 3.2 below.

"Designated Contracts" has the meaning set forth in Section 2.4(a) below.

"DIP Loan" has the meaning set forth in Section 7.3(b) below.

"Disclosure Schedule" means the Disclosure Schedules of Seller attached hereto.

"Employee Claims" has the meaning set forth in Section 7.8(a) below.

"Employee Plan" means any plan, program, agreement, policy or arrangement, whether or not reduced to writing, and whether covering a single individual or a group of individuals, that is (a) a welfare plan within the meaning of Section 3(1) of ERISA or similar foreign, state or local Legal Requirement, (b) a pension benefit plan within the meaning of Section 3(2) of ERISA or similar foreign, state or local Legal Requirement, (c) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right, profit sharing or similar equity-based plan or agreement, or (d) any other deferred-compensation, retirement, severance, retention, change-in-control, leave, vacation, welfare-benefit, bonus, incentive or material fringe-benefit plan, program, agreement or arrangement maintained for the benefit of any officers, directors, employees or consultants of the Business.

"Encumbrance" means any lien, license to a third party, option, warrant, pledge, security interest, Claim, mortgage, right of way, easement, encroachment, profit, servitude, community property interest, equitable interest, right of first offer or first refusal, buy/sell agreement and/or any other material restriction or covenant with respect to, or material condition governing the use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of, any other material attribute of ownership.

"Environmental Laws" means any Legal Requirement relating to the environment, natural resources, pollutants, contaminants, wastes, chemicals or public health and safety, including any Legal Requirement pertaining to (a) treatment, storage, disposal, generation and transportation of toxic or hazardous substances or solid or hazardous waste, (b) air, water and noise pollution, (c) groundwater and soil contamination, (d) the release or threatened release into the environment of toxic or hazardous substances or solid or hazardous waste, including emissions, discharges, injections, spills, escapes or dumping of pollutants, contaminants or chemicals, (e) manufacture, processing, use, distribution, treatment, storage, disposal, transportation or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or oil or petroleum products or solid or hazardous waste, (f) underground and other storage tanks or vessels, abandoned, disposed or discarded barrels, containers and other closed receptacles, (g) public health and safety and (h) the protection of wild life, marine sanctuaries and wetlands, including all endangered and threatened species, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Hazardous Substances Transportation Act, 49 U.S.C. § 5101 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the

4

Clean Air Act, 42 U.S.C. § 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., and the regulations promulgated pursuant thereto, and all analogous state and local statutes and laws.

"ERISA" means the federal Employee Retirement Income Security Act of 1974, as amended.

"Essential Vendors" means vendors, licensors, customers or trade partners of Seller that (a) Purchaser believes, in good faith, will be significant vendors, licensors, customers or trade partners of Purchaser and (b) Purchaser designates in a writing delivered to Seller on or before the Closing Date.

"Excluded Assets" has the meaning set forth in Section 2.2 below.

"Excluded Contracts" has the meaning set forth in Section 2.2 below.

"Excluded Leases" has the meaning set forth in Section 2.2 below.

"Excluded Liabilities" has the meaning set forth in Section 2.3(b) below.

"Existing Leases" means the Contracts of Seller under which Seller leases or subleases, as the case may be, the Leased Premises.

"Final Order" means an order or an action taken or Governmental Order issued by the applicable Governmental Authority as to which: (a) no request for stay of the order, action or Governmental Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the order, action or Governmental Order, or protest of any kind, is pending and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have the action or Governmental Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (d) the order, action or Governmental Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Financial Statements" has the meaning set forth in Section 5.3(a) below.

"Governmental Authority" means any foreign, United States federal, state or local government, or political subdivision thereof, or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"Governmental Authorization" means any consent, license, registration or permit issued or otherwise made available by or under the authority of a Governmental Authority.

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 32 of 74

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered, issued, made or rendered by any Governmental Authority.

"Hazardous Materials" means any (a) petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, mold dielectric fluid containing levels of polychlorinated biphenyls, (b) chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law, and (c) other material, substance or waste that is limited or regulated by any Governmental Authority or, even if not so limited or regulated, could pose a hazard to the health or safety of the occupants of the Leased Premises or adjacent properties or any property or facility formerly owned, leased or used by the Seller.

"Hired Employees" has the meaning set forth in Section 7.8(b) below.

"Idea King" mean Idea King Enterprises, Limited, a Hong Kong company.

"IEI" means Imperial Entertainment International Limited, a Hong Kong company.

"Imperial Toy Mexico" means Imperial Toy de Mexico, S. de R.L., a Mexico company.

"Intellectual Property Rights" has the meaning set forth in Section 5.16(a) below.

"IT Assets" means computers, computer software, code, websites, applications, databases, networks, hardware, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology related equipment.

"Kortoy" means Kortoy, a California corporation.

"Knowledge of Seller", "Seller's Knowledge" or any similar term means the actual knowledge and belief any one or more of the Knowledge Parties.

"Knowledge Parties" means Peter Tiger, the Chief Executive Officer of Seller, Stefanie Tiger, Jason Tiger, and all of the individuals who on November 15, 2019, were officers, Directors or Managers of Seller.

"Lease Assignment" has the meaning set forth in Section 4.3(b) below.

"Leased Premises" means the real property leased by Seller in connection with the Business.

"Legal Requirement" means any Mexico, Canada or other foreign, federal, state or local law, statute, ordinance, common law ruling or regulation, or any Governmental Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

6

"Liability" means any liability or obligation of or Claim against a Person, whether known or unknown, asserted or unasserted, determined, determinable or otherwise, absolute or contingent, accrued or unaccrued, liquidated or unliquidated and due or to become due.

"Material Adverse Change" means a Material Adverse Effect shall have occurred since the date of this Agreement with respect to the Purchased Assets, the Business (including events affecting Affiliates of Seller that impact the Business), the assets of Imperial Toy Mexico, the financial prospects of Seller and its successors, Seller's or Imperial Toy Mexico's relations with its customers, suppliers, licensors or licensees, or the prospects of these relationships continuing undiminished after the Closing with Purchaser.

"Material Adverse Effect" means an effect caused by a change in the condition (financial or otherwise), properties, assets, liabilities, rights, obligations, operations, business or prospects, which effect, individually or in the aggregate, is materially adverse to the relevant condition, properties, assets, liabilities, rights, obligations, operations, business or prospects, as applicable.

"Material Consents" has the meaning set forth in Section 7.2(a) below.

"Member" means Peter Tiger.

"Monthly Financial Statements" has the meaning set forth in Section 5.3(a) below.

"Nonassignable Contract" has the meaning set forth in Section 2.4(e) below.

"Notification" has the meaning set forth in Section 2.4(b) below.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority, including an order of the Bankruptcy Court.

"Ordinary Course of Business" means an action taken by a Person in the ordinary course of such Person's business that is consistent with the past customs and practices in frequency and amount of such Person and, with respect to Seller subsequent to the commencement of the Bankruptcy Case, means continuing operations of the Business in a manner that is consistent with past customs and practices and in accordance with the covenants and requirements contained in the DIP Loan documents; provided that Seller shall be deemed to be acting in the Ordinary Course of Business with respect to any action or omission (x) pursuant to this Agreement, (y) with the consent of Purchaser or (z) by an Order.

"Organizational Documents" means the certificate or articles of incorporation or organization, certificate of limited partnership and any joint venture, limited liability company, operating, voting or partnership agreement, by-laws, or similar documents, instruments or agreements relating to the organization or governance of a Person, in each case, as amended or supplemented.

"Patent Rights" has the meaning set forth in Section 5.16(a) below.

"Permit" means any Approval, bond, certificate of authority, accreditation, qualification, provider number, license, franchise, permit, order, registration, variance, right, privilege,

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 34 of 74

certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority to which or by which a Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Petition Date" has the meaning set forth in the Preliminary Statement above.

"Postpetition Contract" has the meaning set forth in Section 2.4(c) below.

"Pre-Closing Activities" has the meaning set forth in Section 7.1(b) below.

"Proceeding" means any litigation, action, suit, mediation, arbitration, assessment, investigation, hearing, grievance or similar proceeding (in each case, whether civil, criminal, administrative, investigative or informal) commenced, conducted, heard, pending by or before any Governmental Authority, arbitrator or mediator.

"Purchased Assets" has the meaning set forth in Section 2.1 below.

"Purchaser" means Ja-Ru, Inc., a Florida corporation, or its assignee.

"Sale Hearing" has the meaning set forth in Section 7.3(c)(x) below.

"Sale Motion" has the meaning set forth in Section 7.3(b)(i) below.

"Sale Order" has the meaning set forth in Section 7.3(b)(ii)(B) below.

"Sale Procedures Motion" has the meaning set forth in Section 7.3(b)(i) below.

"Sale Procedures Order" has the meaning set forth in Section 7.3(b)(ii)(A) below.

"Saleable" means inventory that has been subjected to, and passed testing by, a CPSC accredited testing company within the twelve (12) month period prior to the Closing Date and that Purchaser reasonably believes it can sell in the Ordinary Course of Business within the twelve (12) month period after the Closing Date. Testing shall include ASTM F963-17 testing, flammability tests 16 CFR 1500.3(c)(6)(vi), and other testing required by CPSIA, EPA, FDA or other Legal Requirements for selling the items in the United States. Perishable inventory, which shall mean battery operated or merchandise that contains liquids, glows, compounds or paints, shall not be "Saleable" unless via a random sample testing of six random cartons there is a failure rate of less than 10%. Inventory not in full master cartons is not "Saleable". Inventory for which there is any patent, copyright or license infringement claim shall not be deemed "Saleable". Inventory shall not be deemed "saleable" if it is not dry, clean and shippable. Inventory that Purchaser does not have the right to sell or that is not reasonably likely to be sold before the expiration of the applicable license and sell-off period is not "Saleable". Inventory shall not be Saleable if it is older than twenty-four (24) months. Raw materials and work-in-process shall be

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 35 of 74

"Saleable" only to the extent that it can be incorporated into current and Saleable finished goods within twelve (12) months after the Closing Date.

"Seller" means Imperial Toy LLC, a California limited liability company.

"Subsidiary" means any corporation, partnership, joint venture, limited liability company, trust or other legal entity of which a Person owns, directly or indirectly, ten percent (10%) or more of the stock or other equity interests in such entity, or of which such Person is a general partner, manager or managing member.

"Tax" or "Taxes" means any (a) federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, tariff, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind, whether direct or indirect and whether imposed by way of a withholding or a deduction for or on an account of tax, or any charge of any kind in the nature of (or similar to) taxes whatsoever, however denominated or computed, including any interest, penalty, or addition thereto, whether disputed or not and (b) Liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable as a transferee or successor, by contract or from any express or implied obligation to indemnify or otherwise assume or succeed to the Liability of another Person.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trademarks" has the meaning set forth in Section 5.16(a) below.

"Trade Secrets" has the meaning set forth in Section 5.16(a) below.

"Transaction" means, collectively, the transactions contemplated by this Agreement.

"Transaction Documents" means this Agreement, the Deposit Escrow Agreement, the Assumption Agreement, the Lease Assignment, the Bill of Sale and all other written agreements, documents and certificates contemplated by any of the foregoing documents.

"Transfer Taxes" has the meaning set forth in Section 12.1 below.

"Undisclosed Contract" has the meaning set forth in Section 2.4(b) below.

"Undisclosed Contract Assignment Order" has the meaning set forth in Section 2.4(b) below.

"Winning Bid" has the meaning set forth in Section 7.3(c)(v) below.

