# EXHIBIT A TO JEREMIAH HARRINGTON DECLARATION

<center>C O M M E R C I A L   P A R K   L E A S E</center>

THIS LEASE CONTRACT, entered into by and between Landlord and Tenant on this $27$ day of _____ JUNE , 2012 in accordance with the terms and conditions hereinafter set forth.

<center>W I T N E S S E T H</center>

<center>ARTICLE I - BASIC PROVISIONS AND CERTAIN DEFINED TERMS</center>

1.  **"LANDLORD"**: SV Portfolio LP
    **"NOTICE ADDRESS"**: P. O. Box 924133, Houston, TX 77292-4133; Attn: General Counsel

2.  **"TENANT"**:  Imperial Toy, LLC

    State Where Incorporated: California          Corporate I.D.#: 20-397 3067
    Social Security #: N/A                        Drivers License #: N/A
    Tenant's Trade Name (d/b/a):      N/A

    **"NOTICE ADDRESS"**:  "Primary Address": 9043 Siempre Viva Road, #100, San Diego, CA 92154
    **"Secondary Address"**:    16641 Roscoe Place, North Hills, CA 91343, Attn: Art Hirsch

    So long as Tenant is occupying the Leased Premises, the Primary Address shall be deemed to be the Notice Address. At any time when Tenant is not occupying the Leased Premises, the Secondary Address shall be deemed to be the Notice Address.

3.  **"GUARANTOR"**:      None

4.  **"LEASED PREMISES"**: Approximately 257,972 square foot building (the "Building") constituting part of the Commercial Park as shown on Exhibit "A". The Leased Premises are known by street address as: 9043 Siempre Viva Road, #100, San Diego, CA 92154

5.  **LEASE TERM**:
    **"COMMENCEMENT DATE"**:    Upon the execution date hereof.
    **"TERMINATION DATE"**: Last day of the 60th full calendar month after the "Base Rent Commencement Date" (as hereinafter defined).

6.  **"BASE RENT"**:
    For the period from the Commencement Date through the day prior to the Base Rent Commencement Date, no Base Rent shall be due and payable.

    Commencing on the Base Rent Commencement Date and continuing through August 31, 2013: Zero and 00/100 Dollars ($0.00)/month.

    Commencing on September 1, 2013 and continuing through March 31, 2014: Sixty-Two Thousand and 00/100 Dollars ($62,000.00)/month.

    Commencing on April 1, 2014 and continuing through March 31, 2015: Seventy-One Thousand Eight Hundred Forty-Two and 50/100 Dollars ($71,842.50)/month.

    Commencing on April 1, 2015 and continuing through March 31, 2016: Eighty-Four Thousand Eight Hundred Forty-One and 57/100 Dollars ($84,841.57)/month.

    Commencing on April 1, 2016 and continuing through March 31, 2017: Eight-Seven Thousand Three Hundred Eighty-Six and 82/100 Dollars ($87,386.82)/month.

    Commencing on April 1, 2017 and continuing through March 31, 2018: Ninety Thousand Eight and 43/100 Dollars ($90,008.43)/month.

    As used herein, the term "Base Rent Commencement Date" shall be defined as April 1, 2013.

7.  **"SECURITY DEPOSIT"**: Sixty-Two Thousand and 00/100 Dollars ($62,000.00)

8.  **"PERMITTED USE"**: Office, warehousing, storage, shipping, assembly and light manufacturing, in accordance with applicable law.

9.  **"WATER COSTS"**: Included in Tenant's Operating Costs (as defined in Article XXI).

10. **ADDITIONAL RENT**: Commencing on September 1, 2013, Tenant shall pay the "Operating Costs" (as said term is defined in Article XXI) for the Building. The initial monthly amount payable shall be $30,879.25, subject to adjustment as provided in Article XXI.

11. **"ADVANCE RENTAL"**: In addition to the Security Deposit referenced in Article 1.7. above, upon execution hereof, Tenant shall pay to Landlord the sum of sixty-two thousand and 00/100 Dollars ($62,000.00) as Advance Rental. Upon the Base Rent Commencement Date, the Advance Rental shall be credited toward Tenant's Base Rent first coming due hereunder.

12. **"PARKING ALLOCATION"**: Tenant shall have exclusive use of all the parking located adjacent to the Leased Premises as outlined in the attached "Exhibit A". Tenant shall have non-exclusive use of any additional parking spaces in the Commercial Park, as long as the total parking allocation does not exceed two hundred fifty-eight (258) parking spaces.

13. **"BROKER"**: Tenant's Broker: CBRE, 4365 Executive Drive, Suite 1600, San Diego, CA 92121 and Landlord's Broker: CBRE, Inc., 350 Tenth Avenue, Suite 800, San Diego, CA 92101.

14. **"RENT"**. Shall mean Base Rent and Additional Rent.


Each of the foregoing provisions and defined terms shall be construed in conjunction with the references thereto contained in the other sections of this Lease. Each reference in this Lease to any of the foregoing basic Lease provisions and defined terms shall be construed to incorporate each term set forth above under such basic Lease provisions or defined term.

## ARTICLE II - PREMISES

**Section 2.01.** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the leased premises (the "Leased Premises") as described in Article 1.4. hereinabove, which, for all purposes, shall be deemed to consist of that number of square feet stated in Article 1.4. above. The Leased Premises (aka the Building) are located on part of the tract of property described in Exhibit "B", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes. The land described in Exhibit "B" and any existing and future buildings, parking area, truck loading areas, service areas and other improvements now existing or hereafter erected thereon are sometimes herein referred to as the "Commercial Park". Landlord reserves the right to place in, under, over or through the Leased Premises pipes, wires, lines, and facilities serving other areas of the Commercial Park and the right to grant and record easements, restrictive covenants, conditions and dedications encumbering or relating to the Commercial Park or any portion thereof, provided such right is exercised in a manner which does not unreasonably interfere with Tenant's conduct of its business at the Leased Premises.

**Section 2.02.** The Leased Premises shall be constructed in accordance with the Construction Rider attached hereto and incorporated by reference herein for all purposes. Notwithstanding the foregoing, Tenant shall have the right to utilize the Leased Premises upon the execution date hereof.

## ARTICLE III - TERM

**Section 3.01.** The term of this Lease shall commence on the Commencement Date as defined in Article 1.5. and shall terminate on the Termination Date as defined in Article 1.5. above unless sooner terminated in accordance with the terms and conditions hereinafter set forth. At the request of Landlord from time to time made, Tenant will execute one or more Memoranda or letters stating the commencement and termination dates of the Lease. During the last one hundred eighty (180) days of the lease term, Landlord shall have the right to place signs in, at, on and about the Leased Premises advertising it for rent or sale.

## ARTICLE IV - RENTAL

**Section 4.01.** As "Base Rent", Tenant covenants and agrees to pay to Landlord in Houston, Harris County, Texas, at P.O. Box 924133, Houston, Texas 77292-4133 or at such other address as Landlord may from time to time designate in writing the sum(s) set forth in Article 1.6. above. Notwithstanding anything to the contrary contained herein, in lieu of mailing Tenant's payment of Rent to Landlord, Tenant may elect to wire its payment whereby it shall notify Landlord and Landlord agrees to provide, within a reasonable period of time, wiring instructions. All such Base Rent payments shall be made on the first day of each calendar month, monthly in advance, for each and every month in the term of this Lease following the Base Rent Commencement Date. Upon the Base Rent Commencement Date, the Advance Rental, described in Article 1.11., shall be applied toward the Base Rent for the first full calendar month for which Base Rent is due following the Base Rent Commencement Date; but if the Base Rent Commencement Date does not commence on the first day of the calendar month, Tenant will pay in advance a pro rata part of such sum as Base Rent for such partial month and the Advance Rental shall be applied to the first full calendar month following the Base Rent Commencement Date.

**Section 4.02.** All rent and other sums hereunder provided to be paid by Tenant shall be due and payable by Tenant without demand, deduction, abatement or set-off except as expressly provided herein.

**Section 4.03.** All other sums and charges of whatever nature required to be paid by Tenant to Landlord pursuant to the terms of this Lease (including, without limitation, all payments set forth in Article XXI, below, entitled "Additional Rent") constitute additional rent (whether or not same be designated "Additional Rent") and failure by Tenant to timely pay such other sums or charges may be treated by Landlord as a failure by Tenant to pay Base Rent.

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 3 of 73

## ARTICLE V - UTILITIES

**Section 5.01.**    Tenant will at its own cost and expense pay for all water, sanitary sewer, gas, electricity and other utilities used in the Leased Premises and will save and hold Landlord harmless from any charge or liability for same. Such payments shall be made directly to the supplier of any utility separately metered (or submetered) to the Leased Premises and on such equitable basis as may be determined by Landlord with respect to any such utilities which are metered to Tenant in common with other occupants of the Commercial Park.  As of the date hereof, the cost for water and sanitary sewer service at the Leased Premises are included in the Operating Costs for which Tenant pays pursuant to Article XXI hereof.  Landlord reserves the right to require that Tenant pay for water and sanitary sewer service directly to Landlord, in lieu of including same in Operating Costs, in which event Tenant will pay "Water Costs" in an amount which accurately reflects Landlord's estimate of Tenant's actual water usage, and additionally, Landlord may submit an invoice to Tenant for the difference between the actual cost of supplying water and sanitary sewer service to the Leased Premises and the amount theretofore paid by Tenant during any calendar year. Additionally, Tenant shall pay to Landlord a proportionate share (determined on an equitable basis) of any *professional fees and expenses incurred by Landlord for utility consultants employed in connection with attempts to reduce the utility costs for the Commercial Park.*  As of the date hereof, but only for those utilities that are separately metered, Tenant shall contact the utility carrier(s) and request that the services be transferred to Tenant's name and Tenant shall be responsible for their exclusive usage of said utilities.

**Section 5.02.**    No interruption or malfunction of any utility services (including, without limitation, water and sanitary sewer services) for any reason whatsoever shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for any damages (including, without limitation, consequential or special damages) or entitle Tenant to be relieved from any of its obligations hereunder (including the obligation to pay rent) or grant Tenant any right of set-off or recoupment. In the event of any such interruption of any such services, Landlord shall use reasonable diligence to restore such service in any circumstances in which such interruption is caused by Landlord's fault.

## ARTICLE VI - USE

**Section 6.01.**    Tenant will use the Leased Premises solely for the Permitted Use.  Tenant, at its own expense: will comply with all Federal, State, municipal and other laws, codes, ordinances, rules and regulations (including those promulgated by Landlord) applicable to the Leased Premises and the business conducted therein by Tenant. Tenant shall be responsible, at its sole cost and expense, for the removal of its trash and rubbish.  In the event Landlord has established or should establish a common trash and rubbish removal program or disposal program at the Commercial Park, Tenant shall participate in such program.  In the event the Leased Premises are to be used for storage of merchandise, Tenant will not stack goods or merchandise higher than 24 inches below the bottom of the lowest fire sprinkler head (if the Leased Premises are sprinklered) or 24 inches below the bottom of the lowest roof joist (if the Leased Premises are not sprinklered).  Tenant agrees to comply with all rules and regulations of any property owners' association or similar association covering the Leased Premises and those which may be prescribed by Landlord from time to time.  Without limiting the above provisions in this Section 6.01, Tenant shall not do anything or permit anything to be done or any hazardous or unsafe condition to exist (an "Increased Risk") that shall invalidate or cause the cancellation of the insurance policies carried by either Landlord or Tenant.  If Tenant creates or permits any Increased Risk that causes an increase in the cost of Landlord's insurance policies, then Tenant shall reimburse Landlord pursuant to the last grammatical paragraph in Section 15.02 hereof for the additional premiums attributable to any act, or omission or operation of Tenant causing the increase in the premiums.  Payment of additional premiums shall not excuse Tenant from terminating or removing the Increased Risk, unless Landlord agrees in writing thereto.  Absent such agreement, Tenant shall promptly terminate or remove the Increased Risk.

**Section 6.02.**    Tenant will not store or handle "Hazardous Substances" (as hereinafter defined) in, on, or about the Commercial Park except for such types and in such quantities as are reasonably necessary for Tenant's business. In no event will Tenant dispose of Hazardous Substances in, on or about the Commercial Park.  Tenant will notify Landlord promptly when it becomes aware of the spillage, release, or other discharge of any Hazardous Substance in, on, or about the Commercial Park, however caused. Tenant will take all necessary steps to promptly clean up any spills, releases, or other discharges of Hazardous Substances caused by Tenant or Tenant's use of the Commercial Park or caused by any of Tenant's agents, employees, invitees, assignees, sublessees, contractors or customers or their respective uses of the Commercial Park.  Tenant agrees to indemnify and hold Landlord and Landlord's employees, directors, officers, and agents harmless from all losses, claims, suits, actions, damages, or liability (including costs and expenses of defending against the aforesaid) arising from Tenant's breach of any provision of this paragraph of Article VI or arising from any spills, releases, or other discharges of Hazardous Substances caused by Tenant or Tenant's use of the Commercial Park or caused by any of Tenant's agents, employees, invitees, assignees, sublessees, contractors or customers or their respective uses of the Commercial Park.  For the purpose of this Lease, Hazardous Substance shall mean any hazardous substance, hazardous waste, or hazardous material as such terms are defined in the Comprehensive Environmental Response, Compensation, and Liability Act. 42. U.S.C. Sect. 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Sect. 6901 et seq., and Hazardous Materials Transportation Act, 49 U.S.C. Sect. 1801 et seq., respectively.  The respective rights and obligations of Landlord and Tenant under this Section 6.02 concerning Hazardous Substances shall survive the expiration or earlier termination of this Lease.

## ARTICLE VII - COMMON AREA

**Section 7.01.**    A.    Landlord will provide a "Common Area" (as hereinafter defined) in the Commercial Park and make necessary repairs thereto.  Landlord may also provide lighting in the parking area in the Commercial Park. During the term of this Lease, Tenant, its employees, customers and invitees shall have the non-exclusive use, along with other tenants in the Commercial Park, of the Common Area subject to rules and regulations for the use of the

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 4 of
73

Common Area (including parking) which Landlord shall have the right to establish, from time to time. Landlord shall have the right, from time to time, to change the arrangement, layout and/or size of the Common Area; and to do and perform such other acts in the Common Area as Landlord shall, in its good faith judgment, determine to be advisable; provided such change does not impact Tenant's access to the Leased Premises or its parking rights.

       B.    Tenant and its employees shall have the use of not more than the number of parking spaces at Landlord's Commercial Park designated in Article 1.12. The usage rights to the parking area herein granted to Tenant shall constitute a license existing during the term of this Lease and any extension terms thereafter

       C.    For purposes of this Lease, the phrase "Common Area" includes such areas and facilities within the Commercial Park as are from time to time so designated by Landlord.

**Section 7.02.**    Tenant will at all times keep all merchandise and personal property (including pallets containing same) within the Leased Premises and will not at any time display or store any merchandise or permit it to be on driveways or sidewalks or at any other point outside the Leased Premises, nor will Tenant in any other way use or obstruct such sidewalks, driveways or other area outside the Leased Premises.

**Section 7.03.**    Tenant will not load or unload any trucks or permit any trucks serving the Leased Premises, whether owned by Tenant or not, to be loaded or unloaded in the Commercial Park except in the area specifically designated for such use by Landlord.

**Section 7.04.**    Nothing in this Article or elsewhere in this Lease shall be construed as constituting the Common Area, or any part thereof, as part of the Leased Premises.

## ARTICLE VIII - ASSIGNMENT AND SUBLETTING

**Section 8.01.**    Except as otherwise expressly provided herein, Tenant shall not assign this Lease or sublease the Leased Premises or any part thereof or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Leased Premises or sublease any operating department therein without Landlord's consent, which consent shall not be unreasonably withheld, and any attempt to do any of the foregoing shall be void and of no effect. This prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law.

**Section 8.02.**    A.    If Tenant is a corporation, then any transfer of this Lease from Tenant by merger, consolidation or dissolution or any change in ownership or power to vote a majority of the voting stock in Tenant outstanding at the time of execution of this instrument (or at any future time) shall constitute an assignment for the purpose of this Lease. For purposes of this Article VIII, the term "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation involved.

       B.    Notwithstanding anything to the contrary contained in Section 8.01 above, Tenant shall be permitted to assign this Lease to an "Affiliate" or "Qualified Transferee" of Tenant (hereinafter called a "Permitted Assignment"). An "Affiliate" is hereby defined as the parent corporation of Tenant, any wholly owned Subsidiary Corporation of Tenant, or any wholly owned subsidiary of Tenant's parent corporation. A "Qualified Transferee" is hereby defined as an entity that meets the following criteria: (1) That the proposed assignee is purchasing all or substantially all of the assets or stock of the Tenant as of the date hereof; (2) That the proposed assignee will continue to use the Leased Premises for that use as set forth in Article VI, hereof; (3) That the proposed assignee has at least five (5) years experience in managing and operating the type of business as described in Article VI, hereof; and (4) That the proposed assignee has a net worth (based upon generally accepted accounting principles) equal to or greater than Tenant's net worth on the execution date hereof or on the date the proposed assignment is to become effective, whichever is greater. In the event of a Permitted Assignment, the following shall apply: (i) Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties and obligations of Tenant hereunder and such assignee shall be jointly and severally liable therefor along with Tenant; (ii) A signed counterpart of all such instruments relative thereto, executed by all parties to such transaction with the exception of Landlord shall be submitted by Tenant to Landlord within ten (10) days of execution of same; (iii) Tenant shall remain directly and primarily liable for the performance of all of the covenants, duties and obligations of Tenant hereunder (including, without limitation, the obligation to pay all rent and other sums herein provided to be paid), and Landlord shall be permitted to enforce the provisions of this instrument against the undersigned Tenant and/or any assignee without demand upon or proceeding in any way against any other person; and (iv) Tenant shall have supplied Landlord with the name of the proposed assignee, a financial statement of the proposed assignee (including both an income statement and balance sheet), and a resume covering the business experience of the proposed assignee. In the event that the foregoing do not in Landlord's reasonable discretion, evidence the satisfaction of conditions in i – iv above, then the transfer will not be deemed to be a Permitted Assignment.

**Section 8.03.**    If Tenant should in any way transfer its leasehold interest as contemplated above, Landlord may nevertheless collect rent from the transferee and apply the net amount collected to the rent payable hereunder, but no such transaction or collection of rent or application thereof by Landlord shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties and obligations hereunder.

**Section 8.04.**    If Landlord consents to a sublease of the Leased Premises or any portion thereof, Tenant will pay to Landlord forty percent (40%) of any Sublease Gross Receipts (as defined below) derived by Tenant from such subletting in excess of the Base Rent and Additional Rent and all other charges payable by Tenant to Landlord under the Lease. "Sublease Gross Receipts" shall mean any rents and pass through of insurance, taxes and maintenance

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 5 of 73

and operating charges payable under the sublease to Tenant. Such portion of excess Sublease Gross Receipts shall be paid by Tenant to Landlord on a monthly basis in arrears commencing thirty (30) days after the effective date of the sublease. Within thirty (30) days after the effective date of the sublease, Tenant will submit to Landlord a statement containing a reasonably detailed calculation of any Sublease Gross Receipts derived from subletting certified as correct by an officer of Tenant. At Landlord's request, Tenant will provide substantiation of Tenant's calculation of Sublease Gross Receipts, reasonably satisfactory to Landlord and Landlord shall have the right upon request to inspect Tenant's books and records to confirm as correct the Tenant's calculation of any Sublease Gross Receipts.

**Section 8.05.** If Landlord consents to an assignment of this Lease, Tenant will pay to Landlord forty percent (40%) of any Assignment Gross Receipts (as defined below) Tenant derives from such assignment. The term "Assignment Gross Receipts" means any amount paid or payable by an assignee to Tenant as consideration for such assignment. Within thirty (30) days after Tenant receives any amount from an assignee as consideration for an assignment, Tenant will submit to Landlord a statement containing a reasonably detailed calculation of any Assignment Gross Receipts derived from such assignment, certified as correct by an officer of Tenant, and simultaneously with the delivery of such statements, Tenant will pay such portion of any Assignment Gross Receipts shown by such statements. At Landlord's request, Tenant will substantiate Tenant's calculation of any Assignment Gross Receipts in a manner reasonably satisfactory to Landlord, and Landlord shall have the right upon request to inspect Tenant's books and records to confirm as correct the Tenant's calculation of any Assignment Gross Receipts. In addition to any other certifications required under this Lease, the Tenant must obtain from any assignee or deliver to Landlord the certifications described as follows: (i) a certification that such sublessee or assignee will not sublease the Leased Premises or assign the Lease based on rents or other consideration which depend in whole or part on the income or profits of any person derived from the Leased Premises (other than amounts based on a percentage or percentages of gross receipts; (ii) a certification from the sublessee or assignee under ERISA (as hereinafter defined) of the same type, if any, which is required of the Tenant under the Lease; and (iii) a certification that such sublessee or assignee will obtain and deliver to Landlord such a certification or certifications from any further subtenant or assignee of the Lease.

## ARTICLE IX - REPAIR AND MAINTENANCE

**Section 9.01.** Upon the condition precedent that Tenant shall have given Landlord prior written notice of the item damaged, Landlord will repair and maintain only the following portions of the Leased Premises: roof (exclusive of flashing around the rooftop air conditioning unit); structural portions of the Leased Premises (consisting only of the foundation and members supporting the roof); and any utility lines (sewer, water, gas or electrical) located outside the boundaries of the Leased Premises that serve other premises in common with the Leased Premises. If, however, damage to any of the foregoing is caused by the acts or omissions of Tenant, its agents, contractors, employees, customers or invitees, or any burglar, vandal, or unauthorized entrant, then notwithstanding the provisions of Article XI, Tenant shall bear the cost of such repairs.

**Section 9.02.** A. All maintenance, repair and replacements other than those required to be made by Landlord in the first paragraph of Article IX or Articles XI or XVIII will be made by Tenant at Tenant's cost and expense, including without limitation, heating and air conditioning equipment (whether roof mounted or otherwise affixed outside the Leased Premises); electrical and plumbing equipment; all fixtures; all wiring and plumbing lines (whether exposed or concealed); doors, door frames, molding, trim, windows, window frames, closure devices, hardware, plate glass and floor covering. Tenant shall not make or permit any penetration in the roof above the Leased Premises and shall be responsible for all rooftop flashing around the rooftop air conditioning unit. If any such roof penetration is required in connection with Tenant's repair responsibilities, Landlord shall perform such roof penetration at Tenant's cost, which shall be paid upon demand.

