COURTESY COPY

32600 Bobcat Drive
Mission | British Columbia
CANADA | V2V 5L1
E-Mail: peter@eurekainnovates.com
Ph.: (604) 287-5676
Fx.: (807) 345-3902

*Pro Per— for Movant,*
PIETRO PASQUALE ANTONIO SGROMO
(a/k/a PETER ANTHONY SGROMO)

FILED
DEC 1 3 2019
CLERK
United States Bankruptcy Court
San Jose, California

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re<br>IMPERIAL TOY LLC, a California Limited Liability Company<br>*Debtor.*<br><br>PIETRO PASQUALE ANTONIO SGROMO (a/k/a PETER ANTHONY SGROMO),<br>*Movant.* | Case No.: 19-52335<br><br>Chapter 11<br><br>**MOVANT'S, OPPOSITION TO DEBTOR'S ASSUMPTION AND ASSIGNMENT OF TERMINATED EXECUTORY LICENSE AGREEMENTS;**<br><br>**MOTION TO APPROVE OR DENY DEBTOR'S REJECTION OF NDA; and**<br><br>**MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D)(1) AND BANKRUPTCY RULE 9014**<br><br>Date: December 16, 2019<br>Time: 1:30 p.m.<br>Judge: Honorable M. Elaine Hammond<br><br>United States Bankruptcy Court<br>280 South First Street, Rm. 3035<br>San Jose, CA 95113-3099 |

## I. INTRODUCTION

On November 26, 2019, debtor Imperial Toy LLC, filed its "CORRECTED SUPPLEMENT TO DEBTOR'S SALE MOTION AND NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED." The debtor has filed an automatic stay in two pending actions with movant, Pietro Pasquale Antonio Sgromo (a/k/a Peter Anthony Sgromo— hereinafter "Sgromo" or "Movant")— *In re: Pietro Pasquale Antonio Sgromo, Petitioner,* Case No.: 20-108, Federal Court of Appeals) and the pending arbitration— RE: *Sgromo, Pietro Pasquale A., et al. vs. Imperial Toy LLC* - JAMS Ref No. 1210035259. Debtor proposes it assumes and assigns certain terminated, non-executory License Agreements while rejecting the executory Non-Disclosure Agreement ("NDA"). Movant files this opposition to the assignment of the terminated contracts, and for this Honorable Court's approval of the debtor's proposed rejection of the NDA.

The movant files this instant motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and Bankruptcy Rule 9014— "Contested Matters" as this proceeding does not mean, of course, that the Licensor is helpless and is at the mercy of the debtor indefinitely. On the contrary, the licensor may move forthwith to seek relief from the automatic stay pursuant to Sec. 362(a)(1); 11 U.S.C. § 362(a)(1) or may seek an order to compel the debtor to assume this executory contract on or before the time fixed by the Court and, of course, compel before the debtor is permitted to assume his contract to comply with the requirements of the Code, Sec. 365b(1)(A)(B)(C); 11 U.S.C. § 365b(1)(A)(B)(C), and cure all defaults as they relate to the standard of operation required by the License Agreement. Matter of R. S. Pinellas Motel Part., 2 B.R. 113, 119 (Bankr. M.D. Fla. 1979)

## II. SUMMARY OF THE RELEVANT FACTS

Movant, is an Inventor, Marketing & Product Development Consultant, Management Consultant, part-time Professor of Marketing. Sgromo Decl.#1, ¶1. On or about September 25, 2008 Sgromo in his individual capacity entered into a Non-Disclosure Agreement ("NDA") with debtor. (Id. ¶2) and then proceeded to present numerous inventions (Ibid.). Under the NDA, on or about

- 2 -

March 2009, movant confidentially disclosed his Bubble Globe Light invention ("Blitz") to debtor Id. ¶6; Exh.3. On March 23, 2009 Sgromo in his individual capacity filed patent "System and Method For Generating a Three-Dimensional Image on a Pre-Printed Substrate" (the "243 Patent") granted on June 30, 2015. Id. ¶7. On or about August 2009, Sgromo on behalf of his British Columbia Corporation, Wide Eyes Marketing Ltd. ("WEM") entered into a Deal Memo to license various inventions disclosed at the September 25, 2008 meeting but Blitz was excluded from the deal. Id. ¶8. The Deal Memo expired on September 6, 2009 (Id. ¶9) and to further protect his intellectual property rights, on October 6, 2009 movant in his personal capacity filed second patent—"Holographic Bubble Generating System"— granted U.S. Patent No.: 8,654,422 (the "422 Patent"). Id. ¶10.