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 36 of 74

# ARTICLE II
## Sale and Transfer of Assets.

2.1  Purchased Assets. Upon the terms and subject to the conditions of this Agreement, at the Closing (and on the applicable Assumption Date with respect to the Purchased Assets consisting of rights under any Assumed Contract or Assumed Lease assumed by Seller and assigned to Purchaser after the Closing Date as provided herein), Seller shall, and the Member shall cause Seller to, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, free and clear of all Encumbrances, all of the assets of Seller, other than the Excluded Assets, as the same shall exist on the Closing Date (collectively referred to herein as the "Purchased Assets"), including all right, title and interest of Seller in, to and under all of its:

(a)  accounts receivable;

(b)  personal property (other than inventory and supplies) owned by Seller, including equipment, accessories, machinery, apparatus, furniture, fixtures, motor vehicles, molds (including molds used by Affiliates of Seller in the conduct of the Business, Imperial Toy Mexico's, Idea King's and IEI's business), computer hardware, show booths, and office equipment, including those items identified on Schedule 2.1(b) attached hereto;

(c)  inventory and supplies maintained by Seller, including raw materials, goods consigned to vendors or subcontractors, works in process, finished goods, spare parts, goods in transit, products under research and development, demonstration equipment and inventory on consignment, including such inventory and supplies listed on Schedule 2.1(c) attached hereto;

(d)  to the extent assignable under applicable Legal Requirements, Permits necessary for or incident to the operation of the Business, including those listed on Schedule 2.1(d) attached hereto;

(e)  rights under any Contracts that Purchaser elects to purchase and assume and have Seller assign to Purchaser as Designated Contracts (the "Assumed Contracts");

(f)  rights under any Existing Leases that Purchaser elects to purchase and assume and have Seller assign to Purchaser as Designated Contracts (the "Assumed Leases");

(g)  intangible rights and property associated with the Business, including Seller's Intellectual Property Rights (including, specifically, all trade names and marks related to the Business), computer software licenses, software programs, telephone and telecopy listings, websites and domain names, going concern value and goodwill;

(h)  books and records relating to Seller, Imperial Toy Mexico, Idea King, IEI, and Kortoy, including customer lists, vendor contracts and general ledgers;

(i)  past and pending documents of sales and service information, customer lists, payor and supplier lists, artwork files (including the artwork files used in connection with Imperial Toy Mexico's, Idea King's and IEI's business), general ledgers and other accounting records related to the Purchased Assets, inventory cost records, machinery and equipment records,

10

mailing lists, sales and purchasing materials, employee policy manuals, quality control records and procedures, product testing data and reports (including those used in Imperial Toy Mexico's, Idea King's and IEI's business), books of account, customer records, computer records, employment and personnel records, quotations, purchase orders, correspondence, sales, brochures, advertising materials, samples and display materials of Seller and its Affiliates, to the extent the foregoing are in the possession of Seller;

(j)     claims against third parties relating to the Purchased Assets, whether choate or inchoate, known or unknown, or contingent or non-contingent;

(k)     rights relating to deposits and prepaid expenses relating to the Purchased Assets or the Business, including those listed on Schedule 2.1(j), but excluding deposits and prepaid expenses relating to Excluded Contracts and Excluded Leases;

(l)     IT Assets;

(m)     warranties (express and implied) with respect to any Purchased Asset; and

(n)     Seller's Claims and causes of action, including claims for relief arising under Chapter 5 of the Bankruptcy Code, against Essential Vendors and Hired Employees; and

(o)     the membership interests of Kortoy and of Imperial Toy Mexico (or, at the option of Purchaser, Purchaser may require Seller to cause Imperial Toy Mexico to sell its assets (without liabilities) to Purchaser in lieu of transferring to Purchaser the Imperial Toy Mexico membership interest).

2.2     Excluded Assets. Notwithstanding the provisions of Section 2.1, the Purchased Assets shall not include any of the right, title or interest of Seller in, to and under the following (herein referred to as the "Excluded Assets"): (a) the Company Records; (b) Contracts not assumed by Purchaser (the "Excluded Contracts") and any deposits and prepaid expenses subject to setoff or recoupment thereunder; (c) Existing Leases that are not Assumed Leases (the "Excluded Leases") and any deposits and prepaid expenses subject to setoff or recoupment thereunder; (d) rights under this Agreement and the Transaction Documents; (e) the Company Plans; (f) rights under any director and officer insurance policies; (g) the membership interest in Idea King and its Subsidiary, IEI; (h) the assets listed on Schedule 2.2 attached hereto; and (i) any assets that are currently listed as "Purchased Assets" that Purchaser, prior to Closing, elects by notice to Seller to re-designate as "Excluded Assets".

2.3     Assumption of Liabilities.

(a)     Subject to the terms and conditions of this Agreement, at the Closing (and with respect to Assumed Liabilities under any Assumed Contract or Assumed Lease assumed by Seller and assigned to Purchaser after the Closing Date as provided herein at the applicable Assumption Date), Purchaser shall assume and agree to perform (i) the Liabilities of Seller under the Assumed Contracts solely to the extent arising after the Assumption Date and excluding any Liability arising out of or relating to a breach, violation, default or failure to perform by Seller that occurred prior to the Assumption Date, except that Purchaser shall assume any amounts under the Assumed Contracts to cure prepetition defaults (hereunder, "Cure Amounts") and (ii)

Case: 19-52335     Doc# 15     Filed: 11/18/19     Entered: 11/18/19 17:43:25     Page 38 of 74

the Liabilities of Seller under the Assumed Leases solely to the extent arising after the Assumption Date and excluding any Liability arising out of or relating to a breach, violation, default or failure to perform by Seller that occurred prior to the Assumption Date, except that Purchaser shall assume any fees and costs under the Assumed Leases with respect to change of control or cure of default (collectively, the "Assumed Liabilities"). For the avoidance of doubt, Seller shall remain responsible for keeping current all post-petition obligations arising under Assumed Contracts and Assumed Leases (but shall not be responsible for paying Cure Amounts on prepetition defaults).

(b) Except as expressly stated in Section 2.3(a), Purchaser shall not and does not assume, nor shall it agree to pay, perform or discharge, any Liability of Seller or any Affiliate of Seller, whether or not arising from or relating to the conduct of the Business (the "Excluded Liabilities"). Without limiting the generality of the prior sentence, Excluded Liabilities shall include any:

(i) Liability of Seller for Taxes (whether federal, state, local or foreign), including Taxes incurred in respect of or measured by (1) the sales of goods or services by Seller, (2) the wages or other compensation paid by Seller to its employees and other service providers, (3) the value of Seller's property (tangible and intangible personal as well as real property), (4) the income of Seller, and (5) any gain or income from the sale of the Purchased Assets and other transactions contemplated hereby;

(ii) Liability of Seller or its Affiliates for performance under this Agreement or any of the agreements contemplated hereby;

(iii) Liability under any Assumed Contract or Assumed Lease, other than the Cure Amounts, arising prior to the Assumption Date or relating to or resulting from any breach, violation, default or failure to perform by Seller that occurred prior to the Assumption Date;

(iv) Liability relating to (A) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (B) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(v) Liability relating to any Debt of Seller or its Affiliates;

(vi) Liability of Seller with respect to any Proceeding;

(vii) Liability for any accounts payable or other accruals;

(viii) Liability relating to the Excluded Assets;

(ix) Liability relating to or arising out of any Company Plan, including all Liabilities for or arising from any "COBRA" health care continuation coverage required to be provided under Section 4980B of the Code and Sections 601-608 of ERISA to employees, former employees and any other COBRA qualified beneficiaries of

12

Seller, including those who incur a COBRA qualifying event in connection with the transactions contemplated by this Agreement;

(x) Liability relating to Employee Claims;

(xi) Liability relating to severance, termination, change of control or other similar payment obligations of Seller (whether arising prior to or after the Closing);

(xii) Liability (A) arising under Environmental Laws attributable to or incurred as a result of any acts, omissions or conditions first occurring or in existence as of or prior to the Closing Date, including Liability with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Materials, (B) from claims relating to employee health and safety prior to the Closing, including claims for injury, sickness, disease or death of any Person or (C) compliance with any Legal Requirement relating to any of the foregoing; and

(xiii) other Liability of Seller or its Affiliates that is not an Assumed Liability.

2.4 <u>Assumption and Assignment of Contracts and Leases</u>.

(a) Section 5.13(a) of the Disclosure Schedule lists all Contracts of Seller, and Section 5.6(b) of the Disclosure Schedule lists all Existing Leases of Seller, that Purchaser may elect to assume and have Seller assign to Purchaser at Closing. On or before December 23, 2019 (the "<u>Contract Designation Date</u>"), Purchaser shall designate in writing the Contracts and Existing Leases it chooses to purchase and assume and have Seller assign to Purchaser (the "<u>Designated Contracts</u>"). The Designated Contracts shall be identified by (i) the name and date of the Designated Contract and (ii) the other party to the Designated Contract, all included on any designation of Designated Contracts and Seller shall include this information and the address of each other party for notice purposes on an exhibit attached to either the motion filed in connection with the Sale Order, a motion for authority to assume and assign such Designated Contract or a notice filed pursuant to the Sale Procedures Order. Such exhibit shall also (A) set forth the amounts necessary to cure any defaults under each of the Designated Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court and (B) delineate a procedure for transferring to Purchaser the rights to any security deposits with the other party to any Designated Contract. At the Closing, all Designated Contracts shall become Assumed Contracts or Assumed Leases, as the case may be, for purposes of this Agreement.

(b) If, at any time after the date hereof through the Contract Designation Date, Seller is or becomes aware that it is a party to any Contract related to the Business that is not an Excluded Asset and is not disclosed in Section 5.13(a) or Section 5.6(b) of the Disclosure Schedule (each, an "<u>Undisclosed Contract</u>"), Seller shall promptly notify Purchaser in writing (the "<u>Notification</u>") of such Undisclosed Contract. For a period of twenty (20) Business Days after the date of Purchaser's receipt of the Notification, Purchaser shall have the right in its sole discretion to require Seller to file one or more motions with the Bankruptcy Court (which motions shall be in form and substance reasonably satisfactory to Purchaser) seeking the entry of an order (the "<u>Undisclosed Contract Assignment Order</u>"), pursuant to Sections 363 and 365 of the Bankruptcy Code, to assign, transfer, convey and deliver to Purchaser or one or more of

13

its designated Affiliates such Undisclosed Contract as if it had been disclosed in Section 5.13(a) or Section 5.6(b) of the Disclosure Schedule, or to otherwise transfer the benefits of such Undisclosed Contract to Purchaser or one or more of its designated Affiliates without any additional consideration. In the event that Purchaser notifies Seller of Purchaser's desire to assume any Undisclosed Contract, Seller shall, promptly after receiving such notification, file with the Bankruptcy Court the motions seeking the entry of the Undisclosed Contract Assignment Order. In addition, Seller shall (i) use commercially reasonable efforts to cause the Undisclosed Contract Assignment Order to become a Final Order and (ii) not take any action that would reasonably be expected to delay, prevent or impede the entry of, or result in the revocation, modification or amendment of, the Undisclosed Contract Assignment Order. Any Undisclosed Contract that Purchaser elects to assume and for which an Undisclosed Contract Assignment Order is entered and becomes a Final Order shall constitute a Purchased Asset and an Assumed Contract.

(c)     Seller shall promptly notify Purchaser in writing of any new Contract entered into after the date hereof (each a "Postpetition Contract"). No later than the date that is the later of (i) the Contract Designation Date and (ii) ten (10) Business Days subsequent to the date on which a copy of such Postpetition Contract is delivered or made available to Purchaser, Purchaser shall notify Seller in writing whether it shall assume such Postpetition Contract.

(d)     The Sale Order shall provide that, as of the Closing (or, with respect to the Contracts to be assigned after Closing, the Assumption Date), Seller shall (i) assume the Assumed Contracts and the Assumed Leases in the Bankruptcy Case and (ii) assign the Assumed Contracts and the Assumed Leases to Purchaser.

(e)     (i) If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the efforts of Seller in accordance with the covenants set forth herein, or Approval for a Designated Contract is required but not obtained (such Contract being a "Nonassignable Contract"), Purchaser may in its sole discretion waive a breach of this Agreement without adjustment to the Purchase Price nor (but subject to Purchaser's termination right set forth in Section 11.1(c)(vii)) delay of the Closing.  From and after the date thereof, including through and after the Closing, Seller shall use commercially reasonable efforts to obtain all Approvals that are required with respect to Assumed Contracts, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Seller to assume and assign to Purchaser such Nonassignable Contract.  For the avoidance of doubt, nothing in this Section 2.4(e) shall be deemed to (x) limit the liability, if any, of Seller pursuant to this Agreement for failing to have obtained any required consent or approval or (y) alter or limit any rights of Purchaser under Section 10.1 of this Agreement.

(ii)     To the extent permitted by Legal Requirements, if consents to the assignment of any Nonassignable Contract cannot be obtained, or Cure Amounts cannot be negotiated in an amount acceptable to Purchaser prior to the Closing, then, upon delivery of an indemnity from Purchaser protecting Seller from liability therefor, Seller shall use commercially reasonable efforts to provide Purchaser, without profit to Seller, with the benefits under any such Nonassignable Contract in accordance with the terms thereof and the use of any other asset including entering into subcontracts, subleases, sale and leasebacks, use and service agreements or other contractual arrangements that will provide such benefits to Purchaser.

14

(f)     Notwithstanding anything contained in this Agreement to the contrary, Purchaser reserves the right, and shall have the right, to designate in one or more written notices delivered to Seller (i) at any time prior to the Closing Date, any Designated Contract Asset as an Excluded Asset and (ii) at any time after the Contract Designation Date, any Contract as a Designated Contract; provided that Seller shall use commercially reasonable efforts to assume and assign each such late-designated Contract to Purchaser as required under Section 7.10 hereof but shall not be in default of this Agreement for its failure to do so.  The Assumption Date of a Contract that is assumed and assigned pursuant to this Section 2.4(f) shall be the date specified in the order therefor.

## ARTICLE III
## Purchase Price.

3.1     <u>Aggregate Purchase Price</u>. The aggregate purchase price to be paid by Purchaser for the Purchased Assets shall be an amount equal to (a) Thirteen Million Dollars ($13,000,000.00) (which includes the Deposit), plus (b) the Cure Amounts, plus (c) assumption of the Assumed Liabilities, minus (x) the amount, if any, by which the Actual Landed Cost of Seller's inventory at Closing that is Saleable in the Ordinary Course of Business at customary prices and on customary terms is less than $10,000,000 and (y) the amount, if any, by which Seller's collectible accounts receivable at Closing that are free and clear of Encumbrances and are less than sixty (60) days old, net of credit memos for damaged goods, shortages or rebates due customers, is less than $2,000,000 (collectively, the "<u>Aggregate Purchase Price</u>"). Purchaser's obligations pursuant to subsection (a) above may be satisfied in cash or by credit against Seller's obligations under the DIP Loan.