If Landlord considers necessary any repairs, maintenance or replacements required to be performed by Tenant, under this Lease, and if Tenant refuses or neglects to perform same after reasonable notice (except in the event of an emergency, when no prior notice shall be required), Landlord shall have the right (but shall not be obligated), to perform such repair, maintenance or replacement and Tenant will pay the cost thereof on demand plus an administrative fee in the amount of ten percent (10%) of such costs.

B. On or before the Commencement Date of this Lease, Tenant shall enter into a maintenance contract ("Contract") with an air conditioning maintenance contractor ("HVAC Contractor") approved by Landlord for the maintenance and service of the HVAC system. Such Contract shall provide for maintenance of the HVAC system not less than quarterly and changing of the air filters not less than monthly. Tenant shall be responsible for all costs associated with the Contract. During the first six (6) months following the Base Rent Commencement Date (hereinafter referred to as the "Warranty Period"), Landlord shall be responsible for all repairs required to be made to the HVAC system serving the Leased Premises, excepting only those necessitated by the intentional abuse or misuse by Tenant or Tenant's employees. In the event Landlord, in its sole discretion, elects to replace at its sole cost any or all of the HVAC mechanical units, Landlord shall have no further liability with respect to the cost of maintenance and/or repair of the portion of the HVAC mechanical system so replaced. In such event and in any event after expiration of said Warranty Period, Tenant shall thereafter have total responsibility for the maintenance, repair and replacement in accordance with Section 9.02.A above.

**Section 9.03.** Tenant will not commit waste but will maintain the Leased Premises in as clean and as attractive condition as when Landlord tendered possession of the Leased Premises to Tenant, and shall also keep adjacent sidewalks clean. Upon termination of this Lease, Tenant will surrender the Leased Premises to Landlord broom-clean and in the same condition in which they existed at the commencement of this Lease, excepting only ordinary wear and tear, any pre-existing damages or defects as documented in writing as set forth in Exhibit "C" to this Lease during the walk-through of the space prior to Landlord's tendering possession of the Leased Premises to Tenant,

Case: 19-52335    Doc# 73-3    Filed: 12/09/19 A    Entered: 12/09/19 17:39:21    Page 6 of 73

damage arising from acts of God, and any damage required hereunder to be repaired by Landlord. Without limiting the generality of the foregoing sentence, Tenant shall be responsible, prior to termination or expiration of the term of this Lease, to perform, to Landlord's reasonable satisfaction, each and every repair and maintenance item listed on "Exhibit C" attached hereto and incorporated herein (the "Tenant Move-Out Responsibilities"). At least thirty (30) days, but not more than sixty (60) days, prior to the termination or expiration of the term of this Lease, Tenant shall schedule a meeting with Landlord at the Leased Premises to review the status of the Tenant Move-Out Responsibilities (the "Move-Out Meeting"), which Move-Out Meeting shall occur no later than fifteen (15) days prior to the termination or expiration date. At the Move-Out Meeting, the parties shall identify those items of the Tenant Move-Out Responsibilities which have been completed and those that have not been completed. If certain items have not been completed, Landlord and Tenant shall schedule a subsequent, final walk-through of the Leased Premises prior to the termination or expiration date so that Landlord may confirm that Tenant has completed all of the Tenant Move-Out Responsibilities. If Tenant fails or refuses to complete all of the Tenant Move-Out Responsibilities, to Landlord's satisfaction, prior to the termination or expiration date of this Lease, then Landlord may (but shall not be obligated to) complete all remaining Tenant Move-Out Responsibilities. Tenant shall reimburse Landlord, upon demand, for all costs and expenses incurred by Landlord to complete any unfinished, incomplete Tenant Move-Out Responsibilities ("Landlord Move-Out Costs"). Failure of Tenant to perform any of its obligations under this section including, but not limited to, its failure to perform the Tenant Move-Out Responsibilities to Landlord's satisfaction, within the time period required in this section, shall constitute an Event of Default under this Lease and shall entitle Landlord, in addition to all other recourses and remedies provided in this Lease, to deduct from any security deposit held by Landlord under this Lease an amount equal to the Landlord Move-Out Costs. In connection with the Tenant Move-Out Responsibilities, Tenant shall comply with the provisions of Article XXV of this Lease. Upon termination, Tenant will also surrender to Landlord all keys to the Leased Premises. Landlord may promulgate reasonable rules and regulations, which provide the details of the foregoing requirements.

**Section 9.04.**     Upon twenty-four (24) hours notice (except in an emergency, wherein no notice shall be required) Landlord will have the right to enter the Leased Premises at any reasonable time (including during Tenant's business hours) to inspect the condition thereof, to make necessary repairs or to repair or maintain pipes, wires, and other facilities serving other premises in the Commercial Park or to show same to prospective purchasers or during the last six (6) months of the Lease term to prospective tenants.

**Section 9.05.**     Should any mechanic's liens or other liens or affidavits claiming liens be filed against the Leased Premises or the Commercial Park for any reason whatsoever incident to the acts or omissions of Tenant, its agents or contractors, Tenant shall cause the same to be cancelled and discharged of record by payment, bonding or otherwise, within fifteen (15) days after notice by Landlord.

**Section 9.06.**     The provisions of Section 25.01 shall apply to maintenance, repairs, and replacements to the Leased Premises to be performed by or on behalf of Tenant.

## ARTICLE X - ADDITIONS AND FIXTURES

**Section 10.01.**     Tenant will make no alterations or additions to the Leased Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld; provided, the alterations or additions are interior, non-structural modifications not requiring a permit, they do not affect the building systems and the total cost of the alteration or addition is under $25,000.00. At such time as Tenant requests such written consent of Landlord, Tenant shall submit plans and specifications for such alterations or additions to Landlord.

**Section 10.02.**     Subject to the lien and security interest and other rights of Landlord referred to in Article XIV, Tenant shall remove only "Removable Trade Fixtures", as hereinafter defined (excluding all components of the HVAC system, pipes, paneling or other wall covering or floor covering), and, in addition to other applicable provisions of this Lease regarding such removal, the following shall apply: (1) such removal must be made prior to the termination of the term of this Lease; (2) Tenant must not be in default of any obligation or covenant under this Lease at the time of such removal; and (3) such removal must be effected without damage to the Leased Premises or the building of which the Leased Premises are a part and Tenant must promptly repair all damage caused by such removal. For the purposes hereof, the phrase "Removable Trade Fixtures" means the following: all of Tenant's signs (excluding fascia signs), tables, chairs, desks, racks, merchandisers and displayers, standards, wall brackets, hang-rods, shelves, mirrors, marking equipment, cash registers and other business machines. If, by the termination of this Lease, Tenant fails to remove any Removable Trade Fixtures or all alterations, additions, fixtures, equipment and property which Landlord has requested that Tenant remove or Tenant fails to repair any damage caused by its removal, then Landlord shall have the right (but not the obligation) to remove such Removable Trade Fixtures and/or other alterations, additions, fixtures, equipment or property or repair any such damage caused by the removal thereof and thereupon Tenant will, on demand pay to Landlord the cost of such removal, transportation and storage on any Removable Trade Fixtures (or other alterations, additions, fixtures, equipment and property installed or placed by Tenant in the Leased Premises), and the cost of repairing any such damage caused by the removal thereof together with interest on all such sums at the highest lawful rate.

All plumbing or electrical wiring connections exposed as a result of the removal of Tenant's Removable Trade Fixtures, or other alterations, additions, fixtures, equipment and property installed or placed by it in the Leased Premises (if such removal is so requested by Landlord) shall be capped by Tenant in a safe and workmanlike manner.

**Section 10.03.**     Tenant shall pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed by any governmental authority or other taxing authority upon Tenant's leasehold interest under this Lease and all alterations, additions, fixtures (including

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 7 of 73

Removable Trade Fixtures), inventory and other property installed or placed or permitted at the Leased Premises by Tenant. Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment received by Tenant from the governmental authority or other taxing authority assessing such charges.

**Section 10.04.**    The provisions of Section 25.02 shall apply to alterations or improvements to the Leased Premises to be performed by or on behalf of Tenant.

## ARTICLE XI - FIRE AND DESTRUCTION OF PREMISES

**Section 11.01.**    If the Leased Premises are destroyed or damaged by fire or other casualty to an extent of less than twenty-five percent (25%) of replacement costs above the foundation and, as of the date of loss, at least twenty-four (24) full calendar months remain in the term of this Lease, then Landlord shall be obligated to repair and restore the Leased Premises, at Landlord's sole cost and expense, to the condition that existed upon the date Landlord originally tendered possession of the Leased Premises to Tenant. If the Leased Premises should be destroyed or damaged by fire or any other risk, peril or casualty (whether or not covered by insurance), other than as provided in the immediately preceding sentence, then Landlord shall have the right to terminate this Lease by written notice to Tenant, which termination shall be effective one hundred twenty (120) days following the effective date of Landlord's termination notice. In the event Landlord does not exercise such right, then within a reasonable time following such casualty, Landlord shall provide Tenant with its good faith estimate of the time it will take for Landlord to complete its repair and restoration obligations as set forth in this Lease (the "Restoration Estimate"). In the event (i) the damage to the Leased Premises was not caused by one or more acts or omissions of Tenant and (ii) the Restoration Estimate states that it will likely take longer than one hundred eighty (180) days from the date of such notice for Landlord to complete its restoration obligations, then Tenant shall have the right to terminate this Lease, which termination will be effective sixty (60) days after the effective date of Tenant's termination notice. If the Lease is not terminated as provided above, and the repairs and restoration to be performed by Landlord pursuant to this Lease are not completed within one hundred eighty (180) days after the effective date of the Restoration Estimate, Tenant may deliver written notice to Landlord stating that if all such repairs are not completed within sixty (60) days thereafter, Tenant will terminate the Lease; and, in such event, if the repairs and restoration are not completed within sixty (60) days after Tenant delivers such notice to Landlord, Tenant may terminate the Lease at any time thereafter until such repairs are completed by delivering written notice thereof to Landlord.

If all or any portion of any other buildings in the Commercial Park, should be destroyed or damaged by fire or any other risk, peril or casualty (whether or not covered by insurance), then Landlord shall have the election to terminate this Lease, or to repair and reconstruct the Commercial Park. Landlord will notify Tenant of its election within ninety (90) days after receipt of written notice from Tenant of such damage or destruction.

**Section 11.02.**    In any circumstances described above where Landlord elects to repair and restore the Leased Premises, this Lease shall continue in full force and effect, and such repairs will be made by Landlord within a reasonable time thereafter, subject to delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, Acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any other cause beyond the control of Landlord (all of the aforesaid causes for delay being herein sometimes referred to as "Force Majeure"). Rent shall abate proportionately during the period and to the extent that the Leased Premises are unfit for use by Tenant and not actually used by Tenant in the ordinary conduct of its business.

## ARTICLE XII - LIABILITY AND INDEMNITY

**Section 12.01.**    Tenant agrees to indemnify and hold Landlord, Landlord's agents and Landlord's employees harmless from all claims, actions and damages (including costs and expenses of defending against all of the aforesaid) arising (or alleged to arise) from any act or omission of Tenant or Tenant's agents, employees, assignees, sublessees, contractors, customers or invitees, or arising from any injury to or death of any person or persons or damage to or destruction of the property of any person or persons occurring in or about the Leased Premises or on the sidewalks adjacent thereto, and Tenant assumes responsibility for the condition of the Leased Premises and agrees to give Landlord written notice in the event of any damage, defect or disrepair therein.

**Section 12.02.**    Tenant agrees to take out and maintain at all times during the lease term a policy of fire and extended coverage insurance on its alterations and other personal property placed at the Leased Premises (including, but not limited to the rooftop HVAC and plate glass). Such policy shall contain a replacement cost endorsement. In the event that Tenant sustains a loss by reason of fire or other casualty, and such fire or casualty is caused in whole or in part by acts or omissions of Landlord, its agents, servants or employees, then Tenant agrees to look solely to its insurance proceeds (if any); and Tenant shall have no claim or right of recovery against Landlord, or the agents, servants or employees of Landlord; and no third party shall have any claim or right of recovery by way of subrogation or assignment or otherwise. Such insurance policy shall contain a loss payable clause designating Tenant and Landlord as loss payees as their respective interests may appear. Tenant shall be responsible for the safety and personal well being of Tenant's employees, both within the Leased Premises and in the Common Area.

**Section 12.03.**    Tenant will take out and maintain, at its own cost and expense, commercial general liability insurance coverage in a minimum amount of $2,000,000.00 combined single limit and shall include products liability coverage. Such policy shall name Landlord (and any of its affiliates, subsidiaries, successors and assigns designated by Landlord) and Tenant as the insureds. Such policy shall be in a form and with a company acceptable to Landlord and shall be endorsed so as to be non-cancelable with respect to Landlord and not subject to material change except upon thirty (30) days prior written notice to Landlord given in the manner set forth in Article XXII, below.

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 8 of 73

**Section 12.04.** Each party releases the other party from any and all liability or responsibility (to the releasing party or anyone claiming through or under the releasing party by way of subrogation or otherwise) for loss or damage to property resulting from causes insured against, even if such casualty has been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible.

## ARTICLE XIII - SECURITY DEPOSIT

**Section 13.01.** Tenant will, promptly upon execution of this instrument, pay to Landlord the Security Deposit, if any, which may be commingled by Landlord with its other funds and which shall be received and held by Landlord without liability for interest as security for the faithful performance of all of the terms and provisions of this Lease by Tenant, including the obligation to pay rent. If Tenant should default with respect to any covenant, duty or obligation of Tenant hereunder, then the Security Deposit, or any part thereof, may be applied by Landlord on the damages sustained by Landlord by reason of any such default or on indebtedness owing by reason of any failure of Tenant to make any required monetary payment hereunder. At any time or times when Landlord has made any such application of all or any portion of the Security Deposit, Landlord shall have the right at any time thereafter to require that Tenant pay to Landlord a sum equal to the amount(s) so applied by Landlord so that Landlord will always be in possession of a sum equal to the amount of the Security Deposit stated above. If any sale or transfer occurs of Landlord's interest in the Commercial Park, Landlord may transfer the Security Deposit to the purchaser or transferee, in which event Tenant will look solely to the new landlord for the return of the Security Deposit and Landlord will thereupon be released from all liability to Tenant for the return of the Security Deposit.

## ARTICLE XIV - LANDLORD'S LIEN

**Section 14.01.** To secure the payment of all rent due and to become due hereunder and the faithful performance of this Lease by Tenant and to secure all other indebtedness and liabilities of Tenant to Landlord now existing or hereafter incurred, Tenant hereby gives to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, chattels and merchandise) which may be placed in the Leased Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. All exemption laws are hereby waived in favor of said lien and security interest and in favor of Landlord's statutory lien. This lien and security interest may be foreclosed with or without court proceedings by public or private sale provided Landlord gives Tenant at least ten (10) days' notice of the time and place of said sale, and Landlord shall have the right to become the purchaser, upon being the highest bidder at such sale. Landlord shall, in addition to all of its rights hereunder, also have all of the rights and remedies of a secured party under applicable state law. Tenant hereby authorizes the filing of a National Uniform Commercial Code Financing Statement so that when properly filed, the security interest hereby given shall thereupon be perfected.

**Section 14.02.** In the event that Landlord shall have taken possession of the Leased Premises pursuant to the authority hereinafter granted in connection with an Event of Default or for any other lawful reason, Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Leased Premises, including that which is owned by or leased to Tenant, at all times prior to any foreclosure thereon by Landlord or repossession thereof by any lessor thereof or third party having a lien thereon. Landlord shall also have the right to remove from the Leased Premises and Commercial Park (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the county in which the Leased Premises are located or dispose of same in any manner acceptable to Landlord; and in such event, Tenant shall be liable to Landlord for costs incurred by Landlord in connection with such removal, storage and/or disposal and shall indemnify and hold Landlord harmless from all loss, damage, cost, expense and liability in connection with such removal, storage and/or disposal. Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

## ARTICLE XV - DEFAULT, REMEDIES AND DETERMINATION OF DAMAGES

**Section 15.01.** Each of the following acts or omissions of Tenant or occurrences shall constitute an "Event of Default":

    (a)    Failure or refusal by Tenant to timely pay Rent or any other sum when due following five (5) days written notice; provided that, in no event shall Landlord be required to give such notice more than two (2) times during any calendar year, and from and after Tenant's third (3rd) such failure or refusal during any calendar year, Landlord shall be entitled to exercise any or all of the remedies set forth in Article XVI without prior notice to Tenant; or

    (b)    Failure or refusal by Tenant to comply with the obligations of Tenant set forth in Article VI and/or Article VIII of this Lease; or

    (c)    Failure or refusal by Tenant to timely perform or observe any other covenant, representation, duty or obligation of Tenant under this Lease; provided, however, notwithstanding the occurrence of such Event of Default, Landlord shall not be entitled to exercise any of the remedies provided for in this Lease or by law unless such Event of Default continues beyond the expiration of thirty (30) days following notice to Tenant of such Event of Default; or

    (d)    if this Lease is guaranteed, any event of default under any such guaranty; or

    (e)    if Tenant or any subsidiary of Tenant shall lease other premises from Landlord, any event of default shall occur under any such other lease; or

Case: 19-52335   Doc# 73-3   Filed: 12/09/19   Entered: 12/09/19 17:39:21   Page 9 of 73

(f)     Abandonment of the Leased Premises or any significant portion thereof; provided, however, vacating the Leased Premises shall not be deemed an "abandonment" so long as Tenant complies with all other obligations of Tenant under the Lease, including, but not limited to, the obligation to timely pay Rent and perform Tenant's repair obligations set forth in the Lease.

**Section 15.02.**     If and whenever any Event of Default shall occur, after such notice, if any, as is provided in the first paragraph of Article XV, Landlord may, at its option, in addition to all other rights and remedies given hereunder or by law or equity, do any one or more of the following:

(a)     Terminate this Lease or Tenant's right to possession of the Leased Premises, in either event, Tenant shall immediately surrender possession of the Leased Premises to Landlord;

(b)     Enter upon and take possession of the Leased Premises and expel or remove Tenant and any other occupant therefrom, with or without having terminated the Lease;

(c)     Alter locks and other security devices at the Leased Premises as provided under state law.

Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Leased Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant.

Upon the occurrence of an Event of Default, Landlord shall not be obligated to give any notice (written or oral) regarding Landlord's exercise of any remedies hereunder. Tenant hereby waives (to the extent legally permissible) any and all notices otherwise required under statutory or common law. To the extent of any inconsistency between this Lease and any statutory or common law, it is the agreement of the parties that this Lease shall prevail.

If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Leased Premises for such purpose), and thereupon Tenant shall be obligated to, and hereby agrees to pay Landlord, upon demand, all costs, expenses and disbursements incurred by Landlord in taking such remedial action.

**Section 15.03.**     In the event Landlord elects to terminate this Lease by reason of an Event of Default or in the event Landlord elects to terminate Tenant's right to possession of the Leased Premises without terminating this Lease, Landlord may hold Tenant liable for all rent and other indebtedness accrued to the date of such termination, plus such future rent and other indebtedness as would otherwise have been required to be paid by Tenant to Landlord during the balance of the term of the Lease had Landlord not elected to terminate the Lease or Tenant's right to possession.

In the event Landlord elects to terminate this Lease by reason of an Event of Default, regardless of whether Landlord has then collected all amounts currently due under this Lease ("Current Damages"), Tenant shall pay to Landlord, on demand, as liquidated and agreed "Final Damages" (but not as a penalty) for such Event of Default and in lieu of all Current Damages beyond the date of demand, an amount equal to the present cash value on the date of demand of the Base Rent and Additional Rent that would have been payable from the date of demand for what would have been the unexpired Lease Term if it had not been terminated, plus the Base Rent and Additional Rent due through the earlier of the date of termination, and the Current Damages up to the date of demand, which remain unpaid. If any statute or rule of law governing a proceeding in which Final Damages are to be proved validly limits the Final Damages to an amount less than that provided for herein, Landlord is entitled to the maximum allowable under the statute or rule of law. The discount rate of interest shall be provided in Section 15.05.

In case of an Event of Default, Tenant shall also be liable for and shall pay to Landlord at Houston, Harris County, Texas, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Leased Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Leased Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing Landlord's remedies.

Notwithstanding anything to the contrary contained herein, if Tenant is evicted or Landlord takes possession of the Leased Premises by reason of Tenant's default hereunder, Tenant hereby waives any right of redemption or relief from forfeiture under California Code of Civil Procedure Sections 1174 or 1179, or under any other present or future law. The various rights and remedies reserved to Landlord herein, including those not specifically described herein, shall be cumulative. Except as otherwise provided by the California statutory law in force and effect at the time of the execution hereof, Landlord may pursue any or all of such rights and remedies. No delays or omission by Landlord to exercise any right or remedy shall be construed as a waiver of any such right or remedy or of Tenant's default hereunder.

Any termination of this Lease shall automatically terminate existing subtenancies, unless Landlord, in its sole discretion, agrees in writing otherwise.

**Section 15.04.**     Tenant and Landlord agree that Landlord shall have a duty to make a "reasonable attempt" to relet the Leased Premises in the event such Leased Premises should become vacant due to an Event of Default by Tenant. Tenant agrees that Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished, because of Landlord's failure to actually relet the Leased Premises or collect rent due with respect to such reletting so long as Landlord has fulfilled its duty to make a "reasonable attempt" to relet.

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 10 of 73

Landlord and Tenant agree that Landlord shall be conclusively deemed to have made a "reasonable attempt" to relet the Leased Premises by doing the following: (a) posting a "For Lease" sign on the Leased Premises, and (b) advising Landlord's leasing staff of the availability of the Leased Premises, including the property in Landlord's overall marketing program including advertising the Leased Premises on Loop-Net and Co-Star or another commonly used commercial property availability database.

Landlord shall not in any event be required to give any preference or priority to the leasing of the Leased Premises over any other space that Landlord may have available in the Commercial Park. Landlord shall not be required to: (i) take any instruction or advice given by Tenant regarding reletting the Leased Premises; (ii) accept any proposed tenant unless such tenant has a credit-worthiness acceptable to Landlord in its sole discretion; (iii) accept any proposed tenant unless such tenant leases the entire Leased Premises upon terms and conditions satisfactory to Landlord in its sole discretion (after giving consideration to all expenditures by Landlord for tenant improvements, broker's commissions and other leasing costs); or (iv) consent to any assignment or sublease for a period which extends beyond the expiration of the current term or which Landlord would not otherwise be required to consent to under the provisions of this Lease.