Despite expiration of the deal memo, the parties entered into a consulting agreement to keep negotiations alive where parties "confirm[ed] [ ] the $5K monthly advance…will continue through March [2010] w[ould] start to see much larger Quarterly royalty statements" and "the $5K advances w[ould] be deducted from [movant's] Q1 royalty payment." Id., Exh.10 at ¶23. All monthly consulting payments were received in full and therefore, on or about December 2009, movant agreed to enter a license agreement on behalf of WEM, with several conditions— i) less-than all substantial rights to patents— "If Licensee in its sole discretion considers it necessary or desirable to obtain patent protection in the United States or any other country for the Product, Licensee shall notify Licensor…." (Id., Exh.7, ¶2(a)); ii) "Licensee shall introduce the Licensed Products on or before February, 2010 at the Toy Industry Association's Toy Fair in New York, NY. This [wa]s a material provision of the Agreement" (Ibid., ¶12(f)) blatantly breached by the debtor just weeks after signing. Id., ¶12. Given the material breach and automatic termination within weeks of signing, "[a]ll rights [ ] granted to Licensee …shall automatically revert to Licensor which shall be free to exploit same without any further obligation to Licensee" (Ibid., 11(d) which he immediately did— commercializing his inventions directly with retailers like Toys R Us ("TRU")"). In fact, the movant did not even have an opportunity to assign the patents to WEM in order for WEM to license to debtor.

Case: 19-52335    Doc# 95    Filed: 12/13/19    Entered: 12/13/19 18:03:15    Page 3 of 19

Debtor threated legal action and parties resolved the dispute— terminating the 3D Agreement and entering into a narrower integrated license agreement on or about May 2010 (the "Cosmic Agreement"). Id. ¶13. Debtor attempted negotiate patent rights under the Cosmic Agreement, but movant refused to assign any rights to the patents and demanded debtor acknowledge there were no assignment rights on the Cosmic Agreement. Id., ¶13, Exh.9 at ¶2 at comments (Tiger initialed acknowledgement that Licensed Grants only give the rights to license and "…Imperial is excluded from protecting [Licensed Grants] by patent…"). But again, debtor materially breached the agreement when it failed to market the inventions at Dallas Toy Fair in October 2010. Id. ¶14. In fact, none of the items, including the Cosmic Bubbles that movant had placed at TRU were launched. Ibid. Satisfied with the advance for non-performance the parties allowed the Cosmic Agreement to terminate on its own. Id., ¶15.

Based on debtor organizational changes, on or about November 2010 and on invitation of debtor, movant traveled from Toronto Canada to debtor's LA offices in an effort as debtor stated "get the relationship back on track." Id., ¶16. Movant and his development team met with debtor and leadership team to present new ideas and revisit inventions previously passed. Id., ¶¶16-17. Parties agreed to reinstate the consulting arrangement, where Imperial acknowledged that "[i]n 2010 Mr. Sgromo's consulting fees [roaylties] amounted to just over $103,000 and his expected [royalties] from consulting [wa]s to at least match that each year over the next 3 years" (Ibid., Exh.11). And with that Debtor successfully petitioned a Trade North America work permit ["TN Visa"] with the CBP and Dept. Homeland Security for the movant. Id. ¶19. However, after months of development debtor lacked ability to develop, market and distribute products. On or about July 2011, movant once again travelled from Toronto, Canada to debtor's LA offices to meet Tiger to no productive result and movant walked from the relationship. Id., ¶¶20-21. Nonetheless, debtor continued to report and pay royalties throughout term of TN Contract until its expiry January 10, 2014. Movant declared said royalties on his personal CA Income Tax Return and his own personal Ch. 13. Id., ¶¶21-22.

From 2014 to 2016, movant completed several inventing and consulting projects in the same seasonal category (Id., Exh.1, ¶¶1-2) and in early 2017 movant looked to resurrect the various inventions presented to debtor. However, to movant's shock and disbelief, debtor had been commercializing the various inventions under the various agreements without paying royalties. Id. ¶23. Litigation followed however, actions were dismissed for jurisdiction as debtor asserted CA arbitration provision. Id., ¶24. On March 29, 2018, movant as an individual filed arbitration (Id., ¶ 24) only to learn debtor took the immediate position the movant as an individual could not compel arbitration as he was a third-party to the WEM Licenses. ¶25. Now debtor flips back to its earlier position that movant was bound by the WEM Licenses because "Mr. Sgromo's signature on the license agreements as an individual inventor was significant, as it confirmed his cooperation in the required transfer of patent rights" from himself to WEM to Imperial. Id., ¶26. However, this new position contradicts the purported patent assignment agreements where Imperial forged the movant's signature to record a purported patent assignment from Sgromo to Imperial in consideration for $1.00 (Id., ¶27, Exh. 8) and not any purported automatic transfer of rights by WEM in the Licenses. Id., ¶26. Suddenly after three years of litigation, Imperial produces royalty reports dating back to 2013 (Id., ¶28), which it failed to do under the Licenses. Id., Exh.s 7&9, ¶¶5 ("royalty payments due… shall be calculated and paid quarterly, and shall be due thirty (30) calendar days after the end of each calendar quarter for the previous quarter… accompanied by a written report, setting forth all information necessary for the calculation of such payment."). This seems to be to support a new position where Imperial believes it can argue automatic rights from the WEM Agreements. Id., ¶28 Notwithstanding, movant sent a notice of termination if royalties were not paid within 30 days as required if the agreement was still valid. Id., ¶29. Despite promises that, it would "look into this issue and get back to [movant]" and that it was "Imperial's intent is to capture all royalty-bearing sales" it failed to cure the breach and the agreements automatically terminated on April 11, 2019 and debtor had until October 11, 2019 to sell-off remaining inventory. Id., ¶¶30-31.Debtor continues to sell the terminated licensed grants post-petition amounting to at least $18 Million in sales and nine-

hundred-thousand dollars ($900,000.00) in administrative expenses. Id., ¶31. Debtor has declared it plans to reject the NDA (Id., ¶¶34-36) whilst proposing to assume the terminated and therefore non-executory, WEM License Agreements (See DKT No.: 47).