3.2     <u>Deposit</u>. Promptly after the execution and delivery of this Agreement by Purchaser and Seller, Purchaser shall deposit into an escrow account with the law firm of Smith Hulsey & Busey (the "<u>Deposit Escrow Agent</u>") an amount equal to One Million Dollars ($1,000,000.00) (the "<u>Deposit</u>"). The Deposit shall be held pursuant to the terms of the Deposit Escrow Agreement in the form attached hereto as Exhibit 3.2 (the "<u>Deposit Escrow Agreement</u>") and shall not be withdrawn except pursuant to the terms of the Deposit Escrow Agreement or as otherwise agreed by the parties in writing or ordered by the Bankruptcy Court.

3.3     <u>Payment of the Aggregate Purchase Price</u>. The Aggregate Purchase Price shall be paid as follows:

(a)     At the Closing, Purchaser shall pay to or on behalf of Seller by wire transfer of immediately available funds to an account designated by Seller (such designation to be delivered to Purchaser at least two (2) Business Days prior to the Closing Date) an amount equal to the Aggregate Purchase Price less (i) the Deposit, (ii) the Cure Amounts, (iii) the Assumed Liabilities, (iv) the amounts, if any, referenced in Section 3.1(x) and 3.1(y), and (v) the total amount of Seller's obligations to Purchaser under the DIP Loan. All closing payments shall be reflected on a closing statement executed at Closing in form and substance reasonably satisfactory to the parties.

(b)     At the Closing, Purchaser and Seller shall deliver joint written instructions to the Deposit Escrow Agent directing the Deposit Escrow Agent to deliver (i) the Deposit to

Case: 19-52335     Doc# 15     Filed: 11/18/19     Entered: 11/18/19 17:43:25     Page 42 of 74

Seller by wire transfer of immediately available funds to an account designated in writing by Seller and (ii) any interest and income thereon to Purchaser.

(c)     Purchaser shall be responsible for delivering all Cure Amounts payable hereunder and fulfilling its obligations relating to the Assumed Liabilities.

3.4     Allocation of Purchase Price.

(a)     Within the earlier of the date that is (i) 180 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Purchaser shall deliver to Seller a statement (the "Allocation Schedule") allocating, for tax purposes, the consideration paid by Purchaser for the Purchased Assets among the Purchased Assets in accordance with Section 1060 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

(b)     The parties to this Agreement shall (i) be bound by the Allocation Schedule (except to the extent that Seller reasonably disagrees with the Allocation Schedule, in which case the parties shall work in good faith to resolve such disagreement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any tax return (including in the filing of IRS Form 8594 and any other corresponding tax forms), and (iii) take no position inconsistent with the Allocation Schedule for any tax purpose (including in any audit, judicial or administrative proceeding).

**ARTICLE IV**
**Closing.**

4.1     Closing. The Closing shall be consummated at 10:00 a.m. Pacific Time at the offices of Sheppard Mullin, Four Embarcadero Center, Seventeenth Floor, San Francisco, California, 94111, or by electronic communication, on the third (3rd) Business Day after entry of the Sale Order, or on such other date or at such other place or time as is mutually agreed upon by the parties hereto; provided, that, all conditions set forth in Article VIII and Article IX have been satisfied or waived. The Closing shall be effective for economic and accounting purposes as of the close of business local time for Seller on the Closing Date.

4.2     Closing Actions and Deliveries. All actions to be taken and all documents to be executed and delivered by the parties at the Closing shall be deemed to have been taken and executed simultaneously, and no action shall be deemed taken nor any document executed and delivered until all have been taken, executed and delivered.

4.3     Seller's Closing Deliveries. Subject to the fulfillment or waiver of the conditions set forth in Article IX, at Closing, Seller shall deliver to Purchaser the following:

(a)     an accurate and complete list of the customers of Seller and Imperial Toy Mexico who have received services provided by Seller or Imperial Toy Mexico during the 2019 calendar year, updated as of the Closing Date;

16

(b)    an agreement for the assignment by Seller and assumption by Purchaser of the Assumed Leases, substantially in the form attached hereto as Exhibit 4.3(b) (the "Lease Assignment"), duly executed by Seller;

(c)    an agreement for the assignment by Seller and assumption by Purchaser of the Assumed Contracts, substantially in the form attached hereto as Exhibit 4.3(c) (as may hereafter be supplemented or amended, the "Assumption Agreement"), duly executed by Seller;

(d)    a general bill of sale, substantially in the form attached hereto as Exhibit 4.3(d) (the "Bill of Sale"), duly executed by Seller;

(e)    all Material Consents that are required by Section 7.2 hereof;

(f)    a certificate of the secretary of Seller, in form and substance reasonably satisfactory to Purchaser, certifying that (A) attached thereto is a true, correct and complete copy of (1) the articles or certificate of organization of Seller, certified as of a recent date by the Secretary of State of the State of California, and the operating agreement of Seller, (2) resolutions duly adopted by the members and Managers of Seller authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Transaction Documents to which it is a party and (3) a certificate of good standing as of a recent date of Seller from the Secretary of State of the State of California and a certificate of good standing as of a recent date of Seller from each state in which it is qualified to conduct business, (B) the resolutions referenced in subsection (A)(2) are still in effect and (C) nothing has occurred since the date of the issuance of the certificate(s) referenced in subsection (A)(3) that would adversely affect Seller's existence or good standing in any such jurisdiction after giving effect to the Bankruptcy Case;

(g)    the certificate referred to in Section 8.3;

(h)    a certificate of Seller's non-foreign status as set forth in Treasury Regulation Section 1.1445-2(b);

(i)    to the extent in Seller's possession, (i) all lease files for the Assumed Leases (including copies of any plans of the Leased Premises) and the leases of Imperial Toy Mexico and (ii) keys for the Leased Premises and the premises leased by Imperial Toy Mexico, the combination of any safes or lock boxes located on the Leased Premises, or on the premises leased by Imperial Toy Mexico and the access codes for any electronic security systems located at the Leased Premises and the premises leased by Imperial Toy Mexico;

(j)    joint instructions releasing the Deposit in accordance with the Deposit Escrow Agreement; and

(k)    such other bills of sale, assignments and other instruments of transfer or conveyance, including instruments of assignment of the Intellectual Property Rights, trade names and domain names included in the Purchased Assets, duly executed by Seller, as may be reasonably requested by Purchaser to effect the sale, conveyance and delivery of the Purchased Assets, free of Encumbrances, to Purchaser.

17

4.4     Purchaser's Closing Deliveries. Subject to the fulfillment or waiver of the conditions set forth in Article VIII, at Closing, Purchaser shall:

(a)     pay the portion of the Aggregate Purchase Price due and payable to Seller in accordance with Section 3.3(a); and

(b)     execute and deliver to Seller (i) the certificate contemplated by Section 9.3, (ii) the Lease Assignment, (iii) the Assumption Agreement, (iv) the Bill of Sale, (v) joint instructions releasing the Deposit in accordance with the Deposit Escrow Agreement, and (vi) a certificate of the secretary of Purchaser, in form and substance reasonably satisfactory to Seller, certifying that the resolutions duly adopted by the Board of Directors of Purchaser authorizing the performance of the transactions contemplated by this Agreement and the execution and delivery of the Transaction Documents to which it is a party and the resolutions are still in effect.

**ARTICLE V**
**Representations and Warranties of Seller and the Member**.

In order to induce Purchaser to enter into and perform this Agreement and to consummate the transactions contemplated hereunder, Seller and the Member hereby jointly and severally make the following representations and warranties to Purchaser as of the date hereof and as of the Closing Date:

5.1     Organization; Subsidiaries; Ownership; Predecessors.

(a)     Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California and has the full right, power and authority to own, lease and operate all of its properties and assets and carry out its business as it is presently conducted. Section 5.1(a) of the Disclosure Schedule sets forth each jurisdiction in which Seller is qualified or licensed to do business as a foreign Person, and to Seller's Knowledge there are no other jurisdictions in which the character of Seller's properties or the nature of Seller's activities require it to be qualified.

(b)     Imperial Toy Mexico is a company duly organized in Mexico, validly existing and in good standing under the Legal Requirements of Mexico and has the full right, power and authority to own, lease and operate all of its properties and assets and carry out its business as it is presently conducted. Section 5.1(b) of the Disclosure Schedule sets forth each jurisdiction in which Imperial Toy Mexico is qualified or licensed to do business, and there are no other jurisdictions in which the character of its properties of the nature of its activities require it to be qualified.

(c)     The Member and Arthur Hirsch together own all of the equity interests of Seller, and Seller owns all of the equity interests of Imperial Toy Mexico. There are no outstanding securities convertible or exchangeable into equity interests of Seller or rights or options to require an equity interest in Seller or Imperial Toy Mexico.

(d)     Seller does not own equity interests, directly or indirectly, in any Person other than Imperial Toy Mexico, Kortoy, Idea King, and IEI, all of whose equity interests are

18

owned directly or indirectly 100% by Seller. Imperial Toy Mexico does not own equity interests, directly or indirectly, in any Person. Kortoy does not own any assets, have any Liabilities, or conduct business.

(e)     Section 5.1(e) of the Disclosure Schedule lists each of Seller's and Imperial Toy Mexico's prior legal names and any other trade name, fictitious name or other name under which Seller currently conducts business, or has ever conducted any business or activity.

5.2     Due Authorization; No Conflict.

(a)     Seller has the full company power and authority to execute, deliver and, subject to the Sale Order or other requirements of the Bankruptcy Court, perform this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Seller of this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith have been duly authorized by all necessary company action. Subject to the entry of the Sale Order or other requirements of the Bankruptcy Court, this Agreement, and all other agreements, certificates and documents executed or to be executed in connection herewith, constitute or, when executed and delivered, will constitute a legal, valid and binding Contract of Seller, enforceable against Seller in accordance with its terms.

(b)     Except for the entry of the Sale Order, other requirements of the Bankruptcy Court and any required Approvals in connection with the assignment of the Assumed Contracts and except as set forth in Section 5.2(b) of the Disclosure Schedule, the execution and delivery by Seller of this Agreement and the Transaction Documents, the consummation of the transactions contemplated hereby and thereby, and the performance by Seller of its obligations hereunder and thereunder, will not: (i) result in a material breach of the terms or conditions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any of the Purchased Assets under, (A) any Assumed Contract, (B) any of the Purchased Assets, or (C) any assets of Imperial Toy Mexico or (D) any Legal Requirement or Governmental Order applicable to Seller, the Purchased Assets, the Business, the Assumed Liabilities, or Imperial Toy Mexico or its assets or business; (ii) contravene the Organizational Documents of Seller; (iii) require Seller or Imperial Toy Mexico to make any declaration, filing or registration with, or provide any notice to, any Governmental Authority or obtain any Governmental Authorization; (iv) require any consent, approval or authorization of, declaration, filing or registration with, or notice to, any other Person; or (v) result in the creation or imposition of any Encumbrance upon any of the Purchased Assets or the assets of Imperial Toy Mexico.

5.3     Financial Statements.

(a)     Set forth in Section 5.3(a) of the Disclosure Schedule are the following financial statements (collectively, the "Financial Statements"): (i) the audited consolidated balance sheets of Seller and unconsolidated balance sheets of each of its Subsidiaries as of December 31, 2018 and December 31, 2017, and related consolidated or unconsolidated,

19

respectively, statements of operations and comprehensive loss, cash flows and Members' deficit, including in each case the notes thereto, (ii) the unaudited unconsolidated balance sheets of Seller and unconsolidated balance sheets of each of its Subsidiaries as of September 30, 2019, and the related unaudited consolidated or unconsolidated, respectively, statements of income and cash flows for the nine-month period then ended; and (iii) the monthly unaudited consolidated financial statements (including balance sheets and the related statements of income and cash flow) of Seller and unconsolidated balance sheets of each of its Subsidiaries for each complete calendar month ending after September 30, 2019, through the date of this Agreement (the "Monthly Financial Statements").

(b)     The Financial Statements, together with the October financial statements to be delivered by Seller to Purchaser as provided in Section 7.5, fairly present, in all material respects, the financial condition of Seller and each of its Subsidiaries as at the respective dates thereof and the results of operations of Seller and each of its Subsidiaries and changes in financial condition for the respective periods covered thereby, except (i) for the treatment of The CIT Group/Commercial Services, Inc. factored accounts receivable and corresponding liability and (ii) that the Monthly Financial Statements do not contain notes and may be subject to normal audit adjustments, none of which adjustments are expected to be material.

(c)     Except as disclosed in the Financial Statements, none of Seller, Imperial Toy Mexico, or any of their Affiliates is subject to any Liability, whether absolute, contingent, accrued or otherwise, other than Liabilities that (i) have arisen in the Ordinary Course of Business since the most recent balance sheet included in the Monthly Financial Statements and (ii) that individually, or in the aggregate, would not be expected to have a Material Adverse Effect.