If Landlord receives any payments from the reletting of the Leased Premises, any such payments shall first be applied to any costs or expenses incurred by Landlord as a result of Tenant's Event of Default under the Lease, including but not limited to leasing and brokerage fees (including expenses to third party brokers, to Landlord's affiliates and employees of Landlord and its affiliates), attorneys' fees, and construction expenses relating to reletting the Leased Premises (whether paid to a third party contractor or to the Tenant as a construction allowance) and in no event shall Tenant be entitled to any excess of rent (or rent plus other sums) obtained by reletting over and above the rent herein reserved.

**Section 15.05.**   In the event that Landlord has to pursue any of its rights or remedies under this Lease, Landlord shall be entitled to recover from Tenant all reasonable costs incurred by Landlord in attempting to collect such sum, including reasonable attorneys' fees.

**Section 15.06.**   In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have a reasonable period, but in no event less than thirty (30) days, in which to commence to cure any such default. Unless and until Landlord fails so to commence to cure any default after such notice or having so commenced thereafter fails to exercise reasonable diligence to complete such curing, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as independent covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Commercial Park and not thereafter.

**Section 15.07.**   If any payment of Rent or any other sum due from Tenant under this Lease shall not be received by Landlord on or before the fifth (5th) day of each month, then, in addition to such required payment, Tenant shall also pay to Landlord a "Late Charge" equal to five cents ($0.05) for each One Dollar ($1.00) so past due; provided that with respect to the first late payment in any calendar year Landlord shall provide notice to Tenant, and Tenant shall have three (3) days to cure said default without penalty. Landlord and Tenant agree that such Late Charge represents a fair and reasonable estimate of the expenses that Landlord will incur by reason of such late payment by Tenant. Acceptance of such Late Charge by Landlord shall not constitute a waiver of Tenant's default with respect to any such past due amounts, nor prevent Landlord from exercising any other rights and remedies granted to Landlord under this Lease or at law or in equity. Any amount due to Landlord that is not paid when due shall bear interest from the date due until paid at the rate that is equal to the lower of (a) the floating and fluctuating "prime rate" of interest identified as such on a daily basis in the "Money Rates" section of *The Wall Street Journal* (and defined therein as the base rate on corporate loans posted by at least seventy-five percent (75%) of the thirty (30) largest U.S. banks) plus six percent (6%) per annum; or (b) the highest rate of interest payable under law. If *The Wall Street Journal* shall cease to publish such "prime rate," Landlord shall have the right to substitute an alternative index set forth in a similar publication. The interest rate payable by Tenant pursuant to the preceding sentence shall increase or decrease automatically and contemporaneously with every increase or decrease in such interest rate index. Payment of interest shall not cure any default by Tenant under this Lease, except as expressly provided.

**Section 15.08.**   No remedy or election by Landlord for an Event of Default is exclusive but, wherever possible, is cumulative with all other remedies or elections provided hereunder and at law and in equity.

**Section 15.09.**   LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THEY OR ANY OF THEM MAY BE A PARTY ARISING OUT OF OR IN ANY WAY RELATED TO THIS LEASE. IT IS UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS. THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY MADE BY LANDLORD AND TENANT, AND EACH PARTY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. LANDLORD AND TENANT ACKNOWLEDGE THAT THIS PROVISION IS A SPECIFIC AND MATERIAL ASPECT OF THIS LEASE. LANDLORD AND TENANT EACH REPRESENT THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS LEASE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, AND THAT IT HAS HAD AN OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 11
of 73

## ARTICLE XVI - NON-WAIVER

**Section 16.01.**    Neither acceptance of rent (or any portion thereof) or any other sums payable by Tenant hereunder (or any portion thereof) by Landlord nor failure by Landlord to complain of any action, non-action or default of Tenant shall constitute a waiver as to any breach of any covenant or condition of Tenant contained herein nor a waiver of any of Landlord's rights hereunder.

## ARTICLE XVII - LANDLORD-TENANT RELATION

**Section 17.01.**    The relation created by this Lease Contract is that of landlord and tenant. No provision of this Lease shall be construed in such a way as to constitute Landlord and Tenant joint venturers or co-partners or to make Tenant the agent of Landlord or to make Landlord liable for the debts of Tenant.

## ARTICLE XVIII - EMINENT DOMAIN

**Section 18.01.**    If there shall be taken during the term of this Lease any portion of the Commercial Park, by any authority having the power of eminent domain, then and in that event, the term of this Lease may cease and terminate at Landlord's election, and the date of such termination shall be, at Landlord's election, either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority. If a lesser part of the Leased Premises shall be taken, either Landlord or Tenant may elect to terminate this Lease or to continue this Lease in effect, but if Landlord and Tenant elect to continue this Lease in effect, the Base Rent and Additional Rent shall be reduced in proportion to the area of the Leased Premises so taken.

**Section 18.02.**    A.        Except as expressly provided to the contrary contained in Section 18.02.B. below, all sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold interest, whether as damages or as compensation, will be the property of Landlord. Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, otherwise payable to Tenant for the leasehold interest by reason of such taking.

B.        Notwithstanding anything contained herein to the contrary, in the event the Lease is terminated due to a complete or partial taking of the Leased Premises, and to the extent (and only to the extent) then compensable under California law, Tenant may apply to the condemning authority for (i) the value of any non-removable personal property and equipment, or the unamortized cost of leasehold improvements installed or made by Tenant in the Leased Premises, (ii) interruption or damage to Tenant's business; and (iii) moving and relocation expenses; provided, however, in no event whatsoever shall compensation to Tenant for any of the foregoing reduce (and Tenant shall have no interest in) the award to Landlord provided in this Section 18.02.

## ARTICLE XIX - HOLDING OVER

**Section 19.01.**    If Tenant should remain in possession of the Leased Premises after the expiration of the term of this Lease, without the execution of a new lease, then Tenant shall be deemed to be occupying the Leased Premises as a tenant from month-to-month, subject to all the covenants and obligations of this Lease, except that as liquidated damages by reason of such holding over, the monthly amounts payable by Tenant under this Lease shall be increased to one hundred fifty percent (150%) of the monthly amounts payable in the last month of the stated term.

**Section 19.02.**    The above described tenancy from month-to-month may be terminated by either party upon thirty (30) days written notice to the other.

## ARTICLE XX - LANDLORD'S MORTGAGEE

**Section 20.01.**    Landlord warrants and represents to Tenant that, as of the date of this Lease, no mortgages or deeds of trust encumber the Commercial Park. Tenant agrees that its interest under this Lease shall be subordinate to any mortgage, deed of trust or similar device now or hereafter placed upon the Leased Premises or all or any portion of the Commercial Park by Landlord if the mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created so elects, and, upon notice to Tenant of such election, Tenant will execute any instruments required to evidence such subordination. Likewise, such mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created may elect, by notice to Tenant, to make this Lease superior to such mortgage or deed of trust or other security device; and in the event of any such election, Tenant will execute any instruments required to evidence such superiority.

**Section 20.02.**    Landlord and Tenant shall execute and deliver to each other, at such time or times as either Landlord or Tenant may request, a certificate stating:

(a)        Whether or not the Lease is in full force and effect;

(b)        Whether or not the Lease has been modified or amended in any respect, and submitting copies of such modifications or amendments, if any;

(c)        Whether or not there are any existing defaults under this Lease to the knowledge of the party executing the certificate, and specifying the nature of such defaults, if any; and

(d)        Such other information as may be reasonably requested.

The aforesaid certificate(s) shall be delivered to Landlord or Tenant, as the case may be, promptly upon receipt of a

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 12 of 73

written request therefor, but in no event more than five (5) days following receipt of such request.

**Section 20.03.** In the event Landlord obtains new debt on the Commercial Park or a new owner purchases the Commercial Park, Landlord hereby agrees to use commercially reasonable efforts to obtain a Non-Disturbance and Attornment Agreement between any future "Landlord's Mortgagee" and Tenant. Such Agreement shall substantially provide that in the event Landlord's Mortgagee should succeed to the interest of Landlord in the Commercial Park, then: (i) Landlord's Mortgagee will recognize the leasehold estate granted to Tenant herein so long as Tenant is not in default of the terms of this Lease, and (ii) Tenant will attorn to Landlord's Mortgagee. Landlord shall be responsible for any reasonable costs or expenses incurred by Landlord's Mortgagee in connection with obtaining said Agreement, including, but not limited to, attorney fees. Tenant hereby agrees to be responsible for any reasonable legal costs and expenses attributable to Tenant in connection with obtaining said Agreement.

**Section 20.04.** If Landlord herein does not own the fee to any portion of the property which constitutes the Commercial Park, but instead holds only a leasehold interest therein under a ground lease, then in such event, this instrument shall be a sublease agreement subject and subordinate to the underlying ground lease. This Lease is made by Landlord and accepted by Tenant subject to any and all matters of record affecting the Leased Premises or the Commercial Park.

## ARTICLE XXI - ADDITIONAL RENT

**Section 21.01.** Tenant shall pay to Landlord, as Additional Rent, at the address set forth in Section 4.01 or at such other place designated by Landlord, the Operating Costs (as set forth in Article I.10) for the Building during any calendar year during the term hereof. The first amount which may be due hereunder shall be due within ten (10) days after Landlord submits to Tenant a bill or invoice therefor. In addition, Landlord shall have the right, exercisable by Landlord's giving notice to Tenant from time to time during the term of this Lease, to estimate the Operating Costs, whereupon commencing on the future date during the term of this Lease indicated by Landlord and continuing for the balance of the period during the term of this Lease, Tenant shall pay to Landlord on the first day of each month, monthly in advance, the monthly charge so indicated by Landlord as Landlord's estimate of such increase. Said amount shall be adjusted between Landlord and Tenant annually (and at the expiration or earlier termination of this Lease), and payment shall be made to, or credit made by, Landlord (as the case may be) in order that Landlord shall receive the precise amount due in payment of any such increase of Operating Costs for the preceding calendar year or any fractional calendar year.

**Section 21.02.** For purposes of this Lease, the term "Operating Costs", shall include all expenses incurred with respect to the maintenance, management and operation of the Commercial Park of which the Leased Premises are a part (except for those detailed in "Exhibit D"), including, but not limited to, the following:

    A. The aggregate of all costs, expenses and liabilities of every kind or nature paid or incurred by Landlord (to the extent that Landlord, in its good faith judgment, regards it as reasonably necessary or appropriate to provide the services and materials hereafter referred to and to pay and incur the costs, expenses and liabilities hereafter referred to) in connection with operating, maintaining, managing and equipping the Common Area including, without limitation, subdivision maintenance fees or dues and also including a fair and equitable portion of Landlord's costs of maintaining common improvements of the Commercial Park (as determined by Landlord); constructing, operating, repairing and maintaining any necessary on-site or off-site utilities; maintenance of rail lines serving the Commercial Park; exterior maintenance of the Building, including periodic repainting of exterior walls, fascias and parapets and steam cleaning, sandblasting, filling holes and graffiti-removal procedures thereof; repairing and maintaining the structural portions of the Building; repairing and maintaining the roof of the Building; providing security services with respect to the Common Area (Tenant acknowledging that Landlord is not obligated to provide such security service and Tenant assumes all responsibility for the protection of Tenant, its agents, invitees and property from acts of third parties), the cost of maintaining and repairing the fire sprinkler systems; the cost of supplying utilities to the Common Area; the costs to provide water and sanitary sewer service to the Leased Premises; costs incurred by Landlord in providing the Tenant with trash removal services (to the extent that Landlord elects to provide such services); the costs associated with changing HVAC filters on a monthly basis; plus a commercially reasonable property management fee payable to the manager of the Commercial Park based upon the gross receipts of the Commercial Park not to exceed two percent (2%) of the gross receipts collected.

    B. All taxes, assessments (including all present and future Mello-Roos assessments), impositions, levies, charges, excises, fees, licenses and other sums (whether now existing or hereafter arising, whether foreseen or unforeseen and whether under the present system of real estate taxation or some other system), levied, assessed, charged or imposed by any governmental authority or other taxing authority (or by any property owners' or similar association) or which accrue on the Building for each calendar year (or portion thereof) during the term of this Lease, including, without limitation, all penalties, interest and other charges (with respect to Taxes) payable by reason of any delay in or failure or refusal of Tenant to make timely payment as required under this Lease. Tenant waives any rights it may have pursuant to statutory or common law to protest the appraised value of the Building or to appeal the same.

    C. In regard to the Operating Costs included above, the phrase "Tenant's Share" shall mean the proportion that the ground floor area of the Leased Premises (as indicated in Article I.4. and Section 2.01 of this Lease Contract) bears to the total ground floor area of the Building on the first day of January for the relevant calendar year for which any calculation referred to in this Article XXI is being made. Tenant's Share with respect to the Operating Expenses listed above, including, but not limited to Taxes, shall be one hundred percent (100%) of the Leased Premises as defined in Section 2.01.

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 13 of 73

D. The total annual insurance premiums which accrue on all fire and extended coverage insurance, boiler insurance, public liability and property damage insurance, rent insurance and other insurance which, from time to time, may at Landlord's election be carried by Landlord with respect to the Commercial Park during any applicable calendar year (or portion thereof) occurring during the term of this Lease; provided, however, in the event that during any such calendar year all or any part of such coverage is written under a "blanket policy" or otherwise in such manner that Landlord was not charged a specific insurance premium applicable solely to the Commercial Park, then in such event, the amount considered to be the insurance premium with respect to such coverage for such calendar year shall be that amount which equals the percentage of the total cost of the annual insurance premium payable under such blanket policy that the total leasable square footage of the building in which the Leased Premises is situated bears to the total leasable square footage of the buildings insured under the blanket policy.

E. Property owners association fees or dues and similar charges.

F. Notwithstanding anything to the contrary contained herein, in regard to the annual insurance premiums and property owners association fees, the phrase Tenant's Share shall mean the proportion that the ground floor area of the Leased Premises (as indicated in Article I.4. of this Lease Contract) bears to the total ground floor area in all the buildings in the Commercial Park (whether or not actually leased) on the first day of January for the relevant calendar year for which any calculation referred to in this Article XXI is being made.

G. If the Leased Premises are served by rail lines in the Commercial Park, then Tenant's Share of Operating Costs shall also include the total costs to maintain such rail lines multiplied by a fraction, the numerator of which is the square footage of the Leased Premises and the denominator of which is the square footage of all premises in the Commercial Park served by such rail lines

H. After the expiration of calendar year 2013 (the "Base Year"), the amount which Tenant shall be obligated to pay to Landlord as a portion of the Operating Costs as defined in Section 21.02.A. calculated on a monthly, per square foot basis shall not exceed an amount equal to the "Base Costs" (as hereinafter defined) increased by five percent (5%) per year for each calendar year after the Base Year. For purposes hereof, the term "Base Costs" shall be defined as Tenant's Share of Operating Costs computed on an average monthly basis for the Base Year. The foregoing limitation on increases in Operating Costs shall not apply to the property management fee, security costs, utility costs, insurance premiums, taxes, assessments, impositions, levies, charges, excises, fees and licenses for the Commercial Park. Furthermore, should any action or inaction by Tenant result in an Event of Default (as hereinafter defined), and such Event of Default remains uncured at the expiration of the relevant notice period as set forth in Article XV hereof, then the foregoing limitation on the Operating Costs shall be immediately rendered null and void without further force and effect.

**Section 21.03.** If there is presently in effect or hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease (herein referred to as "Rent Sales Tax"), then in addition to all rent and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax. The term "Rent Sales Tax" shall not include any income taxes applicable to Landlord.

## ARTICLE XXII - NOTICE

**Section 22.01.** Any notice which may or shall be given under the terms of this Lease shall be in writing and shall be either delivered to the Notice Address of either Landlord or Tenant, by hand or sent by United States Registered or Certified Mail, adequate postage prepaid. Either party's address may be changed from time to time by such party by giving notice as provided above, except that the Leased Premises may not be used by Tenant as the sole Notice Address. No change of address of either party shall be binding on the other party until notice of such change of address is given as herein provided. A post office receipt for registration of such notice or signed return receipt shall be conclusive that such notice was delivered in due course of mail if mailed as provided above. For purposes of the calculation of various time periods referred to herein, notice delivered by hand shall be deemed received when delivered to the place for giving notice to a party referred to above and notice mailed in the manner provided above shall be deemed completed upon the earlier to occur of (i) actual receipt as indicated on the signed return receipt, or (ii) three (3) days after posting as herein provided. Finally, any written notice addressed as provided hereinabove and actually received by the addressee, shall constitute sufficient notice for all purposes under this Lease.

## ARTICLE XXIII - TENANT'S SIGNS

**Section 23.01.** Tenant shall be responsible for the costs and installation of a building fascia sign, including any required licenses or permits. Sign plans shall be prepared by Tenant in accordance with any existing sign criteria for the Commercial Park and submitted to Landlord for Landlord's prior written approval, which shall not be unreasonably withheld. Except as approved by Landlord in writing, no sign, placard or advertisement, or exterior or interior window sign, placard or advertisement shall be painted, erected or displayed and no awnings shall be erected. Any interior sign which is not designed or reasonably calculated to be seen from outside the Leased Premises may be placed and displayed by Tenant, without Landlord's further consent.

## ARTICLE XXIV - ERISA/UBIT

**Section 24.01.** Tenant represents and warrants to Landlord that neither Tenant nor any guarantor of Tenant's obligations under this Lease is (a) a party in interest, as defined in Section 3(14) of the of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), to the AFL-CIO Building Investment Trust ("Trust"), or of any of the plans participating therein, a list of which plans has previously been delivered to Tenant (or which will be delivered to Tenant upon Tenant's request), or (b) a disqualified person under Section 4975(e)(2) of the Internal

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 14 of 73

Revenue Code of 1986, as amended ("Code"), with respect to the Trust or the plans participating therein. Tenant further represents and warrants to Landlord that Imperial Toy, LLC and its principals and subsidiaries are not affiliated with The PNC Financial Services Group, Inc. Neither Tenant nor any guarantor of Tenant's obligations under this Lease shall take any action that would cause this Lease or the exercise by Landlord or the Trust of any rights hereunder, to be a non-exempt prohibited transaction under ERISA. Notwithstanding any contrary provision of this Lease, Tenant shall not assign this Lease or sublease all or any portion of the Leased Premises unless (i) such assignee or subtenant delivers to Landlord a certification (in form and content satisfactory to Landlord) with respect to the status of such assignee or subtenant (and any guarantor of such assignee's or subtenant's obligations) as a party in interest and a disqualified person, as provided above; and (ii) such assignee or subtenant undertakes not to take any action that would cause this Lease or the exercise by Landlord or the Trust of any rights hereunder, to constitute a non-exempt prohibited transaction under ERISA.

**Section 24.02.**    Notwithstanding any contrary provision of this Lease, Tenant shall not (a) sublease all or any portion of the Leased Premises under a sublease in which the rent is based on the net income or net profits of any person, or (b) take any other action with respect to this Lease or the Leased Premises such that the revenues to be received by Landlord or the Trust from time to time in connection with this Lease would, as a result of such action, be subject to the Unrelated Business Income Tax under Sections 511 through 514 of the Code.

**Section 24.03.**    Tenant agrees that it shall incorporate the requirements of this Article XXIV in any sublease of the Leased Premises (without implying Landlord's consent thereto).

## ARTICLE XXV - LABOR COVENANT

**Section 25.01.**    Tenant shall use Union Labor (defined below) for all maintenance, repair, and replacement of the Leased Premises (the "Maintenance Labor Covenant"). Notwithstanding the foregoing, the Maintenance Labor Covenant shall not apply to (i) the services for installation, operation, maintenance and repair of personal property owned exclusively by Tenant (e.g., computer systems, telephones, and furniture other than modular furniture) or for any of Tenant's specialized equipment, (ii) a specific item or instance of maintenance, repair or replacement to the extent Union Labor is not available in the market to perform such specific item or instance of maintenance, repair or replacement, and/or (iii) maintenance, repairs and replacements that may be and are self-performed by the existing staff of Tenant without the retention, engagement or hiring of any third party or additional employee. Tenant shall (a) include the Maintenance Labor Covenant in each of its service contracts, (b) provide such evidence as Landlord may reasonably require, from time to time during the Lease Term, that the Maintenance Labor Covenant is being fully and faithfully observed and Tenant shall include the obligation to provide such evidence in each service contract entered into by Tenant for such services, and (c) incorporate the foregoing requirements in any sublease, license, or occupancy agreement relating to all or any part of the Leased Premises (without implying Landlord's consent to same).

**Section 25.02.**    In addition to any other conditions contained in this Lease with respect to Tenant making any alterations or improvements, before making any alterations or improvements to the interior or exterior of the Leased Premises, Tenant shall (a) deliver to Landlord evidence satisfactory to Landlord that Tenant shall cause such construction or alteration work (collectively, the "Construction Activities") to be performed by contractors who employ craft workers who are members of unions that are affiliated with The Building and Construction Trades Department, AFL-CIO ("Union Labor"), and such work shall conform to traditional craft jurisdictions as established in the area (the "Construction Labor Covenant"), (b) include the Construction Labor Covenant in each of its contracts for the Construction Activities, (c) provide such evidence as Landlord may reasonably require, from time to time during the course of the Construction Activities, that the Construction Labor Covenant is being fully and faithfully observed and Tenant shall include the obligation to provide such evidence in each contract entered into by Tenant for the Construction Activities, and (d) incorporate the foregoing requirements in any sublease, license, or occupancy agreement relating to all or any part of the Leased Premises (without implying Landlord's consent to same). Tenant shall require that all contractors and subcontractors, of whatever tier, performing Construction Activities agree to submit all construction jurisdictional disputes (i.e., disputes about which union is the appropriate union to perform a given contract) to final and binding arbitration to the procedures of the jointly administered "Plan for the Settlement of Jurisdictional Disputes in the Construction Industry," a dispute resolution plan established and administered by The Building and Construction Trades Department, AFL-CIO, and various construction industry employer associations. If a resolution to a construction-related jurisdictional dispute cannot be obtained through The Building and Construction Trades Department, AFL-CIO, contractors and subcontractors, of whatever tier, shall agree to submit all such disputes to final and binding arbitration procedures to be administered by the American Arbitration Association ("AAA") and in conformity with AAA's Commercial Arbitration Rules, Expedited Procedures, with an arbitrator who is an experienced labor arbitrator and is a member of the National Academy of Arbitration.

## ARTICLE XXVI - TERMINOLOGY AND MISCELLANEOUS

**Section 26.01.**    With respect to terminology in this Lease, each number (singular or plural) shall include all numbers, and each gender (male, female or neuter) shall include all genders. If any provision of this Lease shall ever be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Lease, but such other provisions shall continue in full force and effect. The titles of the Articles in this Lease shall have no effect and shall neither limit nor amplify the provisions of the Lease itself. This Lease shall be binding upon and shall accrue to the benefit of Landlord, its successors and assigns.