## III. LAW AND ARGUMENT

### A. EXECUTORY CONTRACTS— GENERAL PRINCIPLES

[The] trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). With some limitations a debtor-in-possession has the same rights as a trustee serving in chapter 11 cases. 11 U.S.C. § 1107(a). Before approval, the debtor must satisfy a two-step analysis. The first step, referred to as the "material breach" step, requires the court to determine whether the contract at issue is executory. Then, in the "business judgment" step, the court must determine if allowing the debtor to assume or reject the contract would be in the debtor's best business judgment. *In re Sandman Associates, L.L.C.,* 251 B.R. 473 (Bankr. W.D. Va. 2000); *see also Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1045 (4th Cir. 1985).

The Code does not define executory contract, but Congress has ratified the application of the Countryman definition. *Gloria Mfg. Corp. v. International Ladies' Garment Workers' Union,* 734 F.2d 1020, 1022 (4th Cir. 1984); *Lubrizol,* 765 F.2d at 1043 (confirming the Fourth Circuit has adopted the Countryman definition of executory contract). Countryman defines an executory contract as "[a] contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other. *Gloria Mfg. Corp.,* 734 F.2d at 1022 (quoting Countryman, "Executory Contracts in Bankruptcy: Part I," 57 Minn. L. Rev. 439, 460 (1973)).

Assets such as real property or chattels owned by the debtor automatically become part of the bankruptcy estate. Sales of assets completed prior to bankruptcy are outside of the bankruptcy case, and beyond the reach of the bankruptcy court, unless the transaction amounts to a fraudulent

Case: 19-52335   Doc# 95   Filed: 12/13/19   Entered: 12/13/19 18:03:15   Page 6 of 19

transfer. U.S.C. § 548 (2000). See generally David G. Epstein, Steve H. Nickles & James J. White, Bankruptcy supra note 55, § 6-47 (1993).

Most IP licensees fall into a middle ground labeled "executory contracts" that do not automatically enter the bankruptcy estate. Depending on the performance provisions of such contracts, they may constitute net assets or net liabilities of the estate. See generally Jesse M. Fried, *Executory Contracts and Performance Decisions in Bankruptcy*, 46 DUKE L.J. 517 (1996). However, where an executory contract has been terminated in accordance with its terms prior to bankruptcy, section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract. *In re Wills Motors, Inc.*, 133 B.R. 297, 300-1 (Bankr. S.D.N.Y. 1991); *see also In re Wills Motors, Inc.*, 133 B.R. 297 (Bankr.S.D.N Y 1991); *In re Seven Stars Restaurant Inc.*, 122 B.R. 213 (Bankr.S.D.N.Y. 1990); *In re Commodity Merchants Inc.*, 538 F.2d 1260 (7th Cir. 1976). Nor has Congress the ability, in the absence of bankruptcy or an effect on interstate commerce, to legislate such a matter, which is purely a state law concern. *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*, 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992). Here, California law governs the agreements.

In making a decision on whether the rejection of a contract is in the best business judgment of a debtor, the court "acts in its fact-finding role." *In re Sandman*, 251 B.R. at 481.

**B. THE WEM LICENSES ARE NON-EXECUTORY AND CANNOT BE REINSTATED**

As a threshold matter, the movant and debtor disagree as the validity and enforceability of the WEM 3D License (See SgromoDecl., Exh.7) and the WEM Cosmic License Agreement (Id., Exh.9)— with the debtor asserting both are valid and enforceable. Further compounding the dispute, debtor takes position Sgromo was individually bound by the Licenses and as a matter of law, Sgromo assigned ownership of the '243 & '422 Patents to Imperial vis-à-vis his signature in his corporate capacity as WEM's sole shareholder. The evidence will prove the 3D Agreement was integrated into the Cosmic Agreement which was automatically terminated for non-performance and expressly states there were no patent assignment rights.