5.4     Title to Assets; Condition.

(a)     Section 5.4(a) of the Disclosure Schedule sets forth all of the assets owned by Seller and Imperial Toy Mexico.  Seller has good and marketable title to all of the Purchased Assets, and Imperial Toy Mexico has good and marketable title to all of its assets (all of which are listed in Section 5.4(a) of the Disclosure Schedule), in each case free and clear of Encumbrances, except as set forth in Section 5.4(a) of the Disclosure Schedule. Subject to the terms of the Sale Order or other requirement of the Bankruptcy Court, upon delivery to Purchaser on the Closing Date of the instruments of transfer contemplated by Section 4.3 hereof, Seller shall thereby transfer to Purchaser good and marketable title to the Purchased Assets, free and clear of Encumbrances.

(b)     Except as set forth in Section 5.4(b) of the Disclosure Schedule, (i) the tangible assets included in the Purchased Assets and Imperial Toy Mexico's assets are in good working order, condition and repair, reasonable wear and tear excepted, and are not in need of maintenance or repairs except for maintenance or repairs that are routine, ordinary and are not material in costs or nature and (ii) all of the Purchased Assets are located at the Leased Premises.

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 47 of 74

5.5     Inventory. Except as set forth in Section 5.5 of the Disclosure Schedule, (i) the inventory of Seller and of Imperial Toy Mexico (including all merchandise to which Seller has title, whether located in a warehouse in transit or elsewhere) consists of a quality and quantity usable for its intended purpose and Saleable in the Ordinary Course of Business and (ii) all of the inventory (other than goods in transit) of Seller is located on the Leased Premises, and all of the inventory (other than goods in transit) of Imperial Toy Mexico is located on premises specified in Section 5.6(b)(ii) of the Disclosure Schedule.

5.6     Real Property.

(a)     Neither Seller nor Imperial Toy Mexico owns any right, title or interest in any real property, nor to Seller's Knowledge has any owned real property ever been used in connection with the Business or the business of Imperial Toy Mexico.

(b)     Section 5.6(b) of the Disclosure Schedule contains a list of (i) all of the Leased Premises and identifies each Existing Lease and (ii) all premises leased by Imperial Toy Mexico. There are no subleases, licenses, concessions, occupancy agreements or other Contract granting to any other Person the right of use or occupancy of the Leased Premises or Imperial Toy Mexico's premises, and there is no Person (other than Seller) in possession of the Leased Premises or Imperial Toy Mexico's premises. There is no pending or, to the Knowledge of Seller, threatened eminent domain taking affecting any portion of the Leased Premises or Imperial Toy Mexico's premises. Seller has delivered to Purchaser true, correct and complete copies of the Existing Leases covering the Leased Premises and Imperial Toy Mexico's premises, including all amendments, modifications, notices or memoranda of lease thereto and all estoppel certificates or subordinations, non-disturbance and attornment agreements, if any, related thereto. To the Knowledge of Seller, no event or condition currently exists that would create a legal or other impediment to the use of the Leased Premises or Imperial Toy Mexico's premises as currently used, or would increase the additional charges or other sums payable by the tenant under any Existing Lease for the Leased Premises or any lease of premises of Imperial Toy Mexico (including any pending Tax reassessment or other special assessment).  Except as set forth in Section 5.6(b) of the Disclosure Schedule, the Leased Premises and Imperial Toy Mexico's premises (including the roof, the walls and all plumbing, wiring, electrical, heating, air conditioning, fire protection and other systems, as well as all paved areas, included therein or located thereat) are in good working order, condition and repair, reasonable wear and tear excepted, and are not in need of maintenance or repairs except for maintenance or repairs that are routine, ordinary and are not material in costs or nature. Except as set forth in Section 5.6(b) of the Disclosure Schedule, each of the Leased Premises and Imperial Toy Mexico's premises, and Seller's and Imperial Toy Mexico's operation thereof, fully comply with all applicable Legal Requirements and applicable restrictive covenants and with the terms and conditions of the applicable Existing Leases covering the Leased Premises and leases covering Imperial Toy Mexico's leased premises, other than to the extent it would not reasonably be expected to result in a Material Adverse Effect. Neither Seller nor Imperial Toy Mexico has received written notice from any Governmental Authority or other Person of any violations of any Legal Requirement affecting any portion of the Leased Premises or Imperial Toy Mexico's premises.

Case: 19-52335     Doc# 15     Filed: 11/18/19     Entered: 11/18/19 17:43:25     Page 48 of 74

5.7    Taxes.

(a)    Each of Seller and Imperial Toy Mexico has timely filed with the appropriate Governmental Authority all Tax Returns that are required to be filed prior to the date of this Agreement. All Tax Returns of Imperial Toy Mexico and, to Seller's Knowledge, of Seller are true, correct and complete in all respects. All Taxes owed (or to be remitted) by Seller (whether or not shown or required to be shown on any Tax Return) have been paid or shall timely be paid to the appropriate Governmental Authority.

(b)    Each of Seller and Imperial Toy Mexico has withheld and paid proper and accurate Taxes and other amounts from or on behalf of, as the case may be, its employees, customers, creditors, stockholders, independent contractors and other third parties, in compliance with all withholding and similar provisions of the Code and all other applicable United States, foreign, state or local laws, statutes, codes, ordinances, rules and regulations. Neither Seller, Imperial Toy Mexico nor Purchaser shall be required to deduct and withhold any amounts upon the transfer of the Purchased Assets to Purchaser.

5.8    Governmental Authorizations; Legal Requirements.

(a)    Each of Seller and Imperial Toy Mexico possesses all Governmental Authorizations that are necessary to entitle Seller to own or lease, operate and use the Purchased Assets or Imperial Toy Mexico's assets, as applicable, and to carry on and conduct the Business or Imperial Toy Mexico's business, as applicable, as currently conducted other than to the extent the failure to hold or possess such Governmental Authorization would not reasonably be expected to result in a Material Adverse Effect. Section 5.8(a) of the Disclosure Schedule sets forth a list of each Governmental Authorization of Seller and of Imperial Toy Mexico and indicates which of such Governmental Authorizations will be assigned to Purchaser at the Closing. The Governmental Authorizations to be assigned to Purchaser at the Closing, if any, and the Governmental Authorizations of Imperial Toy Mexico constitute all of the Governmental Authorizations necessary to enable each of Purchaser and Imperial Toy Mexico to own or lease, operate and use the Purchased Assets or Imperial Toy Mexico's assets, as applicable, and to carry on and conduct the Business or Imperial Toy Mexico's business, as applicable, as currently conducted. Except as disclosed in Section 5.8(a) of the Disclosure Schedule or as otherwise disclosed to Purchaser in due diligence, (i) such Governmental Authorizations are valid and in full force and effect and (ii) Seller is not in material breach or violation of, or default under, any such Governmental Authorization.

(b)    Seller has not received any notice from a Governmental Authority that any of its or Imperial Toy Mexico's properties, facilities, equipment, operations or business procedures or practices fails to comply with any Legal Requirement or applicable Governmental Authorization. There is no pending or, to Seller's Knowledge, threatened, Proceeding or Governmental Order with respect to any of the Governmental Authorizations listed or required to be listed in Section 5.8(a) of the Disclosure Schedule. Seller has not received any written notice of any Proceeding pending or recommended by any Governmental Authority having jurisdiction over the Governmental Authorizations listed or required to be listed in Section 5.8(a) of the Disclosure Schedule to revoke, withdraw or suspend any such Governmental Authorization. To Seller's Knowledge, no event has occurred that, with or without notice or the passage of time,

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 49 of 74

would constitute a breach or violation of, or would constitute grounds for a Proceeding or Governmental Order with respect to any of the Governmental Authorizations listed or required to be listed in Section 5.8(a) of the Disclosure Schedule.

(c)     Except as set forth in Section 5.8(c) of the Disclosure Schedule, Seller and Imperial Toy Mexico are, and have been at all times since January 1, 2017, in compliance in all respects with all Legal Requirements applicable to any of them, the Business or the Purchased Assets, including the Consumer Product Safety Act, the Consumer Product Safety Improvement Act of 2008, the Federal Hazardous Substances Act, the Child Safety Protection Act, the Flammable Fabrics Act, and Legal Requirements relating to (a) wages, hours, hiring, non-discrimination, promotion, retirement, benefits, pensions and working conditions, (b) health and safety, (c) zoning and building codes, (d) production, storage, processing, advertising, sale, transportation, destruction, disposal, use and warranty of products, (e) the Americans with Disabilities Act and (f) trade and antitrust regulations, except to the extent that non-compliance would not have a Materially Adverse Effect. Seller has not received any notice from any Governmental Entity or other Person, and has no knowledge, that it or Imperial Toy Mexico is not in such compliance.

5.9     <u>Environmental Matters</u>. To Seller's Knowledge, except as set forth in Section 5.9 of the Disclosure Schedule, (a) neither Seller nor Imperial Toy Mexico has at any time generated, used, treated or stored Hazardous Materials on, or transported Hazardous Materials to or from, the Leased Premises, the premises of Imperial Toy Mexico, or any property adjoining or adjacent to the Leased Premises or the premises of Imperial Toy Mexico, other than in compliance in all material respects with all Environmental Laws, and, to the Knowledge of the Seller, no party has taken such actions on or with respect to the Leased Premises or the premises of Imperial Toy Mexico, (b) to Seller's Knowledge, Seller has not at any time released or disposed of Hazardous Materials on the Leased Premises, the premises of Imperial Toy Mexico, or any property adjoining or adjacent to the Leased Premises or the premises of Imperial Toy Mexico, and no party has taken any such actions on the Leased Premises or the premises of Imperial Toy Mexico, other than such release or disposal as would not reasonably be expected to result in a Material Adverse Effect, (c) to Seller's Knowledge, each of Seller and Imperial Toy Mexico has at all times been in compliance in all material respects with all Environmental Laws and the Legal Requirements of any Governmental Authorizations issued under such Environmental Laws with respect to the Leased Premises, the premises of Imperial Toy Mexico, the Purchased Assets and the operation of the Business and the business of Imperial Toy Mexico, (d) to Seller's Knowledge, there are no past, pending or, to the Knowledge of Seller, threatened environmental claims against Seller, the Leased Premises, the premises of Imperial Toy Mexico, any of the Purchased Assets, the Business or the business of Imperial Toy Mexico, (e) to Seller's Knowledge, there are not now and there never have been any underground storage tanks located on the Leased Premises, and (f) to Seller's Knowledge, neither Seller nor Imperial Toy Mexico has ever transported or arranged for the transportation of any Hazardous Materials to any site from the Leased Premises or the premises of Imperial Toy Mexico, other than in compliance in all material respects with Environmental Laws.

5.10     <u>Proceedings</u>. Except as set forth in Section 5.10 of the Disclosure Schedule: (a) there is no Proceeding pending or, to the Knowledge of Seller, threatened (i) against Seller or Imperial Toy Mexico or affecting the Purchased Assets, the assets or business of Imperial Toy

23

Mexico, or the Business or (ii) that seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement or any of the conditions to consummation of such transactions and (b) there is no Governmental Order outstanding or, to the Knowledge of Seller, threatened (i) against Seller or Imperial Toy Mexico or affecting the Purchased Assets, the business or assets of Imperial Toy Mexico or the Business or (ii) that seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement.

        5.11    <u>Employee Benefit Plans; Employees</u>.

        (a)    Section 5.11(a) of the Disclosure Schedule lists all Employee Plans as to which Seller or Imperial Toy Mexico sponsors, maintains, contributes or is obligated to contribute, or under which Seller or Imperial Toy Mexico has or may have any Liability. With respect to each Company Plan, Seller has delivered to Purchaser true, accurate and complete copies of each of the following: (i) if the Company Plan has been reduced to writing, the plan document together with all amendments thereto, (ii) if the Company Plan has not been reduced to writing, a written summary of all material plan terms, and (iii) copies of any summary plan descriptions, employee handbooks or similar employee communications.

        (b)    Neither Seller nor Imperial Toy Mexico maintains, participates in or contributes to, and has never maintained, participated in or contributed to (i) an Employee Plan subject to Title IV of ERISA or similar foreign Legal Requirement; (ii) a multiemployer plan within the meaning of Section 3(37) of ERISA or a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA; or (iii) an Employee Plan subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA. Each Company Plan conforms to and has been operated and administered in all material respects in compliance with the applicable requirements of ERISA, the Code and applicable Legal Requirements. There are no facts relating to any Company Plans that (A) have resulted in a "prohibited transaction" under Section 4975 of the Code or Section 406 of ERISA or otherwise have resulted in or could result in the imposition of a material excise Tax, penalty or similar Liability under ERISA, the Code or any other Legal Requirement; or (B) have resulted in a breach of fiduciary duty or violation of Part 4 of Title I of ERISA or any other Legal Requirement. Neither Seller nor Imperial Toy Mexico is delinquent as to contributions or payments to, or in respect of, any of its Company Plans, and all amounts payable with respect to the portion of the plan year ending on the Closing Date shall be paid on or before the Closing Date. Each of Seller and Imperial Toy Mexico is and has been in compliance in all material respects with the "COBRA" health care continuation requirements of Sections 601-608 of ERISA, Section 4980B of the Code and any applicable foreign or state Legal Requirements regarding health care continuation coverage. There are no pending or, to the Knowledge of the Seller, threatened, claims (other than routine claims for benefits) or Proceedings with respect to the Company Plans.