**Section 26.02.**    In all instances where Tenant is required hereunder to pay any sum or do any act at a particular indicated time or within an indicated period, it is understood that time is of the essence.

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 15 of 73

**Section 26.03.** So long as Tenant has not been wrongfully or constructively evicted from the Leased Premises, the doctrine of independent covenants will apply in all matters relating to this Lease including, without limitation, all obligations of Landlord and Tenant to perform their respective obligations under this Lease. The preceding sentence shall apply notwithstanding that Landlord may have defaulted in fulfilling a covenant to maintain or repair the Leased Premises even if such default results in the unsuitability of the Leased Premises for Tenant's intended commercial use. Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien against or withhold, or deduct from or off-set against any rent and other sums provided hereunder to be paid Landlord by Tenant.

**Section 26.04.** Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential damages or special damages; and all liability of Landlord for damages for breach of any covenant, duty or obligation of Landlord hereunder may be satisfied only out of the interest of Landlord in the Commercial Park existing at the time any such liability is adjudicated in a proceeding as to which the judgment adjudicating such liability is non-appealable and not subject to further review. The term "Landlord" shall mean only the owner, for the time being of the Commercial Park, and in the event the transfer by such owner of its interest in the Commercial Park, such owner shall thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the lease term upon each new owner for the duration of such owner's ownership.

**Section 26.05.** All monetary obligations of Landlord and Tenant (including, without limitation, any monetary obligation of Landlord or Tenant for damages for any breach of the respective covenants, duties or obligations of Landlord or Tenant hereunder) are performable exclusively in San Diego, California. This Lease shall be governed by the internal laws of the State in which the Commercial Park is located, regardless of conflicts of laws principles.

**Section 26.06.** Tenant hereby waives and relinquishes any right to assert, as either a claim or a defense, that Landlord is bound to perform or is liable for the non-performance of any implied covenant or implied duty of Landlord not expressly set forth herein. Tenant waives any implied warranty of Landlord that the Leased Premises are suitable for their intended commercial purpose. Tenant agrees to perform all of its Lease obligations (including without limitation, the obligation to pay rent), notwithstanding an alleged breach by Landlord of any such implied warranty. Tenant agrees that Landlord shall incur no liability to Tenant by reason of any defect in the Leased Premises, whether apparent or latent.

**Section 26.07.** If this Lease is executed by more than one person or entity as "Tenant", each such person or entity shall be jointly and severally liable hereunder. It is expressly understood that any one of the parties who have executed this Lease as "Tenant" (herein individually referred to as "Signatory") shall be empowered to execute any modification, amendment, exhibit, floor plan, or other document ("Future Instrument") and bind each of the Signatories who has executed this Lease regardless of whether each Signatory, in fact, executes such Future Instrument. If Tenant is executing this Lease as an entity, then the individual so executing this Lease on behalf of such entity represents and warrants to Landlord that he or she is duly authorized to execute and deliver this Lease on behalf of such entity, in accordance with all of such entity's documents and that this Lease is binding upon such entity. Tenant shall furnish Landlord, promptly upon demand by Landlord, such corporate resolutions, proof of authorization or other appropriate documentation evidencing the due authorization of Tenant to enter into this Lease and the authority of the individual executing this Lease on behalf of Tenant to bind Tenant hereunder.

**Section 26.08.** Upon written request, Tenant shall provide to Landlord, within fourteen (14) days of such request, a copy of its most recent audited financial statement including both a balance sheet and income statement. Such request may be made by Landlord from time to time during the Lease Term, but not more often than annually.

**Section 26.09.** If during the term of this Lease Tenant requests that Landlord prepare, review, or negotiate legal documentation for any reason other than a transaction solely between Tenant and Landlord, then Landlord reserves the right to charge Tenant a reasonable fee for the preparation, review and/or negotiation of such documentation. Such fee shall be due and payable to Landlord on demand.

**Section 26.10.** Landlord is a limited liability partnership. None of the officers, partners, members, employees or other agents of Landlord are personally, corporately or individually liable for any debt, act, omission or obligation of the limited partnership, and all persons having claims of any kind against the limited partnership must look solely to the property of the limited partnership for the enforcement of their rights.

**Section 26.11.** Tenant represents and warrants to Landlord that Tenant is currently in compliance with and shall at all times during the Lease Term (including any extension thereof) remain in compliance with the regulations of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury (including those named on OFAC's Specifically Designated Nationals and Blocked Persons List) and any statute, executive order (including Executive Order 13224, dated September 24, 2001, and entitled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action relating thereto.

**Section 26.12.** If Landlord's performance of any obligation under this Lease is delayed by an act or neglect of Tenant, act of God, strike, labor dispute, unavailability of materials, boycott, governmental restriction, riot, insurrection, war, terrorism, catastrophe, act of the public enemy, or any other cause beyond Landlord's control, the period for the beginning or completion of the obligation is extended for a period equal to the delay.

**Section 26.13.** Landlord and Tenant represent and warrant to each other that, except as listed in the Basic Provisions of this Lease, no broker, agent or finder has been employed by it in connection with this Lease and no commissions are payable to any person procuring or negotiating this Lease on its behalf. Landlord and Tenant each

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 16
of 73

agree to indemnify, defend and save harmless the other from (a) any claim for fees or commissions resulting from the indemnifying party having dealt with any broker, agent or finder in procuring or negotiating this Lease, and (b) all expenses (including reasonable attorneys' fees) incurred in connection with any such claim. Landlord and Tenant acknowledge that the Broker(s) in this transaction are as listed in the Basic Provisions and that each party shall be obligated to pay the commission charged by its own broker, subject to any commission sharing agreement which the Brokers may have. Tenant represents it did not deal with any other broker, agent or finder purporting to represent Landlord. The provisions of this Section 26.17 shall survive any expiration or termination of this Lease.

**Section 26.14.** Provided there shall not have occurred an "Event of Default" (as defined in Article XV hereof), there has been no assignment of this Lease and Tenant currently owns the building adjacent to the Leased Premises, then, at such time as 112,000 square feet of space which is located in the building adjacent to the Leased Premises and known as 8863 Siempre Viva Road, #HOA, San Diego, California, becomes available for lease to third parties (hereinafter, "Right of First Offer Space"), Landlord shall give Tenant notice that such space is available and offer such space to Tenant at the same terms and conditions as those contained in a bona fide letter of intent from a third party (hereinafter, "Option to Expand"). The date of Landlord's notice that the Right of First Offer Space is available is herein referred to as the "Notice Date". Tenant shall have a period of ten (10) business days following the Notice Date in which to exercise its option by notifying Landlord that it desires to expand the Leased Premises into the Right of First Offer Space at the same terms and conditions as those contained in the bona fide letter of intent from the third party as set forth in Landlord's notice. Upon receipt by Landlord of Tenant's notice exercising its rights hereunder, Landlord shall submit to Tenant a lease amendment incorporating the Right of First Offer Space into the Leased Premises upon the terms and conditions set forth in this Section 26.14, and Tenant shall execute and deliver to Landlord signed counterparts of such lease amendment within ten (10) days following receipt thereof by Tenant. Such amendment shall provide that rental attributable to the Right of First Offer Space shall be payable thirty (30) days following the "Tender Date" (as hereinafter defined). Time is of the essence with respect to the exercise by Tenant of its Option to Expand.

In the event Tenant exercises its rights herein granted, the Right of First Offer Space shall be tendered to Tenant and accepted by Tenant on an "as is" basis and shall become part of the Leased Premises, subject to all of the terms and provisions of this Lease as of the Tender Date (which shall be defined as the date upon which Landlord tenders possession of the Right of First Offer Space to Tenant). The term of this Lease with respect to any Right of First Offer Space shall be co-terminous with that of the original Leased Premises.

In the event Landlord offers to Tenant the Right of First Offer Space as provided in Section 26.14 above, and Tenant either: (i) declines to exercise its Option to Expand, or (ii) fails to timely exercise its Option to Expand, or (iii) after exercising its Option to Expand, fails to execute a lease amendment within the ten (10) day period set forth above, then in any such event Tenant will be deemed to have waived its right to expand as to the Right of First Offer Space, the rights granted herein shall be rendered null and void, and Tenant shall have no further options to expand the Leased Premises in accordance with this Section 26.14. Notwithstanding the foregoing, if Tenant waives its Option to Expand and Landlord and the third party with which it has a bona fide offer do not execute a lease for the Right of First Offer Space, then Tenant shall again have the Option to Expand if Landlord receives another bona fide letter of intent from a third party to lease the Right of First Offer Space.

**Section 26.15.** Tenant shall have and is hereby granted one (1) conditional option to purchase the land and improvements located at 9043 Siempre Viva Road, Building 9, San Diego, California 92154 more particularly described on Exhibit "B" to this Lease Contract ("Siempre Viva 9") subject to and contingent upon the following terms and conditions:

> At any time prior to March 31, 2014, Tenant shall have the option to purchase Siempre Viva 9 (the "Option") as follows:

> (a) The Option shall be exercised by Tenant's giving Landlord written notice of its irrevocable election to exercise the Option not later than 5:00 pm Pacific Time on March 31, 2014. In the event Tenant does not exercise the Option on or before 5:00 pm Pacific Time on March 31, 2014, then the Option shall be considered null and void and of no further force and effect;

> (b) The purchase price to be paid for Siempre Viva 9 under the Option shall be Sixteen Million and 00/100 Dollars ($16,000,000.00) (the "Purchase Price"). Tenant shall pay all normal and customary fees, which may include conveyance, transfer, sales and like taxes under State or local law or custom. Tenant shall make an earnest money deposit in the amount of Three Hundred Thousand and 00/100 Dollars ($300,000.00), not later than the earlier of (x) execution of an agreement of sale for Siempre Viva 9, and (y) thirty (30) days after Tenant receives from Landlord applicable due diligence information;

> (c) Tenant shall not be in default under any of the terms, covenants and conditions of this Lease Contract to be kept, observed or performed by Tenant at any time throughout the continuance of the term hereof, or at the time Tenant gives notice of its election to exercise the Option, or at any time thereafter;

> (d) Tenant shall pay the Purchase Price by transferring immediately available funds to such account and in such bank or banks as Landlord shall designate, upon delivery of a special warranty deed (or local equivalent) conveying Siempre Viva 9 to Tenant. The special warranty deed (or local equivalent) shall convey title subject to all matters of record as of the date of closing other than mortgages, deeds of trust and similar security instruments. The Purchase Price shall be charged or credited, as the case may be, on the date of closing to reflect adjustments in the Base Rent and Additional Rent paid or payable to and including the date of closing, apportioned as of the date of closing. The date of closing shall be agreed upon between the parties hereto but shall not be later than sixty (60) days following Tenant's delivery of its written notice

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 17 of 73

exercising the Option. All other conditions of settlement shall be as agreed upon between the parties hereto;

(e)       Tenant and Landlord, as owner of 8863 Siempre Viva Road, San Diego, California, or any successor owner of 8863 Siempre Viva Road, San Diego, California, shall agree upon the terms of a reciprocal easement agreement that addresses truck loading logistics between Siempre Viva 9 and 8863 Siempre Viva Road, San Diego, California (the "REA"), the form of which REA shall be attached to the agreement of sale for Siempre Viva 9 and recorded at the closing of such sale of Siempre Viva 9;

(f)       The Option shall not be severed from this Lease Contract, or separately sold, assigned or transferred. In the event of an assignment of this Lease Contract, other than a Permitted Assignment, or subletting of the entire Leased Premises by Tenant pursuant to the provisions of this Lease Contract, the options to purchase contained herein shall terminate and be of no further force and effect; and

(g)       Tenant agrees that upon Tenant's exercising the Option, Landlord and Tenant will enter into an agreement of sale outlining the general terms and conditions of the purchase of Siempre Viva 9, which terms and conditions shall include the applicable provisions set forth in this Section 26.16.

Time is of the essence with respect to the Option.

**Section 26.16.**    Provided there shall not have occurred an "Event of Default" (as defined in Article XV hereof) and there has been no assignment of this Lease, then, if at any time during the Lease Term, Landlord shall elect to sell Siempre Viva 9, whether separately or together with all or any other portion of the Commercial Park (as applicable, the "Purchase Property"), Tenant is hereby given the right of first refusal to purchase the Purchase Property in accordance with the terms and conditions hereinafter set forth. Landlord shall give Tenant notice that the Purchase Property is being offered for sale and offer the Purchase Property to Tenant at the same terms and conditions as those contained in a bona fide letter of intent from a third party (hereinafter, "ROFR Option"). The date of Landlord's notice that the Purchase Property is available for purchase is herein referred to as the "ROFR Notice Date". Tenant shall have a period of ten (10) business days following the ROFR Notice Date in which to exercise its option to purchase the Purchase Property by notifying Landlord that it desires to purchase the Purchase Property on the same terms and conditions as those contained in the bona fide letter of intent from the third party as set forth in Landlord's notice. Upon receipt by Landlord of Tenant's notice exercising its rights hereunder, Landlord shall submit to Tenant an agreement of sale outlining the general terms and conditions of the purchase of the Purchase Property. Tenant and Landlord shall have a period of thirty (30) days from the date of receipt of such agreement of sale to negotiate and execute such agreement. In the event that Tenant and Landlord shall not have executed such agreement within such thirty (30) day period, then Landlord shall have the right to sell the Purchase Property to the purchaser or any other third party upon the material terms of the offer as set forth in said bona fide letter of intent and Tenant will be deemed to have waived its right to purchase the Purchased Property. In the event that Tenant and Landlord shall have executed such agreement of sale, but Tenant fails to close the purchase of the Purchase Property thereunder, then Landlord shall have the right to sell all or any portion of the Purchase Property to any purchaser on any terms, and Tenant will be deemed to have waived its right the purchase the Purchase Property. Time is of the essence with respect to the exercise by Tenant of its ROFR Option. The ROFR Option shall not be severed from this Lease Contract, or separately sold, assigned or transferred. In the event of an assignment of this Lease Contract, other than a Permitted Assignment, or subletting of the entire Leased Premises by Tenant pursuant to the provisions of this Lease Contract, the options to purchase contained herein shall terminate and be of no further force and effect. Anything contained herein to the contrary notwithstanding, the provisions of this Section 26.16, including Tenant's ROFR Option, shall not apply in connection with (i) a transfer of the Purchase Property pursuant to a foreclosure, deed in lieu of foreclosure or similar conveyance or transfer in whole or partial satisfaction of any indebtedness encumbering the Purchase Property or any portion thereof, or (ii) transfers of ownership interests in Landlord or in any person holding an interest, directly or indirectly, in Landlord or (iii) a transfer of the Purchase Property to a Landlord Affiliate (as hereinafter defined). For purposes hereof, a "Landlord Affiliate" shall mean any entity in which either Weingarten Realty or the AFL-CIO Building Investment Trust has a direct or indirect ownership interest.

## ARTICLE XXVII - ENTIRE AGREEMENT

**Section 27.01.**    This instrument (including all Riders, Exhibits and Guaranty, if any), constitutes the entire agreement between Landlord and Tenant; no prior written or prior or contemporaneous oral promises or representations shall be binding. This Lease shall not be amended, changed or extended except by written instrument signed by both parties hereto.

Case: 19-52335   Doc# 73-3   Filed: 12/09/19   Entered: 12/09/19 17:39:21   Page 18 of 73

THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION AND/OR EXECUTION HEREOF SHALL BECOME EFFECTIVE ONLY UPON EXECUTION BY ALL PARTIES HERETO AND DELIVERY OF A FULLY EXECUTED COUNTERPART BY LANDLORD TO THE OTHER PARTIES HERETO.

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original, on the day and year first written above.

**SV PORTFOLIO LP,**
a Delaware limited partnership

By:    WB Sub GP, LLC,
       a Delaware limited liability company,
       Its General Partner

       By:
       Name: Mark D. Stout
       Title: Vice President/General Counsel

              "LANDLORD"

ATTEST:

_____
Secretary

**IMPERIAL TOY, LLC**
a California limited liability company

By:
Name:
Title: President

         "TENANT"

DMEAST #14770411 v8

GBP-MAJ/FUND
Rev. 11/11/94

# CONSTRUCTION RIDER

This Construction Rider is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated June 27, 2012, between **SV PORTFOLIO LP**, as "Landlord" and **IMPERIAL TOY, LLC**, as "Tenant".

**Section 1.01. A.** Tenant agrees that it has examined the Leased Premises and accepts the same in their present physical condition on an "AS IS" basis. Such acceptance by Tenant includes, but is not limited to, air conditioning and heating system, light fixtures, and floor covering. Any work, construction or installations desired by Tenant shall be the sole obligation and, except as expressly provided in Section 1.04. A. below, at the sole cost of Tenant and shall only be made with Landlord's prior written consent. Landlord or its agents have made no representations or promises with respect to the Leased Premises or the buildings of which the Leased Premises form a part, except that the mechanical, electrical and plumbing systems serving the Leased Premises are in good working order as the date hereof and Landlord shall warranty the same for sixty (60) days from the date Tenant takes possession of the Leased Premises. Tenant may construct improvements at the Leased Premises only upon satisfying the following "conditions precedent": (i) that Landlord and Tenant shall have mutually agreed in writing upon plans and specifications and one or more general contractors (herein sometimes referred to as "contractor") to be utilized by Tenant, and (ii) that Tenant has tendered to Landlord: a true copy of a "Building Permit" (meaning all required governmental, regulatory authority and other permits, consents and letters of utility availability) for the work of Tenant and its contractors, and certificates of all insurance required to be obtained by Tenant pursuant to the Lease Contract. Tenant, at its sole cost and expense, shall have the plans for its improvements prepared and submitted to Landlord within thirty (30) days of the date Tenant takes possession of the Leased Premises and Landlord shall have no less than forty-five (45), *but no more than sixty (60) days to approve or dispute Tenant's plans. Tenant is solely responsible for compliance* with all municipal, State and Federal rules, regulations, and laws which govern Tenant's construction and occupancy of the Leased Premises. Landlord's approval of Tenant's plans and specifications is to satisfy a condition precedent to the commencement of Tenant's construction, and should not be relied upon by Tenant as a representation or warranty by Landlord of any kind or nature, expressed or implied, all of which are hereby disclaimed. Landlord makes no representation or warranty that Tenant's proposed construction is structurally sound, is in compliance with the above-mentioned rules, regulations, or laws, or is sufficient to obtain all required permits. In the event that the Lease Contract is in full force and effect but Tenant has not provided Landlord with a Building Permit within one hundred eighty (180) days after the date condition (i) is satisfied; provided, Tenant makes a full and proper application for a building permit within five (5) business days following the approval of Tenant's plans and contractor and thereafter pursues the same diligently and in good faith, Landlord may, in addition to other remedies which may then be available to Landlord, cancel and terminate the Lease Contract by notice to Tenant given at any time thereafter. Upon any such cancellation and termination by Landlord, Landlord and Tenant shall each respectively be released from all further liability under the Lease Contract, irrespective of what costs or expenses either of such parties shall have incurred prior to any such cancellation and termination. If such final working drawings are mutually approved by Landlord and Tenant in writing, such working drawings shall be initialed or signed by Landlord and Tenant and dated and designated Exhibit "E", but need not be attached to the Lease.

**B.** If Landlord and Tenant have not agreed in writing upon said plans and specifications or one or more general contractors to be utilized by Tenant on or before the date hereof, then within thirty (30) days after the date hereof, Tenant shall cause complete plans and specifications ("working drawings") to be prepared and three (3) counterparts to be submitted to Landlord for examination along with a list of one (1) or more contractors acceptable to Tenant. If by the expiration of sixty (60) days from the date hereof, Landlord and Tenant shall not have agreed in writing upon said completed working drawings and one or more contractors to be utilized by Tenant; then Landlord shall have the right to terminate the Lease Contract at any time thereafter, upon which termination neither party shall have any claim against the other under the Lease Contract irrespective of what costs or expenses, if any, either party shall have incurred in connection with the Lease Contract prior to such cancellation. If such final working drawings are mutually approved by Landlord and Tenant in writing, such working drawings shall be initialled or signed by Landlord and Tenant and dated and designated Exhibit "E", but need not be attached to the Lease Contract.

**C.** Upon tender of possession of the Leased Premises by Landlord to Tenant, Tenant shall enter the Leased Premises and Tenant will perform such construction work and provide and install such materials as are provided in Exhibit "E", if any, and this Lease Contract to be constructed or performed and installed by Tenant. Tenant will also provide and install all *other interior work, trade equipment, furniture, fixtures,* and effects of every description necessary or appropriate for Tenant's business (other than those specifically stated in Exhibit "E" to be provided by Landlord) and all such items to be provided and installed by Tenant shall be new and modern and of first-class quality.

In the event Tenant fails to satisfy the conditions precedent and also commence construction on or before the expiration of the thirtieth (30th) day from the date Tenant secures a Building Permit for the Leased Premises, then such failure shall constitute an Event of Default under the Lease and without further notice Landlord shall have the right to ei terminate this Lease at any time thereafter or exercise such other remedies as may be available to Landlord pursuan terms of the Lease.

**D.** At all times while Tenant is constructing the improvements at the Leased Premises and installin equipment, furniture and fixtures, Tenant shall not interfere with the conducting of business at the Commercial Pa shall comply with said reasonable requests of Landlord as Landlord might make for the purpose of avoiding such interference. If at any time during the course of Tenant's work at the Leased Premises the storefront of the Leased Premises is not fully secure, Tenant shall construct a barricade of plywood or other material approved by Landlord to secure the Leased Premises and adjoining lease spaces

| INITIAL |
| --- |
| TENANT |
| LANDLORD |

**Section 1.02.** With respect to any labor performed or materials furnished by Tenant at the Leased Premises, the following shall apply: All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk. Labor and materials used in the installation of Tenant's furniture and fixtures, and in any other work on the Leased Premises performed by Tenant, will be subject to Landlord's prior written approval. Any such approval of Tenant's labor shall constitute a revocable license authorizing Tenant to permit such labor to enter upon the Commercial Park and Leased Premises prior to the commencement of the lease term for so long as Tenant's labor does not interfere with labor utilized by Landlord or any other tenant. With respect to any contract for any such labor or materials, Tenant acts as a principal and not as the agent of Landlord. Tenant agrees to indemnify and hold Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees, contractors, subcontractors, laborers, materialmen or invitees or arising from any bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Leased Premises. Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord; and any attempt to do so shall be void and of no effect. Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant. If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof. All of Tenant's construction at the Leased Premises shall be performed by Tenant in strict compliance with the working drawings, applicable codes and other legal requirements, and in a good and workmanlike manner satisfactory to Landlord's Architect and in such manner as to not cause Landlord's fire and extended coverage insurance to be canceled or the rate therefor increased. In the performance of such work, Tenant shall not interfere with or delay any work being done by Landlord's contractors.