Case: 19-52335    Doc# 95    Filed: 12/13/19    Entered: 12/13/19 18:03:15    Page 7 of 19

### i. *The Cosmic Agreement is a Final Expression between WEM and Imperial*

The crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement. The instrument itself may help to resolve that issue. *Masterson v. Sine,* 68 Cal.2d 222, 225-26 (Cal. 1968). Here, the Cosmic Agreement contains an "Integration" clause (See SgromoDecl. Exh.9, at ¶18(i)) that states, "[t]his Agreement constitutes the entire understanding of the parties, revokes and supersedes all prior agreements between the parties, and is intended as a final expression of their Agreement" and, "shall take precedence over any other documents which may be in conflict with said Agreement." *Gerdlund v. Electronic Dispensers International,* 190 Cal.App.3d 263, 271 (Cal. Ct. App. 1987) (the Court found "[b]y any standard, the agreement was integrated" as "it clearly states that it is integrated.") "It is difficult to imagine how the parties could have more clearly expressed their intent to make the written instrument a full and complete expression of their agreement" than including that integration clause. *Davis Wine Co. v. Vina Y Bodega Estampa, S.A.,* 823 F. Supp. 2d 1159, 1171 (D. Or. 2011).

### ii. *Breach of a Contract by One Party Excuses Non-performance by the Other*

Breach or repudiation of a contract by one party excuses non-performance by the other. *Cox v. Ocean View Hotel Corp.,* 533 F.3d 1114, 1121 (9th Cir. 2008). "A bedrock principle of California contract law is that he who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." *Brown v. Dillard's, Inc.,* 430 F.3d 1004, at 1010 (9th Cir. 2005); *See also Local 659, I.A.T.S.E. v. Color Corp. of Am.,* 302 P.2d 294, 299 (Cal. 1956) (*In Bank*) ("A repudiation of a contract accepted by the promisor excuses performance by the promisee."). Where an executory contract has been terminated in accordance with its terms prior to bankruptcy, section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract. *In re Wills Motors, Inc.,* 133 B.R. 297, 300-1 (Bankr. S.D.N.Y. 1991); *see also In re Wills Motors, Inc.,*133 B.R. 297 (Bankr.S.D.N Y 1991); *In re Seven Stars Restaurant Inc.,* 122 B.R. 213 (Bankr.S.D.N.Y. 1990); *In re Commodity Merchants Inc.,*538 F.2d 1260 (7th Cir. 1976). Nor has Congress the ability, in the absence of bankruptcy or an effect on interstate

commerce, to legislate such a matter, which is purely a state law concern. *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.),* 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992).

Here, debtor materially breached the 3D Agreement (SgromoDecl., ¶12) and "…all rights granted to Licensee … shall automatically revert to Licensor which shall be free to exploit same without any further obligation to Licensee" (Id., Exh.7, ¶11(d)) but Imperial threatened legal action when debtor exercised his right (Id., ¶13) so the parties settled the dispute by entering the integrated Cosmic Agreement (Id., ¶14) only to have debtor repeat the material breaches and with no performance whatsoever and the agreement terminated on its own (Id., ¶15). And once again, "…all rights granted to Licensee … shall automatically revert to Licensor which shall be free to exploit same without any further obligation to Licensee" (Id., Exh.9, ¶11(d)).

California recognizes "an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 684, 765 P.2d 373, 390 (1988). Even when given a final opportunity to cure the breach, when notice was given on March 11, 2019 (SgromoDecl. ¶21) and would "look into this issue and get back to [debtor]" (Id., Exh. 21) and "Imperial's intent is to capture all royalty-bearing sales" (Ibid) debtor failed to cure the breach within the 30-day period (Id., ¶22) and debtor's non-performance provides an excuse for movant's non-performance. *Loral Corp. v. Moyes,* 174 Cal. App. 3d 268, 280, 219 Cal. Rptr. 836, 844 (Ct. App. 1985).. Debtor had "…the right to dispose of any Products which are on hand or in-process for a period of one hundred eighty (180) days following such termination. Any Products sold or distributed by Licensee during the sell-off period shall be subject to the royalty set forth in Section 3 hereof was not breached" (Id., ¶¶11) which expired on October 11, 2019 and section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract. *In re Wills Motors, Inc.,* 133 B.R. 297, 300-1 (Bankr. S.D.N.Y. 1991).

Case: 19-52335   Doc# 95   Filed: 12/13/19   Entered: 12/13/19 18:03:15   Page 9 of 19

### iii. *"License" and "Agreement" are not Synonymous Terms*

`[L]icense' and `assignment' have separate and distinct meanings, i.e., the right to use the '422 and '243 Patents versus an ownership interest in them. *Motorola Inc. v. Amkor Technology*, 958 A.2d 852, 860 (Del. 2008). In determining the scope of a transfer of rights, it is the legal effect of the provisions of the agreement which is dispositive, not the nomenclature of the instrument for transferring rights such as "assignment" or "license" [emphasis added]. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991). The rights retained by the grantor are also relevant. *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1342 (Fed. Cir. 2001). Whether an assignment of patent rights in an agreement is automatic or merely a promise to assign depends on the contractual language itself. *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d .1284, 1290 (Fed. Cir. 2008). If the contract expressly conveys rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law. Id.; *see also Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) ("hereby conveys, transfers and assigns . . . all right, title and interest in and to Inventions" operated as an automatic assignment once the invention was created). In contrast, contracts that obligate the owner to grant rights in the future do not vest legal title to the patents in the assignee. *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841-42 (Fed. Cir. 2009) (cert. granted Nov. 1, 2010) (finding that "agree to assign" reflects a mere promise to assign rights in the future, not an immediate transfer of expectant interests); *Ip-Venture, Inc. v. ProStar Computer, Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007) (interpreting "agree to assign" as "an agreement to assign," requiring a subsequent written instrument); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580-81 (Fed. Cir. 1991) (holding that "will be assigned" does not create "a present assignment of an expectant interest").