        (c)    Section 5.11(c) of the Disclosure Schedule contains a list of: (i) all employees, contractors or commission salespersons of Seller and Imperial Toy Mexico as of the date hereof; (ii) the then-current annual or hourly compensation and/or commission rate provided to such employees, contractors or salespersons; and (iii) all present employees, contractors or commission salespersons of Seller or Imperial Toy Mexico who have given notice of their intention to terminate their relationship with Seller.

        5.12    <u>Reserved</u>.

24

5.13    Contracts.

(a)    Section 5.13(a) of the Disclosure Schedule contains a list of each oral or written Contract to which Seller or Imperial Toy Mexico is a party or by which Seller or Imperial Toy Mexico is bound and that relates to the Business, the Purchased Assets or the assets or business of Imperial Toy Mexico.

(b)    Except as otherwise stated in Section 5.13(b) of the Disclosure Schedule, each of the Contracts listed in the Disclosure Schedule is in full force and effect, is in compliance with all applicable Legal Requirements in all respects other than failures to comply that do not have, individually or in the aggregate, a Material Adverse Effect, and constitutes a valid, legal, binding and enforceable obligation of Seller or Imperial Toy Mexico, as applicable, and the other parties thereto. Except as set forth in Section 5.13(b) of the Disclosure Schedule, neither Seller nor Imperial Toy Mexico, as applicable, is in breach or default under any of the Contracts listed in Section 5.13(a) of the Disclosure Schedule and, to the Knowledge of Seller, no other party to any of such Contracts has breached or defaulted thereunder.

5.14    Brokers.    Neither Seller, Imperial Toy Mexico, the Member nor any Person acting on behalf of any of them has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

5.15    Material Customers, Suppliers, Licensors and Licensees. Since January 1, 2019, Neither Seller, nor Imperial Toy Mexico, nor any of their Affiliates has received notice from any of its material customers, suppliers, licensees or licensors, and Seller has no Knowledge that any such customer, supplier, licensee or licensor, will cease to do business with Seller, Imperial Toy Mexico or Purchaser or will materially decrease the volume or value of its business with Seller, Imperial Toy Mexico, its Affiliates or (after the Closing) Purchaser.

5.16    Intellectual Property.

(a)    As used herein, (i) "Copyrights" means works of authorship in which copyright protection subsists, whether registered or unregistered, and pending applications to register the same; (ii) "Intellectual Property Rights" means Copyrights, Patent Rights, Trademarks and Trade Secrets; (iii) "Patent Rights" means United States and foreign patents, patent applications, continuations, continuations-in-part, divisions, reissues, patent disclosures, inventions (whether patentable or not patentable) or improvements thereto; (iv) "Trademarks" means United States, state and foreign trademarks, service marks, logos, trade dress and trade names, whether registered or unregistered, and pending applications to register the foregoing; and (v) "Trade Secrets" means confidential and proprietary ideas, trade secrets, know how, concepts, methods, processes, formulae, reports, data, customer lists, mailing lists, business plans, or other proprietary information that derives independent commercial value from not being generally known or readily available.

(b)    Section 5.16(b) of the Disclosure Schedule contains a list and description of (i) all Patent Rights and Trademarks (including all assumed or fictitious names under which Seller or Imperial Toy Mexico is conducting business or has within the previous five (5) years

25

conducted business), and all material Copyrights owned by, licensed to or used by Seller or Imperial Toy Mexico (other than "shrink wrap" or other commercially available off-the-shelf non-customized software) and (ii) all agreements, contracts, licenses, sublicenses, assignments and indemnities (other than "shrink wrap" or other commercially available off-the-shelf non-customized software) that relate to (A) any such Copyrights, Patent Rights or Trademarks or (B) any Trade Secrets owned by, licensed to or used by Seller or Imperial Toy Mexico. Except as disclosed in Section 5.16(b) of the Disclosure Schedule, Seller or Imperial Toy Mexico, as applicable, either owns the entire right, title and interest in and to the Intellectual Property Rights that are included in the Purchased Assets or its assets, as applicable, free and clear of any Encumbrance or has the worldwide, irrevocable, perpetual, transferable, sublicenseable royalty-free right to use the same.

(c)     Except as disclosed in Section 5.16(c) of the Disclosure Schedule: (i) all issued Patent Rights and registered Trademarks identified in Section 5.16(b) of the Disclosure Schedule are valid and enforceable; (ii) all applications for issuance of Patent Rights and all applications to register Trademarks identified in Section 5.16(b) of the Disclosure Schedule are in good standing and without challenge by any Person; and (iii) there are no pending Proceedings that challenge the validity of any Intellectual Property Rights identified in Section 5.16(b) of the Disclosure Schedule or that form the basis for such Intellectual Property Rights being adjudicated invalid or unenforceable.

(d)     Except as disclosed in Section 5.16(d) of the Disclosure Schedule, (i) to the Knowledge of Seller, no infringement of any Intellectual Property Rights of any other Person has occurred or results in any way from Seller's operation of the Business or Imperial Toy Mexico's operation of its business, (ii) no claim of any infringement of any Intellectual Property Rights of any other Person has been made or asserted against or to Seller or Imperial Toy Mexico in respect of their operation of the Business or Imperial Toy Mexico's business and (iii) Seller has no notice of, nor is there any basis for, a claim against Seller that the operations, activities, products, software, equipment, machinery or processes of Seller or Imperial Toy Mexico infringe any Intellectual Property Rights of any other Person.

5.17    Accounts Receivable.  Each account receivable of Seller and of Imperial Toy Mexico to be purchased by Purchaser does and will represent a valid obligation arising from sales actually made or services actually performed by Seller or Imperial Toy Mexico in the Ordinary Course of Business collectible in full within the prescribed payment period and subject to no offset, counterclaim or defense by or on behalf of the account party.

5.18    Transactions with Related Parties. To Seller's Knowledge, except as set forth in Section 5.18 of the Disclosure Schedule, neither any present officer, director, Member or Manager of Seller or Imperial Toy Mexico, nor any other Person that, to the Knowledge of Seller, is an Affiliate of any of the foregoing, is currently a party to any transaction or Contract of any nature with Seller or Imperial Toy Mexico.

5.19    Privacy and Data Protection.  Each of Seller and Imperial Toy Mexico has taken commercially reasonable measures to protect (i) any personal information collected, stored, used, disclosed, transmitted, processed or disposed of by or on behalf of Seller or Imperial Toy Mexico and (ii) the integrity, continuous operation and security of its IT Assets (and data contained

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 53 of 74

therein or stored, transmitted or processed thereby). There has been no unauthorized access to, and no material breaches, outages, or violations of, any IT Assets (or data contained therein or stored, transmitted or processed thereby) used by or on behalf of Seller or Imperial Toy Mexico, except for any that were resolved without material liability or cost or the obligation to notify any Person. Each of Seller and Imperial Toy Mexico is in compliance with its policies, procedures, terms and conditions relating to personal, personally identifiable, sensitive or regulated information, privacy, or the operation or security of any IT Assets.

5.20    Disclosure. Seller has caused to be made available for inspection and copying by Purchaser complete and correct copies of all documents referred to in this Article V or in any Schedule furnished to Purchaser by Seller. No representation or warranty contained in this Agreement, and no statement, certificate, schedule, list or other information furnished or to be furnished by or on behalf of Seller to Purchaser in connection with this Agreement, contains or will contain any untrue statement of a material fact, or omits to state or will omit to state a material fact necessary in order to make the statements herein or therein not misleading.

## ARTICLE VI
## Representations and Warranties of Purchaser.

In order to induce Seller to enter into and perform this Agreement and to consummate the transactions contemplated hereunder, Purchaser hereby makes the following representations and warranties to Seller as of the date hereof and as of the Closing Date:

6.1    Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in active status under the laws of the State of Florida, with full corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

6.2    Due Authorization; No Conflict.

(a)    Purchaser has full corporate power and authority to execute, deliver and perform this Agreement and all other agreements, certificates, and documents executed or to be executed in connection herewith, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and all other agreements, certificates and documents executed or to be executed in connection herewith have been duly authorized by all necessary corporate action. This Agreement, and all other agreements, certificates and documents executed or to be executed in connection herewith, constitute or, when executed and delivered, will constitute, a legal, valid and binding Contract of Purchaser enforceable against Purchaser in accordance with its terms.

(b)    Except for the filings with the Bankruptcy Court, the execution and delivery by Purchaser of this Agreement and the agreements contemplated hereby, the consummation of the transactions contemplated hereby and thereby, and the performance by Purchaser of its obligations hereunder and thereunder, will not (i) contravene the Organizational

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 54 of 74

Documents of Purchaser or (ii) require the consent, authorization or Approval of, or notice to, or filing or registration with, any Governmental Authority or any other Person.

       6.3    <u>No Brokers</u>. Neither Purchaser nor any Person acting on behalf of Purchaser has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement, except for Heritage Capital Group, Inc., whose fees will be paid by Purchaser.

       6.4    <u>Proceedings</u>. There is no Proceeding pending or, to the Knowledge of Purchaser, threatened against Purchaser that seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement or any of the conditions to consummation of such transactions and there is no Governmental Order outstanding or, to the Knowledge of Purchaser, threatened against Purchaser that seeks to prohibit, restrict or delay consummation of the transactions contemplated by this Agreement or any of the conditions to consummation of such transactions.

       6.5    <u>Disclosure</u>. No representation or warranty contained in this Agreement, and no statement, certificate, schedule, list or other information furnished or to be furnished by or on behalf of Purchaser to Seller in connection with this Agreement, contains or will contain any untrue statement of a material fact, or omits to state or will omit to state a material fact necessary in order to make the statements herein or therein not misleading.

**ARTICLE VII**
**<u>Covenants and Agreements</u>.**

       7.1    <u>Purchaser's Investigation</u>.

       (a)    From the date hereof through the Closing Date, Purchaser shall have the right, at its own expense, through its employees, attorneys and other representatives, to perform a due diligence investigation of the assets, properties, business and operations of Seller and Imperial Toy Mexico and their Affiliates, and Seller shall fully cooperate with Purchaser and its representatives in this review. Purchaser shall be permitted reasonable access during normal business hours and upon reasonable notice to the Leased Premises, the premises of Imperial Toy Mexico and the books and records of Seller, Imperial Toy Mexico and their Affiliates, including the opportunity to observe and verify the Purchased Assets and Imperial Toy Mexico's assets, provided that such access does not unreasonably interfere with the normal operations of Seller, Imperial Toy Mexico or the Business. Seller, Imperial Toy Mexico and their Affiliates shall cooperate with all reasonable requests and shall use commercially reasonable efforts to cause its officers, employees, consultants, agents, accountants and attorneys to cooperate with such review and investigation.

       (b)    Purchaser shall be entitled to (i) meet with Seller's, Imperial Toy Mexico's and their Affiliates' customers, suppliers, licensors, licensees, sales representatives, and other Persons in order to introduce them to Purchaser, educate them on using Purchaser's services, provide requisitions, supplies, etc. and determine the need for computers and printers and (ii) meet with Seller's and Imperial Toy Mexico's employees in order to obtain information from them, to introduce such employees to Purchaser, complete paperwork for background checks,

28

provide employee benefits orientation, to obtain information, and for any other reasonable purpose of Purchaser (collectively, the "Pre-Closing Activities"). Purchaser shall coordinate the conduct of the Pre-Closing Activities with Seller. Seller shall use commercially reasonable efforts to cooperate with Purchaser in completing the Pre-Closing Activities prior to the Closing Date.

(c)     Seller hereby acknowledges and confirms that Purchaser's obligations under the letter confidentiality agreement dated June 20, 2019, between Purchaser and CriticalPoint Partners, LLC, on behalf of Seller, have terminated and that the letter confidentiality agreement is of no further force and effect.

7.2     Consents of Third Parties.

(a)     Seller shall act diligently and reasonably to secure, before the Closing Date, all Approvals, notices, filings and/or registrations in form and substance reasonably satisfactory to Purchaser and as necessary to consummate the transactions hereby and to ensure that all conditions to Purchaser's obligations in Article 8 hereof are satisfied (collectively, the "Material Consents").

(b)     To the extent applicable and subject to the terms and conditions of this Agreement, each party shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Legal Requirements to consummate the transactions contemplated by this Agreement.

7.3     Bankruptcy Matters; Bidding Process.

(a)     Seller and Purchaser acknowledge that this Agreement and the Transaction is subject to Bankruptcy Court approval. Seller and Purchaser acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including giving notice of the Transaction to creditors and certain other interested Persons as required by applicable law or ordered by the Bankruptcy Court and conducting an auction in respect of the Purchased Assets, and (ii) with Seller's assistance, Purchaser shall provide for the cure of all defaults and for adequate assurance of future performance with respect to the Assumed Contracts and Assumed Leases.