**Section 1.03.** Tenant agrees that its construction at the Leased Premises will be completed in accordance with Exhibit "E" within one hundred eighty (180) days after the aforesaid tender of possession of the Leased Premises to Tenant by Landlord. If Tenant shall not have so completed such construction by the expiration of said one hundred eighty (180) day period (plus additional time for "excusable delays" defined as delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Tenant), then Landlord shall have the right to terminate the Lease Contract at any time within thirty (30) days thereafter by giving written notice of such termination within such time to Tenant; upon the giving of such notice, all obligations of all parties under the Lease Contract shall cease and Tenant shall immediately vacate and relinquish possession of the Leased Premises to Landlord. In the event that Landlord exercises the aforesaid right to cancel and terminate the Lease Contract (or Tenant's right to possession of the Leased Premises) prior to the stated expiration date of the term of the Lease Contract (under Article III of the Lease Contract), Tenant shall have no right or claim against Landlord on account of improvements constructed by Tenant at the Leased Premises.

**Section 1.04. A.** Upon full completion of construction of the improvements by Tenant in accordance with Exhibit "E" and the sign criteria, if any, Landlord shall pay to Tenant (or, at Landlord's option, Landlord may pay Tenant and the general contractor and/or one or more subcontractors) as an "Allowance", the lesser of (i) Tenant's actual "Building Improvement Costs" (as hereinafter defined) or (ii) the sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00) toward Building Improvement Costs with respect to the Leased Premises, provided that Tenant has furnished to Landlord the following (on forms to be furnished by Landlord where applicable):

      (1)    A certificate of occupancy (or other certificates evidencing inspection and acceptance of all of Tenant's construction by appropriate government authorities);

      (2)    A copy of Tenant's contract with the general contractor performing such work, which contract shall contain a schedule of values totaling the full amount of the contract. In the event that Tenant has acted as its own general contractor, Tenant must have entered into written subcontracts with all parties who furnished labor and/or materials totaling more than Five Hundred and No/100 Dollars ($500.00) and copies of such subcontracts must be furnished to Landlord;

      (3)    Tenant's affidavit, in the form attached hereto as Exhibit "E-1", that such construction has been completed to its satisfaction and in strict accordance with Exhibit "E", which affidavit shall also state the total Building Improvement Costs itemized in reasonable detail;

      (4)    General Contractor's Affidavit and Lien Waiver with respect to the Leased Premises and Commercial Park, in the form attached hereto as Exhibit "E-2", executed by the general contractor(s) performing such work stating that construction has been fully completed in accordance with Exhibit "E" and that all subcontractors, laborers and material suppliers engaged in or supplying materials for such work have been paid in full (in the event, however, that Tenant has acted as its own general contractor, Tenant, itself, will execute Exhibit "E-2");

      (5)    Subcontractor's Lien Waiver with respect to the Leased Premises and Commercial Park, in the form attached hereto as Exhibit "E-3", executed by all subcontractors and materialmen who shall have furnished labor and/or materials for the work;

      (6)    Certificate of substantial completion from Tenant's architect or engineer certifying that such construction work has been fully completed in accordance with Exhibit "E";

2

(7)    Notice from Tenant to Landlord that Tenant has opened for business at the Leased Premises and execution by Tenant and delivery to Landlord of a commencement letter indicating the commencement and termination dates of the lease term;

(8)    Delivery to Landlord of certificates or duplicate originals of all insurance which Tenant is required to carry under the terms of the Lease;

(9)    Payment by Tenant to Landlord of such Base Rent and other sums as shall have come due between the commencement date of the lease term and the date upon which Tenant makes application for payment of its Allowance (but in all events, not less than Base Rent for the first month of the lease term); and

(10)    Delivery to Landlord of one (1) set of as-built plans for the Leased Premises.

Tenant must submit the foregoing items and apply for the Allowance, if at all, no later than ninety (90) days following the completion of construction, and in the event Tenant fails to do so, Landlord shall not thereafter be obligated to fund the Allowance or any portion thereof.

**B.** The phrase "Building Improvement Costs", as used herein, means the total reasonable costs paid by Tenant to all contractors furnishing labor and materials for erection and improvement of those items constructed in accordance with Exhibit "D".

"Building Improvement Costs" shall not include any sum paid or liability incurred by Tenant for: any brokerage or finder's fee or similar fee; any sum which is paid pursuant to a liability incurred prior to the date of the Lease Contract; or any item of "Removable Trade Fixtures" (as defined in Article X of the Lease Contract).

**Section 1.05.**  In connection with any construction of improvements at the Leased Premises by Tenant, the following shall apply:

Tenant shall take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) Commercial General Liability insurance in a minimum amount of $2,000,000.00 combined single limit. Said liability insurance shall name Landlord as an additional insured with Tenant (and shall contain a cross-liability endorsement) and shall be non-cancellable with respect to Landlord except upon thirty (30) days' notice to Landlord (given in the same manner as provided in the Lease Contract) (or, at the request of Landlord, shall be in the form of a separate liability policy in which Landlord alone is the named insured).  Tenant shall also take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) all builder's risk insurance to the full insurable value of improvements constructed and materials stored at the Leased Premises.  Said builder's risk insurance shall name Landlord as an additional insured and shall be non-cancellable with respect to Landlord. Tenant shall take out (or cause contractor under its construction contract(s)) to take out and maintain Workers' Compensation and Employers Liability in a minimum amount of $500,000 bodily injury for each accident, $500,000 bodily injury by disease for each employee, and $500,000 bodily injury disease aggregate and provide a waiver of subrogation for the Tenant and Landlord.  Certificates of all such insurance shall be delivered by Tenant to Landlord within five (5) days following Tenant's entering into any such construction contract(s) (but in all events prior to Tenant or Tenant's general contractor commencing construction).

**Section 1.06.**  All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease Contract.  The aforesaid improvements, if constructed by Tenant, are not intended as any nature of rent or compensation to Landlord.

**Section 1.07.**  Any work at the Leased Premises involving the sprinkler system (if any) serving the Leased Premises shall be performed by Landlord or its contractors at Tenant's cost.  Tenant shall pay the cost of any such work (or reimburse Landlord therefor) within ten (10) days after delivery to Tenant of a statement therefor.

**Section 1.08.**  The terms of Article XXV of the Lease are incorporated by reference into this Construction Rider.



INITIAL

Landlord

Tenant

3

## OPTION RIDER

This Option Rider is attached to and forms a part of that certain Commercial Park Lease (the "Lease Contract") dated June 7th, 2012, between **SV PORTFOLIO LP**, as "Landlord," and **IMPERIAL TOY, LLC**, as "Tenant."

Contingent upon Tenant satisfying all of the following conditions, Tenant is hereby granted an option to extend the term of the Lease, as set forth in Section 3.01 of the Lease Contract (the "Primary Term"), for two (2) additional periods of sixty (60) full calendar months each (respectively, the "First Extension Term" and "Second Extension Term", and each, an "Extension Term"), said conditions being that:

    (i)     Tenant shall have fully performed all of its covenants, duties and obligations hereunder during the Primary Term and First Extension Term;

    (ii)     Except as permitted by the Lease Contract, Tenant shall not have assigned the Lease Contract or any interest therein, except for a Permitted Assignment, or sublet (or otherwise permitted occupancy by any third party of) all or any portion of the Leased Premises during the Primary Term or First Extension Term (any such assignment, subletting or occupancy being subject to the provisions of Article VIII of the Lease Contract) regardless of whether any such assignment, sublease or occupancy is then still in effect and regardless of whether Landlord shall have consented to any such assignment, subletting or occupancy; and

    (iii)     Tenant shall have given notice (the "Notice Date") to Landlord not less than one hundred eighty (180) days, nor more than two hundred seventy (270) days, prior to the expiration of the then current Primary Term or First Extension Term, as applicable, of Tenant's exercise of the option for the First Extension Term or Second Extension Term, as applicable.

Time is of the essence in the exercise of these options and should Tenant fail to exercise said options by timely notice, said options shall lapse and be of no further force or effect. Tenant further acknowledges that a failure to properly exercise the option for any Extension Term as provided hereinabove, shall render Tenant's option for any subsequent Extension Term null and void and without further force and effect.

In the event that Tenant effectively exercises the options herein granted, then all of the terms and provisions of the Lease Contract as are applicable during the Primary Term shall likewise be applicable during the Extension Term except:

    (a)     Tenant shall have no further right to renew or extend the lease term after the expiration or other termination of the Second Extension Term; and

    (b) The "Base Rent" (as defined in Articles I.6 and IV of the Lease Contract) which shall be due and payable each month during the Extension Term at the same time and place, and in the same manner, as set forth in Section 4.01 of the Lease Contract (relative to payment of Base Rent during the Primary Term), shall be an amount equal to the ninety-five percent (95%) of the "Prevailing Rental", which is defined as the rate for comparable space in the Otay Mesa Submarket (taking into account any concessions, credits or construction allowances granted) on (i) new leases entered into within the twelve (12) month period immediately preceding the expiration of the Primary Term or First Extension Term, as applicable, and (ii) extensions of lease agreements which were extended during the twelve (12) month period preceding the expiration of the Primary Term or First Extension Term, as applicable where there was no renewal option at a fixed rental rate or a specific formula applicable for such extension. In no event shall the foregoing formula cause the Base Rental for the Extension Term to be less than the rental rate payable by Tenant (on a per square foot basis) for the last month of the Primary Term or First Extension Term, as applicable.

If Tenant elects to proceed with the process for determining the Prevailing Rental, then the Prevailing Rental shall be determined in accordance with the following procedures. Within fifteen (15) days after the Notice Date, Landlord and Tenant shall each select a real estate professional (based on the criteria set forth in this rider). Within thirty (30) days of their selection, each professional shall deliver a written report to Landlord and Tenant of the professional's determination of the Prevailing Rental. All determinations of the Prevailing Rental shall be in writing. The party appointing each professional shall be obligated, promptly after receipt of the valuation report prepared by the professional appointed by such party, to deliver a copy of such valuation report to the other party.

If the Prevailing Rental determination of the professional designated by Landlord is within five percent (5%) of the Prevailing Rental determination of the professional designated by Tenant, then the Prevailing Rental shall be the average of the two Prevailing Rental determinations.

If the Prevailing Rental determinations of the two professions vary by more than five percent (5%), then a third professional shall be selected by the initial two professionals within fifteen (15) days after the initial two valuation reports have been delivered to the parties (the third professional also having the qualifications set forth in this rider). If a third professional is appointed, the third professional shall review the valuation reports for the initial two professionals and shall select the one of the initial two valuation reports that best determines the Prevailing Rental in accordance with the terms of this Lease Contract. The third professional shall promptly deliver a written report of his or her determination to each of the parties.

The determination of the Prevailing Rental pursuant to this rider shall be final and binding on Landlord and Tenant.

The expenses of each of the first two professionals appointed under this rider shall be borne by the party appointing such professional. The expenses of the third professional appointed under this rider shall be paid on-half (1/2) by Landlord and one-half (1/2 by Tenant).

The real estate professionals selected by Landlord and Tenant shall have the following qualifications: (a) must be a licensed real estate broker in the Otay Mesa Submarket; (b) must have a minimum of seven (7) years' experience in commercial industrial leasing in the Otay Mesa Submarket; (c) must be an active broker in the Otay Mesa Submarket and known for industrial expertise; (d) must have experience representing both landlords and tenants; (e) [in the case of the third professional only,] is not representing either Landlord or Tenant; and (f) [in the case of the third professional only,] has not been involved in any current disputes with Landlord, Tenant, or either of the other professionals. If real estate professionals with the qualifications described in this paragraph are unavailable, qualified consultants with similar qualifications may be substituted.

References in this Rider and the Lease Contract to the "term" or the "lease term" shall be understood to refer to both the Primary Term and (if Tenant's options therefor are effectively exercised in accordance with the provisions hereof) also the hereinabove stated Extension Term unless such interpretation is expressly negated.

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 24 of 73



MELKSEE STREET

OWNED BY OTHERS

OWNED BY OTHERS

OWNED BY OTHERS

KERNS STREET

SARNEN ROAD

SIEMPRE VIVA ROAD

NORTH

"Leased Premises"
Approx.: 257,972sf.
9043 Siempre Viva Road. #100
San Diego, CA 92154

"Common Area"

"Exclusive Parking Area"

DRUCKER LANE

The "Leased Premises" as shown hereon is for **Imperial Toy, LLC**

Subject to the terms of the Lease, any future construction by the Landlord within the Commercial Park will not affect the validity of the Lease covering the Leased Premises. Subject to the terms of the Lease , Landlord may elect to change the location, size, layout, or other details of any buildings, or Common Area in the Commercial Park and/or to construct other buildings in the Commercial Park and such changes will not affect the validity of the Lease covering the Leased Premises.

The post office address designated  hereon, if any, is subject to change at any time.

DATE: 03-20-2012
REV.: 05-09-2012

# EXHIBIT "A"
## SIEMPRE VIVA BUSINESS PARK

Floor No:
JOD

Unit No:
JOA

Project No:
0498

INPRAL

PREPARED BY: GEH

DMEAST #14770411 v8

REAL PROPERTY IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

PARCEL I:

ALL THOSE PORTIONS OF LOT 16 AND THE WESTERLY 200.48 FEET OF LOT 17 OF SIEMPRE VIVA BUSINESS PARK, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 12659, FILED IN THE RECORDER'S OFFICE OF SAID COUNTY ON JULY 5, 1990, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE NORTHEASTERLY CORNER OF THE WESTERLY 155.50 FEET OF SAID LOT 16; THENCE ALONG THE EASTERLY LINE OF SAID WESTERLY 155.50 FEET, SOUTH 1 DEGREES, 23'37" WEST 371.47 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED LINE; THENCE LEAVING SAID EASTERLY LINE, SOUTH 88 DEGREES, 27'23" EAST, 337.00 FEET TO THE EASTERLY LINE OF SAID WESTERLY 200.48 FEET OF LOT 17.

EXCEPTING THEREFROM THE WESTERLY 155.50 FEET OF SAID LOT 16.

SAID PROPERTY BEING DESCRIBED AS PARCEL B IN A CERTIFICATE OF COMPLIANCE RECORDED ON JULY 1, 2002 AS DOCUMENT NO. 2002-0555679 OF OFFICIAL RECORDS OF SAID SAN DIEGO COUNTY.

PARCEL J:

ALL THOSE PORTIONS OF LOTS 17 AND 18 OF SIEMPRE VIVA BUSINESS PARK, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 12659, FILED IN THE RECORDERS OFFICE OF SAID COUNTY ON JULY 5, 1990, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE NORTHEASTERLY CORNER OF THE WESTERLY 200.48 FEET OF SAID LOT 17; THENCE ALONG THE EASTERLY LINE OF SAID WESTERLY 200.48 FEET, SOUTH 1 DEGREES, 23' 37" WEST, 326.48 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED LINE; THENCE LEAVING SAID EASTERLY LINE, SOUTH 88 DEGREES, 27'23" EAST 383.48 FEET TO THE EASTERLY LINE OF SAID LOT 18.

EXCEPTING THEREFROM THE WESTERLY 200.48 FEET OF SAID LOT 17.

SAID PROPERTY BEING DESCRIBED AS PARCEL C IN A CERTIFICATE OF COMPLIANCE RECORDED ON JULY 1, 2002 AS DOCUMENT NO. 2002-0555679 OF OFFICIAL RECORDS OF SAID SAN DIEGO COUNTY.

PARCEL K:

ALL OF LOT 19 OF SIEMPRE VIVA BUSINESS PARK, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 12659, FILED IN THE RECORDER'S OFFICE OF SAID COUNTY ON JULY 5, 1990, TOGETHER WITH THOSE PORTIONS OF LOTS 17 AND 18 OF SAID MAP 12659 LYING SOUTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE NORTHEASTERLY CORNER OF THE WESTERLY 200.48 FEET OF SAID LOT 17; THENCE ALONG THE EASTERLY LINE OF SAID WESTERLY 200.48 FEET, SOUTH 1 DEGREES, 23'37" WEST, 326.48 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED LINE; THENCE LEAVING SAID EASTERLY LINE, SOUTH 88 DEGREES, 27'23" EAST 383.48 FEET TO THE EASTERLY LINE OF SAID LOT 18.

EXCEPTING THEREFROM THE WESTERLY 200.48 FEET OF SAID LOT 17.

SAID PROPERTY BEING DESCRIBED AS PARCEL D IN A CERTIFICATE OF COMPLIANCE RECORDED ON JULY 1, 2002 AS DOCUMENT NO. 2002-0555679 OF OFFICIAL RECORDS OF SAID SAN DIEGO COUNTY.

PARCEL L:

ALL THOSE PORTIONS OF LOT 16 AND THE WESTERLY 200.48 FEET OF LOT 17 OF SIEMPRE VIVA BUSINESS PARK, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 12659, FILED IN THE RECORDER'S OFFICE OF SAID COUNTY ON JULY 5, 1990, LYING SOUTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE NORTHEASTERLY CORNER OF THE WESTERLY 155.50 FEET, SOUTH 1 DEGREES, 23'37" WEST, 371.47 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED LINE; THENCE LEAVING SAID EASTERLY LINE, SOUTH 88 DEGREES, 27'23" EAST, 337.00 FEET TO THE EASTERLY LINE OF SAID WESTERLY 200.48 FEET OF LOT 17.

EXCEPTING THEREFROM THE WESTERLY 155.50 FEET OF SAID LOT 16.

SAID PROPERTY BEING DESCRIBED AS PARCEL E IN A CERTIFICATE OF COMPLIANCE RECORDED ON JULY 1, 2002 AS DOCUMENT NO. 2002-0555679 OF OFFICIAL RECORDS OF SAID SAN DIEGO COUNTY.

EXHIBIT "B"

PG#55-A
08/22/06 MDS/jl
10/20/06 jl
06/27/11 APB/anc

DMEAST #14770411 v8

EXHIBIT C
TENANT MOVE-OUT RESPONSIBILITIES

| ITEM | EXPECTED CONDITION |
|---|---|
| **Ceiling:** | 1. Replace all damaged, missing and stained tiles and ceiling grid |
| **Dock Doors/ Truck Wells:** | 1. Repair and replace dented/damaged panels<br>2. Ensure doors operate properly<br>3. Leave keys to doors near the locks on inside of the premises<br>4. Clean truck wells<br>5. Ensure sump pumps operating properly<br>6. Replace any missing dock bumpers and repair damage to grade beam<br>7. Truck levelers are to be put in working order |
| **Doors:** | 1. Ensure all front and rear doors close and lock properly, leave keys in locks. |
| **Electrical:** | 1. Ensure all outlets, telephone jacks and switches are in good working order and have faceplates |
| **Exterior:** | 1. Ensure all downspouts and drains are in good condition, replace damaged downspouts and drains |
| **Floors:** | 1. Clean tile areas<br>2. Vacuum all carpet<br>3. Repair cut and torn carpets<br>4. Ensure cove base is attached and intact<br>5. Remove any protrusions from floor area—cut off at floor level<br>6. Remove any tars, paints, greases or other residue from warehouse floor, sweep, power wash or mop and seal if necessary. |
| **HVAC:** | 1. Ensure that HVAC is in good operating condition (filters, ducts, thermostats, coils, pan, Freon levels, belt).<br>2. Clean all HVAC vent returns |
| **Lighting:** | 1. Ensure all lamps, bulbs and ballasts are in good operating condition<br>2. Ensure all light lenses covers are intact and if broken replace |
| **Plumbing:** | 1. Ensure all plumbing fixtures are in good working order<br>2. Ensure fire sprinklers are in good working order (if applicable)<br>3. Turn off all gas and equipment and ensure all is in good working order<br>4. Ensure that any leaks are repaired |
| **Signs:** | 1. Remove storefront signage<br>2. Cap off wires if applicable<br>3. Landlord will patch fascia and bill tenant |
| **Trash:** | 1. Dispose of trash/debris within space as well as the exterior rear<br>2. Remove dumpsters<br>3. Remove all warehouse racking systems, fences, etc. |
| **Walls:** | 1. Repair any damage to interior, exterior and demising walls, and paint colored walls white.<br>2. Repair or replace any damaged structural steel columns (must consult with Property Manager). |
| **Windows:** | 1. Remove all paint/vinyl/markings/tape except address and suite number<br>2. Clean windows, mullions and blinds<br>3. Replace damaged glass<br>4. Ensure all window blinds are operating properly (remove if necessary) |

Note: Tenant shall not be responsible for repair and/or replacement of any pre-existing damages or defects as documented by the walk-through by Landlord and Tenant prior to Landlord delivering the Leased Premises to Tenant.

| INITIAL |
|---|
| Landlord |
| |
| Tenant |
| ⏟ |

DMEAST #14770411 v8

EXHIBIT D
OPERATING EXPENSE EXCLUSIONS

The following items should be excluded from Operating Expenses:

1) Depreciation, interest, or amortization on mortgages or ground lease payments, and any other costs related to mortgages and ground leases.

   i) Legal fees incurred in negotiating and enforcing tenant leases.

   ii) Real estate brokers' leasing commissions.

   iii) Initial improvements or alterations to other tenant spaces.

   iv) The cost of providing any service directly to and paid directly by any tenant.

   v) Costs of any items for which Landlord receives reimbursement from insurance proceeds or a third party.

   vi) Costs of capital improvements in excess of $10,000.00, except for capital improvements required to comply with laws enacted after the Commencement Date or which are intended as a labor-saving device or to effect other economies in the maintenance and operation of the Building. Costs of such capital improvements shall be amortized at a rate of eight percent (8%) per annum over their useful life as reasonably determined by Landlord.

   vii) Unless required by the holder of a mortgage or other debt instrument encumbering the Building, flood insurance premiums.

   viii) Any bad debt loss, rent loss, or reserves for bad debt or rent loss.

   ix) Landlord's costs of electricity and other utilities, items, benefits, and services that are sold or provided to other tenants or occupants but that are not offered or provided to Tenant.

   x) Interest or penalties incurred as a result of Landlord's gross negligence or willful misconduct.

   xi) Costs, fees, and compensation paid to Landlord, or to Landlord's subsidiaries or affiliates, for services in or to the Building to the extent that they exceed the charges for comparable services rendered by an unaffiliated third party of comparable skill, competence, stature, and reputation.

   xii) Costs associated with:

      (1) Operation of the business of the ownership of the Building or entity that constitutes Landlord or Landlord's property manager, as distinguished from the cost of Building operations.