For title to vest in Imperial, a further assignment by Sgromo to WEM was required. Whether Sgromo and WEM are part of the same corporate structure and are not "complete strangers," therefore, is irrelevant because there was no valid written assignment from Sgromo to WEM. See 35 U.S.C. § 261 (assignments of patents must be in writing); *Enzo APA & Son, Inc. v. Geapag A.G.*, 134

F.3d 1090, 1093 (Fed. Cir. 1998). Common corporate structure does not overcome the requirement that even between a parent and a subsidiary, an appropriate written assignment is necessary to transfer legal title from one to the other. Without the transfer of legal title of the patents, Sgromo not WEM has standing to bring an infringement action. *Lans v. Digital Equipment Corp*, 252 F.3d 1320, 1328 (Fed. Cir. 2001) (holding that a plaintiff-inventor, who assigned his patent to a corporation in which he was the sole shareholder and managing director prior to filing the action, lacked standing to sue).

Even if the 3D Agreement was still in effect (which it is not) "Licensee shall notify Licensor of that decision" (to obtain patent protection) and "Licensor shall cooperate as reasonably requested by Licensee in obtaining patent protection requested by Licensee." The disputed Patent Assignment Agreement ("PPA") debtor filed with the PTO does not arise out of the purported automatic rights Imperial argues now as a matter of law under the 3D Agreement. The purported disputed PPA was not incorporated into the License Agreement and could not add to or vary WEM's obligations under the Contract." *Paramount Auto Body Shop, Inc. v. Mitchell Int'l, Inc.,* D058664, at *32 (Cal. Ct. App. Jun. 5, 2012). Generally, "[s]pecific performance cannot be granted unless the terms of the contract are sufficiently definite for the court to know what to enforce." (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 42, p. 334; Civ. Code, § 3390, subd. (5).) For this reason, a contract that "leaves an essential element for future agreement of the parties" is ordinarily unenforceable. *Okun v. Morton* (1988) 203 Cal.App.3d 805, 817.

As per the well settled case law, this does not grant Respondents any automatic rights— there was no future obligations regarding patent assignments. Simply because the NDA predates Cosmic Agreement does not mean that it was superseded by that contract's integration clause. Each agreement was with different parties and contained their individual "entire agreement" clause (*Williams v. Atria Las Posas*, 2d Civil No. B282513, at *4-5 (Cal. Ct. App. Jun. 27, 2018)) and the two disputed Agreements name different parties. "The only safe rule is to confine the right to recover to those who enter into the contract: if we go one step beyond that, there is no reason why we should

- 11 -

not go fifty." This introduced the so-called "privity rule" to the United States." *National Savings Bank of D.C. v. Ward,* 100 U.S. 195 (1879).

### C. ALL PURPORTED PATENT ASSIGNMENTS ARE VOID

When Sgromo as an individual filed the '243 and '422 patents prior to signing the License Agrement in his corporate capacity as the sole shareholder of WEM, he "g[a]ve notice to the world that [his] particular idea[s] [were] owned, and the owner is accorded a monopoly on the use of the idea[s]. *Waterman v. Mackenzie,* 138 U.S. 252, 260-261, 11 S.Ct. 334, 337, 34 L.Ed. 923 (1891). "The monopoly thus granted is one entire thing and cannot be divided into parts," except as authorized by law. Id. at 335. The Federal Patent Act requires that all assignments of patent interest be in writing. 35 U.S.C. § 261 (2006). This requirement dates back to the 1881 Supreme Court decision in *Ager v. Murray,* which held that a debtor's interest in a patent that would be used to satisfy a judgment against him was property, "assignable by him, and . . . [could not] be taken on execution at law." 105 U.S. 126, 131-32, 26 L.Ed. 942 (1881). If the bankruptcy courts were to expand the exception to include the purported parol evidence proffered by the defendants to verbal licenses, the exception would swallow the rule. Debtor would be free to engage in revisionist history, circumventing the certainty provided by the writing requirement of section 261 by claiming to be patentee by virtue of a verbal licensing arrangement. *Enzo APA & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1093 (Fed. Cir. 1998).