(b)     On or before November 18, 2019:

(i)     Seller shall file with the Bankruptcy Court motions (the "Sale Motion" and the "Sale Procedures Motion") together with related notices, ex parte applications for an order shortening time and proposed orders, each in form and substance reasonably satisfactory to Purchaser;

(ii)     Seller shall seek the Bankruptcy Court's issuance of:

(A)     an Order approving the process respecting the sale of the Purchased Assets in substantially the form attached as Exhibit 7.3(b)(ii)(A) (the "Sale Procedures Order"), and

29

(B)    an Order approving this Agreement and the Transaction in substantially the form attached as Exhibit 7.3(b)(ii)(B) (the "Sale Order"); and

(iii)    Seller shall file a motion seeking approval of debtor-in-possession financing (the "DIP Loan") by Purchaser as the senior, super-priority lender in the amount of $5,750,000.00, providing security that is adequate, and otherwise on terms satisfactory, to Purchaser in its sole discretion.

(c)    Without in any way limiting the foregoing, the Sale Procedures Order shall:

(i)    approve a break up fee payable to Purchaser upon and pursuant to the events set forth in the Sale Procedures Order in an amount equal to Six Hundred Fifty Thousand Dollars ($650,000.00) (the "Break Up Fee");

(ii)    require a minimum initial overbid increment of Seven Hundred Fifty Thousand Dollars ($750,000.00);

(iii)    require minimum subsequent bid increments of One Hundred Thousand Dollars ($100,000.00);

(iv)    require that, to be considered a "qualified bidder," a bidder must, on or before two (2) Business Days before the Sale Hearing, submit to Seller and Purchaser (x) an executed form of Asset Purchase Agreement without financing, diligence, or other contingencies, for a cash amount not less than $13,750,000 million, and capable of being executed by Seller immediately, and (y) confirmation of financing committed or immediate funding available that indicates its financial ability to pay the Purchase Price;

(v)    provide that the winning bid shall be the highest bid (the "Winning Bid"); provided, however, that if (x) the highest bid made by a qualified bidder other than Purchaser minus the Break Up Fee is less than (y) the highest bid of Purchaser, then the bid of Purchaser shall be the Winning Bid, so that, no matter how high bidding may go, a successful winning bid will result in a payment to Purchaser of the Break-up Fee;

(vi)    provide that all bids made by Purchaser as part of the Sale Hearing will be authorized to be comprised of (i) a cash payment and (ii) a credit equal to the Break Up Fee;

(vii)    require a "good faith deposit" from any qualified bidder in an amount no less than One Million Dollars ($1,000,000.00) to be deposited in escrow in immediately available funds no later than two (2) Business Days before the Sale Hearing;

(viii)    provide, in the event that Purchaser is not the prevailing bidder and an Order is entered authorizing Seller to sell to a party other than Purchaser, that Seller's Break-up Fee shall be paid immediately from the prevailing party's deposit; and

30

(ix)    establish a date for commencement of the hearing on the Sale Motion (the "<u>Sale Hearing</u>") no later than December 16, 2019,

(d)    Without in any way limiting the foregoing, the Sale Order shall:

(i)    contain findings and conclusions of fact to the effect that (a) Purchaser is a good faith purchaser and entitled to the protections of Section 363(m) of the Bankruptcy Code and (b) the sale to Purchaser was negotiated at arms' length and without any agreement or collusion between Purchaser and any third party.

(ii)    authorize the sale of the Purchased Assets free and clear of all Claims and Encumbrances under and pursuant to Section 363(f) of the Bankruptcy Code; such Order (or an abstract thereof) shall be in form suitable for filing in applicable lien records and shall enjoin any holder of a claim against or interest in Seller from asserting any such claim or interest against Purchaser or the Purchased Assets; and

(iii)    authorize the assumption by Seller and assignment to Purchaser of the Assumed Contracts as of the Closing Date and otherwise in accordance with the terms of this Agreement.

(e)    Seller shall serve a copy of the Sale Motion and all related pleadings on: (i) all Persons that claim any interest in or Encumbrance upon the Purchased Assets, (ii) all parties to Designated Contracts, (iii) all Governmental Authorities with taxing power that have, or as a result of the sale of the Purchased Assets may have, claims, contingent or otherwise, against Seller, (iv) all Persons that file requests for notices under Bankruptcy Rule 9010(b), (v) all interested Governmental Authorities, including those administering Governmental Programs, (vi) the attorneys general of all states in which the Purchased Assets are located, (vii) the Office of the United States Trustee, (viii) all Persons that expressed to Seller an interest in purchasing the Purchased Assets during the twelve (12) months prior to the date of this Agreement; and (ix) any other Person reasonably requested by Purchaser. In addition, Seller shall serve notice of the Sale Motion in a form acceptable to Purchaser and approved by the Bankruptcy Court on (x) all creditors (whether liquidated, contingent or unsecured) of Seller, (y) all other Persons entitled to notification under Bankruptcy Rule 2002 and (z) all other Persons entitled to notice pursuant to applicable Legal Requirements. Seller also shall post a copy of the Sale Motion on its website and publish notice of such Sale Motion in publications to be agreed upon.

(f)    Seller shall use commercially reasonable efforts to provide Purchaser with copies of all motions, applications and supporting papers prepared by or on behalf of Seller (including forms of orders and notices to interested Persons) directly relating to the Purchased Assets or this Agreement at least two (2) Business Days prior to the filing thereof in the Bankruptcy Case so as to allow Purchaser to provide reasonable comments for incorporation into same.

7.4    <u>Operations of the Business Prior to the Closing</u>. During the period from the date hereof through the Closing Date, except as contemplated by this Agreement, Seller shall operate and carry on the Business only in the Ordinary Course of Business and Imperial Toy Mexico shall operate its business only in the Ordinary Course of Business. Seller shall (a) not transfer or encumber any of the Purchased Assets or the assets owned by Imperial Toy Mexico and keep and

31

maintain in all material respects the Purchased Assets and Imperial Toy Mexico's assets in good operating condition and repair subject to normal wear and tear; (b) use its commercially reasonable efforts consistent with good business practice to maintain the Business and the business of Imperial Toy Mexico intact and to preserve the goodwill of the suppliers, licensors, employees, distributors and others having business relations with Seller and Imperial Toy Mexico, including keeping current all postpetition obligations to landlords, vendors and lessors; (c) maintain (except for expiration due to lapse of time) all Designated Contracts and Contracts of Imperial Toy Mexico in effect without change, except those Designated Contracts that expire or terminate by their terms or as otherwise expressly provided herein; (d) comply in all material respects with the provisions of all Legal Requirements applicable to Seller, Imperial Toy Mexico, the Purchased Assets, the business and assets of Imperial Toy Mexico and the conduct of the Business; (e) not increase compensation of any of its or Imperial Toy Mexico's officers, directors or employees other than in the Ordinary Course of Business; (f) not pay any prepetition Debt unless permitted by an Order authorizing the DIP Loan; (g) not enter into any Contract with any Member or Manager of Seller or Imperial Toy Mexico or an Affiliate of any Member or Manager of Seller; (h) not take any action to change accounting policies or procedures (including procedures with respect to collection of accounts receivable); and (i) otherwise use commercially reasonable efforts to prevent a Materially Adverse Change with respect to Seller or Imperial Toy Mexico from occurring.

7.5    Notification of Certain Matters. From the date of this Agreement until the Closing Date, Seller shall give Purchaser prompt written notice upon becoming aware of any material development affecting the Purchased Assets, assets or business of Imperial Toy Mexico, Assumed Liabilities, Business, or financial condition, operations or prospects of Seller or Imperial Toy Mexico, or any event or circumstance that could reasonably be expected to result in a breach of, or inaccuracy in, any representation or warranty contained in Article V; provided, however, that no such disclosure shall be deemed to prevent or cure any such breach of, or inaccuracy in, amend or supplement any Schedule to, or otherwise disclose any exception to, any of the representations and warranties of Seller set forth in this Agreement. Seller shall (i) furnish to Purchaser Seller's financial statements for the month of October 2019 as soon as they are available, but in no event later than 5:00 p.m. Eastern Time on November 20, 2019, and (ii) prepare and furnish to Purchaser, promptly after becoming available and in any event within fifteen (15) days of the end of each calendar month, Monthly Financial Statements for Seller for each month ending after the date of this Agreement through the Closing Date.  Purchaser agrees that, if and to the extent that Seller has filed with the Bankruptcy Court monthly operating reports within such fifteen (15) day period, the filing of such reports shall satisfy this requirement.

7.6    Acquisition Proposals. Seller shall not release any Person from, or waive any provision of, any such confidentiality agreement or any similar confidentiality or standstill agreement to which Seller is a party. Seller shall promptly (and in any event within one (1) Business Day) notify Purchaser in writing at such time as any Acquisition Proposal has been determined to be a Qualified Bid (as defined in the Sale Procedures Order).

7.7    Required Efforts. Seller and Purchaser shall, and shall cause their respective representatives to, use commercially reasonable efforts to take all of the actions necessary (including as necessary and appropriate, in obtaining all governmental and third party Approvals, licenses, and other Permits) to consummate the transactions hereunder including delivering all of

the certificates, documents and instruments described in Article VIII and Article IX hereto, as the case may be. Without limiting the foregoing, Seller shall not voluntarily dismiss the Bankruptcy Case and shall use its commercially reasonable efforts to prevent the dismissal of the Bankruptcy Case, the appointment of a chapter 11 trustee or the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code.

7.8    <u>Employee Matters</u>.

(a)    Under no circumstances shall Purchaser assume or be obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any claims of Seller's employees, including any claims or Liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour Legal Requirements, any other foreign, state, federal or local labor and employment Legal Requirements, Liability under the Worker Adjustment and Retraining Notification Act of 1988 (as amended), salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension, profit sharing, retirement and/or deferred compensation and any other compensation or benefits (the "<u>Employee Claims</u>"), which Employee Claims shall be and remain the Liability, responsibility and obligations of Seller.

(b)    Purchaser shall have the right (in its sole and absolute discretion), but not the obligation, to offer employment, on an at will basis, effective on the Closing Date, to any employees of Seller. In no event shall Purchaser be obligated to hire or retain any employee of Seller for any period following the Closing. The employees of Seller who accept Purchaser's offer of employment and who commence employment with Purchaser from and after the Closing Date shall be referred to herein as the "<u>Hired Employees</u>". From the date hereof through the Closing, Seller shall use commercially reasonable efforts to maintain the employment of each of its employees and shall not terminate the employment of any of them or materially change his or her compensation, in each case without Purchaser's prior written consent. Under no circumstances shall any individual employed or formerly employed by Seller become an employee of Purchaser unless such individual becomes a Hired Employee.

(c)    With respect to each Hired Employee, Seller hereby waives and releases each such individual from all contractual, common law or other restrictions enforceable by Seller on the employment activities or other conduct of such individuals after their termination of employment with Seller; provided, however, that Seller shall assign (to the extent unilaterally assignable) to Purchaser the rights of Seller to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

(d)    Except as expressly provided in this Agreement, nothing herein shall be construed as transferring to Purchaser (i) any Contract with any current or former employee of Seller or for the employment of any Person or engagement of any independent contractor by Seller or (ii) any rights or obligations Seller may owe to or be owed by any current or former employee, officer, consultant, independent contractor or agent of Seller.

(e)    Nothing herein shall confer upon any employee or former employee of Seller any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement. The

33

provisions of this Agreement are not intended to be for the benefit of or otherwise enforceable by, any third party, including any employee or former employee of Seller.

(f)     At least five (5) Business Days prior to the Auction, Seller shall deliver to Purchaser a current list of all of Seller's and Imperial Toy Mexico's employees, together with particulars of the date of commencement of employment or service, periods of continuous employment or service, job description or grade, date of birth, annual salary or hourly rate of pay and commissions.

(g)     Seller shall retain all Liability and responsibility for its Company Plans.

7.9     <u>Adequate Assurances Regarding Assumed Contracts and Assumed Leases</u>. With respect to each Assumed Contract and each Assumed Lease, Purchaser and Seller shall promptly take all commercially reasonable actions required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and there has been a demonstration of adequate assurance of future performance under the Assumed Contracts and Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making the respective employees and representatives of Purchaser and Seller available to testify before the Bankruptcy Court.

7.10     <u>Further Assurances</u>. After the Closing Date, upon the request of either Seller or Purchaser, each of the parties hereto shall, at the sole expense of the requesting party, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as may be commercially reasonable to carry out the transactions contemplated hereunder. Seller shall not take any action that is designed or intended to have the effect of discouraging any lessor, licensor, supplier, distributor or customer of Seller or other Person with whom Seller has a relationship from maintaining the same relationship with Purchaser after the Closing as it maintained with Seller prior to the Closing. Seller shall refer all customer, supplier, licensor, and licensee inquiries relating to the Business to Purchaser from and after the Closing.

7.11     <u>Prorations; Tax Cooperation</u>.