      (2) Landlord's general corporate or partnership overhead and general administrative expenses.

      (3) Wages, salaries, and other compensation paid to any executive employee of Landlord or Landlord's property manager above the grade of building manager for the Building or paid to any off-site personnel.

   xiii) Advertising and promotional expenditures primarily directed toward leasing tenant space in the Building.

   xiv) Costs arising from the presence of any Hazardous Material in or about the Premises, Building, or Real Property (including Hazardous Material in the ground, water, or soil) that was not placed in the Premises, Building, or real property by Tenant.

   xv) Costs incurred because the Building or common areas violate any applicable building code, regulation, or law in effect before the date of this Lease, including requirements under the Americans With Disabilities Act of 1990 (42 United States Code sections 12101-12213).

   xvi) Costs of:

      (1) Initial construction of the Building;

      (2) Reconstruction of the Building;

      (3) Modification, alteration, or repair of any portion of the Building due to faulty construction (other than by Tenant) or latent defects in that construction; or

      (4) Correcting defects in the Building or any equipment or fixtures appurtenant to, or used in, the Building.

   xvii) Expenses arising out of the operation, management, maintenance, or repair of any retail premises in the Building or any other retail areas operated by Landlord or its agents, contractors, vendors, or affiliates.

xviii)  Property management fee in excess of two percent (2%) of the gross receipts of the Commercial Park for a given year.



INITIAL

Landlord

Tenant

EXHIBIT E
TENANT'S WORK

[to be attached]

DMEAST #14770411 v8

EXHIBIT E-1
TENANT'S AFFIDAVIT

[to be attached]

EXHIBIT E-2
GENERAL CONTRACTOR'S AFFIDAVIT AND LIEN WAIVER

[to be attached]

DMEAST #14770411 v8

EXHIBIT E-3
SUBCONTRACTOR'S LIEN WAIVER

[to be attached]

DMEAST #14770411 v8

## FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE (this "First Amendment to Lease") made and entered into this 26th day of October, 2012, by and between BIT HOLDINGS SEVENTY, INC., hereinafter called "Landlord", and IMPERIAL TOY, LLC, hereinafter called "Tenant".

### W I T N E S S E T H:

WHEREAS, Landlord (as successor-in-interest to SV Portfolio LP, having acquired the property prior to the date hereof) and Tenant entered into a Commercial Park Lease (the "Original Lease") dated June 27, 2012, for certain premises consisting of approximately 257,972 square feet of space located in Landlord's Siempre Viva Business Park, known by street address as 9043 Siempre Viva Road, #100, San Diego, California (the "Leased Premises"); and

WHEREAS, Landlord and Tenant now desire to amend the Lease as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereby agree as follows:

1.

The "Effective Date" of this First Amendment to Lease, as said term is used herein, shall be upon the execution date hereof.

2.

The third sentence of Section 9.02.B of the Lease is hereby amended by adding the following language to the end of that sentence:

"or necessitated on account of any additions, modifications or changes to an HVAC unit or any components thereof (including the existing HVAC units and all existing ductwork) undertaken by or on behalf of Tenant."

3.

The fourth sentence of Section 1.01.A of the Construction Rider of the Lease is hereby deleted in its entirety and replaced and superseded with the following:

"The Leased Premises shall be tendered to Tenant in its current "as-is", "where-is" condition. Tenant acknowledges and agrees that Landlord makes no representations or warranties with respect to the Leased Premises, and that Landlord is not required to make any repairs or improvements to the Leased Premises, or provide any rental abatements, allowance or other leasing concessions in connection with Tenant's leasing of such space. The foregoing notwithstanding, Landlord agrees to make an Allowance available to Tenant pursuant to the terms and conditions set forth in this Construction Rider. Otherwise, Landlord is not required under the Lease to make any alterations, decorations, additions, or improvements to the Leased Premises or the Building from their current "as is" condition."

DMEAST #15655452 v3

4.

Section 1.04.A(ii) of the Construction Rider of the Lease is hereby deleted in its entirety and replaced and superseded with the following:

"(ii) the sum of Three Hundred Twenty-Five Thousand and 00/100 Dollars ($325,000.00) toward Building Improvement Costs with respect to the Leased Premises, provided that Tenant has furnished to Landlord the following (on forms to be furnished by Landlord where applicable):"

EXCEPT as specifically provided to the contrary herein, all the rest and remaining terms and conditions of the Lease shall remain in full force and effect. All defined terms used herein shall have the same meaning as when used in the Lease unless another meaning is clearly indicated.

Even though the Effective Date may occur on a date subsequent to the execution date of this instrument, the parties intend that each shall have vested rights immediately upon full execution hereof and that this instrument shall be fully binding and in full force and effect from and after the execution hereof by Landlord and Tenant.

THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION AND/OR EXECUTION HEREOF SHALL BECOME EFFECTIVE ONLY UPON EXECUTION BY ALL PARTIES HERETO AND DELIVERY OF A FULLY EXECUTED COUNTERPART BY LANDLORD TO THE OTHER PARTIES HERETO.

BIT HOLDINGS SEVENTY, INC.,
a Maryland corporation

By: _William K. Mihm_

Name: ~~Deborah R. Chambliss~~ William K. Mihm

Title: Vice President

LANDLORD

ATTEST:

_____
Secretary

IMPERIAL TOY, LLC,
a California limited liability company

By: _____

Name: _____

Title: _VP Finance_

TENANT

DMEAST #15655452 v3                          2

<u>SECOND AMENDMENT TO LEASE</u>

THIS SECOND AMENDMENT TO LEASE (this "Amendment") made and entered into this _12th_ day of December, 2013 (the "Effective Date"), by and between BIT HOLDINGS SEVENTY, INC., hereinafter called "Landlord", and IMPERIAL TOY, LLC, hereinafter called "Tenant".

W I T N E S S E T H:

WHEREAS, Landlord (as successor-in-interest to SV Portfolio LP) and Tenant entered into a Commercial Park Lease dated June 27, 2012, as amended by that certain First Amendment to Lease by and between Landlord and Tenant dated October 26, 2012 (as amended, the "Lease") for certain premises consisting of approximately 257,972 square feet of space located in Landlord's Siempre Viva Business Park, known by street address as 9043 Siempre Viva Road, #100, San Diego, California (the "Leased Premises"); and

WHEREAS, Landlord and Tenant now desire to amend the Lease as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereby agree as follows:

1.

The following shall be added as new Section 1.01.E of the Construction Rider attached to and forming a part of the Lease (the "Construction Rider):

"Anything contained herein to the contrary notwithstanding, the parties acknowledge that Landlord has agreed to make certain upgrades to the sprinkler system in portions of the Leased Premises substantially in accordance with the scope of work outlined in that certain proposal letter dated March 25, 2013 from Schmidt Fire Protection Co., Inc. ("Schmidt") to Colliers International ("CI"), a copy of which is attached hereto as <u>Schedule 1</u> (the "Sprinkler Proposal").  The work described in the Sprinkler Proposal is referred to herein as the "Sprinkler Work".  The Sprinkler Work shall be performed within the portions of the Premises depicted on the attachments included in <u>Schedule 2</u> hereto.  In

order to accommodate the Sprinkler Work, Tenant covenants and agrees to: (i) permit Landlord and its contractors (including without limitation Schmidt and CI) to have access to the Premises between the hours of 7:00am and 6:00 pm on all weekdays for the purpose of performing the Sprinkler Work; (ii) remove all property currently located on the top racks within the Premises in all areas where Sprinkler Work is to be performed, and ensure that no property is placed on such top racks while the Sprinkler Work is ongoing; (iii) provide Landlord's contractors with a 20' x 20' clear area within the Premises, which area shall be used for the temporary storage of two (2) scissor lifts, an articulating lift and other construction equipment; (iv) permit Landlord's contractors to plug lifts and other construction equipment into existing outlets; and (v) otherwise cooperate with Landlord's contractors in all respects so the Sprinkler Work can be performed in an efficient manner. The Sprinkler Work shall be performed by Schmidt (or another sprinkler contractor selected by Landlord and reasonably acceptable to Tenant), in a good and workmanlike manner and in compliance with all applicable laws, at Landlord's sole cost and expense, except that (i) Tenant shall be responsible for all additional costs and expenses incurred by Landlord which are attributable, in whole or in part, to Tenant's failure to fully and timely comply with the foregoing provisions and to generally cooperate with Landlord and its contractors, and Tenant shall reimburse Landlord for all of such costs and expenses within ten (10) days following its receipt of a written demand therefor and (ii) Tenant shall be responsible for the cost of performing its obligations hereunder, including temporarily relocating Tenant's property as set forth herein and performing all obligations of Tenant under the Lease, as amended hereby, and under that certain Industrial License Agreement of even date herewith by and between Landlord and Tenant.

Tenant acknowledges that the Sprinkler Work will be performed during normal business hours, and may result in some disruption to Tenant's business operations. Tenant agrees that it shall have no right, claim or cause of action against Landlord arising out of

the performance of the Sprinkler Work (including, without limitation, any claim of a breach of any implied warranty of habitability or covenant of quiet enjoyment or any claim of constructive eviction), nor shall Tenant be entitled to reduce or abate any Rent on account thereof or on account of any disruption to Tenant's business.  Landlord shall use reasonable efforts to cause its contractors to prosecute the Sprinkler Work in a manner which minimizes interference with Tenant's business operations.

In connection with the foregoing, the Lease is hereby amended by adding Schedule 1 and Schedule 2 attached to this Amendment as Schedule 1 and Schedule 2 to the Construction Rider.

2.

The parties acknowledge and agree that:  (i) as of the Effective Date, Three Hundred Twelve Thousand Eight Hundred Ninety and 00/00 Dollars ($312,890.00) of the Allowance has previously been advanced by Landlord to Tenant or Tenant's contractors; and (ii) to the extent Tenant is entitled to any portion of the balance of the Allowance pursuant to the terms of the Lease, the same shall be disbursed to Tenant (and **not** to any of Tenant's contractors) only at such time as Tenant has completed and fully paid for all of the improvements to be constructed by Tenant pursuant to the terms of the Lease, and has provided Landlord with all of the documents and information required pursuant to Section 1.04.A of the Lease.

3.

EXCEPT as specifically provided to the contrary herein, all the rest and remaining terms and conditions of the Lease shall remain in full force and effect.  Tenant acknowledges and agrees that it has accepted the Leased Premises in its current "as-is", "where-is" condition, and that subject to Landlord's obligation to advance the balance of the Allowance and to perform the Sprinkler Work as provided hereinabove, Landlord is not required to make any repairs or improvements to the Leased Premises, or provide any rental abatements, allowance or other leasing concessions in connection with Tenant's leasing of the Leased Premises, except as specifically provided in the Lease.   All defined terms used

herein shall have the same meaning as when used in the Lease unless another meaning is clearly indicated. In the event of any conflict between the provisions of the Lease and this Amendment, the provisions of this Amendment shall be controlling. The Lease, as amended hereby, contains the entire agreement of the parties hereto, and supersedes and revokes any negotiations, arrangements, letters of intent, representations, inducements, or other agreements, whether oral or in writing. No representations, inducements or agreements, whether oral or in writing, between the parties not contained in the Lease, as amended hereby, are of any force or effect. Exhibits attached hereto are incorporated herein by reference. This Amendment may be signed in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one instrument. The provisions of the Lease, as amended by this Amendment, shall not be construed for or against either party based upon which party drafted the Lease and/or this Amendment.

[signatures set forth on following page]

THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION AND/OR EXECUTION HEREOF SHALL BECOME EFFECTIVE ONLY UPON EXECUTION BY ALL PARTIES HERETO AND DELIVERY OF A FULLY EXECUTED COUNTERPART BY LANDLORD TO THE OTHER PARTIES HERETO.

WITNESS:

*Kathleen K Spahr*

BIT HOLDINGS SEVENTY, INC.,
a Maryland corporation

By: _____

Name:  William K. Mihm

Title:   Vice President and Assistant Secretary

LANDLORD

WITNESS:

_____

IMPERIAL TOY, LLC,
a California limited liability company

By: _____

Name: _____

Title: _____

TENANT

SCHEDULE 1

SPRINKLER PROPOSAL

[attached hereto]



**Schmidt Fire Protection Co., Inc.**
4760 MURPHY CANYON RD • SAN DIEGO, CA 92123 • (858) 279-6122 • FAX (858) 279-3583

March 25, 2013

**Colliers International**
4660 La Jolla Village Drive, Suite 100
San Diego, CA 92122

Attn: Kimberly Orr

Re: Install K-22 Magnum Fire Sprinklers, 9043 Siempre Viva Road

We submit the price of $122,810.00 (one hundred twenty-two thousand eight hundred ten dollars) to provide labor, material, equipment, design and fees for a City of San Diego Building Department approved fire sprinkler system upgrades per AON report for a existing K-17 ESFR system. This price is based on replacing K-17 ESFR with K-22 Magnum Model HL22 for systems #2 and #5 for rack storage at roof over 40' high per AON report dated March 20, 2013. Existing system as designed and installed is not compliant for storage at roof over 40' high.

Our price is base on the following:

1. Replace system #2 fire sprinkler riser, manifold and 50' of 6" main to 8" (#5 to remain as is).
2. Pull and plug existing ¾" outlet, install new 21/2" x 11/2" mechanical tee with reducing coupling.
3. Replace K-17 with K-22 Magnum Model HL22 intermediate temperature for systems #2 & #5.
4. Labor (M-F 7:00 AM – 3:30 PM), material and equipment.
5. Upgrade seismic bracing on mains being modified.
6. Black steel schedule 10 piping and related hangers and Victaulic couplings/fittings.
7. Design, submittals and hydraulic calculations City of San Diego Building Department.
8. Plan review and inspection fees City of San Diego Building Department.

We exclude the following from our price:

1. Off-hours labor.
2. Protection of product other than visqueen/sheet plastic.
3. Cost for guard or tenant employee for duration of piping replacement (if required).
4. Relocation of product, materials or equipment for installation of fire sprinkler system.
5. Fire watch if required by owner or Insurance Company (system will be impaired during upgrade).

We look forward to working with you on this project. If you have any questions or concerns please feel free to contact me at the office.

Respectfully,
**Schmidt Fire Protection Company, Inc.**

Leonard Moore
Estimator

esfr.bid

*Design · Installation · Servicing of Fire Sprinkler Systems*

Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 42 of 73

LOCATION OF SPRINKLER WORK

[attached hereto]

8

EXHIBIT A

# ATTACHMENT NO. 1



ROOF LAYOUT
NTS

→ N

# ATTACHMENT NO. 2



SPRINKLER SYSTEM ZONES
NTS

# ATTACHMENT No. 4



PROPOSED RACK PLAN

IMPERIAL TOY LLC
9043 SIEMPRE VIVA RD.
SAN DIEGO, CA 92154

WAREHOUSE SOLUTIONS INC.
12570-5 HIGHWAY 67
LAKESIDE, CA 92040
PH (619) 873-4410 FAX (619) 449-1710

STATEMENT OF SPECIAL INSPECTIONS

Case: 19-52335   Doc# 73-3   Filed: 12/09/19   Entered: 12/09/19 17:39:21   Page 46 of 73



Case: 19-52335    Doc# 73-3    Filed: 12/09/19    Entered: 12/09/19 17:39:21    Page 47 of 73

# THIRD AMENDMENT TO LEASE

**THIS THIRD AMENDMENT TO LEASE** (this "**Amendment**") is entered into as of the 11th day of _November_ , 2017 (the "**Effective Date**"), by and between **BIT HOLDINGS SEVENTY, INC.**, a Maryland corporation ("**Landlord**"), and **IMPERIAL TOY LLC**, a California limited liability company ("**Tenant**").

## W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant are parties to that certain Commercial Park Lease dated June 27, 2012, as amended by (i) that certain First Amendment to Lease dated October 26, 2012, and (ii) that certain Second Amendment to Lease dated December 12, 2013 (collectively, the "**Existing Lease**"), pursuant to which Tenant currently leases from Landlord certain premises consisting of approximately 257,972 square feet of space with a street address of 9043 Siempre Viva Road, #100, San Diego, California (the "**Leased Premises**"), which Leased Premises comprises a portion of the Commercial Park (as defined in the Existing Lease), all as more particularly described in the Existing Lease; and

**WHEREAS**, the expiration date of the Existing Lease is March 31, 2018; and

**WHEREAS**, Landlord and Tenant wish to amend the Existing Lease to, among other things, extend the term thereof and make such other changes thereto as are more fully set forth in this Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. **Incorporation of Recitals.** The foregoing recitals are hereby incorporated in this Amendment and made a part hereof by this reference.

2. **Definitions.** All capitalized terms not defined in this Amendment shall have the meaning ascribed to them in the Existing Lease, unless otherwise stated herein. In the event of a conflict between the provisions of the Existing Lease and the provisions of this Amendment, the provisions of this Amendment shall control, and all other provisions of the Existing Lease shall remain in full force and effect. The Existing Lease, as amended by this Amendment, shall hereinafter be referred to as the "**Lease**."

3. **Modifications to the Existing Lease.** The Existing Lease is hereby amended in the following respects:

(a) **Landlord's Address for Notices.** Notwithstanding anything contained in the Existing Lease to the contrary, Landlord's address for all notices under the Lease is as follows:

BIT Holdings Seventy, Inc.
c/o PNC Bank, National Association, Trustee
One East Pratt Street, 5th Floor East
Baltimore, MD 21202
Attn:  BIT Notice Recipient
      Tel:    (410) 237-5727
      Fax:    (410) 237-5420
      e-mail:   bitnoticerecipient@pnc.com

With a concurrent copy to:

BIT Holdings Seventy, Inc.
c/o PNC Realty Investors
800 17th Street NW, 12th Floor
Washington, DC  20006
Attention:  Asset Management

**(b)** **Term.**  The term of the Lease is hereby extended for an additional period of sixty (60) months commencing on April 1, 2018, and ending on March 31, 2023 (the "**Extended Term**"), unless sooner terminated pursuant to the terms of the Lease or further extended as set forth in Section 3(d) below.  All references in the Lease to the "term" or the "Lease Term" shall be deemed to include the Extended Term. Notwithstanding anything that may be contained in the Existing Lease to the contrary, Tenant will have no right or option to extend or renew the term of the Lease after the end of the Extended Term except as expressly set forth in Section 3(d) of this Amendment.

**(c)** **Base Rent.**

    (i)   Base Rent During Extended Term.  Except for the abatement of Base Rent set forth in Section 3(c)(ii) below, Tenant shall continue to pay Base Rent in accordance with the terms of the Existing Lease through March 31, 2018. Commencing on April 1, 2018, Tenant shall pay Base Rent during the Extended Term in accordance with the following schedule:

| Time Period | Base Rent Per Month |
|---|---|
| April 1, 2018 – March 31, 2019 | $144,464.32 |
| April 1, 2019 – March 31, 2020 | $148,798.25 |
| April 1, 2020 – March 31, 2021 | $153,262.20 |
| April 1, 2021 – March 31, 2022 | $157,860.06 |
| April 1, 2022 – March 31, 2023 | $162,595.86 |

    (ii)   Abatement of Base Rent.  Notwithstanding the foregoing Base Rent schedule, the monthly installments of Base Rent due for the months of May 2018 through

2

September 2018, and for the month of April 2019 (the "**Rent Abatement Period**"), in the total amount of $871,119.85 (the "**Abated Rent**") shall be abated, but only to the extent that, at the time such Base Rent would otherwise be due and payable, an Event of Default beyond all applicable notice and cure periods has not occurred and is not then occurring. Without limiting any other right or remedy of Landlord under the Lease: (A) if an Event of Default occurs during the Rent Abatement Period, Tenant shall thereafter be liable for all previously Abated Rent and all accruing Base Rent for the remainder of the Rent Abatement Period without any abatement, and (B) if an Event of Default occurs at any time during the Extended Term, then Landlord shall have the right to require Tenant to immediately pay the Abated Rent in full (even if the Rent Abatement Period has expired). The acceptance by Landlord of any rent or the cure of the Event of Default which initiated the operation of Tenant's forfeiture of its right to the abatement set forth herein shall not be deemed a waiver by Landlord of the provisions of this paragraph unless specifically so stated in writing by Landlord at the time of such acceptance. Notwithstanding the abatement of Base Rent provided for herein, Tenant shall pay in full all other amounts that are due or become due during the Rent Abatement Period, including Operating Costs, as and when the same shall become due.

(iii) <u>Additional Rent</u>. For the avoidance of doubt, during the Extended Term, Tenant shall continue to pay all amounts that it is obligated to pay under the Lease in addition to Base Rent, including, without limitation, Additional Rent (which includes Operating Costs).

**(d)** **Extension Option**. The Option Rider attached to the Existing Lease is hereby deleted in its entirety and replaced with the following new Extension Option, the parties acknowledging and agreeing that all extension options contained in the Existing Lease are hereby declared null and void, and Tenant shall only be permitted to extend the term of the Lease in accordance with the Extension Option set forth herein.

(i) <u>Extension Option</u>. Tenant is granted the right (the "**Extension Option**") to extend the Term of the Lease for one (1) additional period of six (6) years (i.e., commencing on April 1, 2023, and ending on March 31, 2029) (the "**Option Term**"), provided that (A) Tenant gives written notice to Landlord of Tenant's election to exercise such Extension Option no more than twelve (12) months and no less than nine (9) months before the expiration of the Extended Term, TIME BEING OF THE ESSENCE, (B) Tenant has not assigned the Lease or subleased any portion of the Leased Premises and is then in possession of and occupying one hundred percent (100%) of the Leased Premises, and (C) no Event of Default has occurred under the Lease as of the date on which Tenant delivers the exercise notice and no Event of Default occurs after such exercise notice (provided, however, that Tenant may not use such Event of Default as a means to negate the effectiveness of its exercise of such Extension Option).

(ii) <u>Base Rent for Option Term</u>. All terms and conditions of the Lease, including all provisions governing the payment of Additional Rent, shall remain in full force and effect during the Option Term, except that Base Rent payable during the Option Term shall be at an amount equal to the Fair Market Rent (as defined in Section 3(d)(iii) [Fair Market Rent] below) at the time of the start of the Option Term (as determined no more than twelve (12) months before the start of the Option Term). Landlord may require an additional security deposit from Tenant if Landlord determines that, as of the commencement of the Option Term, Tenant is not as financially responsible as Tenant is on the Effective Date hereof, or that Tenant's then financial capacity and

3

creditworthiness indicates that Tenant may not be able to undertake and perform all the obligations of Tenant under the Lease through the Option Term. On the determination of the Fair Market Rent, an amendment modifying the Lease to set forth the Base Rent for the Leased Premises during the Option Term shall be executed by Landlord and Tenant within ten (10) days of such determination.