It is established there were no automatic rights under the WEM Agreements even if still enforceable (which they are not) as "California law requires amendments or modifications to written contracts to be in writing. *Grolsche Bierbrouwerij Nederland v. Dovebid, Inc.,* Case No. 11-763 SC, at *10 (N.D. Cal. Aug. 2, 2011— citing Cal. Civ. Code § 1689)." see also *Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4TH 348, 359-362 ("...when the parties to a proposed contract have themselves fixed the manner in which their assent is to be manifested, an assent thereto, in any other or different mode, will not be presumed..... even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract."). "the agreement would be unenforceable under the statute of frauds (Civ. Code, § 1624) since it could not have been performed

- 12 -

within a year of its making." *Timed Out, LLC v. Bra Smyth of Cal., Inc.,* H039601, at *3 (Cal. Ct. App. Dec. 21, 2015) The courts have consistently ruled that a contract that cannot be performed in one year cannot be taken out of the statute of frauds. *Gilliam v. Kouchoucos,* 161 Tex. 299, 302, 340 S.W.2d 27, 29 (1960). Here, "[t]he contemplated performance would occupy more than a year." *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir. 2010) as the NDA was signed in 2008 and the purported transfer occurred more than two years later.

An agreement to modify a contract that is subject to the statute of frauds is also subject to the statute of frauds. (Civ. Code, § 1698, subd. (a) ["A contract in writing may be modified by a contract in writing."]; Collins v. Marvel Land Co. (1970) 13 Cal.App.3d 34, 43 [ 91 Cal.Rptr. 291].) A modification of a contract is a change in the obligations of a party by a subsequent mutual agreement of the parties. (1 Witkin, Summary of Cal. Law, supra, Contracts, § 964, p. 1055.) Thus, "the agreement would be unenforceable under the statute of frauds (Civ. Code, § 1624) since it could not have been performed within a year of its making." *Timed Out, LLC v. Bra Smyth of Cal., Inc.,* H039601, at *3 (Cal. Ct. App. Dec. 21, 2015)

Imperial had assigned Sgromo's '243 and '422 Patents to themselves— forging Sgromo's signature, unwitnessed, outside the statute of frauds and then assigning the patents to various creditors to finance its other product lines that in no way relate to the '243 and '422 Patents. The NDA however, is between "Imperial and Peter A. Sgromo ("Inventor")" and "contains the entire agreement between the parties and any modification must be in writing signed by both parties." See Exh. 2 at ¶7. The NDA governs the dispute over the '243 and '422 Patents because it was never modified "in writing signed by both parties." Ibid. Therefore, the purported patent transfer assignments between Sgromo and Imperial (See Exh.8) are parol evidence that cannot be added to modify the terms of the unambiguous NDA and are barred. Cal. Civ. Code § 1856; see also, *Masterson v. Sine,* (1968) 68 Cal. 2d 222, 225. Imperial breached its promise under the NDA, when it assigned the patent to monopolize and "commercially exploit the ['243 and '422 Patent] items" by filing the

- 13 -

"information regarding th[ese] designs" with the PTO, "without the consent of the Inventor" which it drafted and identifies as Sgromo individually as the "Inventor" not WEM [Id.].

### D. THE TN CONSULTING CONTRACT— THE PARTIES' FINAL EXPRESSION

"A contract may validly include the provisions of a document not physically a part of the basic contract. . . . 'It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts.' " *Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454.) For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties. *Scott's V.F. Exch. v. Growers Refrig. Co.*, 81 Cal. App. 2d 437, 447 (Cal. Ct. App. 1947); *see also, Weddington Productions, Inc. v. Flick,* 60 Cal. App. 4th 793, 814 (Cal. Ct. App. 1998).

When debtor materially breached the integrated Cosmic Agreement, the agreement automatically terminated and WEM was adequately compensated vis-à-vis the minimum guarantee. See SgromoDecl., ¶¶14-15. On or about November 2010, weeks after the material breach (Ibid.) movant traveled to debtor's offices to resurrect the business relationship. Id., ¶¶16-17. Specifically, the parties 'picked-up' on many of the inventions in discussion up to the signing of the Cosmic Agreement. Id., Exh.10. The parties agreed to continue with the consulting arrangement (Ibid., ¶¶23-24) acknowledging the parties were bound by the NDA. Id., ¶18. However, because movant had returned to his native Canada, debtor needed to petition a TN Visa (that included the terms of the Consulting Contract) with Dept. of Homeland Security | U.S. Customs and Border Patrol which it did. Id., ¶19. The TN Consulting Contract and combined with the NDA "contain[ed] the entire agreement between the parties" as it was "in writing signed by both parties." Id., Ex. 2, ¶7. It is well settled that California courts find an agreement such as this complete despite the omission of an integration clause. *See, e.g., Software Design & Application, Ltd. v. Price Waterhouse,* 49 Cal.App.4th 464,

470, 57 Cal.Rptr.2d 36 (1996) ("although there is no 'integration' clause…they are nonetheless complete.").