(a)     Personal property, ad valorem, use and intangible Taxes and assessments, common area maintenance charges, utility charges and rental payments with respect to the Purchased Assets, the Leased Premises and Imperial Toy Mexico's premises (collectively, "<u>Charges</u>") shall be prorated on a per diem basis and apportioned on a calendar year basis between Seller, on the one hand, and Purchaser, on the other hand, as of the Closing Date. Seller shall be liable for that portion of such Charges relating to, or arising in respect of, periods on or prior to the Closing Date, and Purchaser shall be liable for that portion of such Charges relating to, or arising in respect of, any period after the Closing Date.

(b)     Purchaser and Seller shall cooperate, as and to the extent reasonably requested by any other Person, in connection with the filing and preparation of Tax Returns related to the Purchased Assets and any Tax Proceeding related thereto.

7.12     <u>Remittance of Accounts Receivable Proceeds</u>. After the Closing, Seller shall forward to Purchaser any checks, drafts, or funds that are received by Seller in respect of Seller's

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 61 of 74

accounts receivable, deposits, prepaid expenses or other assets purchased by Purchaser (or their proceeds).

7.13　Customer Relations. Seller and Purchaser acknowledge that they compete in certain markets and that the Bankruptcy Case will be a matter of public record. If a customer of Seller has communications with Purchaser regarding the sale of products that such customer has purchased or may purchase from Seller, Purchaser may continue to compete with Seller in the Ordinary Course of Business. Notwithstanding the foregoing, Purchaser may disclose the existence of this Agreement and its contents; provided that Purchaser shall confirm that it is providing the DIP Loan to Seller and that Purchaser maintains a continuing interest in acquiring the Purchased Assets from Seller as a going concern, unless this Agreement has been terminated.

7.14　Books and Records. Seller (or any subsequently appointed bankruptcy estate representative, including a trustee, a creditor trustee or a plan administrator) and Purchaser agree each shall preserve and keep the books and records, including Company Records, held by it or their respective Affiliates relating to the pre-Closing Business for a period of twelve (12) months from the Closing Date and shall make such books and records available to the other party (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, legal proceedings or Tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates of in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Seller, on the one hand, or Purchaser, on the other hand, wishes to destroy such records during such twelve (12) month period, such party shall first give thirty (30) days' prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within that thirty (30) day period, to take possession of the records within thirty (30) days after the date of such notice.

**ARTICLE VIII**
**Conditions to Performance by Purchaser**.

The obligation of Purchaser to consummate the Closing is subject to the fulfillment of each of the following conditions (unless waived by Purchaser in accordance with Section 12.4):

8.1　Representations and Warranties. Each of the representations and warranties of Seller contained in this Agreement and in any certificate delivered pursuant to this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or true and correct in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect), in either case, as of the date hereof and as of the Closing Date, except that (i) each representation and warranty that expressly speaks only as of a specific date or time shall be true and correct as of such specified date or time and (ii) each representation and warranty that contains the words "to the Knowledge of Seller" or "to Seller's Knowledge" or words of similar import shall be true and correct without regard to such qualification as to Knowledge, and any such qualification shall be disregarded and of no force and effect for purposes of this Section 8.1.

35

8.2     Covenants and Agreements. Seller shall have performed and complied in all material respects with all of its obligations under this Agreement that are to be performed or complied with by it prior to or at the Closing.

8.3     Compliance Certificate. Seller shall have delivered to Purchaser a certificate dated as of the Closing Date, duly executed by an officer of Seller, certifying as to the satisfaction of the conditions set forth in Sections 8.1, 8.2, 8.6 and 8.10.

8.4     Absence of Litigation. No Proceeding shall be pending that may result in a Governmental Order (nor shall there be any Governmental Order in effect) that would (a) prevent consummation of any of the transactions contemplated hereunder, (b) result in any of the transactions contemplated hereunder being rescinded following consummation, (c) limit or otherwise adversely affect the right of Purchaser to operate all or any material portion of either the Business or the Purchased Assets or of the business or assets of Purchaser or any of its Affiliates, or (d) compel Purchaser or any of its Affiliates to dispose of all or any material portion of either the Business or the Purchased Assets or the business or assets of Purchaser or any of its Affiliates.

8.5     Governmental Approvals. All actions by (including any Approval) or in respect of (including notice to), or filings with, any Governmental Authority that are required to consummate the transactions contemplated hereunder shall have been obtained or made in a manner reasonably satisfactory in form and substance to Purchaser, and no such Approval filing or notice shall have been revoked, and Purchaser shall have qualified to participate on a complete basis and without restriction in Mexico's Maquiladora Program.

8.6     Current Assets. The sum of (i) the amount of collectible accounts receivable of Seller that are free of Encumbrances and are less than sixty (60) days old, net of credit memos for damaged goods, shortages or rebates due customers, in respect of which no defense or counterclaim has been raised and that are collectible in full in the Ordinary Course of Business plus (ii) the Actual Landed Cost of inventory of Seller that is Saleable in the Ordinary Course of Business at customary prices and on customary terms shall not be less than Twelve Million Dollars ($12,000,000), including (x) such accounts receivable of no less than Two Million Dollars ($2,000,000) and (y) such inventory, including Saleable finished goods in the United States and Mexico, Saleable finished goods in transit or on the water, and Saleable packing supplies, in each case owned by Seller, with a total Actual Landed Cost of no less than Ten Million Dollars ($10,000,000), and Seller shall have delivered to Purchaser evidence thereof reasonably satisfactory to Purchaser.

8.7     Debtor-in-Possession Financing. The Bankruptcy Court shall have approved the DIP Loan pursuant to an interim Order entered on or before November 21, 2019, and pursuant to a Final Order finally approving the DIP Loan on or before December 10, 2019.  Both Orders shall be in form and substance acceptable to Purchaser in its sole discretion.

8.8     Material Consents. All Material Consents shall have been obtained and shall be in full force and effect and Seller shall have delivered to Purchaser evidence thereof reasonably satisfactory to Purchaser.

Case: 19-52335    Doc# 15    Filed: 11/18/19    Entered: 11/18/19 17:43:25    Page 63 of 74

8.9     Deliveries. Seller shall have made all of the deliveries required by Section 4.3.

8.10    No Material Adverse Change. A Material Adverse Change shall not have occurred.

8.11    Due Diligence Review. Purchaser shall be satisfied in its sole discretion with its due diligence review of the Purchased Assets and the Business. If Purchaser has not notified Seller that it is not satisfied with its due diligence review by 5:00 p.m. Pacific Time on December 3, 2019, this condition shall be deemed satisfied.

8.12    Bankruptcy Court Proceedings. Seller shall have filed all motions, and the Bankruptcy Court shall have entered all Orders, by the dates and otherwise as required in Article VII and Article X.

**ARTICLE IX**
**Conditions to Performance by Seller**.

The obligation of Seller to consummate the Closing is subject to the fulfillment of each of the following conditions (unless waived by Seller in accordance with Section 12.4):

9.1     Representations and Warranties. Each of the representations and warranties of Purchaser contained in this Agreement and in any document, instrument or certificate delivered pursuant to this Agreement shall be true and correct in all respects (in the case of any representation or qualified by materiality) or true and correct in all material respects (in the case of any representation or warranty not qualified by materiality), in either case, as of the date hereof and as of the Closing Date, other than representations and warranties that expressly speak only as of a specific date or time, which shall be true and correct as of such specified date or time.

9.2     Covenants and Agreements. Purchaser shall have performed and complied in all material respects with all of its obligations under this Agreement that are to be performed or complied with by it prior to or at the Closing.

9.3     Compliance Certificate. Purchaser shall have delivered to Seller a certificate dated as of the Closing Date, duly executed by an officer of Purchaser, certifying as to the satisfaction of the conditions set forth in Sections 9.1 and 9.2.

9.4     Absence of Litigation. No Proceeding shall be pending that may result in a Governmental Order (nor shall there be any Governmental Order in effect) that would (a) prevent consummation of any of the transactions contemplated hereunder or (b) result in any of the transactions contemplated hereunder being rescinded following consummation.

9.5     Governmental Approvals. All actions by (including any Approval) or in respect of (including notice to), or filings with, any Governmental Authority that are required to consummate the transactions contemplated hereunder shall have been obtained or made in a manner reasonably satisfactory in form and substance to Seller, and no such Approval filing or notice shall have been revoked.

9.6     Deliveries. Purchaser shall have made all of the deliveries required by Section 4.4.

9.7     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order authorizing Seller to enter into this Agreement and carry out all of the terms hereof.

**ARTICLE X**
**Termination**.

10.1     Termination. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Purchaser and Seller;

(b)     by either Purchaser or Seller, if (i) any Governmental Authority having competent jurisdiction over any party hereto shall have issued a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Governmental Order is or shall have become nonappealable or (ii) there shall be adopted any Legal Requirement that makes the transactions contemplated by this Agreement illegal or otherwise prohibited; provided, however, that the party seeking to terminate this Agreement pursuant to clause (i) above shall not have initiated such Proceeding or taken any action in support of such Proceeding and shall have used its commercially reasonable efforts to challenge such order or other action;

(c)     by Purchaser, in the event of a material breach of any representation, warranty, covenant or agreement on the part of Seller set forth in this Agreement that (i) would cause any of the conditions set forth in Article VIII not to be satisfied if such breach or failure to perform was continuing as of the Closing Date and (ii) cannot be or has not been cured within five (5) Business Days after the receipt of written notice thereof; provided, however, Purchaser may not terminate this Agreement pursuant to this Section 10.1(c) if Purchaser is in material breach of any of its representations, warranties, covenants or agreements under this Agreement;

(d)     by Seller, in the event of a material breach of any representation, warranty, covenant or agreement on the part of Purchaser set forth in this Agreement that (i) would cause any of the conditions set forth in Article IX not to be satisfied if such breach of failure to perform was continuing as of the Closing Date and (ii) cannot be or has not been cured within five (5) Business Days after the receipt of written notice thereof; provided, however, Seller may not terminate this Agreement pursuant to this Section 10.1(d) if Seller is in material breach of any of its representations, warranties, covenants or agreements under this Agreement;

(e)     by Purchaser, in the event of the dismissal of the Bankruptcy Case or conversion of the Bankruptcy Case to a proceeding under Chapter 7 of the Bankruptcy Code, or the appointment of a trustee under Chapter 11 of the Bankruptcy Code;

(f)     by Purchaser or Seller, in the event the Bankruptcy Court approves an Alternative Transaction or an Alternative Transaction is consummated;

38

(g)     by Purchaser, if the Sale Procedures Order has not been entered by the Bankruptcy Court on or before November 29, 2019; provided, that, Purchaser provides notice of its election to terminate this Agreement pursuant to this Section 10.1(g) no later than 5:00 p.m. Pacific time on the fifth (5th) Business day following the such date;

(h)     by Purchaser, if the Sale Order has not been entered by the Bankruptcy Court on or before December 16, 2019; provided, that, Purchaser provides notice of its election to terminate this Agreement pursuant to this Section 10.1(h) no later than 5:00 p.m. Pacific time on the fifth (5th) Business Day following such date;

(i)     by either Purchaser or Seller, if the Closing has not been consummated on or before December 18, 2019 (the "Closing Date Deadline"); provided, that no party may terminate this Agreement pursuant to this Section 10.1(h) if such party's material breach of this Agreement or failure to fulfill any obligation under this Agreement shall have been a principal cause of or resulted in the failure of the Closing to be consummated on or before the Closing Date Deadline;

(j)     by Purchaser, by notice given by no later than 5:00 p.m. Pacific Time on December 3, 2019,  if Purchaser is not satisfied in its sole discretion with the results of its due diligence review referred to in Section 8.11 above; or

(k)     by Purchaser, in the event that an Event of Default occurs under the DIP Loan.

10.2    Notice of Termination; Effect of Termination.

(a)     The party desiring to terminate this Agreement pursuant to Sections 10.1(b) through 10.1(k) shall give written notice of such termination to the other party, specifying the provision or provisions hereof pursuant to which such termination is effected. The right of any party to terminate this Agreement pursuant to Section 10.1 shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any party hereto, whether prior to or after the execution of this Agreement.

(b)     In the event of termination of this Agreement pursuant to Section 10.1, this Agreement shall be of no further force or effect; provided, however, the provisions of Section 7.1(c), Article X, Article XI and Article XII shall survive termination.

(c)     If this Agreement is terminated pursuant to Section 10.1 (other than pursuant to Section 10.1(d)), Purchaser and Seller shall promptly deliver a joint written instruction to the Deposit Escrow Agent directing the Deposit Escrow Agent to return the Deposit (plus any interest thereon) to Purchaser. If this Agreement is terminated pursuant to Section 10.1(d), Purchaser and Seller shall promptly deliver a joint written instruction to the Deposit Escrow Agent directing the Deposit Escrow Agent to deliver the Deposit (plus any interest thereon) to Seller. Purchaser and Seller agree that (i) the amount of the Deposit is a reasonable estimate of the damages that Seller would be likely to incur in the event of a breach by Purchaser of this Agreement and that such amount is their best estimate under the circumstances of such likely damages, and not a penalty or forfeiture, and (ii) if Seller elects to terminate this Agreement pursuant to Section 10.1(d), in lieu of any other remedy (including the

39

remedy of specific performance), Seller shall be entitled to retain the Deposit as liquidated damages as sole compensation to Seller for its loss arising from such breach.