(iii)    Fair Market Rent.  For purposes hereof, the term "**Fair Market Rent**" means the net or base annual rate of rent, expressed in dollars per square foot of rental area, reserved in leases most recently consummated for comparable space in comparable buildings of similar class in the Otay Mesa industrial submarket area of San Diego, California, (the "**Comparable Buildings**") with tenants of similar creditworthiness and stature to Tenant, for comparable space (taking into account the location of the floor and the building) for leases of similar duration inclusive of the prevailing market conditions for the renewal of existing leases in existing buildings for existing tenants. The Fair Market Rent for the Leased Premises during the Option Term will be determined as follows:

(A)    Mutual Agreement.  Landlord and Tenant will negotiate in good faith to determine the Fair Market Rent for the Option Term within twenty (20) days of the date of Landlord's receipt of Tenant's written notice of Tenant's election to exercise the Extension Option.  If Landlord and Tenant cannot agree on the Fair Market Rent within such twenty (20) day period, Fair Market Rent shall be determined as provided in Section 3(d)(iii)(B) (Fair Market Rent Determination) below.

(B)    Fair Market Rent Determination.  If Landlord and Tenant are unable to agree on the Fair Market Rent pursuant to Section 3(d)(iii)(A) above, then within fifteen (15) days after the expiration of the twenty (20) day period set forth therein, Landlord and Tenant shall each select a real-estate professional (based on the criteria set forth in Section 3(d)(iii)(C) below) and provide written notice to the other party of such selection.  Within thirty (30) days of their selection, each professional shall make a written determination to Landlord and Tenant of the Fair Market Rent.  All determinations of the Fair Market Rent shall be in writing.  The party appointing each professional shall be obligated, promptly after receipt of the valuation report prepared by the professional appointed by such party, to deliver a copy of such valuation report to the other party.  If the Fair Market Rent determination of the professional designated by Landlord is within five percent (5%) of the Fair Market Rent determination of the professional designated by Tenant, then the Fair Market Rent shall be the average of the two Fair Market Rent determinations.  If the Fair Market Rent determinations of the two professionals vary by more than five percent (5%), then a third professional shall be selected by the initial two professionals within fifteen (15) days after the initial two valuation reports have been delivered to the parties (the third professional also having the qualifications set forth in Section 3(d)(iii)(C) below).  If a third professional is appointed, the third professional shall review the valuation reports of the initial two professionals and shall select the one of the initial two valuation reports that most closely and accurately reflects such criteria for the Fair Market Rent.  The third professional shall promptly deliver a written report of his or her determination to each of the parties. The determination of the Fair Market Rent pursuant hereto shall be final and binding on Landlord and Tenant.

(C)    Expenses; Qualification of Professionals.  The expenses of each of the first two professionals appointed under Section 3(d)(iii)(B) shall be borne by the party appointing such professional.  The expenses of the third professional appointed under Section

4

3(d)(iii)(B) shall be paid one-half (1/2) by Landlord and one-half (1/2) by Tenant. The real-estate professionals selected by Landlord and Tenant shall have the following qualifications: (1) must be an independent and licensed real estate broker in the San Diego, California, area; (2) must have a minimum of ten (10) years' experience in commercial industrial/warehouse leasing in the Otay Mesa industrial submarket area of San Diego, California; (3) must be an active broker in the Otay Mesa industrial submarket area of San Diego, California, and known for commercial expertise; (4) must have experience representing both landlords and tenants; (5) in the case of the third professional only, is not then representing either Landlord or Tenant; and (6) in the case of the third professional only, has not been involved in any disputes with Landlord, Tenant, or either of the other professionals. If real-estate professionals with the qualifications described herein are unavailable, qualified consultants with similar qualifications may be substituted.

(iv)     <u>Reaffirmation of Representations</u>.  As a condition to the effective exercise of the Extension Option, Tenant shall reaffirm its representations and warranties contained in Article XXIV (ERISA and the Code/UBIT) and Article XXVIII (Anti-Money Laundering/International Trade Law Compliance) of the Lease as of the commencement of the Option Term.

(e)     **Landlord's Remedies**.  Section 15.03 of the Existing Lease is hereby deleted in its entirety and replaced with the following new Section 15.03:

"**Section 15.03**.  If Landlord terminates this Lease and Tenant's right to possession of the Leased Premises (or the Lease is otherwise terminated), Landlord may recover from Tenant the aggregate of all amounts permitted by law, including, but not limited to, the cost of recovering the Leased Premises, and including the following damages set forth in California Civil Code Section 1951.2 as of the Effective Date:

(1)     The worth at the time of award of the unpaid rent which had been earned at the time of termination; plus

(2)     The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(3)     The worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(4)     Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including any legal expenses, brokers' commissions or finders' fees (in connection with re-letting the Leased Premises and the pro rata portion of any leasing commission paid by Landlord in connection with this Lease which is applicable to the portion of the term, including option periods, which is unexpired as of the date on which this Lease terminated), the costs of repairs, cleanup, refurbishing, removal and storage or disposal of Tenant's personal property,

5

equipment, fixtures and anything else that Tenant is required under this Lease to remove but does not remove (including those alterations which Tenant is required to remove pursuant to an election by Landlord and Landlord actually removes whether notice to remove shall be delivered to Tenant), and any costs for alterations, additions and renovations incurred by Landlord in regaining possession of and re-letting (or attempting to re-let) the Leased Premises. Tenant shall also reimburse Landlord for the pro rata portion of leasehold improvement costs paid by Landlord to install leasehold improvements on the Leased Premises which is applicable to that portion of the Term including any terminated option periods which is unexpired as of the date on which this Lease terminated, discounted to present value.

"All computations of the "worth at the time of the award" of amounts recoverable by Landlord under (1) and (2) above shall be computed by allowing interest at the maximum lawful contract rate per annum. The "worth at the time of the award" recoverable by Landlord under (3) above and the discount rate for purposes of determining any amounts recoverable under (4) above, if applicable, shall be computed by discounting the amount recoverable by Landlord at the discount rate of the Federal Reserve Bank, San Francisco, California, at the time of the award plus one percent (1%). Upon termination of this Lease, whether by lapse of time or otherwise, Tenant shall immediately vacate the Leased Premises and deliver possession to Landlord, and Landlord shall have the right to re-enter the Leased Premises. Any termination of this Lease shall automatically terminate existing subtenancies, unless Landlord, in its sole discretion, agrees in writing otherwise. Tenant hereby waives any right of redemption or relief from forfeiture under the laws of the State of California, or under any other present or future law, including, without limitation, the provisions of Sections 1174 and 1179 of the California Code of Civil Procedure. Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due."

(f)     **Tenant Estoppel**. Section 20.02 of the Existing Lease is hereby amended by adding the following new language after the end of the last sentence thereof:

6

"Any owner of the building in which the Leased Premises is located, any prospective purchaser of the building, any mortgagee or prospective mortgagee of the building or of Landlord's interest therein, or any prospective assignee of any such mortgage, may rely on any such statement delivered by Tenant pursuant hereto. Tenant's failure to deliver the statement within such five (5) day period shall be conclusive upon Tenant (i) that the Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) that any security deposit is as represented by Landlord, (iii) that there are no uncured defaults in Landlord's performance, and (iv) that not more than one month's rent has been paid in advance. If Landlord desires to sell or finance or refinance all or part of the Leased Premises, Tenant agrees to deliver to any proposed purchaser or lender named by Landlord the past three (3) years' financial statements of Tenant (which shall be in audited form, if available). All financial statements shall be received by Landlord in confidence and shall be used only for these purposes."

   **(g)** **ERISA and the Code/UBIT**. Sections 24.01 of the Existing Lease is hereby deleted in its entirety and replaced with the following new Section 24.01:

**"Section 24.01**

   "A.    Tenant represents and warrants to Landlord that neither Tenant nor any guarantor of Tenant's obligations under this Lease is (i) a party in interest, as defined in Section 3(14) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), to the AFL-CIO Building Investment Trust ("**Trust**"), or any of the plans participating therein [a current list of which is attached to this Amendment as **Exhibit A**], or (ii) a disqualified person under Section 4975(e)(2) of the Internal Revenue Code of 1986, as amended ("**Code**"), with respect to the Trust or the plans participating therein. Neither Tenant nor any guarantor of Tenant's obligations under this Lease shall take any action that would cause this Lease or the exercise by Landlord or the Trust of any rights hereunder, to be a non-exempt prohibited transaction under ERISA or the Code. Tenant represents and warrants to Landlord that Tenant is not, and shall not be at any time during the term of this Lease, related to the most recent former owner of the real property containing the Premises by a relationship described in Section 514(c)(9)(B)(iii) of the Code.

   "B.    Tenant represents and warrants to Landlord that (i) neither Tenant nor any guarantor of Tenant's obligations under this Lease is an affiliate of PNC Bank, National Association, or any of its affiliates; (ii) Tenant is not using any financing obtained from PNC Bank, National Association, or any of its affiliates in connection with this Lease; and (iii) Tenant has not directly or indirectly granted to PNC Bank, National Association, or any affiliate of PNC Bank, National Association, any security interest in Tenant's interest in this Lease or in any of Tenant's fixtures, furniture or equipment located at the Premises in connection with any financing obtained from PNC Bank, National Association, or any affiliate of PNC Bank, National Association. For purposes hereof, the term "**affiliate**" means any entity directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with PNC Bank, National Association.

7

EXHIBIT A

"C.     Notwithstanding any contrary provision of this Lease, Tenant shall not assign this Lease or sublease all or any portion of the Leased Premises unless (i) such assignee or subtenant delivers to Landlord a certification (in form and content satisfactory to Landlord) disclaiming status of such assignee or subtenant (and any guarantor of such assignee's or subtenant's obligations) as a party in interest and a disqualified person, as provided above in Section 24.01.A, and as an affiliate or subsidiary of PNC Bank, National Association, and as using financing from PNC Bank, National Association, or its affiliates, as provided above in Section 24.01.B; and (ii) such assignee or subtenant undertakes not to take any action that would cause this Lease or the exercise by Landlord or the Trust of any rights hereunder, to constitute a non-exempt prohibited transaction under ERISA or the Code."

(h)     **Labor Covenant**.  Article XXV (Labor Covenant) of the Existing Lease is hereby amended as follows:

(i)     By adding the following language immediately after the first full sentence of Section 25.02: "Off-site construction and fabrication of components traditionally manufactured off-site used in any alterations or improvements to the interior or exterior of the Leased Premises are exempt from the Construction Labor Covenant. Exterior and structural alterations or improvements constructed or fabricated off-site as well as all concrete and cement used must be delivered to the Leased Premises by a union-signatory transportation company."

(ii)     By deleting the last full sentence of Section 25.02 in its entirety (which sentence begins: "If a resolution to a construction-related jurisdictional dispute ....")

(iii)     By adding the following new Sections 25.03 and 25.04:

"**Section 25.03**.   Tenant shall, at its expense, defend (by counsel reasonably approved by Landlord), protect, indemnify and hold harmless Landlord and, as applicable, its shareholders, officers, directors, members, managers, partners (including general and limited partners), and the members of its shareholders, members and partners, and all of its and their respective officers, directors, agents, employees, and invitees (collectively, the "**Indemnified Parties**"), from any loss, damage, liability, or cost (including reasonable attorneys' fees and all court costs) incurred by the Indemnified Parties (collectively, "**Claims**"), including, without limitation, Claims on account of injury (including death and physical, psychological, and emotional injuries) to any person or damage to any property whatsoever, to the extent arising from or caused by (whether in whole or in part, directly or indirectly) any action taken by Landlord in connection with a breach of the Maintenance Labor Covenant or the Construction Labor Covenant.

"**Section 25.04**.   In addition to those events designated as Events of Default pursuant to Section 15.01 of the Lease, and notwithstanding anything to the contrary set forth in the Lease, an Event of Default by Tenant and a breach of the Lease shall also exist if Tenant shall fail to comply with the Maintenance Labor Covenant or the Construction Labor Covenant and shall not cure such failure immediately after (and in all events within one (1) day after) notice thereof to

8

Tenant, which notice may be verbal notice given to Tenant or any employee located at the Leased Premises. Notwithstanding anything contained in the Lease to the contrary, if the Event of Default arises out of or is in any way related to a breach of the Maintenance Labor Covenant or the Construction Labor Covenant, then, in addition to all other remedies, Landlord may immediately take any and all actions that Landlord deems necessary in its sole and absolute discretion to cure said default on behalf of Tenant including, but not limited to, causing the stoppage of any and all work and/or the removal of any workers performing activities in violation of the Maintenance Labor Covenant or the Construction Labor Covenant, in which case, Tenant shall promptly reimburse Landlord for all amounts expended by Landlord in connection therewith together with interest thereon at the rate of one and one-half percent (1½%) per month or at the highest lawful rate, whichever is less, all of which shall constitute additional rent hereunder. No action taken by Landlord in accordance with the provisions of this paragraph shall constitute a breach by Landlord of any implied or express provision of this Lease including, but not limited to, a breach of the covenant of quiet enjoyment, or an act of trespass or conversion. Tenant hereby releases Landlord from all liabilities, claims and causes of action in any way related to the exercise of any rights or remedies set forth in this paragraph. Nothing herein shall impose any duty on the part of Landlord to stop the work of and/or remove any persons, and Landlord's failure to do so shall not constitute a waiver of any remedies available to Landlord resulting from such Event of Default."

(i) **Right of First Offer**. Sections 26.14 of the Existing Lease is hereby deleted in its entirety and replaced with the following new Section 26.14:

"**Section 26.14**. A. Provided this Lease is in full force and effect, no Event of Default is occurring under this Lease (both at the time of the exercise of the right(s) described herein and on the date of entry into the agreement incorporating the ROFO Space [as hereinafter defined]), and Landlord owns the building containing the ROFO Space, Tenant shall have the right (the **"Right of First Offer"**), at the expiration of the term of any lease in respect of the ROFO Space, to lease certain space consisting of approximately 112,000 square feet located in the building adjacent to the Leased Premises and known as 8863 Siempre Viva Road, San Diego, California (the **"ROFO Space"**) on the first (1st) occasion that such ROFO Space "becomes available." For purposes hereof, the ROFO Space will be deemed to "become available" when the lease or other occupancy agreement for the current occupant of the ROFO Space expires or is otherwise terminated, provided that, notwithstanding the foregoing, the ROFO Space will not be deemed to "become available" if the ROFO Space is: (i) assigned or subleased by the current tenant of the ROFO Space (even if Landlord has a recapture right in connection therewith); or (ii) re-leased by the current tenant of the ROFO Space by renewal, extension, or renegotiation (regardless of whether or not an express renewal option is afforded to such tenant under the terms of its lease); or (iii) not leased to a tenant as of the Effective Date of this Amendment (until that space is leased and then subsequently "becomes available"); or (iv) subject to an existing right of first offer of first refusal or similar preferential right of another tenant in the Commercial Park; or (v) subject to a holdover by the current tenant.

9

"B.     Subject to the foregoing, the first time during the term of the Lease that Landlord proposes to offer for lease the ROFO Space which Landlord anticipates will "become available," Landlord shall furnish to Tenant a notice (the **"First Offer Proposal"**) containing the material terms of the proposed lease in respect of the ROFO Space, including (i) annual Base Rent for the ROFO Space (which will be Fair Market Rent as defined in Section 3(d)(iii) of this Amendment, as reasonably determined by Landlord), (ii) the proposed effective date and term of the lease for the ROFO Space, and (iii) any other material terms which Landlord shall deem appropriate. Tenant shall have the option, exercisable by notice delivered to Landlord within five (5) business days after Tenant's receipt, or refusal of receipt, of Landlord's First Offer Proposal, TIME BEING OF THE ESSENCE, to lease the entirety of the ROFO Space upon such terms and conditions as are contained in the First Offer Proposal. If Tenant timely delivers to Landlord written notice of Tenant's exercise of the Right of First Offer for the ROFO Space, then, within ten (10) business days thereafter, the parties shall enter into an amendment to this Lease incorporating the ROFO Space as part of the Leased Premises on the terms and conditions contained in the First Offer Proposal. If Tenant declines or fails to timely exercise its Right of First Offer, Landlord shall thereafter be free to lease the ROFO Space without regard to the restrictions contained herein and on such terms and conditions as Landlord may decide in its sole discretion.  The Right of First Offer is only available to Tenant on the first (1st) occasion that such ROFO Space "becomes available," and Tenant acknowledges and agrees that it shall have no further right to lease such ROFO Space, nor shall Landlord have any obligation to furnish to Tenant a First Offer Proposal with respect to such ROFO Space, at any time thereafter.

"C.     Notwithstanding anything contained in this Section 26.14, Tenant will not be permitted to exercise the Right of First Offer within the last two (2) years of the then-current term of the Lease unless Tenant has then exercised any applicable remaining option granted to Tenant to extend the term of the Lease. In the event the ROFO Space becomes available for leasing during the last two (2) years of the then-current term, and if Tenant at such time still has a remaining unexercised extension option under the Lease and the latest date for Tenant's exercise of such extension option has not then expired, then, prior to Landlord leasing the ROFO Space for a term which would commence prior to the last two (2) years of the then-current term, Landlord shall give Tenant the First Offer Proposal, and Tenant shall have the right to exercise its corresponding Right of First Offer pursuant to, and in accordance with the time frames set forth herein, but only if Tenant concurrently exercises its extension option at the same time that Tenant notifies Landlord of its exercise of the Right of First Offer for the ROFO Space hereunder. If the ROFO Space becomes available for leasing during the last two (2) years of the then-current term and Tenant has no extension option available, Tenant shall have no Right of First Offer with respect thereto, and Landlord shall have no obligation to present Tenant with a First Offer Proposal.

10

"D.     The Right of First Offer is personal to Tenant and shall become null and void upon the occurrence of an assignment of the Lease or subletting of all or any portion of the Premises in accordance with the terms of this Lease."

(j)     **Termination of Purchase Options**.   Sections 26.15 and 26.16 of the Existing Lease are hereby deleted in their entirety and are of no further force or effect.

(k)     **Anti-Money Laundering/International Trade Law Compliance**.   The following new Article XXVIII is hereby added to the Lease:

### "ARTICLE XXVIII – ANTI-MONEY LAUNDERING/ INTERNATIONAL TRADE LAW COMPLIANCE

"**Section 28.01**.     Tenant hereby represents and warrants that, as of the date of execution of this Lease and any amendments hereto, no Covered Entity: (1) is a Sanctioned Person; and (2) either in Covered Entity's own right or through any third party, (a) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law, (b) does business in or with, or derives any of its income from investment in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, or (c) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

"**Section 28.02**.     Tenant hereby covenants during the term of this agreement, that no Covered Entity: (1) will become a Sanctioned Person, and (2) either in Covered Entity's own right or through any third party (a) will have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law, (b) will do business in or with, or derive any of its income from investment in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (c) will engage in any dealings or transactions prohibited by any Anti-Terrorism Law; or (d) will use any proceeds, funds or fees advanced pursuant to this agreement to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law. Tenant further covenants that each Covered Entity shall comply with all Anti-Terrorism Laws. Tenant shall promptly notify Landlord in writing upon the occurrence of a Reportable Compliance Event.

"**Section 28.03**.   As used in this Section:

(i)     "Anti-Terrorism Laws" means any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, and any regulation, order, or directive promulgated, issued, or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

(ii)     "Covered Entity" means (A) Tenant, each of Tenant's subsidiaries and any guarantor of this Lease and (B) each person or entity that, directly or indirectly, is in control of a person or entity described in clause (A) above.  For

11

purposes of this definition, control of a person or entity shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such person or entity or other persons or entities performing similar functions for such person or entity, or (y) power to direct or cause the direction of the management and policies of such person or entity whether by ownership of equity interests, contract or otherwise.

(iii)    "Governmental Body" means any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to a government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

(iv)    "Law" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic.

(v)    "Reportable Compliance Event" means that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

(vi)    "Sanctioned Country" means a country subject to a sanctions program maintained under any Anti-Terrorism Law.

(vii)    "Sanctioned Person" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"**Section 28.04**.    Tenant agrees that it shall incorporate the requirements of this Article XXVIII in any sublease of the Premises."

(l)    **California Provisions.**  The following new Article XXIX is hereby added to the Lease:

"**ARTICLE XXIX - CALIFORNIA PROVISIONS**

12

"**Section 29.01**.   Tenant waives the provisions of California Civil Code Sections 1932.1, 1932.2, and 1933.4 with respect to termination rights due to an interruption, failure or inability to provide services and the destruction of the Leased Premises; California Civil Code Sections 1941 and 1942 with respect to Landlord's repair duties and Tenant's right to repair; California Civil Code Section 1654 with respect to the interpretation of language in a contract being construed most strongly against the party who caused the uncertainty to exist; California Civil Code Section 1950.7 with respect to the use of the Security Deposit by the Landlord; California Code of Civil Procedure Section 1265.130, allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Premises by Condemnation; Section 1995.310 of the California Civil Code permitting Tenant to terminate the Lease if Landlord unreasonably withholds consent to a transfer; and California Code of Civil Procedure Section 1161, *et seq.*, regarding notice required after default. This waiver applies to amendments or modifications to the cited sections and any future statutes enacted in addition or in substitution to the statutes specified herein. Tenant shall have no right to terminate this Lease as a result of a default by Landlord except if expressly provided otherwise herein, and Tenant's remedies shall be limited to damages and/or an injunction.

"**Section 29.02**.   For purposes of Section 1938 of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Leased Premises has not undergone inspection by a Certified Access Specialist (CASp) and in connection therewith: (i) Tenant assumes all risk of, and agrees that Landlord shall not be liable for, any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) sustained as a result of the Leased Premises not having been inspected by a Certified Access Specialist (CASp); (ii) Tenant hereby acknowledges and agrees that Tenant's indemnity obligations set forth in this Lease shall include any and all claims relating to or arising as a result of the Leased Premises not having been inspected by a Certified Access Specialist (CASp); (iii) Landlord may require, as a condition to its consent to any alterations or additions, that any architect retained by Tenant in connection with such alterations or additions be certified as a Certified Access Specialist (CASp), and that following the completion of such alterations or additions, such architect shall certify the Leased Premises as meeting all applicable construction-related accessibility standards pursuant to California Civil Code § 55.51 et seq., and (iv) except to the extent expressly set forth in this Lease, Landlord shall have no liability or responsibility to make any repairs or modifications to the Leased Premises in order to comply with accessibility standards. The following disclosure is hereby made pursuant to applicable California law:

"A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall

13

mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." [Cal. Civ. Code Section 1938(e)]. Any CASp inspection shall be conducted in compliance with reasonable rules in effect at the Shopping Center with regard to such inspections and shall be subject to Landlord's prior written consent."