The debtor warranted to immigration authorities that it had been paying consulting fees in the form of royalties "[i]n 2010 …amounted to just over $103,000…" and is "expected…to at least match that each year over the next three years." Exh.11, ¶5. Sgromo reported these royalties for the term of the consulting contract on his individual CA State Income Tax (as he moved back to CA October 2011) and on his own personal Ch. 13. Id., Exh.12. The Agreement terminated on its own on January 10, 2014, because debtor "[n]either appl[ied] to extend his status or notify the Immigration Service that he [wa]s no longer in [their] employ" prior to the automatic termination date. Exh. 11, ¶6. The consulting arrangement where debtor accepted royalties for his patents and intellectual property did not provide an automatic assignment of those rights. The debtor's position the WEM agreements are enforceable and govern the patent assignemtns is misplaced because "there cannot be a valid, express [consulting] contract and an implied [License] contract, each embracing the same subject matter, existing at the same time." (66 Am. Jur. 2d, Restitution and Implied Contracts, § 6, pp. 948-949; cf. Barrere v. Somps (1896) 113 Cal. 97 [45 P. 177, 572].

Any language used by the owner of the patent or any conduct on his part exhibited to another may properly infer that the owner consents to his use of the patent. *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927). When warranted by such a course of conduct, the law implies a license. *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 1068, 3 USPQ2d 1288, 1293-94 (Fed. Cir.1987); *United States v. Univis Lens Co.*, 316 U.S. 241, 250-51, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408, 53 USPQ 404, 408 (1942); *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 880, 169 USPQ 759, 763-64 (2d Cir.1971), cert. denied, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666. Whether express or implied, a license is a contract "governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.*, 871 F.2d 1082, 1085, 10 USPQ2d 1464, 1466 (Fed.Cir.1989).

However, this implied license does not offend the protection afforded patent and trademark rights by federal law. *Power Lift*, 871 F.2d at 1085; *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 703, 24 USPQ2d 1173, 1176 (Fed. Cir.1992). *Wilder v. Kent*, 15 F. 217, 220 (C.C.W.D.Pa.1883). A state cannot validly enact a law that conflicts with the patent statute or obstructs its underlying legislative intent. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* U.S. 109 S.Ct. 971, 979, 103 L.Ed.2d 118, 9 USPQ2d 1847, 1852 (1989). "[T]he unrestricted sale [of the patent] does not involve the transfer of any interest in the patent.]" Under this implied license, the movant patent holder receives a reward for inventive work in the first sale of the patented product. *Univis*, 316 U.S. at 251, 62 S.Ct. at 1093. At most, movant's conduct and language used in the negotiation of the TN Consulting Contract implied a license and no more.

E. **THE NDA IS AN EXECUTORY CONTRACT**

Rejection of an executory contract is "[o]ne of the most powerful tools in the chapter 11 debtor-in-possession's bankruptcy tool kit." *In re Dehon,* 352 B.R. 546, 558 (Bankr. D. Mass. 2006). "Rejection does not constitute a termination of the contract. . . . It does not cause a contract to magically vanish. Rather, the Debtor's rejection of the NDA (See SgromoDecl., ¶¶34-36) constitutes a breach as of the petition date." *In re The Ground Round, Inc.,* 335 B.R. 253, 261 (1st Cir. B.A.P. 2005), aff'd 482 F.3d 15 (1st Cir. 2007). See 11 U.S.C. § 502(g). The NDA acknowledges the likelihood that non-public information will be exchanged between "Peter A. Sgromo" in his individual capacity as the "Inventor" and Imperial Toy LLC. Id., ¶2. Once rejection occurred, however, Imperial or Ja-Ru's right to the continued use of the exclusive license ended. *Ground Round, Inc.,* 482 F.3d at 18. Upon rejection, Imperial or Ja-Ru can no longer sell inventory using movant's intellectual property because "in consideration to view the concept and discuss with Inventor [Sgromo], Imperial agree[d] that it will not commercially exploit th[e] item[s]…without the consent of the inventor." Id., Exh.2, ¶3. There is no expiry on the NDA.

The movant's intellectual property accounts for $18 Million in retail sales per year and an outstanding royalty of at least $450,000.00 per year (Id., ¶¶32-33). It is difficult to imagine how Imperial plans to successfully reorganize under a Ch. 11 without the movant's intellectual property rights. Notwithstanding, the debtor cannot assume a contract, however, without first meeting the statutory preconditions of curing outstanding defaults under the contract (or providing "adequate assurance" that it will do so). 11 U.S.C. § 365(b)(1)(B) (2000). The debtor must also make whole any third parties who suffered losses as a result of the defaults. Ibid. While the WEM Licenses are terminated and non-executory there remains an outstanding liability on debtor who promised to indemnify Sgromo as a third party to the contract from injury as a result of modifying product. Id., Exh.s7&9, ¶¶8 ("excluding actions founded on intellectual property rights unless the intellectual property rights infringement is a result of a modification or change to the Product created by Licensee.") The debtor modified the licensed rights to the '422 patent (Exh. 6) by simply removing the stereoscopic glasses from the independent claim (Ibid., p.36, Claim #1) leaving the Bubble Globe Light invention which was confidentially disclosed (Exh. 3) and protected by the NDA.