(d)     If this Agreement is terminated by Purchaser pursuant to Section 10.1(f), Seller shall immediately pay to Purchaser in cash an amount equal to the Break-Up Fee.

(e)     In the event this Agreement is terminated (i) pursuant to Sections 10.1(b), 10.1(c), 10.1(e), 10.1(g), 10.1(h) or 10.1(i), (ii) Seller enters into an Alternative Transaction or announces an Alternative Transaction prior to termination of this Agreement, and (iii) Seller subsequently consummates an Alternative Transaction within ninety (90) days following the termination of this Agreement that constitutes a higher and better offer for the Purchased Assets, or (ii) pursuant to Section 10.1(h) solely as a result of the failure of the condition to Closing set forth in Section 8.12, then Purchaser shall be entitled to payment of the Break Up Fee.

(f)     Any payment of the Break Up Fee pursuant to Sections 10.2(d) or 10.2(e) shall be made by Seller on the earlier of (i) entry of a form of Order authorizing a sale to a party other than Purchaser, which payment shall be made from such party's deposit, or (ii) concurrently with the consummation of the applicable Alternative Transaction in all other circumstances.

(g)     Purchaser and Seller hereby agree that the Break Up Fee (i) is a reasonable estimate of the damages that Purchaser would be likely to incur in the event the Transaction is not consummated under the circumstances set forth herein, (ii) is a necessary inducement for Purchaser to enter into this Agreement and (iii) shall be the sole remedy of Purchaser for breach of this Agreement by Seller (other than for non-payment of the Break Up Fee) if this Agreement is terminated under circumstances where the Break Up Fee is payable.

## ARTICLE XI
## Limitation of Liability.

11.1     Limitation of Liability for Purchaser. Notwithstanding anything contained in this Agreement to the contrary, Purchaser's maximum liability for its breach of this Agreement is an amount equal to the Deposit.

11.2     Limitation of Liability for Seller. Notwithstanding anything contained in this Agreement to the contrary, Seller's maximum liability for its breach of this Agreement is an amount equal to the Break Up Fee.

11.3     Survival of Representations and Warranties. Each of the representations and warranties of Purchaser and Seller set forth in this Agreement or in any Transaction Document shall terminate effective immediately as of the Closing such that no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or equity) may be brought against either of them after the Closing. The covenants and agreements of Purchaser and Seller set forth in this Agreement and in any Transaction Document, to the extent contemplating or requiring complete performance by such party prior to the Closing, shall terminate effective immediately as of the Closing. Each covenant and agreement requiring performance at or after the Closing shall expressly survive Closing in accordance with its terms notwithstanding this Section 11.3.

11.4    <u>Acknowledgments by Purchaser</u>. Purchaser prior to Closing will have conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of Seller. In making its determination to proceed with the transactions contemplated by this Agreement, Purchaser will have relied on the results of its own independent investigation and verification and the representations and warranties of Seller expressly and specifically set forth in this Agreement, including the Disclosure Schedule attached hereto. SUCH REPRESENTATIONS AND WARRANTIES BY SELLER CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR EXPRESSED OR IMPLIED (INCLUDING, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF SELLER) ARE SPECIFICALLY DISCLAIMED BY SELLER. IN ADDITION, SELLER MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE PURCHASED ASSETS, BEYOND THOSE EXPRESSLY MADE IN ARTICLE 5, INCLUDING ANY IMPLIED REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE PURCHASED ASSETS. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN ARTICLE 5, PURCHASER TAKES THE ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.

11.5    <u>Acknowledgment by Seller</u>. SELLER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES BY PURCHASER CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF PURCHASER TO SELLER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY.

## ARTICLE XII
## General Provisions.

12.1    <u>Expenses; Transfer Taxes</u>. Whether or not the transactions contemplated herein shall be consummated, except as otherwise expressly provided herein, each of the parties hereto shall pay its own respective expenses incident to the preparation of this Agreement and to the consummation of the transactions provided for herein. All transfer, documentary, sales, use, stamp, registrations and other such Taxes and fees applicable to, imposed upon or arising out of the transactions contemplated hereby ("<u>Transfer Taxes</u>") shall be borne by Seller. Seller shall, at its own expense, file when due all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and if required by Law, Purchaser shall join in the execution of any such properly completed Tax Returns and other documentation.

12.2    <u>Entire Agreement; No Third Party Beneficiaries; Amendment</u>. This Agreement, together with the Exhibits and Schedules hereto, contains the entire agreement of the parties hereto with respect to the subject matter hereof, and all prior understandings, representations and warranties (whether oral or written) with respect to such matters are superseded. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties hereto (or their permitted assignees) any right, benefit or remedy of any nature

41

whatsoever under or by reason of this Agreement. This Agreement may not be amended, modified, or terminated except by an instrument in writing signed by Purchaser and Seller.

12.3    Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted. Furthermore, in lieu of such illegal, invalid or unenforceable provisions there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

12.4    Waiver. Any party to this Agreement may, by written notice to the other parties hereto, waive any provision of this Agreement from which such party is entitled to receive a benefit. No waiver by any party hereto of a breach by another party of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach by such other party of such provision or any other provision of this Agreement.

12.5    Public Announcements. No party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other parties, unless a press release or public announcement is required by Legal Requirement or the Bankruptcy Court. If any such announcement or other disclosure is required by Legal Requirement or the Bankruptcy Court, the disclosing party shall give the nondisclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure.

12.6    Successors and Assigns. This Agreement is not assignable by Seller or the Member without the prior written consent of Purchaser.  Purchaser may, upon written notice to Seller, assign its rights and obligations under this Agreement in whole or in part, provided that such assignment shall not relieve Purchaser of its obligations hereunder. This Agreement shall be binding upon, and shall inure to the benefit of, and be enforceable by, the parties and their respective legal representatives, successors and assigns.

12.7    Notice. All notices or other communications required or permitted hereunder shall be in writing and shall be delivered personally or sent by registered or certified mail, by reputable overnight delivery or courier, by email or by facsimile transmission, addressed as follows:

To Seller or the Member:            Imperial Toy LLC
                                    16641 Roscoe Pl.
                                    North Hills, California 91343
                                    Facsimile No.:
                                    Attn: Peter Tiger
                                    Email: peter.tiger@imptoy.com

With a copy to                      Sheppard Mullin
(which shall not constitute notice): Four Embarcadero Center
                                    Seventeenth Floor
                                    San Francisco, California 94111
                                    Facsimile No.: (415) 434-03947

42

Attn: Ori Katz
Email: Okatz@sheppardmullin.com
and

Arch + Beam
2500 Camino Diablo, Suite 110
Walnut Creek, California 94597
Facsimile No.: 415-358-4486
Attn: Matthew English
Email: menglish@arch-beam.com

To Purchaser:                    Ja-Ru, Inc.
                                 12901 Flagler Center Blvd.
                                 Jacksonville, Florida 32258
                                 Facsimile No.: (904) 730-0113
                                 Attn: Andrew Selevan and Steve Strachota
                                 Email: andrews@jaru.com
                                        and
                                        steves@jaru.com

With a copy to                   Smith Hulsey & Busey
(which shall not constitute notice):  One Independent Drive, Suite 3300
                                 Jacksonville, Florida 32202
                                 Facsimile No.: (904) 359-7708
                                 Attn: M. Richard Lewis, Jr., Esq. and James H. Post, Esq.
                                 Email: rlewis@smithhulsey.com
                                        and
                                        jpost@smithhulsey.com

and

Keller & Benvenutti, LLP
650 California Street, Suite 1900
San Francisco, CA 94108
Facsimile No: (650) 636-9251
Attn: Tobias S. Keller
Email: tkeller@kellerbenvenutti.com

and

Heritage Capital Group, Inc.
4417 Beach Boulevard, Suite 302
Jacksonville, Florida 32207
Facsimile No.: (904) 354-6696
Attn: Dan Edelman and Howard Serkin
Email: hserkin@heritagecapitalgroup.com

43

and
dedelman@heritagecapitalgroup.com

and in any case at such other address as the advisee shall have specified by written notice. Notice of change of address shall be effective only upon receipt thereof. All such other notices and communications shall be deemed effective (a) if by personal delivery, upon receipt, (b) if by registered or certified mail, on the date of receipt or declining delivery, (c) if by reputable overnight delivery or courier, on the first Business Day after the date of mailing or (d) if by facsimile transmission or email, upon receipt, provided notice is sent on a Business Day between the hours of 9:00 a.m. and 5:00 p.m., recipient's time, but if not then upon the following Business Day.

12.8    Section Headings; Counterparts; Facsimile Signature. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same instrument. The exchange of executed copies of this Agreement by facsimile transmission or other electronic transmission shall constitute effective execution and delivery of this Agreement.

12.9    Governing Law. The laws of the State of Delaware (without giving effect to its conflicts of law principles) and, to the extent applicable, the Bankruptcy Code, govern this Agreement and all matters arising out of or relating to this Agreement and any of the transactions contemplated hereby, including its negotiation, execution, validity, interpretation, construction, performance and enforcement.

12.10    Jurisdiction. During the pendency of the Bankruptcy Case, any Proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties only in the Bankruptcy Court. At any time following the pendency of the Bankruptcy Case, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of courts of the State of Delaware (or any federal court sitting in the State of Delaware) over any action or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby and all claims in respect of such action or proceeding may be heard and determined in such courts. The parties hereto hereby irrevocably waive any objection that they may now or hereafter have to the laying of venue of any action or proceeding brought in such court or any claim that such action or proceeding brought in such court has been brought in an inconvenient forum. A judgment in such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Legal Requirement. Each of the parties hereto hereby irrevocably consents to process being served by any party to this Agreement in any action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.7.

12.11    Interpretation. The use of the masculine, feminine or neuter gender or the singular or plural form of words used herein (including defined terms) shall not limit any provision of this Agreement. The terms "include," "includes" and "including" are not intended to be limiting and shall be deemed to be followed by the words "without limitation" (whether or not they are in fact followed by such words) or words of like import. The term "or" has the inclusive meaning

44

represented by the phrase "and/or." Reference to a particular Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement. Reference to a particular agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof. The terms "dollars" and "$" mean United States Dollars. The Exhibits and Schedules identified in this Agreement are incorporated into this Agreement by reference and made a part hereof. The Article, Section, paragraph, Exhibit and Disclosure Schedule headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The use of the terms "hereunder," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Article, Section, paragraph or clause of, or Exhibit or Schedule to, this Agreement.

*[Signature page follows]*

Case: 19-52335   Doc# 15   Filed: 11/18/19   Entered: 11/18/19 17:43:25   Page 72 of 74

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

PURCHASER:                          **JA-RU, INC.**

                                    By: _____
                                        Andrew Selevan
                                        President

COMPANY:                            **IMPERIAL TOY LLC**

                                    By: _____
                                        Peter Tiger
                                        Chief Executive Officer

MEMBER:                             _____
                                    **PETER TIGER**

01051344.10

46

## EXHIBITS AND SCHEDULES

**<u>Exhibits:</u>**

| | |
|---|---|
| Exhibit 3.2 | Form of Deposit Escrow Agreement |
| Exhibit 4.3(b) | Form of Lease Assignment |
| Exhibit 4.3(c) | Form of Assumption Agreement |
| Exhibit 4.3(d) | Form of Bill of Sale |
| Exhibit 7.3(b)(ii)(A) | Form of Sale Procedures Order |
| Exhibit 7.3(b)(ii)(B) | Form of Sale Order |

**<u>Schedules:</u>**

| | |
|---|---|
| Schedule 2.1(b) | Fixed Assets |
| Schedule 2.1(c) | Inventory and Supplies |
| Schedule 2.1(d) | Permits |
| Schedule 2.1(j) | Deposits |
| Schedule 2.2 | Excluded Assets |

**<u>Disclosure Schedule:</u>**

| | |
|---|---|
| Section 5.1(a) | Jurisdiction of Seller |
| Section 5.1(b) | Jurisdiction of Imperial Toy Mexico |
| Section 5.1(e) | Predecessors |
| Section 5.2(b) | No Conflict |
| Section 5.3(a) | Financial Statements |
| Section 5.4(a) | Title to Assets |
| Section 5.4(b) | Location of Purchased Assets |
| Section 5.5 | Inventory |
| Section 5.6(b) | Leased Premises; Existing Leases |
| Section 5.8(a) | Governmental Authorizations |
| Section 5.8(c) | Compliance |
| Section 5.9 | Environmental Matters |
| Section 5.10 | Proceedings |
| Section 5.11(a) | Employee Plans |
| Section 5.11(c) | Employees |
| Section 5.13(a) | Contracts |
| Section 5.13(b) | Validity and Enforceability of Contracts |
| Section 5.16(b) | Intellectual Property Rights |
| Section 5.16(c) | Validity and Enforceability of Intellectual Property Rights |
| Section 5.16(d) | Infringement |
| Section 5.18 | Transactions with Related Parties |

01051344.11