4.    **Condition of Leased Premises; Refurbishment Allowance.**

        (a)    **Condition of Leased Premises.**    Tenant currently occupies the Leased Premises and accepts it in its current "as is," "where is," "with all faults" condition, and Landlord shall have no obligation to make any improvements to, perform any work in, or, except as otherwise provided in Section 4(b) below, fund any improvement allowance for the Leased Premises in connection with this Amendment.

        (b)    **Refurbishment Allowance**.    At any time during the period which commences on the Effective Date of this Amendment and ends on December 31, 2018 (the "**Allowance Availability Period**"), Tenant shall be entitled to receive from Landlord a one (1) time refurbishment allowance (the "**Allowance**") in an amount up to, but not exceeding, One Hundred Sixty Thousand and 00/100 Dollars ($160,000.00), to reimburse Tenant for the costs (collectively, the "**Refurbishment Costs**," which shall include Landlord's Construction Management Fee as defined below) actually incurred and paid for by Tenant for the design, purchase, construction, permitting and installation of tenant improvements and alterations to the Leased Premises (collectively, the "**Refurbishment Work**"), and for no other purpose; provided, however, that if the Refurbishment Costs are less than the amount of the Allowance, then Tenant may use any remaining portion of the Allowance as an offset against Monthly Base Rent, and if Tenant desires to use a portion of the Allowance to offset Monthly Base Rent, Tenant shall deliver written notice to Landlord of its intent to do so at least ten (10) days prior to the applicable due date for the next installment of Monthly Base Rent, provided, further, however, that Tenant may only utilize the Allowance to offset Monthly Base Rent during the Allowance Availability Period.  The Allowance shall not be applied to the costs of any furniture, computers, equipment, personal property, or for any other costs other than as provided above. In no event shall Landlord be obligated to make disbursements of the Allowance: (i) in a total amount which exceeds the amount of the Allowance; (ii) with respect to any Refurbishment Work performed after the expiration of the Allowance Availability Period; (iii) with respect to any Refurbishment Work performed outside of the Leased Premises; or (iv) with respect to any request for payment of the Allowance made after the expiration of the Allowance Availability Period. Landlord will disburse the Allowance directly to Tenant within thirty (30) days after satisfaction of all of the following conditions: (w) Tenant's completion of the Refurbishment Work in accordance with plans and specifications approved by Landlord, (x) a request for payment showing that the Refurbishment Work has been completed and reasonable evidence of the actual costs incurred and paid by Tenant in connection therewith, including invoices, paid receipts and/or cancelled checks; (y) Landlord's receipt of executed final, unconditional mechanics' lien releases/waivers from all contractors and subcontractors, the form and content of which lien waivers shall be satisfactory to Landlord in its sole but reasonable discretion, and (z) Tenant being current in the payment of all rent due under the Lease. Notwithstanding anything contained herein to the contrary, in no event shall Landlord be obligated to make disbursement of any portion of the Allowance with respect to any

14

Refurbishment Work if Tenant does not comply with its obligation to use Union Labor in accordance with Article XXV (Labor Covenant) of the Lease or for any work which otherwise is performed in violation of any provision of the Lease. If Tenant does not fully utilize the Allowance to reimburse it for the costs of the Refurbishment Work by the expiration of the Allowance Availability Period, then any unused portion of the Allowance shall be deemed forfeited by Tenant, and Tenant shall have no further rights with respect thereto.

      **(c)**    **Refurbishment Work**. The Refurbishment Work shall be performed in accordance with all of the terms and conditions of the Lease, including but not limited to Article X (Additions and Fixtures) and Article XXV (Labor Covenant). Prior to the commencement of the Refurbishment Work, Tenant shall submit to Landlord for Landlord's approval final and complete plans and specifications for the Refurbishment Work (the "**Plans**"), including, as applicable, dimensioned and detailed plans and drawings of partition layouts (including openings), ceiling and lighting layouts, colors, mechanical and electrical circuitry plans and any and all other information as may be reasonably necessary to complete the construction of the Refurbishment Work. Tenant shall submit the Plans to Landlord in form, quality and quantity acceptable for the purposes of filing for a building permit with the applicable governmental authority. Landlord shall either approve the Plans or designate by notice to Tenant the specific changes required to be made to the Plans, which Tenant shall make within three (3) business days of receipt. This procedure shall be repeated until the Plans are finally approved by Landlord. Landlord's review of the Plans is solely to protect the interests of Landlord in the Leased Premises, and Landlord shall be neither the guarantor of, nor responsible for, the correctness or accuracy of the Plans, or the compliance of the Plans with applicable requirements of any governmental authority. Landlord's review and approval of any submissions shall not be deemed to be an approval of the adequacy for any particular purpose or system capacity or the cost of the Refurbishment Work. Tenant shall select a contractor (the "**Contractor**"), subject to the prior written approval of Landlord, which approval will not be unreasonably withheld. With its request for approval of the Contractor, Tenant shall furnish to Landlord such information concerning the proposed Contractor's background and experience as Landlord may reasonably require. Tenant shall enter into an agreement with the approved Contractor to perform the Refurbishment Work, at Tenant's sole cost and expense (except for the Allowance). Notwithstanding the foregoing, Landlord's construction manager shall be permitted to monitor the performance of the Refurbishment Work, and Tenant shall pay Landlord a construction management fee (the "**Construction Management Fee**") in the amount of five percent (5%) of the total amount of the Refurbishment Costs, which Landlord may pay directly from the Allowance.

      **5.**    **Re-Affirmation of Representations.** Tenant hereby ratifies and re-affirms all representations, warranties, and covenants contained in Article XXIV (ERISA and the Code/UBIT) and Article XXVIII (Anti-Money Laundering/International Trade Law Compliance) of the Lease (as such provisions have been amended and/or added by this Amendment) as of the date of Tenant's execution of this Amendment. A current list of the plans participating in the Trust referenced in Section 24.01.A of the Existing Lease is attached hereto as **Exhibit "A"**.

      **6.**    **Ratification of Existing Lease; Effect of Amendment.** The Existing Lease, as amended by this Amendment, is hereby ratified and confirmed, and each and every provision, covenant, condition, obligation, right and power contained in and under, or existing in connection with, the Existing Lease, as amended by this Amendment, shall continue in full force and effect. This Amendment is not intended to, and shall not be construed to effect a novation, and, except as

15

expressly provided in this Amendment, the Existing Lease has not been modified, amended, canceled, terminated, surrendered, superseded or otherwise rendered of no force and effect. Landlord and Tenant each acknowledge and agree that the Existing Lease, as amended by this Amendment, is enforceable against them in accordance with its terms. The Existing Lease and this Amendment shall be construed together as a single instrument.

     **7.**    **Brokerage Commissions.** Tenant and Landlord each represent to the other party that, other than Colliers International, Inc., representing Landlord, and Hughes Marino representing Tenant, (i) neither party has dealt with any real estate broker, salesperson or finder in connection with this Amendment, (ii) no real estate broker, salesperson or finder initiated or participated in the negotiation of this Amendment, and (iii) no real estate broker, salesperson or finder is entitled to any commission in connection herewith. Tenant hereby agrees to indemnify, defend and hold Landlord and its agents and employees harmless from and against any and all liabilities, claims, demands, actions, damages, costs and expenses (including attorneys' fees) which arise out of or are in any way connected with Tenant's breach of the foregoing representations.

     **8.**    **Successors and Assigns.** This Amendment shall bind and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.

     **9.**    **Counterparts.** This Amendment may be executed in a number of identical counterparts, each of which for all purposes shall be deemed to be an original, and all of which shall collectively constitute but one agreement, fully binding upon, and enforceable against, the parties hereto.

     **10.**    **Confidentiality.** Tenant agrees to keep this Amendment and the terms, obligations and conditions contained in this Amendment strictly confidential. Tenant shall not disclose any part of this Amendment to anyone other than its attorneys, accountants or employees, and such disclosure shall be on a "need to know" basis only.

[SIGNATURES ON THE FOLLOWING PAGE]

16

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties have duly executed this Amendment, as of the day and year first written above.

LANDLORD:

**BIT HOLDINGS SEVENTY, INC.,**
a Maryland corporation

By: _____
Name: _JILL RUSSELL_
Title: _VP, ASST SECRETARY_

TENANT:

**IMPERIAL TOY LLC,**
a California limited liability company

By: _____
Name: _Peter Tigel_
Title: _CEO_    11/7/2017

17

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties have duly executed this Amendment, as of the day and year first written above.

                    **LANDLORD:**

                    **BIT HOLDINGS SEVENTY, INC.,**
                    a Maryland corporation

                    By: _____
                    Name: _____
                    Title: _____

                    **TENANT:**

                    **IMPERIAL TOY LLC,**
                    a California limited liability company

                    By: _____
                    Name: ____Peter Tiger_____
                    Title: ____CEO_____

17

<u>**EXHIBIT "A"**</u>

<u>**List of Plan Participants**</u>

*Active Participants For Quarter Ending 9/30/2017*
*New participants were added on 7/1/2017*
*Name*

Administrative District Council 1 Pension Fund

AFL-CIO Staff Retirement Plan

American Federation of Government Employees Pension Plan, the plan of benefits of the American Feder

Annuity Plan of the Electrical Industry

Asbestos Workers Local #8 Retirement Trust Fund

Atlanta Plumbers and Steamfitters Pension Fund

BAC #1 & Insulators #49 Supplemental Retirement Fund

BAC Local No. 4 Pension Fund

BAC Local Union 15 Pension Fund

Bakery and Confectionery Union and Industry International Pension Fund

Bank of Labor Retirement Plan

Boilermaker-Blacksmith National Pension Trust

Boston Plasterers' & Cement Masons' Union Local 534 Pension Fund

Bricklayers & Trowel Trades International Retirement Savings Fund

Bricklayers and Masons Local No. 22 Pension Plan

Bricklayers and Stone Masons of Illinois District Council No. 1 BAC Annuity

Bricklayers and Trowel Trades International Pension Fund

Bricklayers Local #55 Pension Plan

Bricklayers Local #8 of Illinois & Employers Pension Plan

Bricklayers Local No. 1 of Kentucky Pension Trust Fund

Bricklayers of Indiana Retirement Plan

Bricklayers Pension Fund of Western Pennsylvania

Bricklayers Pension Trust Fund - Metro Area

Bricklayers Supplemental Annuity Plan

Bricklayers Union Local No. 6 of Indiana Pension Fund

Buffalo Laborers Pension Fund

Building Trades United Pension Trust Fund - Milwaukee & Vicinity

Carpenter's Annuity Trust Fund of Northern California

*Thursday, July 20, 2017 Page 1 of 8*

### Name

Carpenters Labor Management Pension Fund

Carpenters Local #496 Pension Trust Fund

Carpenters Pension and Annuity Fund of Philadelphia and Vicinity

Carpenters Pension Fund of Illinois

Cascade Pension Trust Fund

Cement Masons Union Local No. 502 Pension Fund

Centennial State Carpenters' Pension Trust Fund

Centennial State Carpenters Pension Trust Fund - Annuity Plan

Central California IBEW-NECA Pension Plan

Central Laborers' Annuity Fund

Ceramic Tile and Terrazzo Local 67 B.A.C. Annuity Fund

Chicago and Midwest Regional Pension Fund

Chicago Painters & Decorators Pension Fund

Chicago Regional Council of Carpenters Pension Fund

Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund

Consolidated Retirement Fund

Construction Laborers Pension Trust of Greater Saint Louis

Construction Workers Pension Trust Fund - Lake County & Vicinity

CWA-ITU Negotiated Pension Plan

Detroit Free Press Inc. Newspaper Guild of Detroit Pension Plan

Eighth District Electrical Pension Fund

Electrical Construction Industry Pension Plan

Electrical Workers Local No. 26 Pension Trust Fund

Electrical Workers Local No. 292 Defined Contribution and 401(k) Plan

Electrical Workers Local No. 292 Pension Plan

Electrical Workers Pension Fund, Local 103, IBEW

Electricians Local Union No. 606 Pension-Annuity Fund

Electricians' Salary Deferral Plan

Elevator Constructors Union Local No. 1 Annuity & 401(k) Fund

Employees Security Fund of the Electrical Products Industry-Pension Plan

A-2

## Name

Employees Trust Fund of the Chicago Federation of Labor and Industrial Council

Employers and Cement Masons Local 90 Pension Plan

Employers' and Laborers' Locals 100 & 397 Pension Plan

Employers and Operating Engineers Local 520 Pension Fund

Employers-ILA N.C. Ports Area Pension Plan

Fireman and Oilers Pension Plan of SEIU Local No. 1

Flint Plumbing and Pipefitting Industry Pension Fund

Fort Wayne Public Transportation Corporation Retirement Plan

Fox Valley & Vicinity Construction Workers Pension Fund

Glaziers Local Union No. 558 Pension Fund

Glaziers Union Local 27 Pension and Retirement Fund

GMP and Employers Pension Fund

Greater Pennsylvania Carpenters Pension Fund

Hotel and Restaurant Employees Local 25 and Hotel Association of Washington, D.C. Pension Fund

IBEW Local 117 Pension Fund

IBEW Local 131 Pension Plan

IBEW Local 1919 Pension Fund

IBEW Local 1922 Pension Fund

IBEW Local 43 and Electrical Contractors Pension Fund

IBEW Local 701 Electrical Workers General Pension Fund

IBEW Local No. 38 Pension Fund

IBEW Local Union #226 Open End Pension Trust Fund

IBEW Local Union 1579 Pension Plan

IBEW Local Union 481 Defined Contribution Plan And Trust

IBEW Local Union No. 212 Pension Fund

IBEW Local Union No. 915 Pension-Annuity Fund

IBEW Local Union No. 99 Annuity Plan

IBEW Local Union No. 99 Retirement Plan

Indiana State Council of Carpenters Pension Fund

Indiana/Kentucky/Ohio Regional Council of Carpenters Pension Fund

*Thursday, July 20, 2017 Page 3 of 8*

A-3

## Name

Inland Refrigeration & Air Conditioning Trust Fund

Insulators Local 96 Pension Fund

International Association of Heat and Frost Insulators Local 17 Pension Fund

International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART") Local Union No.

International Association Pension Plan

International Brotherhood of Painters and Allied Trades Union Pension Plan

International Foundation Employees Retirement Plan

International Longshoremen's Association (AFL-CIO) Employers Pension Fund, SE Florida Ports

International Union of Elevator Constructors Officers and Employees Pension Plan

Iron Workers 568 Retirement Plan

Iron Workers Local Number 498 Pension Plan

Iron Workers Local Union No. 16 Pension Fund

Iron Workers' Mid-America Pension Fund

Iron Workers Pension Plan of Western Pennsylvania

Iron Workers St. Louis District Council Annuity Fund

Ironworkers District Council of New England Pension Fund

Ironworkers Local 6 Profit Sharing Plan

IUE CWA Pension Fund

IUOE Local 649 Annuity Trust

IUPAT Industry Annuity Plan

Jacksonville Plumbers and Pipefitters Pension Fund

Kansas Construction Trades Open End Pension Trust Fund

Laborers' District Council Construction Industry Pension Fund

Laborers' District Council, Pension and Disability Trust Fund No. 2

Laborers National Pension Fund

Laborers Pension Fund

Laborers' Pension Fund

LIUNA Staff & Affiliates Pension Fund

Local 138 IUOE Annuity Fund

Local 202 Sheet Metal Workers Pension Fund

*Thursday, July 20, 2017 Page 4 of 8*

A-4

EXHIBIT A

*Name*

Local 282 Annuity Trust Fund

Local 68 Engineers Annuity Fund

Local 68 IUOE Pension Fund

Local 705 IBT Pension Trust Fund

Local 73 Retirement Fund

Local No. 1, IBEW, Pension Benefit Trust Fund

Maryland Electrical Industry Pension Fund

Massachusetts Bay Transportation Authority Retirement Fund

Massachusetts Laborers' Annuity Fund

Massachusetts Service Employees Pension Fund

Midwestern Teamsters Pension Fund

Milwaukee Drivers Pension Trust Fund

Minneapolis Painting Industry Pension Plan

Minnesota and North Dakota Bricklayers & Allied Craftworkers Pension Fund

Motion Picture Industry Individual Account Plan

Motion Picture Laboratory Technicians and Film Editors Local 780 IATSE Pension Fund

Municipal Employees' Annuity & Benefit Fund of Chicago

National Association of Letter Carriers Annuity Trust Fund

National Automatic Sprinkler Industry Pension Fund

National Conference of Firemen and Oilers National Pension Fund

National Electrical Annuity Plan

National Retirement Fund

National Roofing Industry Pension Fund

NECA-IBEW Local 176 Pension Fund

NECA-IBEW Local 364 Defined Contribution Pension Fund

NECA-IBEW Pension Trust Fund

New England Teamsters & Trucking Industry Pension Fund

New Orleans Electrical Pension Plan

New York City District Council of Carpenters Pension Fund

Northern California Glaziers, Architectural Metal & Glassworkers Pension Plan

*Thursday, July 20, 2017 Page 5 of 8*

A-5

## Name

Northwest Publications Pension Plan for Guild Employees of Saint Paul Division

Northwest Sheet Metal Workers Pension Fund

Northwestern Ohio Plumbers & Pipefitters Pension Plan

Nursing Home and Healthcare Employees of Philadelphia and Vicinity Pension Plan

Office and Professional Employees Locals 30 & 537 Retirement Trust Fund

Ohio Bricklayers Pension Plan

Omaha Construction Industry Pension Plan

Operating Engineers Local 57 Pension Fund

Operating Engineers Local No. 147 Annuity Fund

Painters District Council #2 Pension Trust

Painters' District Council No. 30 Pension Fund

Pavers and Road Builders District Council Pension Fund

Pension and Annuity Plans of the Bricklayers Pension Fund

Pension Fund - Technical Engineering Division, Local 130, U.A.

Pension Hospitalization Benefit Plan of the Electrical Industry - Pension Trust Fund

Pension Plan for Employees of the California Labor Federation, AFL-CIO

Pension Plan for Salaried Employees of the Bakery and Confectionery Union and Industry International H

Pension Plan of the Segal Company

Pipefitters Retirement Fund, Local 597

Plasterers' & Cement Masons' Local 40 Pension Fund

Plumbers & Pipefitters Local 172 Pension Fund

Plumbers & Pipefitters Local 502 and 633 Pension Plan

Plumbers & Pipefitters Local 653 Pension Plan

Plumbers & Pipefitters Local No. 333 Pension Fund

Plumbers & Steamfitters #83 Pension Fund

Plumbers & Steamfitters Local 137 Pension Plan

Plumbers & Steamfitters Local No. 452 Pension Trust Fund

Plumbers & Steamfitters Local Union No. 248 Pension Fund

Plumbers and Pipefitters Local 162 Pension Fund

Plumbers' and Pipefitters' Local 562 Pension Fund

*Thursday, July 20, 2017 Page 6 of 8*

A-6

## Name

Plumbers' and Pipefitters' Local 562 Supplemental Pension Fund

Plumbers and Pipefitters Local 99 Pension Fund

Plumbers and Pipefitters National Pension Fund

Plumbers And Steamfitters Local #118 Kenosha Unit Pension Plan

Plumbers Local #8 Pension Plan

Plumbers Local 98 Defined Benefit Pension Fund

Plumbers' Pension Fund, Local 130, U.A.

Plumbers, Pipe Fitters, and MES Local No. 392 Pension Plan

Rhode Island Carpenters Pension Fund

Rockford Area Dairy Industry, Local 754 IBT Retirement Pension Plan

Rockford Pipe Trades Industry Pension Fund

Rodman Local Union 201 Pension Fund

Roofers' Pension Fund

Roofers Union Local 33 Pension Fund

San Francisco Culinary, Bartenders & Service Employees Pension Fund

Seafarers Money Purchase Pension Plan

Seafarers Officers and Employees Pension Plan

Seafarers Pension Plan

SEIU Local No. 4 Pension Fund

Service Employees International Union Master Pension Trust

Sheet Metal Local 10 Supplemental Retirement Fund

Sheet Metal Workers Local 10 Pension Fund

Sheet Metal Workers Local 224 Pension Plan

Sheet Metal Workers Local 4 Pension Fund

Sheet Metal Workers Local No. 177 Pension Fund

Sheet Metal Workers' Local Union No.100 Washington DC Area Pension Fund

Sheet Metal Workers' Pension Fund of Local Union #19

Shopmen's Iron Workers Retirement Trust Fund

Soft Drink Industry Pension Fund

Southern Electrical Retirement Fund

*Thursday, July 20, 2017 Page 7 of 8*

A-7

## Name

Southern Illinois Bricklayers Pension Plan

Southern Illinois Laborers and Employers Annuity

Southern Nevada Culinary & Bartenders Pension Trust

Southwest Ohio District Council of Carpenters - Dayton - Pension Plan

Southwestern Illinois Laborers Annuity Fund

St Paul Painting Industry Pension Plan

Stationary Engineers Local No. 39 Pension Plan

Steamfitters Local 439 Pension Plan

Structural Iron Workers Local Union No. 1 Pension Trust Fund

Studio Mechanics Local 476 IATSE Annuity Fund

Studio Mechanics Local 476 IATSE Retirement Plan

Teamsters Local Union No. 727 Pension Fund

Teamsters Negotiated Pension Plan

The Officers' & Employees' Pension of the International Brotherhood of Boilermakers, Iron Ship Builders,

Transit Employees Retirement Plan

Truck Drivers & Helpers Local Union No. 355 Retirement Pension Plan

Twin City and Vicinity Conference Board Pension Plan

Twin City Carpenters & Joiners Pension Fund

Twin City Pipe Trades Pension Trust

UA Locals 63/353 Joint Pension Trust Fund

UFCW International Union Pension Plan for Employees

United Association of Journeymen Plumbers and Journeymen Steamfitters and Pipefitters Local 357 Pens

United Mine Workers of America, International Pension Trust

UNITE-HERE Pension Fund

Vanderburgh County Sheriffs Pension Plan

West Michigan Plumbers, Fitters and Service Trades Local Union No. 174 Pension Plan and Trust

Will County Local 174 Carpenters Pension Plan

Wisconsin Laborers Pension Plan

## Total Number of Active Participants 236

*Thursday, July 20, 2017 Page 8 of 8*

A-8