The debtor must make a showing of how rejection of executory NDA will benefit the estate. *In re Stable Mews Associates, Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). "The primary element of such a showing is the extent to which a rejection will benefit the general unsecured creditors of the estate." Id. When applying the business judgment rule, "[there is] no room for speculation as to which business choice will yield the greater return;" the analysis is complete "once it has been shown that the [debtor's] choice will benefit the estate and unsecured creditors." *In re Maison Grande Condominium Ass'n, Inc.*, 425 B.R. 684, 691 (S.D. Fla. 2010).

If the NDA were rejected, movant's rights to enforce it through the injunction that is stayed (*In re: Pietro Pasquale Antonio Sgromo, Petitioner*, Case No.: 20-108, Federal Court of Appeals)— pursuant to 11 U.S.C. § 362, must be lifted because the relief sought there cannot be reduced to money damages. A right to an equitable remedy for breach of performance is a claim if the breach gives rise to a right to payment. 11 U.S.C. § 101(5)(B). California law is clear that an injunction is the proper

affirming issuance of preliminary injunction where "trade secret information has potential economic value because [movant] went to great expense" to create the inventions and took reasonable steps to keep the information secret by requiring Imperial sign a nondisclosure agreement. *Readylink Healthcare v. Cotton*, 126 Cal.App.4th 1006 (Cal. Ct. App. 2005); *see also In re Kmart Corp.*, 297 B.R. 525 (N.D. Ill. 2003) ("[w]hen the payment of money damages is permissible in lieu of an equitable remedy, the right to payment is available and there is a claim to be made"); *In re The Ground Round, Inc.*, 335 B.R. 253 (B.A.P. 1st Cir. 2005) "[i]f money damages are not permissible, only equitable relief is available and remedies for the breach may be pursued outside of the bankruptcy proceedings.")

But CA law is also clear that the amount the breaching party would have paid to license the technology could be used to measure the damages resulting from breach of a non-disclosure agreement (NDA). *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.*, 225 Cal.App.4th 786 (Cal. Ct. App. 2014) Here that amount is easily determined by the sales of the infringing products as reported by Nielsen— ($18 Million at retail; $9 Million at cost; which amounts to $450,000.00 in royalties as previously agreed and customary in the industry— SgromoDecl., ¶32). The court must determine if it is in the best interest of the estate to reject the NDA and in turn, an injunction preventing the $18MM in sales but saving the estate $450,000.00 in royalties.

## IV. CONCLUSION

If the court approves the rejection of the NDA then pursuant to 11 U.S.C. § 362, the automatic stay must be lifted because the relief sought there cannot be reduced to money damages. The movant should then be allowed to continue with his noncore claims including injunctive relief in, *In re: Pietro Pasquale Antonio Sgromo, Petitioner*, Case No.: 20-108, Federal Court of Appeals; and RE: *Sgromo, Pietro Pasquale A., et al. vs. Imperial Toy LLC* - JAMS Ref No. 1210035259.

RESPECTFULLY SUBMITTED THIS 10TH DAY OF DECEMBER, 2019

............*/s/ Sgromo/*............
PPASGROMO for Movant

## Service Addresses for Assignment and Assumption Objections

**Proposed Counsel to the Debtor**
Sheppard Mullin Richter & Hampton LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
Attn: Ori Katz, Michael Lauter, Jacqueline Luther, and Shadi Farzan
Email: okatz@sheppardmullin.com
mlauter@sheppardmullin.com
jluther@sheppardmullin.com
sfarzan@sheppardmullin.com

**Counsel to The CIT Group/Commercial Services, Inc. and CIT Finance, LLC**
Valerie Bantner Peo, Esq.
Buchalter, A Professional Corporation
55 Second Street, 17th Floor
San Francisco, California 94105-3493
vbantnerpeo@buchalter.com

**Counsel to Great Rock Capital Partners Management, LLC**
Jennifer C. Hagle
Anna Gumport
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013-1010
Email: jhagle@sidley.com
agumport@sidley.com

**U.S. Trustee**
Office of the United States Trustee
Attn: Jared A. Day
300 Booth Street, Rm 3009
Reno, NV 89509
Email: jared.a.day@usdoj.gov

**Counsel to Ja-Ru, Inc.**
Tobias S. Keller, Esq.
Jane Kim, Esq.
Thomas B. Rupp, Esq.
Keller & Benvenutti LLP
650 California Street, Suite 1900
San Francisco, CA 94108
Email: tkeller@kellerbenvenutti.com;
jkim@kellerbenvenutti.com;
trupp@kellerbenvenutti.com

**Counsel to The CIT Group/Commercial Services, Inc. and CIT Finance, LLC**
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022
Attn: Joshua Divack
Email: JDivack@hahnhessen.com

**Counsel to the Hirsch Parties**
Brutzkus Gubner
Attn: Susan K. Seflin
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Email: sseflin@bg.law

**Counsel to Official Committee of Unsecured Creditors**
John Fiero
Pachulski Stang Ziehl & Jones LLP
Tel: 415.263.7000 | Fax: 415.263.7010
jfiero@pszjlaw.com

Jason Rosell
Pachulski Stang Ziehl & Jones LLP
Direct: 415.217.5118
Mobile: 917.747.9986
jrosell@pszjlaw.com